# EXHIBIT

# BB

**UNITED STATES TAX COURT**

| | | |
|---|---|---|
| UNION CARBIDE CORPORATION and SUBSIDIARIES, | ) | |
| Petitioner, | ) | |
| v. | ) | Docket No. 3501-94 |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| Respondent. | ) | |

---

**Respondent's Memorandum of Law in Support of Respondent's Motion for Partial Summary Judgment**

---

STUART L. BROWN
Chief Counsel
Internal Revenue Service

OF COUNSEL:
JOSEPH F. MASELLI
Regional Counsel

TABLE OF CONTENTS

Page

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . 1

Points Relied Upon . . . . . . . . . . . . . . . . . . . . . . 3

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . 4

Factual Background . . . . . . . . . . . . . . . . . . . . . . 12

Safe Harbor Pricing Methods . . . . . . . . . . . . . . . . . 17

Petitioner's Refund Claims . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I. Petitioner May Not Redetermine The FSC Commissions Payable To UCFSC Because Such Redetermination Was Barred By Temp. Treas. Reg. § 1.925(a)-1T(e)(4) When Petitioner Failed To Raise It Before The Statute Of Limitations Under I.R.C. § 6511(a) Expired For UCFSC's 1987, 1988 And 1989 Taxable Years. . . . . . . . . 29

A. The plain language of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) permits a FSC and its related supplier to redetermine the transfer price or commission only while the statute of limitations under section 6511(a) is open for both. . . . 30

B. The Court owes the highest degree of deference to Treas. Reg. § 1.925(a)-1T(e)(4) in this case, because it is a legislative regulation with respect to commission FSCs, however, the regulation is also valid when viewed even under the lesser degree of judicial deference owed to interpretive regulations. . . . . . . . . . . 38

C. The Conditions Imposed on Taxpayer Redeterminations By Temp. Treas. Reg. § 1.925(a)-1T(e) Are Necessary Ones in Harmony with the General Refund Provisions of the Code. . . . . 42

D. Even if the Court were to invalidate Temp. Treas. Reg. § 1.925(a)-1T(e)(4), petitioner's claim must be dismissed as a matter of law because under the settled principles of section 482, taxpayers may not unilaterally redetermine their transfer pricing. . . . . . . . . . . . . . . . . . . . 51

**TABLE OF CONTENTS**

Page

II. As a Matter of Law, Petitioner May Not Use Section 6501(e) to Satisfy The Conditions of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), Nor Can UCFSC Satisfy the Conditions of Section 6501(e) Under the Undisputed Facts of the Case. . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . 65

# TABLE OF AUTHORITIES

Page

Cases:


Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . 2

Alexander v. Cosden Pipe Line Co., 290 U.S. 484 (1934) . . . . . . . . . . . . . . . . . . . . 37

Anchor Hocking Corp. v. United States, 11 Cl. Ct. 173 (1986) . . . . . . . . . . . . . . . . . . . . 7

Angelus Milling Co. v. Commissioner, 325 U.S. 293 (1945) . . . . . . . . . . . . . . . . . . . . 44

Armstrong World Indus. v. Commissioner, 974 F.2d 422 (3d Cir. 1992) . . . . . . . . . . . . . . . 39

Badaracco v. Commissioner, 464 U.S. 386 (1984) . . . . . . . . . . . . . . . . . . . . 51

BCS Fin. Corp. v. United States, 118 F.3d 522, (7th Cir. 1997) . . . . . . . . . . . . . . . 49

Brockamp, United States v., ___ U.S. ___, 117 S.Ct. 849 (1997) . . . . . . . . . . . . 43, 49

Brown v. United States, 890 F.2d 1329 (5th Cir. 1989) . . . . . . . . . . . . . . . 41

Brown-Forman Corp. v. Commissioner, 94 T.C. 919 (1990), aff'd, 955 F.2d 1037 (6th Cir. 1992) . . . . 6, 7, 17, 19, 28, 46, 52

Cartwright, United States v., 411 U.S. 546 (1973) . . . . . . . . . . . . . . . . . . . . 41

Casanova Co. v. Commissioner, 87 T.C. 214 (1986) . . . . . . . . . . . . . . . . . . . . . 2

Chevron, U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . 39, 41

Colony, Inc. v. Commissioner, 357 U.S. 28 (1958) . . . . . . . . . . . . . . . . . . . . . 59

Correll, United States v., 389 U.S. 299 (1967) . . . . . . . . . . . . . . . . . . . . 40

**TABLE OF AUTHORITIES**

Page


CWT Farms, Inc. v. Commissioner, 755 F.2d 790 (11th Cir. 1985), cert. denied, 477 U.S. 903 (1986) . . . . . . . . . . . . . . . . 47

Danly Mach. Corp. v. United States, 492 F.2d 30 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . 51, 56

Deluxe Check Printers v. United States, 5 Cl. Ct. 498 (1984) [84-2 USTC (CCH) 84,862, 84,864] . . . . . . . . . . . . . . . . . 31

Dow Corning Corp. v. United States, 22 Cl. Ct. 184 (1990), 90-2 USTC ¶ 50,360 at 85,108 (DISC case), aff'd, 984 F.2d 416 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . 55

Dresser Indus. v. Commissioner, 92 T.C. 1276 (1989), aff'd in part, rev'd in part, remanded, 911 F.2d 1128 (5th Cir. 1990) . . . . . . . . . . . 46

E.I. du Pont de Nemours & Co. v. Commissioner, 41 F.3d 130 n. 20 (3d Cir. 1994) . . . . . . . . . . . . . . . . . 39

Faltesek v. Commissioner, 92 T.C. 1204 (1989) . . . . . . . . . . . . . . . . . . . . 42, 47, 50

Foodservice & Lodging Inst. v. Regan, 809 F.2d 842 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . 41

Foster v. Commissioner, 80 T.C. 34 (1983), aff'd in part, vacated in part, 756 F.2d 1430 (9th Cir. 1985), cert. denied, 474 U.S. 1055 (1986) . . . . . . . . . . . . . 32, 51, 53

Garnac Grain Co. v. Commissioner, 95 T.C. 7 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 56

Gehl Co. v. Commissioner, 795 F.2d 1324 (7th Cir. 1986) . . . . . . . . . . . . . . . . . 47

General Dynamics Corp. v. Commissioner, 108 T.C. 107 (1997) . . . . . . . . . . . . . . 6, 19, 30, 37, 40, 47

Helvering v. New York Trust Co., 292 U.S. 455 (1934) . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF AUTHORITIES

Page


Jewett v. Commissioner,
455 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . 31

L & F Int'l. Sales Corp. v. United States,
912 F.2d 377 (9th Cir. 1990) . . . . . . . . . . . . . . . . 46, 47

LeCroy Research Sys. Corp. v. Commissioner,
751 F.2d 123 (2d Cir. 1984) . . . . . . . . . . . . . . . . 47

Lyons v. Board of Education,
523 F.2d 340 (8th Cir. 1975) . . . . . . . . . . . . . . . . . 2

