runs and the "explanations" provided to respondent's International Examiner demonstrate the petitioner claims FSC commissions in whatever amounts its computer programs spit out, leaving to respondent, or the Court should this case proceed further the task of tracing through petitioner's labyrinthine computer processes in attempts to reconcile the computations to the requirements of the regulations. (Stip. ¶¶ 28 & 39; Jt. Exs. 8-H, 9-I, 12-12-L, 13-M & 14-0; Exs. W, X & Y). Even taken in the light most favorable to petitioner, these facts reveal that a full examination of petitioner's redeterminations of UCFSC's FSC commissions would be a daunting exercise in computer science, involving nearly $100 million in additional deductions claimed by petitioner. (Second Amended Petition; Stip. ¶ 41).

## ARGUMENT

### I. Petitioner May Not Redetermine The FSC Commissions Payable To UCFSC Because Such Redetermination Was Barred By Temp. Treas. Reg. § 1.925(a)-1T(e)(4) When Petitioner Failed To Raise It Before The Statute Of Limitations Under I.R.C. § 6511(a) Expired For UCFSC's 1987, 1988 And 1989 Taxable Years.

Treasury Regulation § 1.925(a)-1T(e)(4) is part of the comprehensive set of regulations implementing section 925 that were promulgated March 2, 1987, over one year before petitioner filed the first return in issue. T.D. 8126, 1987-1 C.B. 191-211. The regulation permits taxpayers to redetermine the FSC transfer prices or commissions determined on an original return through the filing of amended returns by the FSC and the related

supplier, if both such amended returns are filed before the expiration of the statute of limitations under section 6511. The undisputed facts show that petitioner failed to heed the requirements of the regulation, but still insists upon ~~receiving~~ its benefits. It is undisputed that petitioner was entirely free to redetermine the commissions payable to UCFSC in accordance with Treas. Reg. § 1.925(a)-1T(e)(4), but that petitioner and UCFSC simply failed to take any action to make any redetermination, or to otherwise preserve their right to do so, before the limitations period applicable to UCFSC under section 6511 expired for the years in issue. (Stip. ¶¶ 23 & 25). Even viewing petitioner's refund claims in their most favorable light, as factually correct in every respect, respondent is entitled to judgment as a matter of law that petitioner's redeterminations are untimely and petitioner's claim should be dismissed.

**A. The plain language of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) permits a FSC and its related supplier to redetermine the transfer price or commission only while the statute of limitations under section 6511(a) is open for both.**

Under the settled rules of statutory construction applied to interpret regulations, this Court will give effect to the plain and ordinary meaning of a regulation unless such effect would produce absurd results. General Dynamics Corp., 108 T.C. at 121. The fundamental tenet of statutory construction is to begin with the language of the regulation itself, and if the plain language of the regulation is clear and unambiguous, "that is where the

inquiry should end." Id., 108 T.C. at 121-22. Since the conditions imposed on taxpayer redeterminations of the FSC commission by Temp. Treas. Reg. § 1.925(a)-1T(e)(4) are plain and unambiguous, there is no need for the Court to consider the administrative documents described and exhibited at ¶¶ 45 through 51 of the stipulation of facts (Jt. Exs. 16-P through 22-V). Jewett v. Commissioner, 455 U.S. 305, 314 (1982)(examination of regulation's history appropriate when text is not clear). The administrative documents are "analogous to the 'legislative history' of [a statute]", which is only relevant "to ventilate background material serving to clarify the scope of an ambiguous regulation." Deluxe Check Printers v. United States, 5 Cl. Ct. 498 (1984) [84-2 USTC (CCH) 84,862, 84,864] (emphasis in original). As a matter of law, the Court need not consider the administrative documents in the instant case where the regulation is "clear on its face... [and] totally unambiguous with respect to the instant facts." Id.

Turning to the regulation, it was plainly written in three parts, covering: 1) the timing of the FSC's and related supplier's initial determination of the transfer price or commission; 2) the Commissioner's authority to redetermine the transfer price or commission; and 3) the circumstances under which, and the extent to which, the FSC and the related supplier may redetermine a transfer price or commission previously reported.

Docket No. 3501-94

Temporary Treasury Regulation § 1.925(a)-1T(e)(4) begins by affirming the general rule that--

> The FSC and its related supplier would ordinarily determine under section 925 and this section the transfer price or rental payment payable by the FSC or the commission payable to the FSC for a transaction before the FSC files its returns for the taxable year of the transaction.

Id. (emphasis added). Since the taxable years of the FSC and the related supplier are generally coterminous, Temp. Treas. Reg. § 1.921-1T(b)(4), the transfer price or commission between the FSC and the related supplier is normally determined during the preparation of the respective returns for any given year. As discussed more fully at 51-57, infra, taxpayers subject to section 482, like a FSC and its related supplier, may not unilaterally redetermine matters of transfer pricing. Treas. Reg. § 1.482-1(b)(3); Foster v. Commissioner, 80 T.C. 34, 191-93 (1983), aff'd in part, vacated in part, 756 F.2d 1430 (9th Cir. 1985), cert. denied, 474 U.S. 1055 (1986). In this case, the safe harbor pricing rules of section 925(a)(1) and (2) were used by the petitioner in lieu of section 482, or the third administrative pricing rule under section 925(a)(3), which is in fact the section 482 method. Thus, absent the right of redetermination granted in the regulation in issue, petitioner and UCFSC could not redetermine the FSC commission under any circumstances.

Docket No. 3501-94

The regulation next addresses redeterminations by the Commissioner--

> After the FSC has filed its return, a redetermination of those amounts by the Commissioner may only be made if specifically permitted by a Code provision or regulations under the Code. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations under that section or section 861 and § 1.861-8 which affects the amounts which entered into the determination.

