Docket No. 3501-94

## ARGUMENT

**Petitioner's Assertion That Temporary Treasury Regulation Section 1.925(a)-1T(e)(4) is the Only Barrier to Unilateral Redeterminations of Transfer Pricing by Taxpayers Subject to Section 482 is Incorrect as a Matter of Law.**

Petitioner's assertion that "[t]here is no barrier to petitioner's FSC recomputations unless, as alleged by respondent, the Regulation creates such a barrier[,]" (Pet'r. Br. at 26) is incorrect as a matter of law. Under I.R.C. § 925(a), petitioner must be "a person described in section 482" in order to qualify for the section 925 safe harbor pricing rules. Absent Temp. Treas. Reg. § 1.925(a)-1T(e)(4), petitioner and UCFSC would be subject to the "firmly founded" rule that--

> Section 482 grants no right to a controlled taxpayer[1/] to apply its provisions at will, nor does it grant any right to compel the district director to apply such provisions.

Foster v. Commissioner, 80 T.C. 34, 192 (1983), aff'd in part, vacated in part, 56 F.2d 1430 (9th Cir. 1985), cert. denied, 474 U.S. 1055 (1986), (quoting Treas. Reg. § 1.482-1(b)(3)). This Court has held as a matter of law that

> Congress enacted section 45, Revenue Act of 1928, ch. 852, 45 Stat. 791, 806, from which section 482 is directly derived. Although that section was based on

---

1/ Petitioner and UCFSC are each "one of two ... businesses owned or controlled directly or indirectly by the same interests," and thus, "controlled taxpayers" as defined in Treas. Reg. § 1.482-1(a)(4), both of which are subject to the provisions of Treas. Reg. § 1.482-1(b)(3).

> section 240(f) of the Revenue Act of 1926 ... it eliminated the right of taxpayers to invoke the benefits of that section. [That change] h[as] been carried forward in section 482.

Foster, 80 T.C. at 192-93 (footnotes omitted) (emphasis added). Thus, given the overarching principle of section 482 embodied in Reg. 1.482-1(a)(4), petitioner's legal position is backwards: Temporary Treasury Regulation § 1.925(a)-1T(e)(4) does not bar redeterminations otherwise permitted by section 482; the regulation permits taxpayer redeterminations, made in accordance with its conditions, which are otherwise barred under section 482. See Res't. Mem. at 51-57.

The fact that petitioner and UCFSC are subject to section 482, through section 925(a), saps all force from the argument that Temp. Reg. 1.925(a)-1T(e)(4) improperly "creates a double standard, permitting respondent to 'whipsaw' taxpayers with respect to the Commissioner's FSC recomputations." Pet'r Br. at 39. As previously observed (Res't Mem. at 33), the regulation does not purport to confer on the Commissioner any powers of redetermination not already "specifically permitted by a Code provision or regulations under the Code ... [such as] a redetermination by reason of an adjustment under section 482 and the regulations under that section." Temp. Treas. Reg. § 1.925(a)-1T(e)(4). Taxpayers, on the other hand, have no such power of redetermination under section 482 and their sole right to redetermine FSC transfer pricing is granted by Temp. Reg.

1.925(a)-1T(e)(4). Thus, the "double standard" complained of is nothing more than the ordinary operation of section 482, which "may not be used by taxpayers as a sword." Foster, 80 T.C. at 191.

Given the one-sided operation of section 482, Temp. Reg. 1.925(a)-1T(e)(4) can hardly be found "arbitrary" simply because the Regulation does not grant taxpayers rights that are coextensive with the redetermination powers of the Commissioner under section 482. Indeed, section 482 is not unique among provisions of the Code granting the Commissioner powers that are not granted to taxpayers. Section 482 is one among a plethora of provisions granting powers to respondent that are not coextensive with the rights of taxpayers. For example, section 446(b) grants the Commissioner the power to change taxpayers' methods of accounting, but section 446(e) bars taxpayers from unilaterally changing their own methods of accounting without the Commissioner's consent.

The unilateral power conferred on the Commissioner under section 446 has not been found to be arbitrary even in cases where taxpayers have been barred from changing from an incorrect to a correct method of accounting without the consent of the Commissioner. See, e.g., Hitachi Sales Corp. v. Commissioner, T.C. Memo. 1994-159. Because Temp. Reg. 1.925(a)-1T(e)(4) liberalizes the effect of section 482 by allowing FSCs and related suppliers to make redeterminations of their transfer

pricing, the Temporary Regulation cannot be arbitrary merely because the grant sets forth certain conditions. There is no authority for the proposition that the Commissioner's administrative grants must fully mirror his own powers under the Code.

Through section 1.925(a)-1T(e)(4), the Commissioner has consented to accept taxpayer redeterminations made in accordance with the conditions prescribed therein. See, Res't. Mem. at 54-56. While the right of redetermination granted to taxpayers through the regulation is not coextensive with respondent's powers under section 482, it is far greater than the rights enjoyed by other taxpayers subject to section 482, and, thus, cannot be said to be unreasonable or arbitrary with respect to taxpayers, like petitioner, who are subject to the FSC regime. Far from being "disadvantaged by respondent's interpretation of the regulation," Pet'r. Br. at 41, taxpayers subject to the Temp. Reg. 1.925(a)-1T(e)(4) have an advantage over all other taxpayers subject to section 482, who cannot redetermine their transfer pricing during an examination. Given the actual advantage bestowed upon taxpayers through Temp. Reg. 1.925(a)-1T(e)(4), petitioner's claims of arbitrariness are unpersuasive and, on the undisputed facts of this case, the Court should find as a matter

of law that petitioner "has gotten itself into its present position by its own inaction rather than through the unreasonableness of the regulation." Ruud Mfg. Co. v. Commissioner, 10 T.C. 14, 17 (1948), aff'd, 173 F.2d 222 (3d Cir. 1949).