Manhattan Gen. Equip. Co. v. Commissioner,
297 U.S. 129 (1936) . . . . . . . . . . . . . . . . . . . . . 45

National Muffler Dealers Ass'n v. United States,
440 U.S. 472 (1979) . . . . . . . . . . . . . . . . . . . 40, 41

Norwest Corp, United States v.,
116 F.3d 1227 (8th Cir. 1997) . . . . . . . . . . . . . . . 43

Portland Cement Co., Commisioner v.,
450 U.S. 156 (1981) . . . . . . . . . . . . . . . . . . . . . 41

Rothensies v. Electric Storage Battery Co.,
329 U.S. 296 (1946) . . . . . . . . . . . . . . . . . . . . . 43

Rowan Cos. v. United States,
452 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . 40

Ruud Mfg. Co. v. Commissioner,
10 T.C. 14 (1948), aff'd,
173 F.2d 222 (3d Cir. 1949) . . . . . . . . . . . 44, 51, 57, 58

Sim-Air USA, Ltd. v. Commissioner,
98 T.C. 187 (1992) . . . . . . . . . . . . . . . . . . . 5, 45, 47

St. Jude Medical, Inc. v. Commissioner,
97 T.C. 457 (1991), aff'd in part,
rev'd in part, remanded,
34 F. 3d 1394 (8th Cir. 1994) . . . . . . . . . . . . . . . 19

Thomas Int'l Ltd. v. United States,
773 F.2d 300 (Fed. Cir. 1985),
cert. denied, 475 U.S. 1045 (1986) . . . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

Page

West v. Sullivan, 973 F.2d 179 (3d Cir. 1992), cert. denied, 508 U.S. 962 (1993) . . . . . . . . . . . . . . 41

I.R.C. §:

I.R.C. § 172(b)(1)(A) . . . . . . . . . . . . . . . . . . . . 48

I.R.C. § 291(a)(4) . . . . . . . . . . . . . . . . . . . . 9

I.R.C. § 482 . . . . . . . 3, 4, 8, 17, 18, 32, 33, 51-53, 56, 57

I.R.C. § 6501 . . . . . . . . . . . . . . . . . . . . . . 58

I.R.C. § 6501(a) . . . . . . . . . . . . . . . . . . 13, 15, 48

I.R.C. § 6501(e) . . . . . . . . . . . . . . 4, 5, 57-60, 63, 64

I.R.C. § 6501(e)(1)(A)(i) . . . . . . . . . . . . . . . . . 59

I.R.C. § 6511 . . . . . . . . . . . 3, 15, 30, 34, 42, 47, 56, 58

I.R.C. § 6511(a) . . . . . . . . . . . . . . . . . . 13, 29, 30

I.R.C. § 7701 . . . . . . . . . . . . . . . . . . . . . . 6

I.R.C. § 7805 . . . . . . . . . . . . . . . . . . . . . . 39

I.R.C. § 861(b) . . . . . . . . . . . . . . . . . . . . 33, 53

I.R.C. § 911 . . . . . . . . . . . . . . . . . . . . . . 42

I.R.C. § 921 . . . . . . . . . . . . . . . . . . . 3, 6, 8, 12

I.R.C. § 921(a) . . . . . . . . . . . . . . . . . . . . . 7, 8

I.R.C. § 922 . . . . . . . . . . . . . . . . . . . . . . 1

I.R.C. § 922(a) . . . . . . . . . . . . . . . . . . . . . 7

I.R.C. § 923 . . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 923(a) . . . . . . . . . . . . . . . . . . . . . 8

I.R.C. § 923(a)(3) . . . . . . . . . . . . . . . . . . . . 8

## TABLE OF AUTHORITIES

Page


I.R.C. § 923(b) . . . . . . . . . . . . . . . . . . . . . . . . 9

I.R.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

I.R.C. § 924(a) . . . . . . . . . . . . . . . . . . . . . . . 59

I.R.C. § 924(a)(1) . . . . . . . . . . . . . . . . . . . . 9, 52

I.R.C. § 924(a)(2) . . . . . . . . . . . . . . . . . . . . 9, 52

I.R.C. § 924(a)(3) . . . . . . . . . . . . . . . . . . . . . 9

I.R.C. § 924(b) . . . . . . . . . . . . . . . . . . . . . . . 9

I.R.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . 10, 23

I.R.C. § 924(d) . . . . . . . . . . . . . . . . . . . . . 10, 23

I.R.C. § 924(d)(1)(A) . . . . . . . . . . . . . . . . . . 11, 61

I.R.C. § 924(e) . . . . . . . . . . . . . . . . . . . 11, 23, 61

I.R.C. § 925 . . . . . . . . . . . . 11, 17, 20, 29, 32, 51, 54

I.R.C. § 925(a) . . . . . . . . . . . . . . . . . . . 18, 19, 51

I.R.C. § 925(a)(1) . . . . . . . . . . . . . . . . . 8, 17, 32, 61

I.R.C. § 925(a)(2) . . . . . . . . . . . . . . . . . 8, 17, 32, 61

I.R.C. § 925(a)(3) . . . . . . . . . . . . . . . 17, 18, 32, 52

I.R.C. § 925(b) . . . . . . . . . . . . . . . . . . . . . . . 19

I.R.C. § 925(b)(1) . . . . . . . . . . . . . . . . . . . . . 38

I.R.C. § 925(b)(2) . . . . . . . . . . . . . . . . . . . . 17, 27

I.R.C. § 925(c) . . . . . . . . . . . . . . . . . . . . . . . 61

I.R.C. § 925(d) . . . . . . . . . . . . . . . . . . . . . . . 18

I.R.C. § 927 . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

I.R.C. § 927(b)(2) . . . . . . . . . . . . . . . . . . 20, 21, 59

I.R.C. § 991 . . . . . . . . . . . . . . . . . . . . . . . . . 7

## TABLE OF AUTHORITIES

Page

I.R.C. § 994 . . . . . . . . . . . . . . . . . . . . . . . 55
I.R.C. § 994(a) . . . . . . . . . . . . . . . . . . . . . . 54
I.R.C. § 994(a)(1) . . . . . . . . . . . . . . . . . . . . 17
I.R.C. § 994(a)(2) . . . . . . . . . . . . . . . . . . . . 17
I.R.C. § 994(a)(3) . . . . . . . . . . . . . . . . . . . 17, 18

Treas. Reg. §:

Temp. Treas. Reg. § 1.921-1T(b)(4) . . . . . . . . . . . . . . 32
Temp. Treas. Reg. § 1.924(a)-1T(b) . . . . . . . . . . . . . . . 9
Temp. Treas. Reg. § 1.925(a)-1T(b)(2) . . . . . . . . . . . . . 11
Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii) . . . . . . . . . 61, 63
Temp. Treas. Reg. § 1.925(a)-1T(c)(3) . . . . . . . . . . . . . 21
Temp. Treas. Reg. § 1.925(a)-1T(c)(6) . . . . . . . . . . . . . 21
Temp. Treas. Reg. § 1.925(a)-1T(c)(6)(iii)(D) . . . . . . . . . 23
Temp. Treas. Reg. § 1.925(a)-1T(d) . . . . . . . . . . . . . . 20
Temp. Treas. Reg. § 1.925(a)-1T(d)(2)(iii) . . . . . . . . . . 22
Temp. Treas. Reg. § 1.925(a)-1T(d)(2)(iv) . . . . . . . . . . . 9
Temp. Treas. Reg. § 1.925(a)-1T(d)(3)(iv) . . . . . . . . . . . 61
Temp. Treas. Reg. § 1.925(a)-1T(e) . . . . . . . . . . . . . . 42
Temp. Treas. Reg. § 1.925(a)-1T(e)(4) 1-4, 29-34, 36-40, 42, 45, 46, 50, 51, 53, 55-58, 61
Temp. Treas. Reg. § 1.925(a)-1T(f) . . . . . . . . 20, 26, 60, 62
Temp. Treas. Reg. § 1.925(b)-1T(c)(2)(ii) . . . . . . . . . . . 27
Temp. Treas. Reg. § 1.925-1T(c) . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES


Page

Temp. Treas. Reg. § 1.927(b)-1T(e)(1) . . . . . . . . . . 9, 23, 60

Temp. Treas. Reg. § 1.927(e)-1T . . . . . . . . . . . . . . . 17

Treas. Reg. § 1.471-11(c)(2)(ii) . . . . . . . . . . . . . . 21

Treas. Reg. § 1.482-1(b)(3) . . . . . . . . . . . . . . 32, 53

Treas. Reg. § 1.861-8 . . . . . . . . . . . . . . . . . 21, 53

Treas. Reg. § 1.861-8(a) . . . . . . . . . . . . . . . . . 53

Treas. Reg. § 1.861-8(a)(4) . . . . . . . . . . . . . . . . 24

Treas. Reg. § 1.861-8(f)(4) . . . . . . . . . . . . . . . . 53

Treas. Reg. § 1.861-8(g) . . . . . . . . . . . . . . . . . 23

Treas. Reg. § 1.911-7 . . . . . . . . . . . . . . . . . . . 42

Treas. Reg. § 1.992-1(a) . . . . . . . . . . . . . . . . . . 7

Treas. Reg. § 1.993-3(d)(2)(i)(b) . . . . . . . . . . . . . 47

Treas. Reg. § 1.994-1(e)(3) . . . . . . . . . . . . . . . . 47

Treas. Reg. § 1.994-1(e)(4) . . . . . . . . . . . . . . . . 54

Treas. Reg. § 1.994-2(c)(2)(i) . . . . . . . . . . . . . . 28

Miscellaneous:

15 Mertens Law of Fed Income Tax,
§ 57.36 at 71-72 (1997) . . . . . . . . . . . . . . . . . 59

1984 Jt. Com. Rept. at 42-44 . . . . . . . . . . . . . . . 17

1987-1 C.B. 912, 921 . . . . . . . . . . . . . . . . . . . 39

B. Bittker & J. Eustice,
Federal Taxation of Corporations and Shareholders
¶ 15.23[3] at 15-82 (6th ed. 1994) . . . . . . . . . . . . 6

H. Rept. No. 92-533 (1971),
1971-1 C.B. 498 . . . . . . . . . . . . . . . . . . . . . 46

## TABLE OF AUTHORITIES

Page

H.R. Conf. Rep. No. 98-861 at 634 (1984) . . . . . . . . 7, 52, 53

Joint Committee on Taxation Explanation of Foreign Sales Corporation Act of 1983, at 26 (1984) . . . . . . . . . . . . . 11

Rev. Rul. 82-81, 1982-1 C.B. 109, 110 . . . . . . . . . . 49, 54, 55

S. Rept. No. 92-437 (1971), 1972-1 C.B. at 618 . . . . . . . . 18

T.A.M. 8527005 . . . . . . . . . . . . . . . . . . . . . . . 55

T.C. Rule 121 . . . . . . . . . . . . . . . . . . . . . . . . 1

T.D. 8126, 1987-1 C.B. 191-211 . . . . . . . . . . . . . . . 29

Webster's Third New International Dictionary (Unabridged), (Merriam-Webster 1986) . . . . . . . . . . . . . . . . . . . 36

**UNITED STATES TAX COURT**

| | | |
|---|---|---|
| UNION CARBIDE CORPORATION and SUBSIDIARIES, Petitioner, | ) | |
| v. | ) | Docket No. 3501-94 |
| COMMISSIONER OF INTERNAL REVENUE, Respondent. | ) | |

**Respondent's Memorandum of Law in Support of**
**Respondent's Motion for Partial Summary Judgment**

**Preliminary Statement**

Union Carbide Corporation ("UCC" or "petitioner"), seeks tax refunds for its taxable years 1987, 1988 and 1989 ("the years in issue"), based upon its redetermination of the commissions payable to its foreign subsidiary, Union Carbide Foreign Sales Corporation ("UCFSC"), a Foreign Sales Corporation ("FSC") as defined under section 922 and attendant regulations[1]. Petitioner, the related supplier to UCFSC, formally raised its refund claims in two amendments to its petition: the first lodged on April 27, 1995; and the second lodged on October 4, 1996. Respondent denied both claims in responsive pleadings because petitioner failed to assert them within the time prescribed in Treas. Reg. § 1.925(a)-1T(e)(4). Respondent now moves for partial summary judgment under T.C. Rule 121 dismissing petitioner's refund claims because petitioner did not meet the conditions for the redeterminations as a matter of law.

---

[1] Unless otherwise stated, all section references refer to the Internal Revenue Code of 1986.

Docket No. 3501-94

Respondent's motion presents the threshold legal question of whether petitioner's failure to assert its refund claims in accordance with the conditions prescribed in Treas. Reg. § 1.925(a)-1T(e)(4) prevents this Court from entertaining the claims. The parties have stipulated the facts material to the Court's decision of the issue in a stipulation of facts filed by the parties on August 4, 1997, and, solely for the threshold legal issue, these facts are not in dispute.[2/]

Summary judgment is particularly appropriate in this case, serving the "salutary purpose [of] avoiding a useless, expensive and time consuming trial where there is no genuine, material fact issue to be tried." Casanova Co. v. Commissioner, 87 T.C. 214, 217 (1986), quoting, Lyons v. Board of Education, 523 F.2d 340, 347 (8th Cir. 1975). The undisputed material facts, considered in the light most favorable to petitioner, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970), show that although it was entirely within petitioner's power to redetermine the commissions payable to its FSC, UCFSC, within the time prescribed in Treas.

---

[2/] The parties' stipulations were prepared solely for purposes of the parties' cross motions for summary judgment. Respondent accepts the facts and characterizations set forth in the stipulation of facts for purposes of the instant motions. However, should the Court decide as a matter of law that petitioner is entitled to raise its refund claims in this proceeding, many of the facts stipulated, particularly those involving the details and correctness of petitioner's computations of the commissions in issue, will become issues of fact in a subsequent proceeding on the merits of the claims. (Joint Motion to File Stipulation of Facts ("Jt. Mot.") ¶¶ 6&7).