Temp. Treas. Reg. § 1.925(a)-1T(e)(4). Plainly, the regulation does not purport to confer any special powers on the Commissioner. Rather, it simply states that the Commissioner may make a redetermination as otherwise "specifically permitted by a Code provision or regulations under the Code." The two examples provided to illustrate permissible redeterminations are the two most obvious Code sections under which respondent is authorized to redetermine transfer pricing between related entities: section 482, by which the taxpayer's transfer price or commission may be adjusted, and the regulations under section 861(b) which serve as a corollary to, or a basis for, a section 482 adjustment by affecting the expense accounting underlying the transfer price or commission.

Finally, the regulation grants taxpayers the otherwise impermissible option to redetermine the transfer price or commission under certain circumstances--

> In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method or grouping of transactions may be more beneficial. Also the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods. Any redetermination shall affect both the FSC and the related supplier. The FSC and the related suppler may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC and vice versa.

Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The first sentence of this final portion of the regulation imposes the clear condition that the FSC and related supplier may change their administrative pricing method, or the grouping of transactions to which the methods are applied, only if the redeterminations based upon such changes are made while the statute of limitations for making claims for refund under section 6511 is still open for both the FSC and the related supplier. The second sentence expands the type of changes permissible in such redeterminations to include changes to amount of foreign trading gross receipts and to the amount of the costs and expenses used to determine profits under the transfer pricing methods. The third sentence mandates

through the use of the word "shall" that "any" redetermination must "affect both the FSC and the related supplier." The fourth sentence states that the FSC and related supplier are bound by their initial selection of a commission FSC or buy-sell FSC.

Apparently petitioner contends that the second sentence of this final portion of the regulation should be read inconsistently with the first and third sentences. (Jt. Mot. ¶ 4(a)). Petitioner urges a construction to permit redeterminations based upon changes to foreign trading gross receipts, or the costs and expenses underlying the safe harbor pricing methods, by the related supplier alone when the statute is closed for the FSC. In effect, petitioner asks the Court to construe the second sentence to mean--

> [either] the FSC [or] related supplier may redetermine the amount of foreign trading gross receipts and the amount of costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods [regardless of whether the other's statute of limitations for making claims for refund is still open under section 6511].

This strained construction is not only absurd under the plain language of the sentence, but also forbidden under the relevant rules of statutory construction.

The Court need only look at the plain language of the second sentence to see that it states a complementary expansion of the rule in the first sentence, not an inconsistent rule. The sentence begins, "Also the FSC and related supplier may

redetermine...." The primary and ordinary meaning of the adverb "also" is "in the same manner as something else: likewise."[14/] Webster's Third New International Dictionary (Unabridged), (Merriam-Webster 1986). Thus, the regulation's use of the adverb "also" can only mean that the permissible redeterminations set forth in the second sentence are to be made "in the same manner" as those in the preceding sentence, i.e., while the statutes of limitations for filing refunds are open for both the FSC and the related supplier.

Petitioner posits the illogical interpretation that a FSC and its related supplier may only redetermine their transfer price or commission through a change in administrative pricing method or grouping while the refund statute is open for both, but that they are free to redetermine their transfer price or commission by redetermining FTGR or by redetermining the underlying costs and expenses when only one of the two taxpayers has an open statute. Against that interpretation stands the third sentence of this final portion of the regulation mandating that "Any redetermination shall affect both the FSC and the

---

[14/] It is worth observing that in the explanation of provisions that accompanied the publication of the regulation, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) was explained almost verbatim, however the sentence under scrutiny was rendered, "Likewise, they may redetermine the amount of foreign trading gross receipts [etc...]." 1987-1 C.B. at 189 (emphasis added).

related supplier." The plain language of the third sentence makes it explicit that taxpayer redeterminations cannot be made unilaterally by only one of the related parties.

Even if the internal consistency of the regulation were not obvious, under the settled tenets of construction, the Court should prefer a consistent reading in harmony with the rest of the regulation to the inconsistent reading suggested by petitioner. The rules for construing regulations are similar to those applied to construe statues. General Dynamics Corp., 108 T.C. at 121. "[S]tatutes are to be considered, each in its entirety and not as if each of its provisions was independent and unaffected by the others.", Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 496 (1934). Where, as in the instant case, "the statute contains no ambiguity, it must be taken literally and given effect according to its language." Helvering v. New York Trust Co., 292 U.S. 455, 464 (1934). Therefore, a consistent interpretation of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is required both as a matter of law and common sense.

Finally, it should be observed that petitioner's construction of the regulation appears to concede that the regulation requires that the statutes of limitations for both the FSC and related supplier be open for redeterminations based upon changes to grouping methods. (Jt. Mot. ¶ 4(a)). Since petitioner's second claim involves changes to grouping methods, see discussion at 26-29, supra, a large portion of its claim must

be disallowed under petitioner's own reading of the regulation. Accordingly, should the Court accept petitioner's "primary position" set forth in Jt. Mot. ¶ 4(a), a portion of petitioner's refund claim, as much as $38 million of the refund adjustments in issue, would be explicitly barred under the regulation.[15] (Stip. ¶¶ 36 & 41).

**B. The Court owes the highest degree of deference to Treas. Reg. § 1.925(a)-1T(e)(4) in this case, because it is a legislative regulation with respect to commission FSCs, however, the regulation is also valid when viewed even under the lesser degree of judicial deference owed to interpretive regulations.**

Petitioner has intimated that, to the extent that its strained reading of Treas. Reg. § 1.925-1T(e)(4) does not entitle it to the refunds sought, the regulation is invalid. (Jt. Mot. ¶ 4(a)). In assessing the validity of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), the Court should recognize that insofar as it affects petitioner and its commission FSC, the regulation is grounded on the specific grant of statutory authority found in I.R.C. § 925(b)(1), requiring the Secretary to prescribe safe

[15] Of course, since petitioner has failed to itemize the amount of the adjustments claimed through each of the three changes underlying its second refund claim (Second Amended Petition; Stip. ¶¶ 39 & 41), petitioner would have to establish at trial the exact amount of its second claim that is not barred by its own reading of Treas. Reg. § 1.925(a)-1T(e)(4).

harbor pricing rules for commission FSCs.[16] Implicit within this authority is the authority to prescribe the conditions under which a commission FSC and its related supplier may redetermine the commission determined on their original returns.