**Petitioner Incorrectly Posits a Statutory Requirement to Allow Redeterminations of FSC Transfer Pricing or Commissions After the Filing of the Returns.**

Despite the fact that section 925 plainly does not allow, or even address, redeterminations of FSC transfer prices or commissions after the filing of the annual returns, petitioner persists in claiming that "the clear statutory language and intent [is] to allow taxpayers to make FSC recomputations under section 925(a)." (Pet'r. Br. at 46, (emphasis added)). Petitioner's case is predicated on its assertion that--

> [the] legislative history establishes [that] Congress intended to allow taxpayers to recompute FSC transfer prices and commissions under section 925(a) via amended returns for the purpose of maximizing the FSC export tax incentive. Given this legislative history, respondent's acceptance of refund claims making FSC recomputations is no longer a discretionary matter.

(Pet'r. Br. at 25). Petitioner has posited a statutory mandate where none exists based solely upon an overreading of the legislative history to section 925(a).

Petitioner relies upon the following passage from the Senate Finance Committee's Explanation of Provisions Approved by the Committee on March 21, 1984, S. Rep. No. 169, 98th Cong., 2d Sess. 649 (1984):

> Under the administrative pricing rules, the transfer price from the related supplier to the FSC may be computed after the FSC sells the goods to a customer. Furthermore, the FSC and related suppler may make adjustments upwards or downwards following the close of the taxable year in which the FSC sells the goods.

Id. at 649; Pet'r. Br. at 25. Petitioner argues that the above passage demonstrates that "Congress expressly endorsed taxpayers making FSC recomputations via amended returns." Pet'r. Br. at 28, (emphasis added). Undeterred by the conspicuous absence of any reference to "amended returns" in the quoted passage, petitioner suggests the negative inference that section 1.925(a)-1T(e)(4), itself, supports that reading of the legislative history because,

> If the statutory language and intent of section 925(a) had been to deny taxpayers the right to make FSC recomputations via amended returns, the Regulation would have provided that FSC computations be made no later than the due date of the taxpayers' returns.

(Pet'r. Br. at 28, emphasis added). But, it does not follow from the fact that section 925(a) does not expressly deny taxpayers the opportunity of redetermining the transfer price or commission on amended returns, "that Congress expressly endorsed taxpayer's making FSC recomputations via amended returns." (Id. (emphasis added)). Congress did not see fit to include in section 925(a),

or elsewhere in the Code, any specific recognition of, or procedure for, taxpayer redeterminations of FSC transfer pricing "via amended returns." (Pet'r. Br. at 25). Therefore, as a matter of law, such bounty cannot be grafted onto the statute by implication. Commissioner v. Acker, 361 U.S. 87, 92-93 (1959)(even explicit legislative history not controlling or persuasive in the absence of statutory enactment).

It is section 1.925(a)-1T(e)(4) itself, not the statute or legislative history, that permits the redetermination procedure, which is prefaced by the general rule that--

> The FSC and its related supplier would ordinarily determine under section 925 and this section the transfer price or rental payment payable by the FSC or the commission payable to the FSC for a transaction before the FSC files its returns for the taxable year of the transaction.

Id. (emphasis added). This general rule is entirely consistent with the Senate Finance Committee Explanation. Far from sanctioning taxpayer redeterminations "via amended returns" (Pet'r. Br. at 25 & 28), the passage states only that the transfer price or commission may be adjusted upward or downward "after the close of the taxable year," not "after the returns are filed," as petitioner suggests. S. Rep. No. 169, 98th Cong., 2d Sess. 649 (1984) (emphasis added). If Congress intended to allow adjustments "via amended returns" it certainly did not say so. The plain language of the passage does not clearly embrace any period except that period "before the FSC files its returns for

the taxable year of the transaction," Temp. Treas. Reg. § 1.925(a)-1T(e)(4), which is, of course, after the close of the taxable year. I.R.C. § 6071.

The Court should not, as petitioner urges, imbue that vague reference with greater applicability than the words, taken in their context, can reasonably imply. Taken in context, the passage expresses nothing more than Congressional approval of transactional hindsight in applying the pricing rules of section 925(a), i.e., the practice of computing the transfer price between the FSC and its related supplier after the actual transaction with the customer. The first sentence in the passage emphasizes that the computation of the transfer price need not be contemporaneous with the transaction but may be made "after the FSC sells the goods to the customer." S. Rep. No. 169, 98th Cong. 2d Sess. 649 (1984) (emphasis added). Taken in context, the second sentence clearly confirms the additional flexibility of making "adjustments [to the transfer price computed under the prior sentence], upwards or downwards, following the close of the taxable year in which the FSC sells the goods," but just as clearly, the passage does not explicitly or implicitly condone such "adjustments" after the filing of the returns. Id., (emphasis added).

As a matter of law, such a vague reference in the legislative history cannot, in and of itself, invite recognition of a positive right under section 925 for taxpayers to

redetermine FSC commissions or transfer pricing after their returns are filed where such right does not exist in the language of the statute. Buffalo Bills, Inc. v. United States, 31 Fed. Cl. 794 (1994) [74 AFTR 2d at 94-6012] (improper to construe plain language of statute by reference to ambiguous legislative history). Had Congress intended to grant such a right, "it clearly could have enacted a specific rule itself." L & F Int'l. Sales Corp. v. United States, 912 F.2d 377, 381 (9th Cir. 1990)(notwithstanding general legislative motivation for DISC regime, Congress vested wide discretion in the Secretary for enforcement).

Moreover, to the extent that the Senate Finance Committee and Joint Committee explanations may be read as not inconsistent with a policy of allowing the FSC and related supplier to redetermine their transfer pricing after the filing of the returns, it is ambiguous. Because the phrase "following the close of the taxable year in which the FSC sells the goods" is at least equally consistent with respondent's reading, the legislative history is ambiguous as to the precise extent of hindsight tax planning contemplated by Congress. Faced with such ambiguity, the Court should recognize that it is the province of the Commissioner to interpret legislative ambiguities. Brewster v. Gage, 280 U.S. 327, 336 (1930). "It is the settled rule that

the practical interpretation of an ambiguous or doubtful statute that has been acted upon by officials charged with its administration will not be disturbed except for weighty reasons." Id.