Reg. § 1.925(a)-1T(e)(4), petitioner and UCFSC failed to make the redeterminations, or request an extension of UCFSC's statute, or file a protective claim before the limitations period applicable to UCFSC under section 6511 expired for the years in issue. (Stip. ¶¶ 23 & 25).

**Points Relied Upon**

The FSC regime established in I.R.C. §§ 921 through 927 and the regulations thereunder allows qualifying domestic manufacturers, know as related suppliers, to exempt from taxation about 65% of the income earned by its related subsidiary, a qualifying FSC. The FSC and the related supplier are subject to section 482, but may elect among two safe harbor pricing methods to determine the profit of the FSC. Treasury Regulation § 1.925(a)-1T(e)(4) grants, as an exception to section 482, the FSC and the related supplier the ability to redetermine the transfer price or commission reported on their original tax returns, as long as the statute of limitations under section 6511 is open for both the FSC and the related supplier. The undisputed facts show that petitioner allowed the statute of limitations to expire for its FSC before it claimed refunds based upon redeterminations of FSC commissions for the years in issue. As a matter of law, petitioner may not claim the benefits of the regulation absent compliance with its conditions.

On its face, Treas. Reg. § 1.925(a)-1T(e)(4) plainly and unambiguously applies to all of petitioner's instant refund claims. The conditions imposed by the regulation on redeterminations made by FSCs and related suppliers foster symmetry in the tax treatment of these related, but separate taxpayers. Moreover, the conditions serve the equally important administrative goal of barring the assertion of stale refund claims by the FSC or the related supplier. Treasury Regulation § 1.925(a)-1T(e)(4) is reasonable and, therefore, valid.

As a matter of law, the conditions for the implementation of this relief provision prescribed in the regulation take precedence over general provisions of the Code that might otherwise be applicable to either petitioner or UCFSC. Moreover, under the facts of this case, there was no general limitations period available to UCFSC at the time the refund claims were made. UCFSC did not qualify for the six-year statute of limitations under section 6501(e) because its redeterminations did not involve the omission of items of gross receipts, much less a 25% omission. Even if Treas. Reg. § 1.925(a)-1T(e)(4) were not a valid regulation, petitioner's refund claims must still be dismissed because, absent that regulation, petitioner and UCFSC may not make a unilateral section 482 adjustment.

**Introduction**

Notwithstanding the undisputed facts material to the issue here, the subsidiary facts are not entirely clear and not capable

of straightforward exposition. This obscurity is due to petitioner's failure to adequately summarize any of its FSC commission computations on either the original or amended returns of its FSC, UCFSC. (Jt. Exs. 4-D, 5-E, 6-F & 15-O(1), (2), & (3)). Petitioner's refund claims were presented, without further computational details, as bottom line adjustments resulting from petitioner's complicated and idiosyncratic data processing programs. (First and Second Amended Petitions; Stip. ¶¶ 26 & 39; Jt. Exs. 8-H, 9-I, 12-L, 13-M & 14-N). Thus, the Court must deduce the shape of petitioner's original computations and claims from the stipulated facts and the applicable statutory and regulatory provisions in order to provide a cogent summary of these facts.

With an understanding of the nature of the computations underlying petitioner's claims, the Court may properly analyze certain of petitioner's legal positions, particularly the applicability of section 6501(e) to UCFSC's taxable years 1988 and 1989. As a prelude to understanding the untimeliness of petitioner's claims, it is helpful examine the statutory framework and legislative aims of United States export incentive legislation before considering its "baffling maze of complicated rules and conditions." Sim-Air USA, Ltd. v. Commissioner, 98 T.C. 187, 193 (1992).

Docket No. 3501-94

**The Foreign Sales Corporation**

Congress created the Foreign Sales Corporation (referred to as "a FSC" in sections 921, et seq.) to replace the Domestic International Sales Corporation ("DISC") as a tax incentive for stimulating exports by United States manufacturers. Brown-Forman Corp. v. Commissioner, 94 T.C. 919, 924-25, 946 (1990), aff'd, 955 F.2d 1037 (6th Cir. 1992). As noted in the current edition of B. Bittker & J. Eustice,

> The Tax Reform Act of 1984 did not repeal, but replaced in practical utility, the DISC rules with a new and equally complex export incentive device, the FSC, which was designed to meet European objections under the GATT to the former DISC taxation framework.

B. Bittker & J. Eustice, Federal Taxation of Corporations and Shareholders ¶ 15.23[3] at 15-82 (6th ed. 1994). While the provisions and benefits of the DISC and FSC regimes are "strikingly similar", id. at 15-81, and analogous in most operative respects, it is through the differences that the requirements of the FSC regime are best understood.

The DISC is a domestic corporation through which a United States manufacturing parent could defer income from qualified export sales, while the FSC is a foreign corporation, as defined in I.R.C. § 7701, through which a U.S. manufacturing parent may permanently exempt a portion of its income from qualified export sales. General Dynamics Corp. v. Commissioner, 108 T.C. 107, 116

(1997); I.R.C. § 922(a).[3] A DISC is not subject to United States taxation, I.R.C. § 991, while a FSC is subject to United States taxation (and estimated taxes) on its nonexempt foreign trade income. I.R.C. § 921(a). These differences are best understood in the historical context of the international trading negotiations among the signatories of the General Agreement on Tariffs and Trade ("GATT"), which prompted Congress to supplant the DISC with the FSC.

The DISC was widely recognized as a "shell" corporation functioning "as an accounting device for measuring the amount of export earnings subject to tax deferral," but deemed to be a separate corporation. Treas. Reg. § 1.992-1(a); Brown-Forman Corp. 94 T.C. at 925, quoting Anchor Hocking Corp. v. United States, 11 Cl. Ct. 173, 174 (1986). Certain European signatories of the GATT "argued that the DISC was an illegal export subsidy because it allowed indefinite deferral of direct taxes on income from exports earned in the United States." H.R. Conf. Rep. No.

---

[3] Section 922(a) provides in pertinent part:
**SEC. 922(a). FSC defined.**-- For purposes of this title, the term "FSC" means any corporation--
**(1)** which--
**(A)** was created or organized under--
**(i)** under the laws of any foreign country which meets the requirements of section 927(e)(3), or
**(ii)** under the laws applicable to any possession of the United States.

* * *

**(2)** which has made an election (at the time and manner provided in section 927(f)(1) which is in effect for the taxable year to be treated as a FSC.

98-861 at 634 (1984). In order to resolve the GATT dispute, Congress designed the FSC around the rationale embodied in the GATT rule that "a country need not tax income from economic processes occurring outside its territory." Id. at 635.