Respondent submits that, as it affects petitioner and UCFSC, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) should be afforded the deference owed a "legislative" regulation. E.g., E.I. du Pont de Nemours & Co. v. Commissioner, 41 F.3d 130, 135 n. 20 (3d Cir. 1994); Armstrong World Indus. v. Commissioner, 974 F.2d 422, 430 (3d Cir. 1992). Legislative regulations are to be contrasted with "interpretive" regulations issued under the general grant of authority found in I.R.C. § 7805, which empowers the Secretary to adopt "all needful rules and regulations" for the enforcement of the internal revenue laws. E.I. du Pont de Nemours & Co., 41 F.3d at 135 n. 20.

It is well settled that "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." E.I. du Pont de Nemours & Co., 41 F.3d at 135, quoting Chevron, U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844 (1984). Thus, "[w]here the Commissioner acts under specific authority, our

---

[16] Temporary Treasury Regulation § 1.925(a)-1T(e)(4) was an integral part of the comprehensive regulations promulgated in T.D. 8126, which were published on March 3, 1987 (52 Fed. Regis. 6468), "[b]ecause of the need for immediate guidance." 1987-1 C.B. 912, 921.

primary inquiry is whether the interpretation or method is within the delegation of authority." Rowan Cos. v. United States, 452 U.S. 247, 253 (1981).

In the export incentive area, this Court has noted that DISC and FSC regulations applied to commission DISCs and FSCs may be a "mix of legislative and interpretative elements." General Dynamics Corp., 108 T.C. at 120, n.7. However, whether the Court finds Temp. Treas. Reg. § 1.925(a)-1T(e)(4) to be legislative, interpretive, or a mixture of both, it is valid under any standard of deference.

Interpretive regulations, although subject to closer scrutiny than legislative regulations, are also entitled to substantial deference by the courts. In this regard, an interpretive regulation will pass muster if it "carries out the congressional mandate in a proper manner" and "harmonizes with the plain language of the statute, its origin, and its purpose." National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 476 (1979). See also, United States v. Correll, 389 U.S. 299, 307 (1967). The deference given to Treasury Regulations by the courts results from the fact that "Congress has delegated to the Secretary of the Treasury, not to [the courts], the task of

'administering the tax laws of the Nation'." Commissioner v. Portland Cement Co., 450 U.S. 156, 169 (1981), quoting United States v. Cartwright, 411 U.S. 546, 550 (1973).

Accordingly, whether a regulation is the most reasonable interpretation of the statute is not the issue. As the cases make clear, the regulation must be upheld if it is a reasonable interpretation of the statute. E.g., National Muffler Dealers Ass'n v. United States, 440 U.S. at 488 ("The choice among reasonable interpretations is for the Commissioner, not the courts."); West v. Sullivan, 973 F.2d 179, 185 (3d Cir. 1992), cert. denied, 508 U.S. 962 (1993), ("The agency's interpretation need not be the only reasonable one."); Brown v. United States, 890 F.2d 1329, 1338 (5th Cir. 1989) ("The issue is whether the Commissioner's interpretation of the statute is a reasonable one, not whether it is the only, or even the best, one."); Foodservice & Lodging Inst. v. Regan, 809 F.2d 842, 847 (D.C. Cir. 1987) ("The mere existence of an equally plausible alternative, however, does not establish that the IRS's decision is unreasonable or inconsistent with the statute, and does not empower a court to substitute its own judgment for that of the agency."). See also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. at 844 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

This Court has recognized regulations prescribing due dates and procedural conditions for exceptional relief to be valid whether legislative or interpretive in origin. Faltesek v. Commissioner, 92 T.C. 1204 (1989). In Faltesek, the Court considered regulations prescribing conditions for obtaining the foreign income exclusion of section 911. In validating the conditions prescribed in Treas. Reg. § 1.911-7, which like the instant regulation incorporated compliance with section 6511 to condition retroactive elections, the Court found the timing requirements to be "generous." Id. 92 T.C. at 1211. The Court went on to hold that the regulations would be valid "whether regarded merely as interpretive or as legislative in character." Faltesek, 92 T.C. at 1212. The fact that the regulations were ultimately held to be legislative in origin simply bolstered their validity in the eyes of the Court: "since these regulations would be valid under the Secretary's general authority to promulgate regulations set forth in section 7805, there is even greater reason for sustaining them here in light of the specific authority given the Secretary...." Id. 92 T.C. at 1212-13.

**C. The Conditions Imposed on Taxpayer Redeterminations By Temp. Treas. Reg. § 1.925(a)-1T(e) Are Necessary Ones in Harmony with the General Refund Provisions of the Code.**

In passing upon the reasonableness of the conditions prescribed in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) the Court must acknowledge that some limitations are appropriate beyond

which taxpayers cannot with the luxury of hindsight continue to tinker with long stale returns. As the Supreme Court has recognized:

> It probably would be all but intolerable, at least Congress has regarded it as ill-advised, to have an income tax system under which there never would come a day of final settlement and which required both the taxpayer and the Government to stand ready forever and a day to produce vouchers, prove events, establish values and recall details of all that goes into an income tax contest. Hence a statute of limitations is an almost indispensable element of fairness as well as of practical administration of an income tax policy.

Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 301 (1946) (emphasis added). The practicalities of administering the tax laws are more difficult today than ever before, both in volume and complexity. Respondent processes over 200 million returns each year and issues more than 90 million refunds. United States v. Brockamp, ___ U.S. ___, 117 S.Ct. 849, 852 (1997).

Today, the nation's largest corporate taxpayers, like petitioner, routinely prepare their income tax returns using highly sophisticated computer software employing "secret" algorithms and formulas, so that respondent's examination of those returns has become as much an exercise in computer science as tax accountancy. Cf. United States v. Norwest Corp., 116 F.3d 1227 (8th Cir. 1997)(One accounting firm's "trade secret" tax preparation software is licensed to about 700 corporate

customers). These verities of present day tax administration underscore the necessity, recognized long ago, for respondent to prescribe regulations:

> The effective administration of these complicated revenue measures inescapably leads Congress to authorize detailed administrative regulations by the Commissioner of Internal Revenue[,] [and] [h]e may insist upon full compliance with his regulations.