Finally, even were the Court to accept petitioner's position that an ambiguous reference in nonstatutory legislative materials could grant taxpayers a statutory right of adjusting FSC commissions "via amended returns," it must be acknowledged that conspicuously absent from the passage is any indication of the operation or timing of the "adjustments" permitted. Once again, it is the province of the Secretary to fill that gap:

> The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.

Chevron U.S.A. v. NRDC, 467 U.S. 837, 843 (1984)(alteration in original), quoting, Morton v. Ruiz, 415 U.S. 199, 231 (1974). Therefore, at a minimum, section 1.925(a)-1T(e)(4) is firmly within the congressional delegation under section 7805 to prescribe "all needful rules and regulations for the enforcement of" the Code.[2/]

---

[2/] Of course, respondent's primary position is that section 1.925(a)-1T(e)(4) is entitled to the even greater deference that this Court affords to legislative regulations. See Res't. Mem. at 38-40. However, the Temporary Regulation is valid whether legislative, interpretative, or both. See id. at 40-42.

Docket No. 3501-94

**Petitioner's Construction of Temporary Treasury Regulation Section 1.925(a)-1T(e)(4) is at Odds with the Plain Language of the Regulation.**

Petitioner's reading of section 1.925(a)-1T(e)(4) to incorporate a taxpayer-initiated correlative relief provision does not comport with the plain language of the Temporary Regulation. While there is no issue that "[s]ection 6501, not section 6511, provides the statute of limitations applicable to respondent's <u>assessment of deficiencies</u>," (Pet'r. Br. at 29 (emphasis added)), that fact does not support the construction that petitioner places upon Temp. Reg. 1.925(a)-1T(e)(4). Petitioner asks the Court to read the taxpayer redetermination portion of Temp. Reg. 1.925(a)-1T(e)(4) to require no more than--

> (a) the party in the overpayment position file a refund claim to make the FSC recomputation during the allowable time period under section 6511, and (b) appropriate correlative adjustments be made with respect to the party in the deficiency position.

Pet'r. Br. at 27. That reading is at odds with the plain language of the Temporary Regulation.

Sentence no. 4[3/] begins the taxpayer redetermination portion of Temp. Treas. Reg. 1.925(a)-1T(e)(4). That sentence provides:

> In addition, a redetermination may be made by the FSC <u>and</u> related supplier if <u>their</u> taxable <u>years</u> are still open under the statute of limitations for making claims

[3/] For convenience, respondent is using petitioner's numbering of the text of section 1.925(a)-1T(e)(4). Pet'r. Br. at 26-27.

> for refund under section 6511 if they determine that a different transfer pricing method or grouping of transactions may be more beneficial.

(Emphasis added). Petitioner argues that the phrase "their taxable years" should not be read to mean "both of their taxable years" because "[t]he Regulation does not use the term 'both,'... and to equate 'their' with 'both' makes no sense." Pet'r. Br. at 27. To the contrary, the plain, ordinary meaning of the adjective "their" is "of or belonging to them." Webster's Third International Dictionary at 2369, (emphasis added). In sentence no. 4, the antecedents of "their" (and the understood pronoun "them") are obviously "the FSC and the related supplier." Thus, the sentence plainly contemplates a dual redetermination (i.e., one made by "the FSC and related supplier"), which is conditioned upon the taxable years of "the FSC and the related supplier" still being open (i.e., "if [the] taxable years [of 'the FSC and related supplier'] are still open under the statute of limitations for making claims for refund under section 6511").

The grammar, logic and natural sense of sentence no. 4 are all conjunctive, signified by use of the words "and", "their taxable years", and "if they determine". The word "both" would be redundant in sentence no. 4 as drafted, but would make sense and comport with the plain meaning. Petitioner's interpretation

of sentence no. 4, on the other hand, finds no support in the language of the sentence. In effect, petitioner asks the Court to rewrite the sentence disjunctively:

> In addition, a redetermination may be made by the FSC [or] related supplier if [either of] their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if [either of them] determine that a different transfer pricing method or grouping of transactions may be more beneficial.

There is no logic or grammatical sense to equating "and" with "or", and "their" and "them" with "either" as petitioner's reading implies.

Respondent submits that section 1.925(a)-1T(e)(4) plainly speaks for itself. Indeed, so clear is the regulation that some commentators merely quote it without further explanations. See, e.g., 12 Mertens, Law of Fed. Income Taxation, § 45F.126 at 134-35 (1996). When paraphrasing the regulation, commentators accept the plain meaning advocated by respondent:

> After an export transaction has been completed, FSC and its related suppler may make a redetermination of the transfer price to the FSC on a transaction or group of transactions if they determine that a different transfer pricing method or grouping of transactions is more advantageous. This redetermination may be made even as late as upon audit, so long as the taxable years of the related supplier and the FSC are still open under § 6511. The temporary regulations also provide that the amount of FTGR and the FSC's and related supplier's costs and expenses may be redetermined within the same time period.

Bruce and Lieberman, 264-4th T.M., Foreign Sales Corporations, at A-36 (BNA 1996)(emphasis added); see also, 1 Rhoades and Langer,

U.S. International Taxation and Tax Treaties, § 9.05[3] at 9-122, n. 75 (1996)(noting that section 6511 statute of limitations is generally three years).

Notwithstanding the grammatical sense and clear meaning of section 1.925(a)-1T(e)(4), petitioner urges the Court to:

> construe the Regulation in a manner that allows either a taxpayer or respondent to make an adjustment to the related supplier or the FSC with an appropriate correlative adjustment being made so that the FSC redetermination affects both parties.