Subpart C, Taxation of Foreign Sales Corporation, accomplishes that design though a series of definitional sections. Section 921 provides:

> **SEC. 921(a). Exclusion.**-- Exempt foreign trade income of a FSC shall be treated as foreign source income which is not effectively connected with the conduct of a trade or business within the United States.

Section 923 defines "exempt foreign trade income" as "the aggregate amount of all foreign trade income ['FTI'] of a FSC for the taxable year which is described in paragraphs (2) or (3)" of section 923(a). (Alteration added).

Section 923(a)(3) exempts 16/23 of the FTI determined under the administrative pricing rules of sections 925(a)(1) and (a)(2), which the FSC and related supplier may use as safe harbor pricing methods in lieu of the rules prescribed in section 482.[4/] The effective exclusion rate is reduced to 15/23, or about 65%,

---

[4/] **SEC. 923(a)(3). Income determined with regard to administrative pricing rules.**-- In the case of any transaction with respect to which paragraph (1) or (2) of section 925(a)(or the corresponding provisions of the regulations prescribed under 925(b)) applies, 16/23 of the foreign trade income derived from such transaction shall be treated as described in this paragraph.

for years after December 31, 1984. I.R.C. § 291(a)(4). Section 923(b) defines "foreign trade income" (or FTI) as "the gross income of a FSC attributable to foreign trading gross receipts."

In the case of a commission FSC, like UCFSC in the instant case, "foreign trade income" is synonymous with the FSC "commission," being the gross income of the FSC attributable to "gross receipts from the sale of export property ... by any principal for whom the FSC acts as a commission agent...," Treas. Reg. § 1.924(a)-1T(b), paid or payable by the related supplier. Treas. Reg. §§ 1.925(a)-1T(d)(2)(iv) and 1.927(b)-1T(e)(1). The defining aspect of the FSC regime lies in the economic substance requirements which are embedded in the definition of "foreign trading gross receipts" found in section 924.

In general, "foreign trading gross receipts" ("FTGR") are the gross receipts of a FSC derived from the sale, lease or rental, or services related and subsidiary to the sale, lease or rental of "export property." I.R.C. § 924(a)(1), (2) and (3). Section 924(b) mandates that the FSC can only have FTGR to the extent that the FSC is managed and conducts business abroad:

> **SEC. 924(b). Foreign management and foreign economic processes requirements. (1) In general.**-- Except as provided in paragraph (2)--
> **(A)** a FSC shall be treated as having foreign trading gross receipts for the taxable year only if the management of such corporation during such taxable year takes place outside the United States as required by subsection (c) and

> **(B)** a FSC has foreign trading gross receipts from any transaction only if economic processes with respect to such transaction take place outside the United States as required by subsection (d).

The foreign management requirements are satisfied if the FSC has a principal bank account outside the United States, conducts all board and shareholder meetings outside the United States, and makes certain disbursements, such as officers' and directors' salaries, outside attorneys' and accountants' fees and cash dividends from the principal bank account located outside the United States. I.R.C. § 924(c). Under section 924(d), the foreign economic processes activities ("FEPA") requirements may be satisfied for the FSC by contract with another person, including the related supplier. In the instant case, the FSC, UCFSC, contracted with petitioner, the related supplier, and Union Carbide Canada, Ltd. ("UCCL") to perform the FEPA. (Stip. ¶¶ 9 & 10).

The aim of Congress in mandating the foreign management and FEPA requirements was to assure that the FSC was a foreign corporation, actually located and conducting real business abroad:

> Under the GATT rules, an exemption from tax of export income is permitted only if the economic processes which give rise to the income take place outside the United States. In light of these rules the bill would provide that a FSC must have a foreign presence, it must have economic substance, and the activities that give rise to the export income must be performed by the foreign sales corporation outside the U.S. customs territory.

Joint Committee on Taxation Explanation of Foreign Sales Corporation Act of 1983, at 26 (1984). Section 924 insures the FSC's economic substance and reality by requiring that the FSC actually pay for the performance of the activities listed in section 924(e), regardless of whether the FSC actually performs the foreign economic processes activities ("FEPA").[5] In other words, economic substance is achieved by requiring the FSC to assume the economic burden of the FEPA expenses. To have economic substance, the FSC must actually book the required expenses and take them into account in computing the FSC profit, which are prerequisites for using the section 925 safe harbor pricing rules. Treas. Reg. § 1.925(a)-1T(b)(2).

---

[5] The foreign economic processes activities ("FEPA") include the contract solicitation, negotiation and making of the contract described in section 924(d)(1)(A) and the five activities listed in section 924(e):

> **SEC. 924(e). Activities relating to the disposition of export property.**-- The activities referred to in subsection (d) are--
> **(1)** advertising and sales promotion,
> **(2)** the processing of customer orders and the arranging for delivery of export property,
> **(3)** transportation from the time of acquisition by the FSC (or in the case of a commission relationship, from the beginning of such relationship) to the delivery to the customer,
> **(4)** the determination and transmittal of final invoice or statement of account and the receipt of payment, and
> **(5)** the assumption of credit risk.

Docket No. 3501-94

**Factual Background**

The foreign sales corporation in this case is UCFSC, which was incorporated under the laws of the United States Virgin Islands and elected to be treated as a FSC under I.R.C. §§ 921 through 927 for each of the taxable years in issue (Stip. ¶ 4) during which UCFSC operated as a commission FSC pursuant to an export distribution and commission agreement with petitioner. (Stip. ¶¶ 6 & 7). UCFSC filed U.S. income tax returns (Forms 1120 FSC) for the taxable years 1987, 1988 and 1989, reporting as FTI, its commissions divided into the exempt, and nonexempt portions as follows:

| | Commissions | Exempt | Nonexempt |
|---|---|---|---|
| 1987 | $295,013,098 | $192,398,692 | $102,614,406 |
| 1988 | $391,916,254 | $255,596,023 | $136,320,231 |
| 1989 | $373,998,714 | $243,910,741 | $130,087,973 |

(Jt. Exs. 4-D, 5-E & 6-G (Schedules B)). On its income tax returns (Forms 1120) for 1987, 1988 and 1989, petitioner claimed deductions for the full amount of the commissions, i.e., the entire FTI reflected on UCFSC's returns for each of those years. (Stip. ¶¶ 13 & 17).

After reducing nonexempt commission income by attributable deductions, UCFSC reported "taxable income attributable to foreign trade income" ("taxable FTI") for those years as follows:

| | Nonexempt FTI | Deductions | Taxable FTI |
|---|---|---|---|
| 1987 | $102,614,406 | ($ 91,309,641) | $ 11,304,765 |
| 1988 | $136,320,231 | ($112,758,242) | $ 23,561,989 |
| 1989 | $130,087,973 | ($110,161,873) | $ 19,926,100 |

(Id.).

UCFSC paid United States income taxes for the years in issue in the following amounts:

| | Taxable FTI | Tax Paid |
|---|---|---|
| 1987 | $ 11,304,765 | $ 4,516,331 |
| 1988 | $ 23,561,989 | $ 8,011,076 |
| 1989 | $ 19,926,100 | $ 6,774,874 |

(Id.).