Angelus Milling Co. v. Commissioner, 325 U.S. 293, 296 (1945). The courts virtually uniformly uphold limitations periods and due dates prescribed by the respondent with respect to the implementation of relief provisions.

This Court has held, as a matter of law, that conditions imposed by respondent on refund claims are reasonable if "not obviously impossible to meet." Ruud Mfg. Co. v. Commissioner, 10 T.C. 14, 17 (1948), aff'd, 173 F.2d 222 (3d Cir. 1949). Ruud Mfg. Co., like the instant case, involved the validity of conditions prescribed by respondent for implementation of a relief provision of the Code. The statute in Ruud Mfg. Co. authorized a taxpayer-favorable method of computing excess profits tax for short taxable years, which could be used retroactively as a basis for a claim for refund. Id. 10 at 14-15. The Commissioner's regulation in Ruud Mfg. Co. was published in the Federal Register on March 30, 1943, and mandated the filing of the refund claim by June 15, 1943, a mere two and one half months later. Id. 10 T.C. at 16. In rejecting the

taxpayer's argument that the short limitations period was "unreasonable or arbitrary" the Court, speaking through Judge Murdock, held that--

> [i]f the Commissioner had set a limitation which was obviously impossible to meet, then his action might be said to be unreasonable or arbitrary and the regulations invalid[,] [b]ut . . . [t]he period thus set was not obviously impossible to meet, unreasonably short, or arbitrary.

Id. 10 T.C. at 17. Since the regulation in issue was published before UCFSC's original tax returns in issue were filed, it was obviously not impossible for petitioner and UCFSC to meet its conditions. Therefore, the regulation is reasonable and valid as a matter of law. Id.

Temporary Treasury Regulation § 1.925(a)-1T(e)(4) is also reasonable because it is in harmony with the legislative aims of the FSC regime. Manhattan Gen. Equip. Co. v. Commissioner, 297 U.S. 129, 134 (1936). While "[t]he legislative objective of the DISC [and, thus, the FSC[17/]] provisions was to stimulate exports from the United States," Sim-Air, USA, Ltd. v. Commissioner, 98 T.C. 187, 194 (1992), the bounty of Congress was not unlimited or bestowed without an awareness of the potential for abuse. The FSC provisions, like those the DISC, were designed to ensure that the favorable tax treatment applies only "to situations which, in

---

[17/] The design and purpose of the FSC regime mirrors that of the DISC regime. See St. Jude Medical, Inc. v. Commissioner, 97 T.C. 457, 486 (1991), aff'd in part, rev'd in part, remanded, 34 F. 3d 1394 (8th Cir. 1994).

fact, involve export transactions." Dresser Indus. v. Commissioner, 92 T.C. 1276, 1281 (1989), aff'd in part, rev'd in part, remanded, 911 F.2d 1128 (5th Cir. 1990), quoting, H. Rept. No. 92-533 (1971), 1971-1 C.B. 498, 533. The DISC and FSC provisions recognize that these special entities "must be subject to certain controls with regard to their transactions with related persons." L & F Int'l. Sales Corp. v. United States, 912 F.2d 377, 381 (9th Cir. 1990).

In instituting the taxpayer-favorable transfer pricing rules for DISCs and FSCs, Congress by no means intended to permit unlimited allocations of income from the related supplier to the DISC or FSC. Brown-Forman Corp., 94 T.C. at 945-946. Rules such as the "no loss rule" and the "overall profit percentage limitation" reflect the congressional design of preventing taxpayer abuse of these export incentives. Id. at 946-947 and nn. 27-30.

Likewise, the conditions set forth in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) reflect the dual goals of Congress in enacting the FSC regime. Temporary Treasury Regulation § 1.925(a)-1T(e)(4) harmonizes with the incentive aspect of the legislative design by allowing taxpayers to redetermine their FSC transfer pricing after the filing of the returns for the given year. By limiting taxpayer redeterminations the regulations recognize that, in the FSC regime as with other foreign tax incentives, "Congress made it abundantly plain that the extended

benefits it was conferring were not open-ended. It did not open the flood gates." Faltesek, 92 T.C. at 1209-10.

Cases construing other timing conditions prescribed by respondent in the FSC and DISC area have uniformly upheld respondent's regulations as reasonable and valid. For example, the prospective application of the 60-day payment rule under Treas. Reg. § 1.994-1(e)(3) has been upheld by every Circuit Court of Appeals to consider it. L & F Int'l Sales Corp. v. United States, 912 F.2d 377 (9th Cir. 1990); Gehl Co. v. Commissioner, 795 F.2d 1324 (7th Cir. 1986); Thomas Int'l Ltd. v. United States, 773 F.2d 300 (Fed. Cir. 1985), cert. denied, 475 U.S. 1045 (1986); LeCroy Research Sys. Corp. v. Commissioner, 751 F.2d 123 (2d Cir. 1984); CWT Farms, Inc. v. Commissioner, 755 F.2d 790 (11th Cir. 1985), cert. denied, 477 U.S. 903 (1986). Similarly, this Court has repeatedly upheld the rule prescribed in Treas. Reg. § 1.993-3(d)(2)(i)(b), requiring the United States purchaser of export property from a DISC to resell the property for use outside the United States within a year of the purchase. General Dynamics Corp., 108 T.C. at 128-130; Sim-Air, USA, Ltd., 98 T.C. at 196-197.