Pet'r. Br. at 31. Petitioner claims its interpretation "is required by Sentence No. 6," which petitioner reads as a correlative relief provision, "the language of which (i.e., 'shall affect') is much stronger than the language of Treas. Reg. § 1.482-1(d)(2) (i.e., 'shall also make appropriate correlative adjustments to the income of the other member')." Id. Sentence no. 6, which is only eleven words long, states-- "Any redetermination shall effect both the FSC and the related supplier." In contrast, the section 482 correlative relief provisions contained in Reg. 1.482-1(d)(2) are over 600 words long, plus three examples averaging about 160 words apiece. There is no mention of the word "correlative" in sentence no. 6, nor reference to Reg. 1.482-1(d)(2). It is simply not logical to interpret the eleven words of sentence no. 6 as a correlative relief provision, particularly when it is clear from Reg. 1.482-1(d)(2) itself that the Secretary knows how to draft a correlative relief provision when he wants to.

It is plain from the context that sentence no. 6 was intended to make it unequivocally clear that any redetermination, either by the taxpayers or respondent, shall affect both the FSC and related supplier. It does not follow, however, that sentence no. 6 confers the unprecedented benefit of allowing taxpayers to make unilateral redeterminations outside the period dictated in sentence no. 4 through the use of a correlative relief provision similar to section 1.482-1(d)(2). In asking the Court to "fashion the appropriate rule" to allow its untimely refund claim, petitioner has overread Collins Electrical Co. v. Commissioner, 67 T.C. 911 (1977). Collins Electrical Co. does not support the proposition that petitioner may make a primary refund adjustment entitling respondent to a correlative adjustment with respect to UCFSC. Rather, Collins Electrical Co. stands for the proposition that respondent may make a primary deficiency adjustment notwithstanding the fact that the related party's taxable year is barred. The Court specifically held:

> Del Monte [the related party] is not a party to this action, and its tax liability is not before the Court. The Commissioner asserted a primary adjustment against petitioner and our jurisdiction extends only to that adjustment. Whether Del Monte will ultimately receive a refund for its 1971 fiscal year despite its failure to file a claim within the period specified by section 6511(a), we need not decide.

Id. 67 T.C. at 922 (emphasis added). Nothing in the Court's holding in Collins Electrical Co. abrogates the rule of Treas. Reg. § 1.482-1(b)(3) barring taxpayers from making "primary adjustments" under section 482.

If respondent had asserted a primary adjustment decreasing petitioner's FSC deduction, then the correlative relief provisions of Reg. 1.482-1(d)(2) might be properly implicated in this case. However, the correlative relief provisions apply only to adjustments made by "the district director" not those proposed by taxpayer. Id. Indeed, even where the Commissioner makes the primary adjustment under section 482, correlative relief is not a matter of right. Nothing in Reg. 1.482-1(d)(2) mandates correlative relief with respect to even respondent's adjustments if such relief would enmesh respondent in "the almost impossible task of properly apportioning and allocating deductions for an uncooperative foreign taxpayer." InverWorld, Inc. v. Commissioner, T.C. Memo. 1996-301 [1996 T.C. Memo. (RIA) at 96-2164], on recons., T.C. Memo. 1997-226. Therefore, there is no legal precedent that would allow petitioner to make the redeterminations in issue outside of the time prescribed, or to satisfy the timing requirements of section 1.925(a)-1T(e)(4) through respondent's correlative relief provisions.

Docket No. 3501-94

**Petitioner's Position that Temporary Treasury Regulation Section 1.925(a)-1T(e)(4) Prescribes a Dual Statute of Limitations or Contemplates a Suspension of Any Statutes of Limitations is Incorrect as a Matter of Law.**

Petitioner consistently mischaracterizes the timing conditions prescribed in section 1.925(a)-1T(e)(4) for taxpayer redeterminations as a "statute of limitations requirement" or a "'dual' statute of limitations requirement." E.g., Pet'r. Br. at 20 & 29. Petitioner argues from that characterization that "a statute of limitations requirement under section 6511 with respect to [UCFSC] is nonsensical, because section 6511 applies [to refunds]," id. at 29, and that respondent has prescribed a "nonstatutory statute of limitations requirement." Id. at 43. However, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is not a statute of limitations provision; it merely conditions the benefit of taxpayer initiated FSC pricing redeterminations upon application for the benefit while the taxable years of both the FSC and related supplier are open under section 6511.

The "timing limitation" imposed on petitioner's and UCFSC's ability to redetermine their FSC commissions is no more a statute of limitation than the "timing limitation" imposed upon the ability to elect the foreign earned income exclusion, which was approved by this Court in Faltesek v. Commissioner, 92 T.C. 1204, 1209 (1989). Thus, petitioner has misplaced its reliance on Fehlhaber v. Commissioner, 954 F.2d 653 (11th Cir. 1992) and Bufferd v. Commissioner, 506 U.S. 523 (1993), for the proposition

that the instant regulation imposes "a dual limitations period." 954 F.2d at 657. Respondent's position is not that petitioner's refund claim is barred because the limitations period has expired for assessing additional tax for UCFSC's years in issue, as was claimed by the taxpayers in Fehlhaber and Bufferd. Rather, respondent's position is that, as a matter of law, petitioner's refund claims must be denied because petitioner has not met the conditions that would entitle it and UCFSC to redetermine their FSC commissions; the redeterminations were not made before the expiration of UCFSC's statute of limitations under section 6511, which is the condition prescribed to the benefit granted in section 1.925(a)-1T(e)(4). Ruud Mfg. Co. v. Commissioner, 10 T.C. 14, 16-17 (1948), aff'd, 173 F.2d 222 (3d Cir. 1949); Faltesek, 92 T.C. 1204, 1211-12; see also, CWT Farms, Inc. v. Commissioner, 755 F.2d 790, 802 (11th Cir. 1985), cert. denied, 477 U.S. 903 (1986) (DISC regulation properly prescribed "due date" for remitting payment).