It is undisputed that petitioner's FSC deductions were not examined during the audit of petitioner's 1987, 1988 and 1989 income tax returns ("1987-1989 Cycle"), which concluded with the issuance of the notice of deficiency on December 7, 1993. (Stip. ¶ 23; Notice of Deficiency (Exhibit I to Petition)). The statutes of limitations under I.R.C. §§ 6501(a) and 6511(a), respectively, for additional assessments and refunds of tax with respect to UCFSC's income tax returns for those years had expired by September 10, 1993, three months before the conclusion of petitioner's audit. (Stip. ¶¶ 23 & 25).

It is also undisputed that petitioner did not consider redetermining the FSC commissions payable to UCFSC during respondent's examination of the years in issue, at the time it filed the petition, or during its initial conference with respondent's Appeals Division. (Stip. ¶¶ 23, 24 & 35). Petitioner waited until one year after the close of the examination of its 1987-1989 Cycle, while the case was pending before the Court, before deciding to raise the refund claims. (Stip. ¶ 35; Jt. Exs. 10-J & 11-K). Four months later, on April 27, 1995, after this case had been docketed for over a year, petitioner filed a motion to file an amendment to its petition to formally claim increased FSC commission deductions. (Stip. ¶ 36). On October 4, 1996, well over two and a half years after the close of the examination of the 1987-1989 Cycle, petitioner filed a second motion to amend the petition to claim further increased FSC commission deductions. (Stip. ¶ 41).

Petitioner's initial refund claims were based upon new computer programs devised by petitioner's tax department while preparing income tax returns for petitioner's and UCFSC's 1993 taxable year in February of 1994. (Stip. ¶¶ 26-28; Jt Exs. 8-H & 9-I). Petitioner claims, and respondent does not dispute for purposes of this motion, that these computer programs enabled petitioner to allocate and apportion its indirect expenses to FTGR based upon "units of production" rather than upon the "sales to sales" method. (Stip. ¶¶ 27-28). The "sales to sales" method

Docket No. 3501-94

had been used to compute the FSC commissions reported on all prior returns of petitioner and UCFSC, including those for the years in issue. (Stip. ¶ 28).

At the time that petitioner's tax department devised the new programming to allocate and apportion expenses to FTGR by units sold, the examination of petitioner's 1987-1989 Cycle had been completed, and the statutes of limitations for UCFSC under sections 6501(a) and 6511 had been closed for about six months. (Stip. ¶¶ 25 & 28). After making its initial refund claim, petitioner continued to tinker with its computer programs and in October 1996, when the instant case had been docketed for over a year and a half, petitioner filed a second amendment to its petition claiming additional refunds based upon further refinements to its computer technology. (Stip. ¶¶ 39, 40 & 41).

The second set of changes are theoretically and mathematically much more complex, amounting to computer programs that purport to individually compute over 40,000 profit determinations, and that, similarly, isolate overall profit limitations for thousands of export products. (Stip. ¶¶ 26, 39 & 41; Second Amendment to Petition). In addition, petitioner's second refund claim includes the comparatively simple changes of reclassifying expenses from foreign to domestic. (Stip. ¶¶ 26, 39 & 41; Second Amendment to Petition).

Docket No. 3501-94

Rather than summarizing and presenting UCFSC's tax information in the comprehensible manner prescribed on the Schedules P, (Computations of Transfer Price or Commission), petitioner supports its FSC commission determinations by voluminous and incomprehensible computer runs. (Exs. W, X & Y to Affidavit of Joseph Long). These computer runs, although labelled "Schedule P," are not reconciled to the comprehensible format of the Schedule P required to be completed by UCFSC. (Stip. ¶ 18; Jt. Ex. 7-G; Exs. W, X & Y to Affidavit of Joseph Long). Also, UCFSC's amended returns do not purport to properly recompute FTI, exempt FTI, nonexempt FTI and taxable FTI. Rather, on each amended return, petitioner merely increased UCFSC's FTI by the additional "commission" desired, multiplied that amount by the exemption percentage and subtracted from the "nonexempt FTI" the same expenses attributed in the original return. (Jt. Exs. 4-D, 5-E, 6-F & 15-O(1), (2), & (3)).

Since the merits of petitioner's computations are not in issue for purposes of the instant motion, a precise understanding of the computer machinations of petitioner's tax department is unnecessary at this stage. Nevertheless, a general understanding of the nature of the redeterminations in issue is essential to shape the legal issue presented.

Although in fact more complicated (see Jt. Mot. ¶¶ 6 & 7(a); Jt. Exs. 8-H, 9-I, 12-12-L, 13-M & 14-O), petitioner's initial claim has been stipulated as flowing from a change from the

"sales to sales" to the "units of production" method of allocating petitioner's operating expenses to the export transactions. (Stip. ¶¶ 27 & 28). For purposes of this motion, it is assumed that both methods are reasonable methods of allocating expenses. (Jt. Mot. ¶¶ 6 & 7[a]). Petitioner's initial claim must be understood in the context of the safe harbor pricing methods of section 925 and the regulations thereunder.

**Safe Harbor Pricing Methods**

The transfer price paid by, or commission paid to, a FSC are determined under the transfer pricing rules of section 925. The three transfer pricing rules that are applicable to FSCs are analogous to the three transfer pricing rules that were applicable to DISCs. Brown-Forman Corp., 94 T.C. at 947. The rules are classified as: 1) the gross receipts pricing rule (§§ 994(a)(1) & 925(a)(1)); 2) the combined taxable income pricing rule (§§ 994(a)(2) & 925(a)(2)); and 3) the section 482 pricing rule (§§ 994(a)(3) & 925(a)(3)).[6] Temp. Treas. Reg. § 1.927(e)-1T; see also, 1984 Jt. Com. Rept. at 42-44. As the Court has recognized with respect to the analogous DISC rules, "the first two intercompany pricing methods... are safe

---

[6] There is actually a fourth transfer pricing method known as "marginal costing" which is a variation on the combined taxable income method available to taxpayers "seeking to establish or maintain a market for export property." I.R.C. § 925(b)(2).

harbors... intended... 'to avoid the complexities of the present pricing rules [of section 482].'" Brown-Forman Corp., 94 T.C. at 926, quoting S. Rept. No. 92-437 (1971), 1972-1 C.B. at 618 (alteration in original)(elision added). Under section 925(a)(3), as under section 994(a)(3), "the rules of section 482 may be used by the taxpayer to allocate an arm's-length profit to the [FSC] if such rules would allow a greater profit to the [FSC] than either safe harbor." Brown-Forman Corp., 94 T.C. at 926.