The undisputed facts show that it is petitioner's inaction, not respondent's regulation, that is unreasonable in the instant case. Petitioner, aware that respondent was not examining FSC issues during the 1987-1989 Cycle, took no action to preserve either UCFSC's statue of limitations under section 6511 or the

statute of limitations under section 6501(a) while the case was under examination. (Stip. ¶ 23). Whether purposefully or not, petitioner saw fit to acquiesce in respondent's determination not to look at the FSC for the years in the 1987-1988 Cycle by letting UCFSC's statutes of limitation expire, foreclosing respondent's examination of the issue, only to raise a unilateral claim for refund nearly one year after the close of the examination as a bargaining chip in the Appeals negotiations. (Stip. ¶ 35; Jt. Exs. 10-J & 11-K).

Far from justifying petitioner's delay, the fact that petitioner did not even devise the new methods until after the close of the 1987-1989 Cycle supports respondent's position that petitioner cannot expect the unlimited benefit of retroactive tax planning.[18/] The undisputed facts show that petitioner's claims are not just an exercise in hindsight planning, but a continuing technological race that increases rather than ceases once a claim is filed. Not satisfied with the $59 million in adjustments claimed one year after the examination of the 1987-1989 Cycle, petitioner continued to tinker with its computer programs and eight months later increased the claimed adjustments by another $39 million. (Stip. ¶¶ 36 & 41).

Considering the resources and staffing necessary to examine petitioner's FSC commission computations (Stip. ¶¶ 26 & 40),

[18/] For example, under section 172(b)(1)(A), net operating losses may only be carried back three years.

Congress could not have intended to burden respondent with the never-ending task of investigating ever-increasing claims for years long closed. In a similar vein, the Supreme Court has recently addressed the "serious administrative problems" that could be created "by forcing the IRS to respond to, and perhaps litigate, large numbers of late claims." United States v. Brockamp, 117 S.Ct. at 852. The Court's rationale in Brockamp is equally applicable to the instant case:

> The nature and potential magnitude of the administrative problem suggest that Congress decided to pay the price of occasional unfairness in individual case (penalizing a taxpayer whose claim is unavoidably delayed) in order to maintain a more workable tax enforcement system. Id.

Respondent's position is even stronger in the instant case where denial of petitioner's refund claims is not unfair in any sense of the word. This is not a case of unavoidable delay through mental illness or other such causes, or even a case involving the correction of a "mistake" made on the original returns as contemplated in Rev. Rul. 82-81, 1982-1 C.B. 109, 110. Rather, this a case of where a large corporation represented by sophisticated lawyers and accountants simply allowed the statute of limitations to expire.

It has been held as a matter of law that "[a] large business firm represented by sophisticated lawyers and accountants, [like petitioner] should have no difficulty filing a timely claim." BCS Fin. Corp. v. United States, 118 F.3d 522, (7th Cir. 1997)

(alteration added). It is no excuse that UCFSC failed to meet the conditions of the regulation because petitioner's tax department had not devised its new programs and methodologies until after the statute had long expired. Petitioner's tax specialists need only to have anticipated the possibility of such revisions and taken the simple expedient of filing protective claims on behalf of UCFSC to preserve petitioner's rights.

Under similar circumstances, this Court has held that an individual, though without the benefit of professional advisors, "was woefully out of time on any theory," when the taxpayer, like the petitioner, did not trouble to seek the benefit of an international tax incentive until the case had been docketed in the Court. Faltesek v. Commissioner, 92 T.C. 1204, 1213 (1989). The Court's opinion in Faltesek is equally applicable in the instant case:

> To permit a taxpayer to make such a belated election would open the door to ex post facto or retroactive tax planning. We think Congress could hardly have intended to authorize any such potential maneuvering, notwithstanding its interest in promoting foreign trade and encouraging the rendition of services abroad. The regulations, which would prevent such easy freewheeling are, we think, manifestly reasonable. They certainly should not be condemned as unreasonable.

Id. 92 T.C. at 1210-1211.

For the same reasons, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is clearly not unreasonable, and should, therefore, be held valid as a matter of law. The facts show that this is simply case where the taxpayer "has gotten itself into its present position

by its own inaction rather than through the unreasonableness of the regulation." Ruud Mfg. Co., 10 T.C. at 17.

**D. Even if the Court were to invalidate Temp. Treas. Reg. § 1.925(a)-1T(e)(4), petitioner's claim must be dismissed as a matter of law because under the settled principles of section 482, taxpayers may not unilaterally redetermine their transfer pricing.**

Like an amended return itself, the redetermination procedure of Treas. Reg. § 1.925(a)-1T(e)(4) "is a creature of administrative origin and grace." Cf. Badaracco v. Commissioner, 464 U.S. 386, 393 (1984); Danly Mach. Corp. v. United States, 492 F.2d 30, 33 (7th Cir. 1974). Far from limiting taxpayer rights, Treas. Reg. § 1.925(a)-1T(e)(4) grants a special class of taxpayers subject to section 482 the exceptional right to redetermine transfer prices reported on previously filed returns provided certain conditions are met.

Absent the regulation in issue, petitioner, who under section 925(a) must be "a person subject to section 482" in order to qualify for the safe harbor rules of section 925, could not redetermine the commission payable to its FSC, UCFSC, because "[s]ection 482 may not be used by taxpayers as a sword; rather it may be invoked only by the Commissioner." Foster v. Commissioner, 80 T.C. 34, 191 (1983), aff'd in part, vacated in part, 756 F. 2d 1430 (9th Cir. 1985), cert. denied, 474 U.S. 1055 (1986). The transfer pricing rules of section 925 are merely safe harbors in the larger section 482 regime, expressly designed

to approximate arm's-length pricing under section 482. Brown-Forman Corp., 94 T.C. at 946; see also, H.R. Conf. Rep. No. 98-861 at 646 (1984). The centrality of section 482 to the FSC regime is also clear from the fact that taxpayers electing the FSC provisions need not use the safe harbors at all, but may elect to compute their transfer price under the ordinary rules of section 482. I.R.C. § 925(a)(3); Brown-Forman Corp., 94 T.C. at 926.