Temporary Treasury Regulation § 1.925(a)-1T(e)(4) prescribes conditions for a discrete act, i.e., taxpayer redeterminations of transfer pricing under section 925. The Temporary Treasury Regulation does not prescribe limitations periods for refunds and deficiencies which may result from such redeterminations. In allowing the FSC and related supplier to redetermine their transfer price or commission "if their taxable years are still open under the statute of limitations for making claims for

refund under section 6511," the regulation conditions taxpayer redeterminations by reference to the fixed, but extendable, time period set forth in a single section, section 6511.

There is no issue that section 6501 is the relevant authority for <u>assessing a deficiency</u> in the taxes of a related supplier or FSC following a timely taxpayer initiated redetermination made in accordance with section 1.925(a)-1T(e)(4). However, it does not follow that the section 6501 period of limitations on making the <u>assessment</u> must also be the relevant time period for taxpayers to make the <u>redetermination</u> under section 1.925(a)-1T(e)(4). Section 1.925(a)-1T(e)(4) expressly references section 6511, not section 6501, to condition taxpayer redeterminations. So as a matter of law the FSC and related supplier may only redetermine their transfer pricing during the period that their statutes of limitation under section 6511 are open. <u>Faltesek</u>, 92 T.C. 1204, 1211-12; <u>Ruud Mfg. Co.</u>, 10 T.C. at 16-17.

In the instant case UCFSC's periods of limitations under sections 6501(a) and 6511 were coterminous (Stip. ¶ 25), but it does not follow that the two Code sections are interchangeable for purposes of satisfying the condition prescribed in the regulation. Even less logical is petitioner's position that <u>all</u> of the various statutory limitations periods set forth in section 6501 are interchangeable with section 6511, at taxpayers' discretion, for purposes of satisfying the condition to the

benefit conferred in section 1.925(a)-1T(e)(4). It is simply not appropriate for taxpayers, who rely upon a regulation not required by statute, to substitute their own conditions for the conditions stated in a regulation. Section 1.925(a)-1T(e)(4) refers to section 6511, not section 6501.

Petitioner posits hypothetical scenarios in which taxpayers might succeed in "whipsawing" respondent through literal compliance with Temp. Treas. Reg. § 1.925(a)-1T(e)(4). Pet'r. Br. at 40-41. Of course, those hypothetical scenarios are entirely speculative and not before the Court in this case. In the instant case, petitioner concedes that UCFSC's statutes of limitations under both section 6511 and 6501(a) expired more than a year before petitioner's refund claims were informally raised. The question for the Court is not how the Commissioner might best have fashioned the regulation. Rather, the question is whether the "Commissioner's regulation falls within his authority to implement the congressional mandate in some reasonable manner." United States v. Correll, 389 U.S. 299, 307 (1967).

"Alternatives ... are of course available... [and] [i]mprovements might be imagined" with respect to virtually every rule and procedure prescribed in every regulation promulgated by the Secretary. Id. at 307. But this Court does not "sit as a committee of revision to perfect the administration of the tax laws." Id. "The choice among reasonable alternatives is for the Commissioner, not the Courts." Nat'l. Muffler Dealers Ass'n v.

United States, 440 U.S. 472, 488 (1979). We know from experience that no net fashioned by Congress or the Secretary will be absolute proof against the vagaries of human experience or the ingenuity of taxpayers, nevertheless--

> the tight net which the Treasury Regulations fashion is for the protection of the revenue, courts should not unduly help disobedient refund claimants slip through it.

Angelus Milling Co. v. Commissioner, 325 U.S. 293, 297 (1945).

There is nothing unreasonable in requiring taxpayers to apply for a benefit offered by respondent as a matter of administrative grace within a certain time measured by reference to a single statutory period. The fact that the two parties to the redetermination are in opposite tax positions underscores the appropriateness of imposing a single condition on both parties as a "bright line" to insure transactional uniformity. Petitioner has misplaced its reliance on Commissioner v. Engle, 464 U.S. 206, 227 (1984), and Goodson-Todman Enter., Ltd. v. Commissioner, 784 F.2d 66, 76 (2d Cir. 1986) for the proposition that the Commissioner may not draw such "bright lines" for purposes of administration. Pet'r. Br. at 43. Those cases involved circumstances where it was held that respondent had attempted to curtail by regulation, specific rights granted to taxpayers by statute. The instant regulation, however, as an act of

administrative grace, curtails no such statutory rights. Rather, section 1.925(a)-1T(e)(4) defines the scope of the right of redetermination granted by the Temporary Regulation itself.

**Respondent's Regulation Files are Irrelevant to the Legal Question Before the Court, but Nevertheless Support the Validity of Temporary Treasury Regulation Section 1.925(a)-1T(e)(4).**

As a matter of law, respondent's administrative files under section 1.925(a)-1T(e)(4) reflect "only personal views of various government representatives, not official statements of respondent or the Treasury." Connecticut General Life Ins. Co. v. Commissioner, 109 T.C. No. 5 (1997); Armco, Inc. v. Commissioner, 87 T.C. 865, 867-68 (1986).

> [T]he personal views of such government representatives would not be able to overcome the particular statutory and regulatory scheme before [the Court] in [this case]. In light of this statutory and regulatory scheme, petitioner's alleged factual matter in dispute (namely the intent of such government representatives) is simply not sufficiently relevant to the resolution of the issue to give rise to a genuine issue of material fact. T. C. Rule 121(b).

Connecticut General Life Ins. Co., slip. op. at 16. Accordingly, the Court should not consider the administrative documents proffered by petitioner because as a matter of law they are not facts material to the Court's decision of the legal questions presented in the instant cross motions. Id.; T.C. Rule 121(b). Moreover, assuming for the sake of argument that it would be appropriate for the Court to consider the administrative documents, the documents clearly support respondent's position

that section 1.925(a)-1T(e)(4) is a valid regulation promulgated through a discretionary act of administrative grace, whether under the authority of section 925(b) or section 7805. (See Res't. Mem. at 38-42). Although petitioner seeks to attribute improper motives to respondent through a selective reading of the administrative documents (see, e.g., Pet'r. Br. at 42-43), these documents are entirely consistent with a finding that the Temporary Regulation is reasonable.