Under the intercompany pricing rules of section 925(a), the FSC and its related supplier may, subject to certain limitations,[7] select the most favorable of two main safe harbor pricing methods: a profit of 23% of combined taxable income ("CTI"), or a profit of 1.83% of foreign trading gross

---

[7] E.g., section 925(d) limits the profit determined under the gross receipts method to two times the profit determined under the CTI method.

receipts.[8] Like the DISC, the FSC may operate either as a "buy-sell FSC" that purchases and resells the export property, or as a "commission FSC" functioning as a commission agent on the sale. St. Jude Medical, Inc. v. Commissioner, 97 T.C. 457, 463 (1991), aff'd in part, rev'd in part, remanded, 34 F. 3d 1394 (8th Cir. 1994); Brown-Forman Corp., 94 T.C. at 946-948. The administrative pricing rules of section 925(a) literally apply only to buy-sell FSCs, but Congress mandated, and the Secretary has prescribed, regulations setting forth consistent rules for commission FSCs. General Dynamics Corp., 107 T.C. at 118. The mandate is found in section 925(b), which states --

> **SEC. 925(b). Rules for commissions, rentals and marginal costing.**-- The Secretary shall prescribe regulations setting forth--

---

[8] Section 925(a) provides:
**SEC. 925(a). In General.**-- In the case of a sale of export property to a FSC by a person described in section 482, the taxable income of such FSC and such person shall be based upon a transfer price which would allow such FSC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of --
**(1)** 1.83 percent of the foreign trading gross receipts derived from the sale of such property by such FSC,
**(2)** 23 percent of the combined taxable income of such FSC and such person which is attributable to the foreign trading gross receipts derived from the sale of such property by such FSC, or
**(3)** taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).
Paragraphs (1) and (2) shall apply only if the FSC meets the requirements of section (c) with respect to the sale.

> **(1)** rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income.
>
> * * *

The FSC in the instant case, UCFSC, is a commission FSC. (Stip. ¶¶ 4, 6 & 7). Thus, the computations involved in the instant case are governed by Temp. Treas. Reg. § 1.925(a)-1T(d). Like the DISC commission, the FSC commission is "backed into" under the applicable regulations. Brown-Forman Corp., 94 T.C. at 927. The computation of the FSC's commission under either of the safe harbor pricing methods in section 925 begins with "gross receipts," which are defined in section 927(b)(2) as follows:

> **SEC. 927(b)(2). Gross receipts taken into account in the case of commissions.**-- In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this subpart as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commissions arose.

In the instant case, the section 927(b)(2) gross receipts were not changed in any of petitioner's redeterminations. (Stip. ¶¶ 28, 39 & 41). Since petitioner's initial redetermination was based upon a change to its method of allocating indirect expenses (Stip. ¶¶ 27, 28 & 36), that claim must relate to FSC profit computed under the combined taxable income ("CTI") method, because such a change to overhead expenses would not affect FSC profit calculations under the gross receipts method. See, e.g., Temp. Treas. Reg. § 1.925(a)-1T(f), Example 2. By its initial

claim, petitioner seeks to affirmatively increase its and UCFSC's CTI by reducing the operating expenses allocated to the section 927(b)(2) gross receipts under Treas. Reg. § 1.861-8.

Temporary Treasury Regulation § 1.925(a)-1T(d)(2)(iii) defines combined taxable income, or CTI, in the case of a commission FSC as follows:

> The combined taxable income of the FSC and the related supplier from the transaction is the excess of the related supplier's gross receipts from the transaction which would have been foreign trading gross receipts had the sale been made by the FSC directly over the FSC's and related supplier's total costs, excluding the commissions payable to the FSC, but including the related supplier's cost of goods sold and its and the FSC's noninventoriable costs (see § 1.471-11(c)(2)(ii)) which relate to the gross receipts from the transaction.

Temporary Treasury Regulation § 1.925(a)-1T(d)(2)(ii) incorporates the rules set forth in Temp. Treas. Reg. § 1.925-1T(c) for determining the income or profit that may be earned by the FSC. Under Temp. Treas. Reg. § 1.925(a)-1T(c)(3) the rules applicable to the CTI pricing method provide that the FSC's profit may not exceed "23 percent of the full costing combined taxable income (as defined in paragraph (c)(6) of this section)...." Temporary Treasury Regulation § 1.925(a)-1T(c)(6)

defines "full costing combined taxable income"[9] and sets forth rules for determining total costs of a FSC and its related supplier. Under subparagraph (iii)(C), cost of goods sold is determined in accordance with the other applicable sections of the Code and regulations and all other costs are determined under subparagraph (iii)(D), which provides in relevant part:

> Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are the expenses, losses and deductions definitely related and therefore allocated and apportioned thereto, and a ratable portion of any other expenses, losses, or deductions which are not definitely related to any class of gross income, determined in a manner consistent with the rules set forth in § 1.861-8.

The regulation distinguishes between "definitely related" expenses and those expenses which are "not definitely related to any class of gross income." The latter type expenses are the type petitioner seeks to reduce in its initial claim. The clearest illustration of how these two different types of costs

[9] The definition of "full costing combined taxable income" in Temp. Treas. Reg. § 1.925(a)-1T(c)(6) is identical to the description of combined taxable income in the commission regulation, Temp. Treas. Reg. § 1.925(a)-1T(d)(2)(iii) except that the latter section refers to "gross receipts from that transaction which would have been foreign trading gross receipts had the sale been made directly" and excludes the "commission paid or payable to the FSC" from costs deductible from CTI.

fit into the full costing computation prescribed in Temp. Treas. Reg. § 1.925(a)-1T(c)(6)(iii)(D) was contained in the former Example 23 to Treas. Reg. § 1.861-8(g).[10]

In former Example 23 of Treas. Reg. § 1.861-8(g), a commission FSC earns a profit of $354,424 on gross CTI of $1,700,000.[11] and FTGR of $7,700,000. The profit is determined by first reducing the gross CTI by the FSC's and related supplier's direct expenses. In the example, the related supplier has no direct expenses, but the FSC has direct expenses of $100,000 representing the section 924(c), (d) and (e) FEPA expenses that the FSC is required to incur.

**Petitioner's Refund Claims**

Petitioner's initial refund claim involves the reallocation of its, the related supplier's, indirect expenses, which are represented by the $125,000 of general and administrative expenses in former Example 23. It is the decrease to these

---

[10] Example 23 of section 1.861-8(g) was withdrawn and reserved by T.D. 8646, effective January 1, 1996, 60 Fed. Reg. 27454 (May 24, 1995), for reasons having to do with the treatment of the research and development expenses in that section in light of section 1.861-17. Former Example 23 remains the best illustration of how the allocation of general and administrative expenses affects FSC profit in general and UCFSC's profit in particular and is cited for that purpose only.

[11] "Gross income" equals the excess of $7,700,000 of foreign trading gross receipts over $6,000,000 cost of goods sold. Id. "Gross income" in this example refers to gross income for purposes of computing CTI and not the "gross income" of the FSC which is defined in Temp. Treas. Reg. § 1.927(b)-1T(e)(1) as "the commission paid or payable by the related supplier."

overhead expenses resulting from the change in method of allocating and apportioning those indirect expenses between foreign and domestic sales that would increase UCFSC's profit and petitioner's FSC deduction in the instant case. In former Example 23, the overhead expenses are allocated to and apportioned between gross income from the production and sale of electronic equipment in foreign and domestic markets, which under Treas. Reg. § 1.861-8(a)(4) are the "statutory grouping" and "residual grouping", respectively.