Manifestly, then, the principles of section 482 must apply to transactions between an FSC and its related supplier unless subject to express exception. The only congressionally condoned exceptions to section 482 in the FSC regime are the special pricing rules between and FSC and related supplier under section 925(a)(1) and (a)(2). In enacting the FSC provisions, Congress did not intend to undermine the administration of section 482 in any other way:

> [t]he transfer pricing rules only apply to determine the price of a sale to a FSC (or FSC commissions). A FSC, or a principal for which the FSC is acting as a commission agent, must sell to a related purchaser on an arm's-length basis, under the provisions of section 482 of the Internal Revenue Code, viewing the FSC and any related supplier as a single entity which sells to the purchaser.
>
> While the committee believes that it is appropriate to provide special FSC pricing rules for purposes of administrative convenience, it does not intend for such rules to be applied by the Internal Revenue Service or claimed by taxpayers in transactions not involving a FSC. The committee believes that the Internal Revenue Service should continue its efforts to

> improve the administration of the section 482 transfer pricing rules.

H.R. Conf. Rep. No. 98-861 at 649 (1984) (emphasis added). The safe harbor pricing rules of section 925(a)(1) and (2) are narrowly tailored to simplify, or even liberalize, certain section 482 pricing principles; but nothing in the FSC legislation abrogates the prohibition in section 482 of ex post facto income reallocations by FSCs and their related suppliers, or any other taxpayers subject to section 482. Treas. Reg. § 1.482-1(b)(3); Foster v. Commissioner 80 T.C. 34, 191-93 (1983), aff'd in part, vacated in part, 756 F. 2d 1430 (9th Cir. 1985), cert. denied, 474 U.S. 1055 (1986).

Likewise, without Temp. Treas. Reg. § 1.925(a)-1T(e)(4), petitioner cannot independently and affirmatively reallocate and reapportion its expenses under Treas. Reg. § 1.861-8, and thereby redetermine the FSC commissions, because section 1.861-8 is not an "operative section," but, rather, a set of auxiliary rules used "in determining taxable income of the taxpayer from specific sources and activities under other sections of the Code." Treas. Reg. § 1.861-8(a). Section 482 is the operative section under which the section 861(b) allocations are made, and except where otherwise permitted, only the Commissioner may make section 482 adjustments resulting from such reallocations. Cf. Treas. Reg. § 1.861-8(f)(4).

The history of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) confirms the interplay of sections 925 and 482 as well as the sensitivity to the legislative goals of the DISC and FSC provisions that inspired its promulgation as an act of pure administrative grace. The predecessor to Temp. Treas. Reg. § 1.925-1T(e)(4), was the DISC provision in Treas. Reg. § 1.994-1(e)(4).[19] In response to questions of whether, and under what circumstances, a DISC and its parent could file amended returns to elect different administrative pricing rules, the Commissioner ruled:

> The Commissioner will accept the timely filed amended returns of a DISC and its parent in which the DISC recomputes its income under a rule described in section 994(a) of the Code, other than that applied in its original return, to determine the maximum allowable commission and in which the parent makes the correlative adjustments.

Rev. Rul. 82-81, 1982-1 C.B. 109. The administrative grant announced in Rev. Rul. 82-81 was expressly conditioned on "timely

---

[19] Section 1.994-1(e)(4) provided:
**Subsequent determination of transfer price or commission.**-- The DISC and its related supplier would ordinarily determine under section 994 and this section the transfer price payable to the DISC (or the commission payable to the DISC) for a transaction before the DISC files its return for the taxable year of the transaction. After the DISC has filed its return, a redetermination may only be made if permitted by the Code and regulations thereunder. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations thereunder or section 861 and § 1.861-8 which affects the amounts which entered into the determination of the transfer price or commission.

filed amended returns by the DISC and its parent" and permitted a switch in safe harbor methods to obtain the maximum benefit under section 994 regardless of whether the "mistake made on the original return" resulted from an audit adjustment or was discovered independently. Id. 1981 C.B. at 110.

Temporary Treasury Regulation § 1.925(a)-1T(e)(4) is simply an extension and further liberalization[20] of the administrative grant announced in Rev. Rul. 82-81. The grant in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is generous in light of the requirements of section 482 that would otherwise pertain. But like any grant, it is limited by its terms: taxpayers may only redetermine their section 925 transfer price if the refund statute is open for both the FSC and the related supplier. Since, absent the grant in the regulation, there is no authority for any redetermination of FSC commissions by petitioner and UCFSC, that grant, like an exercise of legislative grace, must be construed narrowly. "Statutes that confer special tax reduction benefits are to be construed strictly [and] [e]xceptions from the normal tax requirements of the Internal Revenue Code are to be defined narrowly." Dow Corning Corp. v. United States, 22 Cl. Ct. 184 (1990), 90-2 USTC

[20] The Commissioner viewed the grant contained in Rev. Rul. 82-81 as only embracing changes in administrative pricing methods, ruling in T.A.M. 8527005 (March 7, 1985), that it did not apply in the case of additional gross income omitted from the original DISC return. Treasury Regulation § 1.925(a)-1T(e)(4) adopts a more liberal position by allowing redeterminations of "the amount of foreign trading gross receipts."

¶ 50,360 at 85,108 (DISC case), aff'd, 984 F.2d 416 (Fed. Cir. 1993). Broad interpretations are not sufficient to obtain benefits of the FSC provisions in light of the detailed statutory and regulatory framework. See Garnac Grain Co. v. Commissioner, 95 T.C. 7, 32 (1990) (grain merchant not engaged in production of export property within meaning of DISC provisions). Thus, as a matter of law, the exception to section 482 granted in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) must be construed to apply only if the section 6511 statute is open for both the FSC and the related supplier.

Ultimately the Court should recognize that since the grant in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) originated in an act of administrative grace, it would provide no succor for petitioner were the Court to now invalidate the regulation. Petitioner's position is like that of the taxpayer in Danly Mach. Corp. v. United States, 492 F.2d 30 (7th Cir. 1974), wherein the court opined:

> We might initially observe the futility of petitioner's approach, if, as it claims, the regulation were arbitrary and a misapplication of statutory authority, our only power as judges would be to prohibit the Secretary from applying the regulation: that is, to forbid the Secretary to bestow bountifully a new deduction upon corporate taxpayers. ... We as a court have no power to direct the Secretary to give, or direct the Secretary to give, an enlarged bounty to classes of persons not heretofore covered by any regulation.