The parties agree that the taxpayer redetermination provisions of section 1.925(a)-1T(e)(4) grew out of Rev. Rul. 82-81, 1982-1 C.B. 109, the holding of which expressed a policy that evolved over many years of administrative consideration. (Pet'r. Br. at 24-25). It is clear from this history that respondent's decision to accept DISC redeterminations via amended returns was a considered one, balancing the competing policies behind section 482 and the DISC regime and reconciling the prohibition of taxpayer initiated section 482 adjustments with the incentive aspects of the DISC regime.

However, petitioner fails to note that from the outset the administrative grant of redetermination was a discretionary dispensation conditioned upon "timely filed amended returns by the DISC <u>and</u> its parent." Rev. Rul. 82-81 at 109-110 (emphasis added). If anything, the administrative documents reinforce the legal determination that the taxpayer redetermination procedure announced in Rev. Rul. 82-81 was granted as matter of

administrative grace.[4/] The reference to amended returns in Rev. Rul. 82-81 was clearly intended to emphasize the discretionary nature of the dispensation, because acceptance of amended returns is, as a matter of law, discretionary with the Commissioner. Badaracco v. Commissioner, 464 U.S. 386, 393 (1984). By consenting to accept "timely filed" amended returns of a DISC and its parent, the Commissioner promoted the incentive aspect of the DISC regime and at the same time placed reasonable conditions on taxpayers' ability to maximize DISC benefits.

Due to the structural differences in the DISC and FSC regimes, the redetermination grant announced in Rev. Rul. 82-81 required clarification. The administrative documents plainly show that the drafters of the instant regulation realized that the reference to "limitations" in the text of Rev. Rul. 82-81 was too vague to adequately address the timing of FSC redeterminations. The comments on a preliminary draft of section 1.925(a)-1T(e)(4) show the that respondent realized the vague reference to the "statute of limitations" would not suffice in the FSC regime: "basic 3 year statute for [sic] including any extensions? ... wouldn't both parties be required to redetermine their income if either one did?". (Stip. ¶ 47(a); Jt. Ex. 18-

---

[4/] "The proposed revenue ruling was pulled from the Commissioner's list of November 18, 1981 by Mr. Halpern ... [who] requested that the facts be changed to state that both the DISC and related party file timely amended returns. With those facts the issue is whether the Commissioner will accept the amended returns." (Jt. Ex. 17-Q, emphasis added).

R(2)). These questions were resolved by requiring taxpayer redeterminations to be made during the time that both the FSC and related supplier's statutes under section 6511 were open and adding the sentence no. 6 requirement. Temp. Treas. Reg. § 1.925(a)-1T(e)(4).

It is clear the Temp. Treas. Reg. § 1.925(a)-1T(e)(4) was intended to achieve two goals. The fact that respondent chose to key the timing condition for taxpayer redeterminations to a particular statutory limitations period which could be extended under section 6501(c)(4)), see section 6511(c), instead of a set period of, say, three years, shows that respondent was mindful that a close-ended period might bar redeterminations in the case of a lengthy audit. The administrative documents show that the drafters were also sensitive to the needs of the Service and administrability of the benefit. Petitioner implies that the drafters should not have heeded concerns expressed by examiners about an entirely open-ended right of redetermination. Pet'r. Br. at 42-43. To the contrary, it was not only appropriate for the drafters to have considered the administrability of the provision, but it would have been inappropriate not to have "tied down" the operation of the section. As the Supreme Court has recognized--

> even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 301 (1946)(quoting Order of R. Telegraphers v. Railway Express, 321 U.S. 342, 348-49 (1944)).

The reference to section 6511 in the Temporary Regulation serves the two goals of providing the flexibility of an extendable statute of limitations and insuring that taxpayers made their redeteriminations at or near the time of audit, when respondent's resources were devoted to those years. Incorporating the time period of section 6511 insures that taxpayers have a minimum of three years from the filing of their returns to redetermine their FSC pricing. That period may be extended indefinitely if both the taxpayer and respondent agree. It is irrelevant that either taxpayers or the Commissioner may refuse to extend the statutes under section 6511. The point is to assure that taxpayers make their redeterminations within a reasonable period after the filing of their returns, or at least notify respondent of their intent to do so while the relevant information and resources are at hand.

The history of section 1.925(a)-1T(e)(4) shows that the right of redetermination was granted to taxpayers to correct mistakes on their original returns, not to allow taxpayers to tinker with their returns indefinitely. As a matter of law, the

timing condition set forth in the Temporary Regulation should not be found unreasonable just because petitioner took no action to satisfy it. Ruud Mfg. Co., 10 T.C. at 17; Faltesek, 92 T.C. at 1213.

**The Policies Underlying the Enactment of Section 6501(e) Preclude Its Use By Taxpayers Subject to the FSC Regime to Obtain Overall Refunds.**

Petitioner asserts, in the alternative, that it met the conditions prescribed by Temporary Treasury Regulation section 1.925(a)-1T(e)(4) because "respondent could have assessed the correlative deficiencies against UCFSC under section 6501(e)(1)(A)." (Pet'r. Br. at 46). Thus, petitioner assumes that taxpayers may unilaterally replace the conditions expressly prescribed in the Temporary Regulation with the broader limitations period set forth in section 6501(e)(1)(A). However, as discussed supra, neither petitioner nor this Court may rewrite the regulation to fit petitioner's needs, see generally, United States v. Correll, 389 U.S. at 307, and the benefits generally available under section 1.925(a)-1T(e)(4) are subject to the reasonable conditions expressly prescribed therein. Ruud Mfg. Co. v. Commissioner, 10 T.C. at 17.

Moreover, petitioner's alternative attempt to satisfy the requirements of the Temporary Regulation is inconsistent with the policy underlying the enactment of the limitations period set

forth in section 6501(e)(1)(A). This Court has long recognized that section 6501(e) is an extraordinary enforcement tool for the Commissioner:

> We think that in enacting [section] 275(c) [now section 6501(e)] Congress manifested no broader purpose than to give the Commissioner an additional two years [now 3 years] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors.