Although petitioner has not clearly defined its original "sales to sales" allocation method, presumably such allocation is similar, if not identical to, the gross income allocation in former Example 23 where the related supplier's indirect expenses are allocated based upon the ratio of foreign sales of the products over worldwide sales of the products (i.e., foreign sales plus domestic sales). Presumably petitioner's "unit of production" method similarly allocates foreign and domestic sales based upon the amount of the products sold rather than the income generated from the sale.

By substituting the stipulated figures for those in former Example 23, petitioner's and UCFSC's original and first amended computations for 1987 may be approximated and illustrated thus:

Docket No. 3501-94

1987 FSC Profit (Original Return)

| | | |
|---|---|---|
| Gross income from exports: | | $403,820,238 |
| FEPA/UCCL costs | $ 9,414,023 | |
| Apportioned expenses | $253,098,241 | |
| | | ($262,512,264) |
| Combined Taxable Income: | | $141,307,974 |
| FSC Profit (23% of CTI): | | $ 32,500,834 |

(Stip. ¶¶ 13, 15, 16; Jt. Ex. 4-D).

1987 FSC Profit (1st Amended)[12/]

| | | |
|---|---|---|
| Gross income from exports: | | $403,820,238 |
| FEPA/UCCL costs | $ 9,414,023 | |
| Apportioned expenses | $176,671,971 | |
| | | ($186,085,994) |
| Combined Taxable Income: | | $217,734,243 |
| FSC Profit (23% of CTI): | | $ 50,078,876 |

(Stip. ¶¶ 13, 15, 16 & 36; Jt. Exs. 4-D & 15-O(1))

As illustrated above, petitioner's initial refund claim achieved greater FSC profit by simply reducing by one-third the expenses allocated to CTI. Likewise, it may be deduced that petitioner's initial claim decreased the apportioned expenses used to compute CTI for 1988 and 1989 by $81,035,996 and $100,485,526, respectively, again reducing the expenses originally allocated to CTI by about one-third. (Stip. ¶¶ 15 & 36).

[12/] Petitioner's initial claim simply decreased the expenses apportioned to FTGR, increasing UCFSC's profit by $17,578,042 in 1987. (Stip. ¶¶ 27, 30 & 36). Since neither foreign trading gross receipts nor direct (FEPA) expenses were changed (Stip. ¶ 27), the only variable in the CTI computation was the indirect expenses. To solve for the amount by which petitioner's reallocation decreased indirect expenses, the $17,578,042 in additional profit is divided by 23% (the percentage used in the CTI method) to yield $76,426,270, the reduction in indirect expenses achieved under the new allocation method.

Petitioner's second refund claim would also increase the profit of UCFSC (and petitioner's deductions) but not through adjustments to CTI. Rather, petitioner devised programs purporting to isolate the thousands of export transactions from which foreign trading gross receipts were derived,[13] giving petitioner greater flexibility in selecting among the safe harbor pricing methods. (Stip. ¶¶ 26, 39 & 41). The manner in which a change from grouping transactions will affect FSC profits may be illustrated by modifying the table set forth in Example 11 of Temp. Treas. Reg. § 1.925(a)-1T(f).

If we assume that the grouping set forth for Product Line W in Example 11 consists of products L and M only, and further assume that R's expenses for product M are $20 rather than $70, the grouping computation would be as follows:

| Product Line W: | Product L | Product M | Total |
|---|---|---|---|
| CTI: | | | |
| R's GR from sale | $1,000 | $ 625 | $ 1,625 |
| R's COGS | (650) | (445) | ( 1,095) |
| Comb. gross inc. | 350 | 180 | 530 |
| Less: | | | |
| R's expenses | 81 | **20** | 51 |
| F's expenses | 230 | 60 | 240 |
| Total | (311) | (80) | (291) |

[13] Again, the Court may assume for purposes of this motion that the transaction by transaction computation program developed by petitioner's tax department is accurate. However, as indicated in ¶ 12 of Jt. Ex. 14-N, should this case proceed to a decision on the merits of petitioner's claims, there is reason to doubt the accuracy of the program.

| | | | |
|---|---|---|---|
| CTI | $ 39 | $ 100 | $ 139 |
| 23% of CTI | $ 8.97 | $23.00 | $ 31.97 |
| 1.83% of GR | $17.94 | $11.44 | $ 29.74 |

Under product grouping, F's profit would be $31.97, the highest profit afforded both products, or "Product Line W", under the two safe harbor methods. However, if the taxpayers determined the FSC's profit under the transaction-by-transaction method, there will be a much larger overall profit under these facts because the same safe harbor method need not be used for both products L and M if they are not grouped together. Rather, the taxpayers could choose the most favorable safe harbor method for each product transaction: the gross receipts method for Product L ($17.94 profit) and the 23% of CTI method for product M ($23.00 profit) for a total profit of $40.94. This is, in theory at least, part of what petitioner claims to have done in its second claim.

Petitioner's second claim also involves a redetermination of the overall profit percentage limitation on the use of the marginal costing rules of section 925(b)(2) and the regulations thereunder. (Stip. ¶¶ 39 & 41). Although petitioner has supplied no further explanation, this redetermination may be conceptually understood as similar in theory and effect to petitioner's switch from product grouping to the transaction by transaction method of determining FSC profit. The overall profit percentage limitation ("OPPL") for FSCs is set forth in Temp.

Treas. Reg. § 1.925(b)-1T(c)(2)(ii) and is virtually identical to the OPPL for DISCs set forth in Treas. Reg. § 1.994-2(c)(2)(i), which was explained by the Court in Brown-Forman Corp., 94 T.C. at 929-931. In essence, the OPPL is the percentage derived from the ratio of CTI from worldwide sales of a product or product line (determined under the full costing method), to the gross receipts from worldwide sales of the product or product line, multiplied by gross receipts from export sales of the product or product line, which, in effect, limits the "profitability" of export sales subject to the marginal costing rules. Id. 94 T.C. at 929. The OPPL recomputation is a purely mathematical exercise. The final piece of petitioner's amended claim appears merely to reduce CTI by reallocating petitioner's expenses from combined gross income to domestic income. (Stip. ¶¶ 39 & 41).

As previously noted, petitioner has provided no explanation of exactly how it determined (and redetermined) UCFSC's commissions for purposes of its two refund claims, other than the cryptic "flow charts" and summaries of the ever-changing computer programs, which were provided to the International Examiner to justify similar claims for other taxable years. (Stip. ¶¶ 28 & 39; Jt. Exs. 8-H, 9-I, 12-12-L, 13-M & 14-O). During the 1992-1993 Cycle, the only cycle in which petitioner's claims were examined with any degree of completeness, the International Examiner logged over 675 hours examining petitioner's FSC refund claims. (Stip. ¶¶ 31, 40). Petitioner's "Schedule P" computer