Id., 492 F.2d at 33. In the instant case, the Court may curtail Commissioner's bounty by invalidating the regulation, but, as a

matter of law, the Court may not enlarge that bounty to encompass a class of taxpayers, like petitioner, who by their own inaction are no longer covered by the regulation. Absent Treas. Reg. § 1.925(a)-1T(e)(4), there is no authority for any redeterminations by related parties subject to section 482 and petitioner's claim must still be denied as a matter of law.

**II. As a Matter of Law, Petitioner May Not Use Section 6501(e) to Satisfy The Conditions of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), Nor Can UCFSC Satisfy the Conditions of Section 6501(e) Under the Undisputed Facts of the Case.**

Petitioner's alternative position is that it satisfied the conditions set forth in Treas. Reg. § 1.925(a)-1T(e)(4) with respect to UCFSC's 1988 and 1989 taxable years. (Jt. Mot. ¶ 4(b)). Petitioner argues that the conditions of the regulation were met because UCFSC would have been subject to the six-year limitations period under section 6501(e) for its 1988 and 1989 taxable years when petitioner first mentioned its initial claim to the Appeals Officer. (See Stip. ¶¶ 25 & 35). Petitioner appears to argue that any general limitations period will satisfy the explicit conditions to the administrative grant set forth in Treas. Reg. § 1.925(a)-1T(e)(4). (Jt. Mot. ¶ 4(b)). However, as a matter of law, special conditions to an administrative grant implemented through a regulation having the force and effect of law take precedence over other general provisions of the Code. Ruud Mfg. Co. v. Commissioner, 10 T.C. 14, 16-17 (1948), aff'd, 173 F. 2d 222 (3d Cir. 1949).

Setting aside questions as to the legal effect of the manner in which the claim was asserted (see Stip. ¶ 35; Jt. Ex. 11-K), the regulation does not require that the limitations period for assessing a tax under section 6501 be open with respect to UCFSC. Rather, the regulation expressly provides that the limitations period for making a claim for refund under section 6511 be open with respect to petitioner and UCFSC. Thus, as a matter of law, petitioner and UCFSC cannot rely upon the limitations period of section 6501(e) because the benefit sought under Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is conditioned exclusively on the limitations period set forth in section 6511. Ruud Mfg. Co., 10 T.C. at 16-17.

Moreover the undisputed facts of the instant case establish that UCFSC cannot qualify for the six-year statute under section 6501(e) for any of the years in issue. Section 6501(e) confers on the Commissioner the discretion to assess, or bring a proceeding for, additional tax within an extended period in the case of substantial omissions of items from an income tax return:

> **SEC. 6501(e)- Substantial omission of items.** Except as provided in subsection (c)-- **(1) Income taxes.** In the case of any tax imposed by Subtitle A-- (A) General rule. If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment at any time within six years after the return was filed.

Thus, section 6501(e) applies only to "failures to report particular income receipts and accruals." Colony, Inc. v. Commissioner, 357 U.S. 28, 35 (1958).

Overstatements of deductions by a business, such as UCFSC, are by definition not omissions of gross income under section 6501(e):

> in the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services...

I.R.C. § 6501(e)(1)(A)(i) (emphasis added). Accordingly, section 6501(e) is recognized as "adopt[ing] a 'gross receipts' concept." 15 Mertens Law of Fed Income Tax, § 57.36 at 71-72 (1997). The undisputed facts show that none of petitioner's claims are based upon the omission of any item of UCFSC's gross receipts. (Stip. ¶¶ 27 & 39).

For a commission FSC, "gross receipts" are "the gross receipts on the sale, lease or rental of the property upon which the commissions arose." I.R.C. § 927(b)(2). A commission FSC's gross receipts are simply the foreign trading gross receipts ("FTGR") defined in section 924(a). Neither of petitioner's instant claims were based upon the inclusion of additional foreign trading gross receipts. (Stip. ¶¶ 27, 39 & 41). Thus, because no additional foreign trading gross receipts were involved in the redeterminations in issue, UCFSC could not have

omitted any items of gross income from its original income tax returns. Therefore, as a matter of law, section 6501(e) is inapplicable to UCFSC's tax returns in issue.

Further, it would not avail petitioner even were the Court to find that for purposes of section 6501(e) the relevant definition of "gross income" of a commission FSC was not FTGR, but that of Temp. Treas. Reg. § 1.927(b)-1T(e)(1), which provides:

> In the case of transactions which give rise to a commission from the FSC's related supplier on the sale or lease of property or the furnishing of services by a principal, the FSC's gross income from all such transactions shall be the commissions paid or payable to the FSC by the related supplier.

The FSC's "commission" is defined in Temp. Treas. Reg. § 1.925(a)-1T(d)(2)(iv) as follows:

> The maximum commission the FSC may charge the related supplier is the amount of income determined under subdivisions (ii) and (iii) of this paragraph [i.e., the amount of profit determined under the safe-harbor pricing rules] plus the FSC's total costs for the transaction as determined under paragraph (c)(6) of this section.

Id. (emphasis added); see also, Temp. Treas. Reg. § 1.925(a)-1T(f), Example 6. The safe harbor rules determine only the "profit" element of the FSC commission. The full commission must

include reimbursement for the FEPA expenses that section 925(c) requires the FSC to incur in order to qualify for the safe-harbor pricing of sections 925(a)(1) and (2).[21/]

The costs of the FEPA described in sections 924(d)(1)(A) and (e) represent a floor, not a ceiling on the total costs that an FSC must incur and include in its commission under Temp. Treas. Reg. § 1.925(a)-1T(d)(3)(iv). Although to qualify for the safe-harbor pricing methods under section 925(c) a FSC is required to incur only the section 924(d)(1)(A) and (e) FEPA costs, the FSC and related supplier may elect under Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii) to have the FSC incur all of the related supplier's costs. Petitioner and UCFSC made the election under Treas. Reg. § 1.925(a)-1T(e)(4). (Stip. ¶ 11).