University Country Club, Inc. v. Commissioner, 64 T.C. 460, 469 (1975) (alterations in original)(emphasis added), quoting, Colony, Inc. v. Commissioner, 357 U.S. 28, 36 (1958). Thus, the purpose of section 6501(e) is to protect the Government revenues: "The Government should not be penalized when a taxpayer is so negligent as to leave out items of such magnitude." Colestock v. Commissioner, 102 T.C. 380, 389 (1994) (quoting Preliminary Report to the House Comm. on Ways and Means, 73 Cong., 2d Sess. 21 (Comm. Print 1933)). Plainly the limitations period under section 6501(e) was designed to benefit the Government, not taxpayers.

DISC and FSC controversies present "the somewhat unusual circumstances where petitioners argue that the amount of income should be larger, and respondent argues that it should be smaller." General Dynamics Corp. v. Commissioner, 108 T.C. 107, 117 (1997). In this case, it is obviously only advantageous for

UCFSC to claim "omitted" income because petitioner receives a 100% deduction for income that UCFSC may treat as 65% tax-free. I.R.C. §§ 923(a)(3) & 291(a)(4).

**Petitioner's Assertion that UCFSC's Net Income or Taxable Income Should Be Deemed "Gross Income" for Purposes of Section 6501(e) Is Without Legal or Logical Support.**

There is no question that the amounts reported by UCFSC as foreign trade income (see, Stip. ¶¶ 16 & 17; Jt. Exs. 4-D, 5-E & 6-F) "were required to be shown" on UCFSC's returns and represented "amounts received or accrued" by UCFSC "prior to diminution" by related expenses within the meaning of section 6501(e).[5/] Nevertheless, petitioner suggests that only the FSC profit should be considered gross income for purposes of section 6501(e) because the FSC profit is "the critical amount under the FSC provisions... [and because] [t]he FSC export tax incentives are measured by the FSC profit." (Pet'r. Br. at 51). Thus, petitioner takes the paradoxical position that UCFSC's profit is also its gross income. However, in the ordinary world, "profit" is "net income" or "the excess of returns over expenditures in a transaction or series of transactions." Webster's Third

[5/] Section 923(b) defines the term "foreign trade income" as "the gross income of a FSC attributable to foreign trading gross receipts."

International Dictionary (Unabridged) at 1811. Accordingly, petitioner is asking the Court to ignore basic mathematics and logic to hold that "gross income" is "net income."

Petitioner's position is not only illogical, it is also incorrect as a matter of law and not supported by the authorities relied upon. As observed in respondent's memorandum of law, section 6501(e)(1)(A)(i) defines "gross income" of a business as,

> the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services.

Res't. Mem. at 59. Petitioner relies upon Green v. Commissioner, 7 T.C. 263, 277 (1946), aff'd, 168 F.2d 994 (6th Cir. 1948) and Schneider v. Commissioner, T.C. Memo. 1985-139, for the proposition that "[f]or purposes of section 6501(e)(1)(A) ... gross income is 'statutory gross income as defined by section 61.'" Pet'r. Br. at 49. Both cases are inapposite because they concern the application of section 6501(e) to individual taxpayers, and, in addition, Green, was decided under the predecessor section 275(c) of the Internal Revenue Code of 1939.

Indeed, the Schneider case cited by petitioner contains a lengthy discussion by the Court explaining that section 6501(e)(1)(A)(i) resolved a conflict among the courts as to the meaning of "gross income" under section 275(c) of the Internal Revenue Code of 1939 when it was used with respect to a trade or business. Schneider v. Commissioner, T.C. Memo. 1985-139 [49 TCM

(CCH) at 1034-35]. Prior to the enactment of the Internal Revenue Code of 1954, the courts were split on whether "gross income" for a trade or business meant "gross receipts" or "gross profits" under section 275(c).[6] To clear up this conflict, Congress changed the definition of "gross income" for a trade or business for purposes of section 6501(e) from the accepted definition under section 61, see Treas. Reg. § 1.61-3, to total receipts from the sale of goods or services prior to diminution by the cost of such sales or services. Schneider, id.; see also, Colony, Inc., 357 U.S. at 37 & n. 3. Thus, section 6501(e) and the Schneider case rebut petitioner's position that the gross income of a trade or business for purposes of section 6501(e) is equivalent to its profits, or in this case, FSC profits. Id.

The Court should also recognize that petitioner's attempts to portray UCFSC as a mere conduit or shell corporation (Pet'r Br. at 50-51) are fundamentally at odds with the economic substance requirements of the FSC regime. In order to comply with the United States' obligations as a signatory to the General Agreement on Tariffs and Trade (GATT), Congress made it clear that a FSC "must have a foreign presence, it must have economic substance, and that activities that relate to the export income

[6] Compare Goodenow v. Commissioner, 238 F.2d 20, 22 (8th Cir. 1956), rev'g., 25 T.C. 1 (1955) and Uptegrove Lumber Co. v. Commissioner, 204 F.2d 570, 572-73 (3d Cir. 1953) with Carew v. Commissioner, 215 F.2d 58, 61-62 (6th Cir. 1954); Estate of Gibbs v. Commissioner, 21 T.C. 443 (1954) and Edenfield v. Commissioner, 19 T.C. 13 (1952).

must be performed outside the U.S. customs territory." S. Rep. No. 169, 98th Cong., 2d Sess. 636 (1984) (emphasis added). Thus, petitioner's statements that UCFSC possesses "minimal corporate substance" and that "[i]n a real economic sense, UCFSC's gross income consists of the FSC profit because petitioner's export gross receipts, as well as the cost chargeback portion of the commissions, are mere bookkeeping entries" (Pet'r. Br. at 53) would presumably shed UCFSC of the economic substance it needs to qualify as a foreign sales corporation under FSC provisions. Therefore, although petitioner attempts to liken its payment arrangement with UCFSC to the circular flows of cash resulting from a check-kiting scheme (Forster v. Commissioner, T.C. Memo. 1961-281) and a tax shelter devoid of economic substance (Karme v. Commissioner, 73 T.C. 1163 (1980), aff'd, 673 F.2d 1062 (9th Cir. 1982)[7/]), it cannot have it both ways. As a matter of law, UCFSC has economic substance and petitioner's export gross receipts are not merely bookkeeping entries.