Temporary Treasury Regulation § 1.925(a)-1T(b)(2)(ii) provides:

> At the election of the FSC and the related supplier, the requirements of section 925(c) will be deemed to have been met if the related supplier is paid by the FSC an amount equal to all of the costs . . . [incurred by the related supplier except for cost of goods sold]

---

[21/] **SEC. 925(c). Requirements for use of administrative pricing rules.**-- A sale by a FSC meets the requirements of this subsection if--
**(1)** all of the activities described in section 924(e) attributable to such sale, and
**(2)** all of the activities relating to the solicitation (other than advertising), negotiation, and making of the contract for such sale, have been performed by such FSC (or by another person acting under contract with such FSC).

> related to the export sale other than expenses relating to activities performed directly by the FSC or by a person other than the related supplier, and if that payment is reflected on the FSC's books and in computing the FSC's and related supplier's combined taxable income on the transaction or group of transactions.

Id. As shown in Temp. Treas. Reg. § 1.925(a)-1T(f), Example 6, the effect of the (b)(2)(ii) election is to increase the commission payable to the FSC by the amount of the related supplier's expenses. In Example 6, the related party, "R," incurs $50 of direct expenses and allocates $3.89 of general and administrative expenses to export income for a total of $53.89: "F," the FSC, incurred $250 in expenses.[22] The section of Example 6 dealing with the gross receipts safe harbor method shows the commission computation with and without the (b)(2)(ii) election:

> If the election provided for in paragraph (b)(2)(ii) of this section is not made, F may receive a commission from R in the amount of $268.30 computed as follows:

| | |
|---|---|
| F's expenses ................................ | $ 250.00 |
| F's profit .................................. | 18.30 |
| F's commission .............................. | $ 268.30 |

* * *

> If R and F make the election provided for in paragraph (b)(2)(ii) of this section, F may receive a commission from R in the amount of $322.19, computed as follows:

| | |
|---|---|
| F's expenses ................................ | $ 303.89 |
| F's profit .................................. | 18.30 |
| F's commission .............................. | $ 322.19 |

---

[22] Although there is a typographical error in the text of Example 6, which incorrectly states R's expenses as $253.89 rather than the correct amount $53.89, all of the computations set forth in the example are based upon the correct amount.

Regardless of whether the (b)(2)(ii) election is made, the related supplier (petitioner in this case) would deduct the same amount from its taxable income, either all as a commission if the (b)(2)(ii) election is made, or, if no election is made, part as commission and part as its own expenses for the transactions. (Stip. ¶¶ 13 & 17).

In lieu of allocating the FEPA costs, the petitioner and UCFSC made the election permitted in Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii) for UCFSC to assume all of petitioner's costs, to reflect the costs on UCFSC's books and records, and to take the costs into consideration in computing petitioner's and UCFSC's CTI. (Stip. ¶ 11). Although petitioner apparently asks the Court to ignore the election for purposes of the Court's consideration of the section 6501(e) issue (Jt. Mot. ¶ 4(b)), it is undisputed that the election has not been disavowed on UCFSC's amended income tax returns in issue. (Jt. Exs. 15-O(1) (p. 2, last line), 15-O(2) (p. 1, ln. J(2)), & 15-O(3) (p. 1, ln. J(2))). Accordingly, having elected to compute UCFSC's commissions on the original and amended returns under Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii), petitioner and UCFSC are bond by that election for all purposes, including the applicability of section 6501(e).

Pursuant to the Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii) elections on UCFSC's original and amended returns, UCFSC's commissions are the full amounts reported as FTI on the original

Forms 1120-FSC, against which the claimed increases represent the following percentages:

| | Commissions | Claimed Increase | "Omission" |
|---|---|---|---|
| 1987 | $ 295,013,098 | $ 19,176,799 | 7% |
| 1988 | $ 391,916,254 | $ 27,550,019 | 7% |
| 1989 | $ 373,998,714 | $ 51,218,650 | 14% |

(Stip. ¶¶ 16, 17 & 41). The foregoing schedule clearly demonstrates that the redeterminations of UCFSC's commissions for the years in issue do not amount to 25% of the commissions originally reported for any year in issue. Under these undisputed facts, section 6501(e) cannot apply to any of UCFSC's taxable years in issue as a matter of law.[23/]

[23/] Of course, petitioner concedes that section 6501(e) cannot apply to UCFSC's 1988 taxable year in any event. (Jt. Mot. ¶ 4(b)).

Docket No. 3501-94

**Conclusion**

For the foregoing reasons, respondent is entitled to judgement as a matter of law dismissing petitioner's refund claims.

STUART L. BROWN
Chief Counsel
Internal Revenue Service

Date: SEP 15 1997

By: Steven R. Winningham
STEVEN R. WINNINGHAM
Special Trial Attorney
Tax Court Bar No. WS0338
7 World Trade Center
25th Floor
New York, N.Y. 10048
Telephone: (212) 264-0261

Joseph F. Long
JOSEPH F. LONG
Attorney
Tax Court Bar No. LJ0662
Commerce Center One
333 East River Drive
Suite 200
East Hartford, CT 06108
Telephone: (806) 290-4090

OF COUNSEL:
JOSEPH F. MASELLI
Regional Counsel

Docket No. 3501-94

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing **Respondent's Memorandum of Law in Support of Respondent's Motion for Summary Judgment** was served on counsel for petitioners by mailing the same on SEP 15 1997 in a postage paid wrapper addressed as follows:

Thomas M. Haderlein
BAKER & MCKENZIE
One Prudential Plaza
130 E. Randolph Drive
Chicago, IL 60601

Date: SEP 15 1997

For STEVEN R. WINNINGHAM TAX Bar # LJ0662
Special Trial Attorney
Tax Court Bar No. WS0338