---

[7/] Respondent notes that these rather extreme examples are from areas of taxation outside of FSC regime. Petitioner's and UCFSC's practice of offsetting liabilities does not destroy economic substance for purposes of the FSC regime. Temporary Treasury Regulation § 1.925(a)-1T(e)(3)(iii) provides--

> Payment of dividends, transfer prices, rents, commissions, service fees, receivables, or payables may be in the form of money, property, sales discount, or an accounting entry offsetting the amount due the related supplier, or FSC, whichever applies, against an existing debt of the other part to the transaction.

Id. (emphasis added).

Docket No. 3501-94

It is ironic that petitioner should request that the substance and economic significance of the expenses it and UCFSC incurred in transactions between the two corporations be disregard for purposes of section 6501(e), when most of the additional refunds claimed are based upon redeterminations increasing UCFSC's profit by reducing those very expenses. (Stip. ¶¶ 27 & 28; Pet'r. Prop. Finding ¶ 36). Surely expenses that affect the determination of FSC profit are to be included in UCFSC's gross income, under any definition of that term.

Application of section 6501(e) to foreign sales corporations should follow the method of computing FSC profit chosen by the taxpayer. For petitioner's initial refund claim, section 925(a)(2) was chosen. (See Res't Mem. at 23-25). Under section 925(a)(2) 23 percent of combined taxable income is allocated to the FSC. Therefore, in determining whether there is a substantial omission of gross income, the prerequisite for section 6501(e) to be operative, the Court should consider how combined taxable income (CTI) is determined.

As the first step in the CTI computation, the taxpayer must determine foreign trading gross receipts which are the qualified gross receipts from the export sales of the FSC and related supplier. I.R.C. § 924. Those receipts are then reduced by the costs of goods sold relating to the foreign trading gross receipts. Temp. Treas. Reg. §§ 1.925(a)-1T(c)(6)(i), 1.925(a)-1T(d)(2)(iii) & 1.925(a)-1T(f), Example 1. The result is

combined gross income. Id. Combined gross income is then reduced further by the below lines expenses relating to the sales. Id. These expenses include both direct expenses like those expenses of the FSC listed under section 925(c) and other expenses relating to the export sales which are allocable and apportionable to combined gross income under Treas. Regs. §§ 1.861-8 et. seq. and which include but are not limited to interest expense, research and experimental expense, and general and administrative expenses. Temp. Treas. Reg. § 1.925(a)-1T(c)(6)(iii)(D). Applying the CTI profit computation to section 6501(e), the foreign trading gross receipts of the FSC and related supplier correspond to gross income as defined in section 6501(e)(1)(A)(i) because, in the CTI computation, foreign trading gross receipts are sales prior to diminution by the cost of such sales.

The analogy is also valid with respect to the gross receipts method of section 925(a)(1) which was presumably used by petitioner as part of its second claim based upon ungrouping of transactions. (See Res't. Mem. at 26-27). Such ungrouping cannot increase foreign trading gross receipts, it merely affords taxpayers with a choice of a more favorable method of computing profit. (Id.) Given that there are two methods of computing FSC profit (one based upon a CTI computation and one merely a percentage of foreign trading gross receipts) the Court should harmonize the application of section 6501(e) to the disparate

methods by holding foreign trading gross receipts to be gross income for purposes of that section. See I.R.C. § 927(b); (and Respondent's Memo. at 59-60). While combined gross income might also fit the section 6501(e) definition of gross receipts, combined taxable income should not.

Under the facts of the instant case, it is clear that petitioner's refund claims are not based upon an omission by UCFSC of any foreign trading gross receipts. (Stip. ¶¶ 27 & 39). Rather the taxpayer is arguing that the below line expenses allocated and apportioned to the combined gross income derived from the export sales are overstated and that more beneficial computational methods are available by ungrouping transactions. (See Res't. Mem. at 23-28). These clearly are not omissions of gross income under any definition, and therefore, section 6501(e) does not apply to UCFSC's returns in issue as a matter of law. I.R.C. § 6501(e)(1)(A)(i); Colony, Inc. v. Commissioner, 357 U.S. 28 (1958).

Docket No. 3501-94

## CONCLUSION

It follows that respondent's motion for summary judgment should be granted and petitioner's cross-motion for summary judgment should be denied.

STUART L. BROWN
Chief Counsel
Internal Revenue Service

Date: OCT 30 1997

By: For STEVEN R. WINNINGHAM TAX CT BAR NO. LJ06
Special Trial Attorney
Tax Court Bar No. WS0338
7 World Trade Center
25th Floor
New York, NY 10048
Telephone: (212) 264-0261

JOSEPH F. LONG
Attorney
Tax Court Bar No. LJ0662
Commerce Center One
333 East River Drive
Suite 200
East Hartford, CT 06108
Telephone: (860) 290-4090

OF COUNSEL:
JOSEPH F. MASELLI
Regional Counsel

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **Respondent's Reply To Petitioner's Brief In Support Of Its Motion For Partial Summary Judgment (Foreign Sales Corporation Issue)** was served on counsel for petitioners by mailing the same on OCT 30 1997 in a postage paid wrapper addressed as follows:

Thomas M. Haderlein
BAKER & MCKENZIE
One Prudential Plaza
130 E. Randolph Drive
Chicago, IL 60601

Date: OCT 30 1997

For [signature] TAX CT BAR NO. LJ06
STEVEN R. WINNINGHAM
Special Trial Attorney
Tax Court Bar No. WS0338