**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**No. 06-778T**
**(Hon. Francis M. Allegra)**

**ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,**

**Plaintiff**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant**

---

# SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Robert W. DeJoy
Attorney of Record
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 891-3993

Thomas V. M. Linguanti
Robert S. Walton
Of Counsel
BAKER & McKENZIE LLP
130 East Randolph Drive
Chicago, IL 60601
(312) 861-2623

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

I. SUMMARY OF QUESTIONS POSED ..... 2

1. Whether anything concerning the interpretation of the subject regulation can be discerned from the relationship between the foreign sales corporation (FSC) and the predecessor domestic international sales corporation (DISC) provisions in the Code and, in particular, from Treas. Reg. § 1.994-1(e)(4). ..... 2

2. Whether anything concerning the interpretation of the subject regulation can be discerned from examining Temp. Treas. Reg. § 1.925(a)-1T(e)(3) and (5) ..... 3

3. Whether anything concerning the interpretation of the subject regulation can be discerned from either the legislative history of the FSC provisions or the predecessor DISC provisions. ..... 3

II. OVERVIEW AND COMPARISON OF THE DISC AND FSC PROVISIONS ..... 4

A. Overview of Statutory Provisions ..... 4

B. Overview of Regulatory Provisions ..... 7

1. The DISC Regulations on Transfer Prices ..... 7

2. The FSC Regulations on Transfer Pricing ..... 8

3. Comparison of the DISC and FSC Regulations on Transfer Pricing ..... 11

a. Treas. Reg. § 1.994-1(e)(3) and Temp. Treas. Reg. § 1.925(a)-1T(e)(3) ..... 11

b. Treas. Reg. § 1.994-1(e)(4) and Temp. Treas. Reg. § 1.925(a)-1T(e)(4) ..... 12

c. Treas. Reg. § 1.994-1(e)(5) and Temp. Treas. Reg. § 1.925(a)-1T(e)(5) ..... 13

III. THE EVOLUTION FROM TREAS. REG. § 1.994-1(e)(4) TO TEMP. TREAS. REG. § 1.925(a)-1T(e)(4) SHOWS THAT THE "SHALL AFFECT" SENTENCE WAS INCLUDED AS PART OF NEWLY INCLUDED LANGUAGE TO RESOLVE A DISC-ERA AMBIGUITY AS TO WHETHER AMENDED RETURNS COULD BE FILED TO MAKE A REDETERMINATION AND HOW THOSE REDETERMINATIONS MIGHT BE MADE. ..... 14

A. "Shall affect" was included in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) without a corresponding provision in Treas. Reg. § 1.994-1(e)(4). ..... 14

**TABLE OF CONTENTS**
(continued)

**Page**


B. The rulings under Treas. Reg. § 1.994-1(e)(4) addressed the dispute between taxpayers and the Commissioner as to whether amended returns could be filed to redetermine DISC commissions or intercompany pricing........ 15

1. This issue of DISC transfer pricing redeterminations seems to have been first raised in Priv. Let. Rul. 7949036 (Sept. 5, 1979) in which the Service ruled that a DISC could redetermine intercompany prices after its original return was filed ............................ 16

2. From 1980 until January 1982, the Service's position evolved from prohibiting the filing of amended returns to permitting the filing of amended returns in certain circumstances .............................................. 17

3. After resolving the issue of "whether" taxpayers may file amended returns to redetermine DISC transfer pricing, the Service issued rulings and guidance on "how" the redeterminations could be made. ....................................................................................... 19

C. The DISC rulings show that the "shall affect" language added in the FSC regulations addresses the reporting of income and expense; it has nothing to do with the assessment and collection of tax. ................................................. 22

1. The differences between the DISC regime and FSC regime explain the changes from Treas. Reg. § 1.994-1(e)(4) to Temp. Treas. Reg. § 1.925(a)-1T(e)(4). .................................................................... 22

2. "Any redetermination shall affect both the FSC and the related supplier" by creating an offsetting account receivable and account payable. ..................................................................................... 24

IV. THE CONCEPT OF PROPERLY ACCOUNTING FOR THE AMOUNT OF INCOME AND EXPENSES IN THE PARTIES' BOOKS AND RECORDS IS PERVASIVE THROUGHOUT TEMP. TREAS. REG. § 1.925(a)-1T, AS SEEN PARTICULARLY IN TEMP. TREAS. REG. §§ 1.925(a)-1T(e)(3), (4), AND (5). ...... 26

A. Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (5) ensure that the parties' income and expenses are properly accounted for in their books ......................... 26

B. The "effect" required by Temp. Treas. Reg. § 1.925(a)-1T(e)(4) has collateral consequences to the FSC and the related supplier through the consequences detailed in Temp. Treas. Reg. § 1.925(a)-1T(e)(5)....................... 31

V. THE LEGISLATIVE HISTORIES OF THE DISC AND FSC PROVISIONS DO NOT SHED LIGHT ON THE MEANING OF "SHALL AFFECT" .............................. 33

CONCLUSION.................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page**

**STATUTES**

26 U.S.C. § 925(c) .......... 28

**REVENUE ACTS**

Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 .......... 5, 33

Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 497 .......... 4, 33

**REGULATIONS**

Temp. Treas. Reg. § 1.921-3T(c) .......... 32

Temp. Treas. Reg. § 1.925(a)-1T .......... *passim*

Temp. Treas. Reg. § 1.926(a)-1T(a) .......... 32

Temp. Treas. Reg. § 1.926(a)-1T(b)(2) .......... 32

Treas. Reg. § 1.312-6(b) .......... 32

Treas. Reg. § 1.861-8 .......... 20

Treas. Reg. § 1.926(a)-1(b) .......... 32

Treas. Reg. § 1.964-1(a)(1) .......... 32

Treas. Reg. § 1.994-1(c)(7) .......... 20

Treas. Reg. § 1.994-1(e)(3) .......... 7, 11, 19, 20, 24, 27

Treas. Reg. § 1.994-1(e)(4) .......... *passim*

Treas. Reg. § 1.994-1(e)(5) .......... 7, 8, 13, 21, 22, 24

**REGULATORY AND LEGISLATIVE HISTORY**

Certain Intercompany Pricing Rules Notice of Proposed Rulemaking, 26 C.F.R. Part 1 (July 16, 1975) .......... 13

S. Rep. No. 98-169 (1984) .......... 7

Staff of J. Comm. on Taxation, 98th Cong., *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984* (Comm. Print 1984) .......... 4, 5, 6

T.D. 7435, 41 Fed. Reg. 43,141 (Sept. 30, 1976), *reprinted* at 1976-2 C.B. 238 .......... 13

T.D. 7984, 49 Fed. Reg. 40,016 (Oct. 12, 1984), *reprinted* at 1984-2 C.B. 159 .......... 21

T.D. 8126, 52 Fed. Reg. 6428 (March 2, 1987), *reprinted* at 1987-1 C.B. 184 .. 11, 25, 27, 28

**ADMINISTRATIVE RULINGS AND MEMORANDA**

2004 NSAR #010275 .......... 18

Gen. Couns. Memo. 39,374 (Nov. 30, 1984) .......... 19, 20, 23

Priv. Let. Rul. 7949036 (Sept. 5, 1979) .......... 16, 18

Priv. Let. Rul. 8035047 (June 5, 1980) .......... 16, 18

**TABLE OF AUTHORITIES**
(continued)

**Page**


Priv. Let. Rul. 8604013 (Oct. 22, 1985) .......... 21, 22, 25

Rev. Proc. 84-3, 1984-1 C.B. 361, *modified and superseded* by Rev. Proc. 85-45, 1985-2 C.B. 505 .......... 21, 24

Rev. Rul. 82-81, 1982-1 C.B. 109 .......... 15, 16, 17, 19, 20, 23

Rev. Rul. 88-74, 1988-2 C.B. 300 .......... 20

Tech. Adv. Memo. 7728013 (March 23, 1977) .......... 20

Tech. Adv. Memo. 8020008 (1980) .......... 16, 17, 18

Tech. Adv. Memo. 8027018 (March 28, 1980) .......... 20

Tech. Adv. Memo. 8137026 (May 29, 1981) .......... 17, 18

Tech. Adv. Memo. 8204018 (Oct. 13, 1981) .......... 17, 18

Tech. Adv. Memo. 8227002 (Feb. 24, 1982) .......... 17, 18, 19

Tech. Adv. Memo. 8232015 (May 4, 1982) .......... 21, 24

Tech. Adv. Memo. 8310004 (Nov. 13, 1982) .......... 21, 24

Tech. Adv. Memo. 8527005 (March 7, 1985) .......... 19, 20, 23

Tech. Adv. Memo. 8720003 (Jan. 27, 1987) .......... 20

Tech. Adv. Memo. 8721004 (Feb. 18, 1987) .......... 20, 23

Tech. Adv. Memo. 8736006 (June 5, 1987) .......... 20


**CASES**


*Stokely-Van Camp, Inc. v. United States*, 21 Cl. Ct. 731 (1990), *aff'd* 974 ..........

F.2d 1319 (Fed. Cir. 1992) .......... 23

*Union Carbide Corp. v. Commissioner*, 110 T.C. 375 (1998) .......... 18


**OTHER AUTHORITIES**


Bennett Caplan & Matthew Chametzky, *Domestic International Sales Corporations (DISCs) and Foreign Sales Corporations (FSCs): Providers of Economic Incentives for Wholly-Owned Domestic Exporters*, 12 Brook. J. Int'l L. 1 (1986) .......... 6

E. William Pastor, *Foreign Sales Corporations: Cause For Déjà Vu?*, 9 Md. J. Int'l L & Trade 63 (1985) .......... 6

Transcript of Oral Argument, *Abbott Laboratories v. United States*, No. 06-778T (Fed. Cl. argued Feb. 14, 2008) .......... 3, 31

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 06-778T**
**(Hon. Francis M. Allegra)**

**ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,**

**Plaintiff**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant**

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The plaintiff, Abbott Laboratories and U.S. subsidiaries ("Abbott Laboratories"), filed a Motion for Partial Summary Judgment, and the defendant, United States of America, filed a Cross Motion for Summary Judgment. At issue in the parties' motions is whether Abbott Laboratories' refund claims were made timely and in accordance with Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The parties fully briefed the motions, which were heard by the Court on February 14, 2008. At the hearing, the Court stated that it had three discreet questions on which it requested supplemental briefing. In its February 22, 2008, Order, the Court requested the parties address the three questions by March 21, 2008.

This Supplemental Brief is submitted in response to the Court's Order and in further support of Abbott Laboratories' Motion for Partial Summary Judgment.

## I. SUMMARY OF QUESTIONS POSED

The three questions posed by the Court's Order are listed below in bold followed by Abbott Laboratories' summary responses.

1. **Whether anything concerning the interpretation of the subject regulation can be discerned from the relationship between the foreign sales corporation (FSC) and the predecessor domestic international sales corporation (DISC) provisions in the Code and, in particular, from Treas. Reg. § 1.994-1(e)(4).**

Yes. The evolution from the Domestic International Sales Corporation ("DISC") regime to the Foreign Sales Corporation ("FSC") regime informs the reading of Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The so-called "shall affect" language of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is concerned with income and expense and the collateral consequences of a redetermination such as the establishment of accounts payable and receivable reflected in the parties' books and records. Contrary to the government's current position, there is nothing in the evolution of the DISC regulations to Temp. Treas. Reg. § 1.925(a)-1T(e)(4) that suggests the "shall affect" language has anything to do with "timing" or the assessment and collection of tax.

The history of the government's interpretation of Treas. Reg. § 1.994-1(e)(4) is particularly informative. The questions raised by the predecessor to Temp. Treas. Reg. § 1.925(a)-1T pertained to "whether" a taxpayer may initiate a redetermination of DISC transfer pricing and "how" to carry out any such redetermination. There were no disputes as to "when" such a redetermination may be made. In light of that history, the new language added to Temp. Treas. Reg. § 1.925(a)-1T answered those questions: a taxpayer may initiate a FSC transfer pricing redetermination, and the regulation shows a taxpayer how to do so. The "shall affect" language is part of that answer as to whether and how a redetermination is made. The "shall

affect" language requires the FSC and the related supplier to reflect on their respective accounting books and records the change in income and expense, the creation of the corresponding accounts receivable and payable, and the imposition of interest charges.

**2. Whether anything concerning the interpretation of the subject regulation can be discerned from examining Temp. Treas. Reg. § 1.925(a)-1T(e)(3) and (5).**

Yes. As discussed at oral argument (*see* Transcript of Oral Argument at 37-39, *Abbott Laboratories v. United States*, No. 06-778T (Fed. Cl. argued Feb. 14, 2008)), when read in the context of Temp. Treas. Reg. § 1.925(a)-1T as a whole, and Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (5) in particular, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) reflects the pervasive concept of properly accounting for income and expenses relating to FSC transfer pricing on the parties' books and records with no reference whatsoever to the collection or assessment of tax – or to its timing. Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (5) require that the account receivable and corresponding account payable reflect differences between amounts paid and amounts due under the transfer pricing rules or a subsequent redetermination of such pricing. The amount due may be paid by offsetting accounting entries in the FSC and related supplier's books. The effect required by Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is important and has collateral consequences regardless of the assessment or collection of tax. For example, correlative adjustments to the FSC and related supplier's income and expense will result in the recognition of interest income and expense to the parties, as well as resulting adjustments to the FSC's earnings and profits.

**3. Whether anything concerning the interpretation of the subject regulation can be discerned from either the legislative history of the FSC provisions or the predecessor DISC provisions.**

No. Nothing in the publicly available legislative history appears to address redeterminations in general or the meaning of "shall affect" in particular.

## II. OVERVIEW AND COMPARISON OF THE DISC AND FSC PROVISIONS

The FSC provisions evolved from the DISC provisions, and, where the two provisions were similar, rules comparable to those found in the DISC regulations were adopted in the FSC regulations. Thus, the relevant background on the similarity and differences of the DISC regime and the FSC regime is set forth initially below to provide insight into the reasons for changes in the language of the DISC regulations to the language found in the FSC regulations. And to show, ultimately, why Abbott Laboratories is entitled to partial summary judgment as a matter of law.

### A. Overview of Statutory Provisions

The DISC was created by section 501 of the Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 497, which added sections 991-997 to the Internal Revenue Code of 1954. The DISC provisions created a system of tax deferral, under which a DISC's profits were not taxed to the DISC itself but to the shareholders upon distribution. Staff of J. Comm. on Taxation, 98th Cong., *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984*, 1037 (Comm. Print 1984) ("Jnt. C'ttee Staff Explanation"). Each year, a DISC was deemed to have distributed a portion of its income, which was currently taxable to the DISC's shareholders, while taxation of the remaining portion of the DISC's income could be deferred until it was actually distributed.[1] *Id*.

To qualify for these tax benefits, a DISC had to satisfy several requirements, including a "gross receipts" and a "gross assets" test. *Id*. at 1038. The "gross receipts" test required that 95 percent or more of a DISC's gross receipts consist of qualified gross receipts. *Id*. For these

[1] Before the Tax Reform Act of 1976, a DISC was deemed to have distributed 50 percent of its export profits and 100 percent of its non-export profits. Following the 1976 Act, deferral was permitted only for incremental export income, resulting in a deferral of, at most, 42.5 percent of profits.

purposes, qualified gross receipts were defined as receipts from the sale or lease for use outside the United States of export property or from services related to the sale or lease of export property. *Id*.

The "gross assets" test, on the other hand, required at least 95 percent of the DISC's assets to be qualified export assets. *Id*. at 1038. Qualified export assets included, among other things, inventory, export property, necessary operational equipment and supplies, trade receivables from export sales (including commissions receivables), and working capital. *Id*.

The FSC was created by section 801(a) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, which added sections 921-927 to the Internal Revenue Code of 1954. The FSC provisions provide that a portion of a FSC's "foreign trade income" may be exempt from Federal income tax. Jnt. C'ttee Staff Explanation at 1042. To qualify as a FSC, a foreign corporation must satisfy certain requirements evidencing an adequate foreign presence. *Id*. at 1043. A qualifying FSC is eligible to exempt a portion of its foreign trade income, which is defined as the gross income of a FSC attributable to foreign trading gross receipts. *Id*. at 1046. In general, foreign trading gross receipts are the FSC's gross receipts attributable to the export of certain goods and services. *Id*. at 1047. In addition, a FSC will be considered to have foreign trading gross receipts only if it meets both a "foreign management" and a "foreign economic process" requirement. *Id*. The "foreign management" requirement is satisfied only if the management of the corporation during the taxable year takes place outside of the United States. *Id*. The "economic process" requirement is satisfied if the FSC, or a person under contract with the FSC, participates outside the United States in the solicitation, negotiation, or making of the contract for each transaction. *Id*. at 1048. In addition, the economic process requirement will be

satisfied only if foreign direct costs incurred by the FSC constitute at least 50 percent of total direct costs incurred by the FSC with respect to a transaction. *Id*. at 1049.

Thus, while the basic provisions relating to what qualifies as a DISC and as a FSC are similar, there are several relevant, and, thus, key differences for the purpose of interpreting Treas. Reg. § 1.994-1(e)(4) and Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The DISC provisions exempted the DISC from taxation but imposed tax on actual and certain deemed distributions, creating a deferral of tax on export sales. *See* E. William Pastor, *Foreign Sales Corporations: Cause For Déjà Vu?*, 9 Md. J. Int'l L & Trade 63, 92 (1985). The FSC provisions, on the other hand, do not exempt the FSC itself from taxation, but instead provide an exemption for a portion of the FSC's ***income*** attributable to foreign trading gross receipts. *Id*. Unlike the DISC, the FSC pays tax on its income, less deductible expenses. Thus, a FSC produces a lower effective tax rate on the combined income of the FSC and the related supplier.

The most significant difference between the DISC and FSC provisions lies in the tests that must be satisfied to qualify for their respective tax benefits. While a DISC was required to satisfy the gross receipts and gross assets tests, these requirements are absent in the FSC provisions. The FSC provisions require that a FSC satisfy the foreign incorporation, foreign management, and foreign economic process requirements. *Id*. at 89, 94. In this regard, the FSC provisions represent a significant departure from the DISC provisions, requiring the FSC to be more than a "paper" corporation – which was, in essence, what a DISC generally was. *See id*. at 94. *See also*, Bennett Caplan & Matthew Chametzky, *Domestic International Sales Corporations (DISCs) and Foreign Sales Corporations (FSCs): Providers of Economic Incentives for Wholly-Owned Domestic Exporters*, 12 Brook. J. Int'l L. 1, 22 (1986).

### B. Overview of Regulatory Provisions

As discussed above, the FSC regime evolved from the DISC regime. Like the statutory constructs, there are a few key differences between the DISC and the FSC regulations. The legislative history of the FSC provisions provides that "where the provisions of the bill are identical or substantially similar to the DISC provisions . . . the committee intends that rules comparable to the rules in regulations issued under those provisions will be applied to the FSC." S. Rep. No. 98-169 at 636 (1984).

#### 1. The DISC Regulations on Transfer Prices

Treas. Reg. §§ 1.994-1(e)(3), (4), and (5) set forth the DISC rules regarding the payment of transfer prices or commissions, the subsequent determination of transfer prices or commissions, and the procedures for adjusting the transfer prices or commissions following a redetermination, respectively. Specifically, these provisions provided in pertinent part (set forth in full in the Regulatory Appendix attached):

> **(3) Initial payment of transfer price or commission.**
>
> (i) The amount of a transfer price (or reasonable estimate thereof) actually charged by a related supplier to a DISC, or a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.
>
> . . .
>
> (iii) If the district director can demonstrate, based upon the data available as of the 60th day after the close of such taxable year, that the amount actually paid did not represent a reasonable estimate of the transfer price or commission (as the case may be) to be determined under section 994 and this section, an indebtedness will be deemed to arise, from the person required to make the payment in favor of the person to whom the payment is required to be made, in an amount equal to the difference between the amount of the transfer price or commission determined under section 994 and this section and the amount (if any) actually paid and received. . . . Such indebtedness owed to a DISC shall be treated as an asset but shall not be treated as a trade receivable or other qualified export asset (see §1.993-2(d)(3)) as of the end of the taxable year of the DISC in which the indebtedness is deemed to arise.

. . .

**(4) Subsequent determination of transfer price or commission**.

The DISC and its related supplier would ordinarily determine under section 994 and this section the transfer price payable by the DISC (or the commission payable to the DISC) for a transaction before the DISC files its return for the taxable year of the transaction. After the DISC has filed its return, a redetermination of the transfer price (or commission) may only be made if permitted by the Code and the regulations thereunder. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations thereunder or section 861 and §1.861-8 which affects the amounts which entered into the determination of the transfer price or commission.

**(5) Procedure for adjustments to transfer price or commission**.

(i) (a) If the transfer price (or commission) for a transaction determined under section 994 is different from the price (or commission) actually charged, the person who received too small a transfer price (or commission) or paid too large a transfer price (or commission) shall establish (or be deemed to have established), at the date of the determination or redetermination under subparagraph (4) of this paragraph of the transfer price (or commission) under section 994, an account receivable from the person with whom it engaged in the transaction equal to the difference in amount between the transfer price (or commission) so determined and the transfer price (or commission) previously paid and received. If the account receivable due the DISC is paid within 90 days after the date it is established (or deemed established), then as of the end of the taxable year of the DISC in which the transaction occurred which gave rise to the indebtedness, the account receivable shall be treated as an asset and, under §1.993-2(d)(3) as a trade receivable, and thus as a qualified export asset.

. . .

(iv) An account receivable established in accordance with subdivision (i) of this subparagraph shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2) from the day after the date the account receivable is deemed established to the date of payment. The interest so computed shall be accrued and included in the taxpayer's taxable income for each taxable year during which the account receivable is outstanding.

. . .

### 2. The FSC Regulations on Transfer Pricing

Like their predecessor DISC regulations, Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3), (4), and (5) set forth the FSC rules regarding payments, subsequent determinations, and procedures for adjusting the transfer prices or commissions following a redetermination. Specifically, these provisions provide in pertinent part (set forth in full in the Regulatory Appendix attached):

**(3) Creation of receivables**.

(i) If the amount of the transfer price or rental payment actually charged by a related supplier to a FSC or the sales commission actually charged by a FSC to a related supplier has not been paid, an account receivable and payable will be deemed created as of the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of the FSC during which a transaction to which section 925 is applicable occurs. The receivable and payable will be in an amount equal to the difference between the amount of the transfer price or rental payment or commission determined under section 925 and this section and the amount (if any) actually paid or received. For example, a calendar year FSC's related supplier paid the FSC on July 1, 1985, a commission of $50 on the sale of export property. On September 15, 1986, the extended due date of the FSC's income tax return for taxable year 1985, the related supplier determined that the commission should have been $60. The additional $10 of commission had not been paid. Accordingly, an interest-bearing payable to the FSC from the related supplier in the amount of $10 was created as of September 15, 1986. A $10 interest bearing receivable was also created on the FSC's books.

(ii) An indebtedness arising under the above subdivision (i) shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of the FSC in which the transaction occurred which gave rise to the indebtedness to the date of payment of the indebtedness. The interest so computed shall be accrued and included in the taxable income of the person to whom the indebtedness is owed for each taxable year during which the indebtedness is unpaid if that person is an accrual basis taxpayer or when the interest is paid if a cash basis taxpayer. Because the transactions covered by this subdivision are between the related supplier and FSC, the carrying charges provisions of §1.927(d)-1(a) do not apply.

. . .

**(4) Subsequent determination of transfer price, rental income or commission**.

The FSC and its related supplier would ordinarily determine under section 925 and this section the transfer price or rental payment payable by the FSC or the commission payable to the FSC for a transaction before the FSC files its return for the taxable year of the transaction. After the FSC has filed its return, a redetermination of those amounts by the Commissioner may only be made if specifically permitted by a Code provision or regulations under the Code. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations under that section or section 861 and §1.861-8 which affects the amounts which entered into the determination. In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial. Also, the FSC and related supplier may

redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods. Any redetermination shall affect both the FSC and the related supplier. The FSC and the related supplier may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC, and vice versa.

**(5) Procedure for adjustments to redeterminations**.

(i) If a redetermination under paragraph (e)(4) of this section is made of the transfer price, rental payment or commission for a transaction, or group of transactions, the person who was underpaid under this redetermination shall establish (or be deemed to have established), at the date of the redetermination, an account receivable from the person with whom it engaged in the transaction equal to the difference between the amounts as redetermined and the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid. A corresponding account payable will be established by the person who underpaid the amount due.

(ii) An account receivable established in accordance with the above subdivision (5)(i) of this paragraph shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the day after the date the account receivable is deemed established to the date of payment. The interest so computed shall be accrued and included in the taxable income for each taxable year during which the account receivable is outstanding of an accrual basis taxpayer or when paid if a cash basis taxpayer.

(iii) In lieu of establishing an account receivable in accordance with the above subdivision (5)(i) of this paragraph for all or part of an amount due a related supplier, the related supplier and FSC are permitted to treat all or part of any current or prior distribution which was made by the FSC as an additional payment of transfer price or rental payment or repayment of commission (and not as a distribution) made as of the date the distribution was made. Any additional amount arising on the redetermination due the related supplier after this treatment shall be represented by an account receivable established under the above subdivision (5)(i) of this paragraph. To the extent that a distribution is so treated under this subdivision (5)(iii), it shall cease to qualify as a distribution for any Federal income tax purpose. If all or part of any distribution made to a shareholder other than the related supplier is recharacterized under this subdivision (5)(iii), the related supplier shall establish an account receivable from that shareholder for the amount so recharacterized. . . .

. . .

### 3. Comparison of the DISC and FSC Regulations on Transfer Pricing

#### a. Treas. Reg. § 1.994-1(e)(3) and Temp. Treas. Reg. § 1.925(a)-1T(e)(3)

Treas. Reg. § 1.994-1(e)(3) provided that a commission due to the DISC[2] must be paid by the related supplier within 60 days of the close of the DISC's taxable year. Under Treas. Reg. § 1.994-1(e)(3)(ii), payment of the commission could be made by offsetting accounting entries. If the commission paid within 60 days of the close of the DISC's taxable year was not, however, a reasonable estimate of the transfer price or commission due under section 994, in the Commissioner's view, then the Commissioner would deem an "indebtedness" to arise. Treas. Reg. § 1.994-1(e)(3)(iii). That "debt" would be treated as an "account receivable" but would not be treated as a "qualified export" asset. The existence of the receivable, therefore, had the potential to disqualify the DISC for failing the qualified export asset test.

For its part, Temp. Treas. Reg. § 1.925(a)-1T(e)(3) eliminates the requirement that the commission or transfer price be paid within 60 days of the FSC's year end. T.D. 8126, 52 Fed. Reg. 6428, 6432 (March 2, 1987), *reprinted* at 1987-1 C.B. 184. Instead, Temp. Treas. Reg. § 1.925(a)-1T(e)(3) provides that an interest-bearing account receivable and payable will be deemed created on the due date of the FSC's tax return if the transfer price or commission actually paid prior to the due date of FSC's tax return does not equal the amount determined under section 925. T.D. 8126, 52 Fed. Reg. at 6432. The FSC must be paid the commission, but the creation of the receivable for the FSC does not affect its eligibility as a FSC. Like the DISC, the FSC could pay its commission or transfer price by offsetting accounting entries. Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(iii).

---

[2] The regulations also permit a reasonable estimate of the commission to be paid within the 60-day period. The regulations have a safe harbor that deems payment of at least 50% of the final commission to be a reasonable estimate. Treas. Reg. § 1.994-1(e)(3)(iv)(a).

**b. Treas. Reg. § 1.994-1(e)(4) and Temp. Treas. Reg. § 1.925(a)-1T(e)(4)**

Treas. Reg. § 1.994-1(e)(4) provided that, normally, a DISC and its related supplier would determine the transfer price or commission payable to the DISC before the DISC filed its return for the taxable year. Any redetermination of the DISC's transfer price or commission would be permitted after the DISC's return was filed only if permitted by statute or regulation. The DISC regulation was itself silent on whether a redetermination would be permitted.

Temp. Treas. Reg. § 1.925(a)-1T(e)(4) adopted language from Treas. Reg. § 1.994-1(e)(4), modified it, and added to it. As in Treas. Reg. § 1.994-1(e)(4), Temp. Treas. Reg. § 1.925(a)-1T(e)(4) provides that, normally, a FSC and its related supplier will determine the transfer price or commission before the FSC files its return for the taxable year. However, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) altered the second sentence to provide that, after the FSC has filed its return, a redetermination may be made ***by the Commissioner*** only if permitted by the Code or the regulations. Temp. Treas. Reg. § 1.925(a)-1T(e)(4) then adds language not found in Treas. Reg. § 1.994-1(e)(4). Specifically, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) provides that a FSC and a related supplier may also make a redetermination if their taxable years are open under the statute of limitations for making claims for refund under section 6511. Temp. Treas. Reg. § 1.925(a)-1T(e)(4) adds further language that the FSC and the related supplier may redetermine the foreign trade gross receipts and expenses that affect the transfer pricing. Furthermore, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) added the "shall affect" sentence, the meaning of which is the subject of the parties' dispute. The last sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) also adds a restriction that the FSC and related supplier cannot make a redetermination based on a change in the relationship from commission sales to buy-sell (or vice versa).

**c. Treas. Reg. § 1.994-1(e)(5) and Temp. Treas. Reg. § 1.925(a)-1T(e)(5)**

As with the other transfer pricing provisions, the rules set forth in Temp. Treas. Reg. § 1.925(a)-1T(e)(5) were adopted, in part, from Treas. Reg. § 1.994-1(e)(5). Treas. Reg. § 1.994-1(e)(5) provided that, if a DISC's transfer price or commission determined under the pricing rules in section 994 differed from the price or commission actually charged, then the party that was underpaid was obligated to establish or would be deemed to have established an interest-bearing account receivable from the person with whom it engaged in the transaction, equal to the difference between the amounts determined and the amounts actually paid. Furthermore, Treas. Reg. § 1.994-1(e)(5) provided that, if such account receivable was not paid within 90 days, the account receivable would not be treated as a qualified export asset, resulting potentially in the DISC failing to meet the gross asset test and thereby losing its DISC status. *See* Certain Intercompany Pricing Rules Notice of Proposed Rulemaking, 26 C.F.R. Part 1, 40 Fed. Reg. 29,871 (July 16, 1975); T.D. 7435, 41 Fed. Reg. 43,141 (Sept. 30, 1976), *reprinted* at 1976-2 C.B. 238.

Temp. Treas. Reg. § 1.925(a)-1T(e)(5) also requires that an interest-bearing account receivable be created in favor of the party who is underpaid as a result of a subsequent determination under Temp. Treas. Reg. § 1.925(a)-1T(e)(4). However, Temp. Treas. Reg. § 1.925(a)-1T(e)(5) does not require payment of such account receivable to be made within 90 days, as required by Treas. Reg. § 1.994-1(e)(5). Instead, the account receivable will continue to accrue interest until paid. The removal of the 90-day payment requirement is consistent with the FSC's lack of a qualified export asset test.

## III. THE EVOLUTION FROM TREAS. REG. § 1.994-1(e)(4) TO TEMP. TREAS. REG. § 1.925(a)-1T(e)(4) SHOWS THAT THE "SHALL AFFECT" SENTENCE WAS INCLUDED AS PART OF NEWLY INCLUDED LANGUAGE TO RESOLVE A DISC-ERA AMBIGUITY AS TO WHETHER AMENDED RETURNS COULD BE FILED TO MAKE A REDETERMINATION AND HOW THOSE REDETERMINATIONS MIGHT BE MADE.

### A. "Shall affect" was included in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) without a corresponding provision in Treas. Reg. § 1.994-1(e)(4).

The provision that "[a]ny redetermination shall affect both the FSC and the related supplier" was new to the FSC regulations and did not have a predecessor in the DISC regulations. The following paragraph is a redline comparison of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) with Treas. Reg. § 1.994-1(e)(4) with additions to the DISC regulation in double underline and deletions in struck-through text:

1. Reg § ~~**1.994-1. Inter-company**~~**1.925(a)-1T. Transfer** pricing rules for ~~**DISC's.**~~**FSCs (temporary).**

**(e)** ~~**Methods of**~~**Special rules for applying paragraphs (c) and (d) of this section.**

. . .

*(4) Subsequent determination of transfer price**, rental income** or commission.* The ~~**DISC**~~**FSC** and its related supplier would ordinarily determine under section ~~**994**~~**925** and this section the transfer price **or rental payment** payable by the ~~**DISC (**~~**FSC** or the commission payable to the ~~**DISC)**~~**FSC** for a transaction before the ~~**DISC**~~**FSC** files its return for the taxable year of the transaction. After the ~~**DISC**~~**FSC** has filed its return, a redetermination of ~~**the transfer price (or commission)**~~**those amounts by the Commissioner** may only be made if **specifically** permitted by ~~**the**~~**a** Code ~~**and the**~~**provision or** regulations ~~**thereunder**~~**under the Code**. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations ~~**thereunder**~~**under that section** or section 861 and §1.861-8 which affects the amounts which entered into the determination~~ **of the transfer price or commission**~~**. In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial. Also, the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods. Any redetermination shall affect both the FSC and the related**

**supplier. The FSC and the related supplier may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC, and vice versa.**

The first half of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) contains essentially the DISC regulation with slight modifications to conform to the language to the FSC regime. As revealed by the administrative rulings that arose under the DISC regime, the last half of the paragraph is new and clarifies whether taxpayers and the Commissioner may make redeterminations of the FSC transfer prices. The regulation resolved the ambiguity that was contained in the DISC regulation as to whether the ability to make a redetermination was solely the province of the Commissioner or whether taxpayers could also make a redetermination to DISC (now FSC) transfer pricing. The new language in the regulation states unambiguously that the FSC and its related supplier may make redeterminations of the transfer price. The additional language also states how a redetermination is made and describes the consequences of the redetermination. It states that additional sales may be added to the foreign trade gross receipts or expenses may be reallocated to affect the combined taxable income. There is nothing else in the new FSC language that addresses assessment, collection, or timing. The regulation also states that the relationship (buy-sell or commission) between the FSC and the related supplier cannot be changed in a redetermination.

### B. The rulings under Treas. Reg. § 1.994-1(e)(4) addressed the dispute between taxpayers and the Commissioner as to whether amended returns could be filed to redetermine DISC commissions or intercompany pricing.

The focus of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) on whether and, if so, how a taxpayer can make a redetermination is informed by the Service's prior ruling history under Treas. Reg. § 1.994-1(e)(4). Before Rev. Rul. 82-81, 1982-1 C.B. 109, the Service issued a series of rulings addressing whether a DISC and its related supplier were permitted to make redeterminations on amended tax returns. After issuing Rev. Rul. 82-81, there were additional

rulings concerning how redeterminations may be made on the amended returns permitted under Rev. Rul. 82-81. All of the rulings, therefore, were concerned with the disputed questions of "whether" and "how" redeterminations could be made. None of the rulings addressed a dispute as to "when."

**1. This issue of DISC transfer pricing redeterminations seems to have been first raised in Priv. Let. Rul. 7949036 (Sept. 5, 1979) in which the Service ruled that a DISC could redetermine intercompany prices after its original return was filed.**

In Priv. Let. Rul. 7949036 (Sept. 5, 1979), the issue was whether a DISC (referred to as "N" in the Ruling) could file an amended return to claim additional DISC commissions based on a redetermination of the commission amount by using different transfer pricing methods for some of it sales. The ruling reached three conclusions with respect to the redetermination:

> (4) If N desires to, or is required to, redetermine intercompany prices after its original return is filed, it can utilize any of the methods described in section 994(a) of the Code with respect to any SIC group in order to obtain the most favorable allocation of income consistent with section 994 of the Code and the regulations thereunder.
>
> (5) Any increase in N's income as a result of such redetermination constitutes a qualified export receipt within the meaning of section 993(a) of the Code.
>
> (6) In the event that such redetermination of transfer prices or commissions create a receivable from M to N, such receivable will be a qualified export asset within the meaning of section 993(b) of the Code even though such redetermination occurs after N's return is filed, provided that the conditions of section 1.994-1(e)(5) of the regulations are met.

(Emphasis added.) Within two months, the Service contacted the taxpayer stating it was revoking the three rulings above and that the taxpayer may not rely on them. *See* Priv. Let. Rul. 8035047 (June 5, 1980). In between the original ruling and its revocation, the Service decided that taxpayers were ***not*** entitled to file amended returns to adjust DISC commissions. *See* Tech. Adv. Memo. 8020008 (1980).

**2. From 1980 until January 1982, the Service's position evolved from prohibiting the filing of amended returns to permitting the filing of amended returns in certain circumstances.**

In an undated Technical Advice Memorandum, the Service ruled that a DISC may ***not*** file amended returns to change transfer pricing methods. Tech. Adv. Memo. 8020008 (1980). The ruling states that "[n]owhere does the Code or the regulations allow a party at will to change its pricing method in order to maximize income after the original return [is] filed." (Emphasis added.) Just two years later, the Service revoked that advice and stated that they "have determined that the conclusion MAY be erroneous." Tech. Adv. Memo. 8227002 (Feb. 24, 1982) (emphasis in original).

Before the Service revoked Tech. Adv. Memo. 8020008, the Service began issuing rulings permitting the filing of amended returns to redetermine DISC transfer pricing under section 994. In Tech. Adv. Memo. 8137026 (May 29, 1981), the Service allowed a taxpayer to switch from section 482 transfer pricing to redetermine the DISC commissions paid under section 994. The taxpayer had filed its original tax return calculating its DISC commissions under section 482, and the Service allowed the taxpayer to redetermine the commission on an amended return to apply the section 994 pricing methods. Likewise, in Tech. Adv. Memo. 8204018 (Oct. 13, 1981), the Service permitted a DISC and a related supplier to file amended tax returns to redetermine the DISC commissions based on a change of pricing method. The Service stated that there was nothing in the Code or regulations that ***prevented*** the redetermination from being made. *Id*.

In January 1982, the Service solidified its new position and issued Rev. Rul. 82-81, permitting the filing of amended returns to redetermine DISC transfer pricing. The facts of the ruling are similar to the facts in Tech. Adv. Memo. 8137026. The taxpayer originally applied the section 482 transfer pricing rules to its DISC commissions. The Service adjusted the section 482

transfer pricing such that the DISC commissions under the combined taxable income rule would exceed the adjusted section 482 transfer pricing. The Service ruled that it would accept timely filed amended returns to make the changes to both the DISC and the related supplier. The Revenue Ruling does not analyze when the returns must be filed other than stating that they must be "timely." The facts of the ruling assume the "period of limitations has not expired" for either the DISC or the related supplier.[3] In February 1982, the Service expressly revoked its ruling in Tech. Adv. Memo. 8020008. *See* Tech. Adv. Mem. 8227002 (Feb. 24, 1982).

Thus, the Service's struggle with the "whether" of DISC redeterminations is evident through this progression of rulings and memoranda. The Service first allowed the filing of amended returns in Priv. Let. Rul. 7949036 issued in September 1979, questioned that decision in November 1979, and revoked it in June 1980. *See* Priv. Let. Rul. 8035047 (June 5, 1980). The Service then ruled in 1980 that no amended returns were allowed for taxpayer redeterminations of DISC transfer pricing because there was nothing in the Code or regulations specifically ***allowing*** the redetermination. *See* Tech. Adv. Memo. 8020008 (1980). A year later, in May and October 1981, the Service changed its position again and permitted taxpayers to file amended returns because there was nothing in the Code or regulations ***prohibiting*** the redetermination. *See* Tech. Adv. Memo. 8137026 (May 29, 1981); Tech. Adv. Memo. 8204018 (Oct. 13, 1981). Finally, in February 1982, after issuing Rev. Rul. 82-81, the Service revoked

[3] In a Non-Docketed Significant Advice Review dated December 20, 2000 (2004 NSAR #010275) the Service discussed the timing requirement for filing amended tax returns for redetermining DISC transfer pricing. The advice states that the Service should not allow additional DISC deductions where the corresponding income escapes taxation. This document post-dates the decision in *Union Carbide Corp. v. Commissioner*, 110 T.C. 375 (1998), and follows the Service's change in position after the *Union Carbide* decision. It appears the document was released in 2004 in response to a Freedom of Information Act request.

the TAM that had ruled against the filing of the amended returns because the prior "conclusion MAY be erroneous." Tech. Adv. Memo. 8227002 (Feb. 24, 1982) (emphasis in original).

**3. After resolving the issue of "whether" taxpayers may file amended returns to redetermine DISC transfer pricing, the Service issued rulings and guidance on "how" the redeterminations could be made.**

After issuing Rev. Rul. 82-81 that resolved the issue of "whether" DISC transfer pricing redeterminations could be made, the Service turned to the question of "how" to make them. In Rev. Rul. 82-81, the Service permitted the filing of amended tax returns to recalculate the DISC transfer pricing for transactions originally reported on the DISC tax return. The Service later rejected taxpayers' requests to file amended returns and claim additional DISC commissions, however, for transactions that could have been reported on their original returns but were not. Tech. Adv. Memo. 8527005 (March 7, 1985); Gen. Couns. Memo. 39,374 (Nov. 30, 1984). The Service rejected the filing of amended returns in these circumstances because allowing the redetermination to add additional transactions to the DISC's return would circumvent the 60-day payment rule of Treas. Reg. § 1.994-1(e)(3)(iii). The Service explained its rationale for allowing a redetermination caused by changing the transfer pricing of previously reported transactions (as in Rev. Rul. 82-81) and for ***disallowing*** a redetermination caused by adding new transactions altogether.

> Although the DISC in Rev. Rul. 82-81 and the DISC in the instant case both filed amended returns in order to attribute additional income to the DISC and to reduce the income of the related supplier, the additional income in Rev. Rul. 82-81 resulted from a change in the pricing rule that would be applied to the accrued transactions between the DISC and the related supplier, and not from a change in the transactions to which the pricing rule would be applied. By attributing the transactions to the DISC on the original return, the related supplier in Rev. Rul. 82-81 subjected a substantial portion of the proceeds from the transactions (albeit an incorrect amount) to both immediate DISC deferral and immediate export-related restrictions. See Treas. Reg. sections 1.993-2(d)(2), 1.994-1(e)(3), and 1.994-1(e)(6). In the present case, by contrast, the related supplier, by not attributing the transaction to the DISC on the original tax return obtained the use of the entire proceeds of the transaction while completely escaping any export-

> related restrictions on that use. Accordingly, we conclude that a related supplier and its DISC may not file amended returns to attribute to the DISC income resulting from transactions that could have been, but were not, attributed to the DISC on the original returns. Rev. Rul. 82-81 is distinguished.

Gen. Couns. Memo. 39,374 (Nov. 30, 1984).

Attempting to clarify further how redeterminations may be made on amended returns, the Service ruled that, in fact, additional transactions may be added, but only if they fall within the group of transactions that were previously reported on the DISC returns. Tech. Adv. Memo. 8720003 (Jan. 27, 1987); Tech. Adv. Memo. 8736006 (June 5, 1987). The Service ruled that a taxpayer may pay additional commissions so long as the additional transactions met the transaction grouping requirements of Treas. Reg. § 1.994-1(c)(7). In these rulings, the Service also required that the original commission paid within the 60-day period following the end of the tax year be at least 50% of the ultimate commission allowed. The 50% requirement is the safe harbor for the reasonable estimate of the commission required under the 60-day rule in Treas. Reg. § 1.994-1(e)(3) and part of the qualified export asset test.[4] Adding additional transactions from the same group was permitted even if there were multiple related suppliers making the sales of the grouped products. Tech. Adv. Memo. 8736006 (June 5, 1987). The Service also allowed amended returns to be filed for redeterminations based on an increase in combined taxable income for transactions reported on the original return because of changes in expense allocation under Treas. Reg. § 1.861-8. Tech. Adv. Memo. 8721004 (Feb. 18, 1987).

---

[4] The Service ruled that the failure to follow the 60-day rule disqualified the DISC under the qualified export asset test. *See* Tech. Adv. Mem. 8027018 (March 28, 1980); Tech. Adv. Memo. 7728013 (March 23, 1977). The Service ruled that the 50% test did not apply to additional DISC commissions paid after the Service switched its published position on whether the sales were qualified export sales. *See, e.g.*, Rev. Rul. 88-74, 1988-2 C.B. 300 (increased commissions due to change of Service position on qualifying nature of sales exempt from 60-day rule of Treas. Reg. § 1.994-1(e)(3)(iii)); Tech. Adv. Memo. 8527005 (March 7, 1985) (same); Gen. Couns. Memo. 39,374 (Nov. 30, 1984) (same).

In Tech. Adv. Memo. 8232015 (May 4, 1982) and Tech. Adv. Memo. 8310004 (Nov. 13, 1982), the Service ruled that, if the taxpayer made a redetermination of DISC transfer pricing, then the DISC and the related supplier had to create a payable and receivable for the resulting balances owed. If the redetermination increased the DISC benefit, then the DISC was required to create an account receivable, with the related supplier being required to create an account payable under Treas. Reg. § 1.994-1(e)(5). Provided the accounts were settled within 90 days of the redetermination, the receivable was a qualified export asset under Treas. Reg. § 1.994-1(e)(5)(i)(a). If the accounts were not settled within 90 days of creation, then the receivable was treated as a non-qualifying asset that may disqualify the DISC under the qualifying asset test. If, on the other hand, the redetermination decreased the DISC benefit, then the DISC was required to establish an account payable. In both TAMs, the taxpayer asked that it be permitted to reclassify distributions made by the DISC in the taxable year of the redetermination as payment of the DISC account payable (and satisfaction of the account receivable) rather than treat the distributions as DISC dividends to the recipient. In both TAMs, the Service refused to allow the reclassification. The Service later agreed to the taxpayer's request and created a procedure that allowed distributions that taxpayers previously treated as DISC dividends to be treated as a repayment of the account payable created under Treas. Reg. § 1.994-1(e)(5). *See* Rev. Proc. 84-3, 1984-1 C.B. 361, *modified and superseded* by Rev. Proc. 85-45, 1985-2 C.B. 505. Treas. Reg. § 1.994-1(e)(5) was amended to make this position retroactive. T.D. 7984, 49 Fed. Reg. 40,016, 40,017 (Oct. 12, 1984), *reprinted* at 1984-2 C.B. 159.

In Priv. Let. Rul. 8604013, the Service ruled that book entries simulating the effect of a later redetermination may be made even if the taxpayer had liquidated its inactive DISC. Priv. Let. Rul. 8604013 (Oct. 22, 1985). Following the introduction of the FSC, the taxpayer in the

ruling discontinued its use of the DISC. The taxpayer wanted to liquidate the DISC, but was concerned whether liquidation of the DISC would prohibit redeterminations of the DISC transfer pricing. At the time of the ruling, the taxpayer had a number of years with open statutes of limitations that were under audit or were to be audited. The ruling concluded that:

> In the event of future redeterminations of DISC transfer prices or commissions, made after the complete liquidation of S, P may reflect such redeterminations by appropriate <u>book entries</u>, with the same consequences, for federal income tax purposes, <u>as if receivables had been established and paid as provided in section 1.994-1(e)(5) of the Income Tax Regulations</u>.

(Emphasis added.)

### C. The DISC rulings show that the "shall affect" language added in the FSC regulations addresses the reporting of income and expense; it has nothing to do with the assessment and collection of tax.

The DISC rulings discussed above address whether taxpayers were permitted to make transfer price redeterminations under Treas. Reg. § 1.994-1(e)(4). The rulings first considered the threshold question of whether amended returns were allowed at all. Next, the rulings addressed how taxpayers were permitted to make redeterminations. None of the rulings involved a dispute as to when taxpayers were permitted to make a redetermination. The history of the DISC redetermination provisions and subsequent drafting of the FSC redetermination provisions show that "any redetermination shall affect both the FSC and the related supplier" has nothing to do with the timing of the redetermination or with assessment or collection but solely with the consequences that flow from the redetermination.

#### 1. The differences between the DISC regime and FSC regime explain the changes from Treas. Reg. § 1.994-1(e)(4) to Temp. Treas. Reg. § 1.925(a)-1T(e)(4).

The DISC regime had requirements to qualify for the tax benefit that are not present in the FSC regime. The qualified export asset rule with its related 60-day payment rule influenced the Service's rulings on DISC redeterminations. The Service's rulings demonstrate that the

ability of taxpayers to make redeterminations was limited by the fact that certain redeterminations would disqualify the DISC for failing the qualified export asset test. In fact, in one case, the United States Claims Court upheld the Service's disallowance of DISC benefits filed on amended returns for the failure of the DISC to qualify because no commissions were paid within the 60-day period following the close of the DISC's tax year. *Stokely-Van Camp, Inc. v. United States*, 21 Cl. Ct. 731, 741-44 (1990), *aff'd* 974 F.2d 1319 (Fed. Cir. 1992).

In promulgating the FSC regulations, Treasury explicitly addressed the issues raised in the DISC rulings. Temp. Treas. Reg. § 1.925(a)-1T(e)(4) answers the question of "whether" by stating that taxpayers may make FSC redeterminations, thus resolving the issue that led to Rev. Rul. 82-81 ("a redetermination may be made by the FSC and related supplier"). The FSC regulation also answers the question of "how" redeterminations may be made. First, the redetermination of transfer prices may be made if another method provides more FSC benefit ("if they determine that a different transfer pricing method may be more beneficial"). *Cf.* Rev. Rul. 82-81 (permitting change in transfer pricing for transactions on original DISC return to more beneficial method). Second, the redetermination may be of an increase in foreign trading gross receipts or reduction of expenses ("the FSC and related supplier may redetermine the amount of the foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods"). This provision is a loosening of the prior DISC rulings that did not permit the DISC to file an amended return to add transactions not claimed on the original DISC return. *See* Tech. Adv. Memo. 8527005 (March 7, 1985); Gen. Couns. Memo. 39,374 (Nov. 30, 1984). The redetermination based on reallocation of expenses follows that expenses may be adjusted on an amended DISC return. *Cf.* Tech. Adv. Memo. 8721004 (Feb. 18, 1987).

**2. "Any redetermination shall affect both the FSC and the related supplier" by creating an offsetting account receivable and account payable.**

In the DISC rulings, the DISC and related supplier were required to create offsetting accounts payable and accounts receivable as a result of the permitted redeterminations. Tech. Adv. Memo. 8232015 (May 4, 1982); Tech. Adv. Memo. 8310004 (Nov. 13, 1982). The rulings and the Revenue Procedures address the other consequences of setting up the receivables in the context of the DISC's particular rules. *See id.*; *see also* Rev. Proc. 84-3, 1984-1 C.B. 361, *modified and superseded* by Rev. Proc. 85-45, 1985-2 C.B. 505. The rulings required the DISC receivable to be paid within 90 days so that the receivable was a qualified asset. Treas. Reg. § 1.994-1(e)(5)(iii), the rulings, and the Revenue Procedures thus permitted the taxpayer to recharacterize prior DISC distributions as repayments of the DISC account payable, ensuring that taxpayers were not double-taxed by having income from the DISC dividend, while at the same time disallowing the deduction for the DISC commission that gave rise to the account payable. The DISC had distributions each year as a result of these actual and deemed distributions. Payments could be made by offsetting accounting entries between the parties. *See* Treas. Reg. § 1.994-1(e)(5)(ii).

Unlike the DISC, the FSC is neither subject to the qualified asset test, nor is it required to pay distributions. However, the FSC and the related supplier are required to set up corresponding accounts payable and receivable if the transfer price is not equal to the commission paid to the FSC or if there is a redetermination of the commission income due the FSC. *See* Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (5). The DISC had similar requirements for setting up accounts to reflect the difference between the commission paid and the amount due under the transfer pricing rules. *See* Treas. Reg. §§ 1.994-1(e)(3) and (5). The Service even went so far in one DISC ruling to allow the taxpayer to liquidate its DISC and make the

redeterminations solely through bookkeeping entries that simulated the effect of the redetermination. Priv. Ltr. Rul. 8604013 (Oct. 22, 1985). Thus, with respect to the DISC, the Service acknowledged that the redetermination could be made solely through the making of bookkeeping entries to give effect to the redetermination. The FSC does not have the requirements of the qualified asset test and the deemed distributions as the DISC did, which drove the results in the DISC rulings. However, the temporary FSC regulations continued the use of accounts receivable and payable and satisfaction of such accounts through bookkeeping entries. "Payment of the original amount due the related supplier or FSC, whichever is applicable, or of any receivable deemed created, may be in the form of money, property, sales discount or offset accounting entry." T.D. 8126, 52 Fed. Reg. at 6432 (emphasis added). The original payment of the receivable may be "an accounting entry offsetting the amount due the related supplier, or FSC, whichever applies, against an existing debt of the other party . . ." Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(iii). "The offset accounting entries must be clearly identified in both the related supplier's and FSC's books of account." *Id.* The FSC regulations also permit the recharacterization of dividends from the FSC to the related supplier as a payment of the account receivable and account payable created in a redetermination. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(iii).

The FSC requirements that "[a]ny redetermination shall affect both the FSC and related supplier" can be read in light of the DISC rulings and the changes between the DISC and FSC regimes. The "shall affect" language merely requires that the corresponding income and expense affect the FSC and the related supplier by the establishment of accounts receivable and payable to reflect the amount of the redetermination. The "shall affect" language requires the

corresponding book-keeping adjustments arising from the redetermined FSC commissions like the book-keeping adjustments required for the DISC commissions.

## IV. THE CONCEPT OF PROPERLY ACCOUNTING FOR THE AMOUNT OF INCOME AND EXPENSES IN THE PARTIES' BOOKS AND RECORDS IS PERVASIVE THROUGHOUT TEMP. TREAS. REG. § 1.925(a)-1T, AS SEEN PARTICULARLY IN TEMP. TREAS. REG. §§ 1.925(a)-1T(e)(3), (4), AND (5).

In its opening and reply briefs, Abbott Laboratories showed that the "shall affect" sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) merely sets forth the basic principle that any changes to a related supplier's FSC commission expenses must correspond with changes to the FSC's income. This conclusion is confirmed not only by its plain language, but also in the context of Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The same holds true when the "shall affect" sentence is read in the context of the entire Temp. Treas. Reg. § 1.925(a)-1T as well. A pervasive theme within Temp. Treas. Reg. § 1.925(a)-1T is that income and expense must be correspondingly and accurately reflected on the books of both the related supplier and the FSC. While this theme is pervasive throughout this regulation, the concepts that are neither pervasive, nor, indeed, existent are those relating to assessment, liability, or collection.

### A. Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (5) ensure that the parties' income and expenses are properly accounted for in their books.

Temp. Treas. Reg. § 1.925(a)-1T(e)(3) addresses the situation of when the related supplier does not pay the amount owed to the FSC before the end of their taxable year. The section establishes the mechanisms by which receivables and payables are set up, and the ramifications of doing so – an interest charge. Temp. Treas. Reg. § 1.925(a)-1T(e)(3) provides:

> **(3) Creation of receivables**.
>
> (i) If the amount of the transfer price or rental payment actually charged by a related supplier to a FSC or the sales commission actually charged by a FSC to a related supplier has not been paid, an account receivable and payable will be deemed created as of the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of

> the FSC during which a transaction to which section 925 is applicable occurs. The receivable and payable will be in an amount equal to the difference between the amount of the transfer price or rental payment or commission determined under section 925 and this section and the amount (if any) actually paid or received. For example, a calendar year FSC's related supplier paid the FSC on July 1, 1985, a commission of $50 on the sale of export property. On September 15, 1986, the extended due date of the FSC's income tax return for taxable year 1985, the related supplier determined that the commission should have been $60. The additional $10 of commission had not been paid. Accordingly, an interest-bearing payable to the FSC from the related supplier in the amount of $10 was created as of September 15, 1986. A $10 interest bearing receivable was also created on the FSC's books.
>
> (ii) An indebtedness arising under the above subdivision (i) shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of the FSC in which the transaction occurred which gave rise to the indebtedness to the date of payment of the indebtedness. The interest so computed shall be accrued and included in the taxable income of the person to whom the indebtedness is owed for each taxable year during which the indebtedness is unpaid if that person is an accrual basis taxpayer or when the interest is paid if a cash basis taxpayer. Because the transactions covered by this subdivision are between the related supplier and FSC, the carrying charges provisions of §1.927(d)-1(a) do not apply.
>
> (iii) Payment of dividends, transfer prices, rents, commissions, service fees, receivables, or payables may be in the form of money, property, sales discount, or an accounting entry offsetting the amount due the related supplier, or FSC, whichever applies, against an existing debt of the other party to the transaction. This provision does not eliminate the requirement that actual cash payments be made by the related supplier to a commission FSC if the receipt of payment test of section 924(e)(4) is used to meet the foreign economic process requirements of section 924(d). The offset accounting entries must be clearly identified in both the related supplier's and FSC's books of account.

The preamble to Temp. Treas. Reg. § 1.925(a)-1T explains that this provision replaced Treas. Reg. § 1.994-1(e)(3), which required, in the DISC context, that commissions due the DISC be paid within 60 days of the DISC's year end. T.D. 8126, 52 Fed. Reg. at 6432. Rather than continuing this 60-day requirement, Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(i) provides that, if upon the due date of the FSC's tax return, the amount of the commission determined under the pricing rules established in section 925 has not been fully paid, an account receivable and corresponding account payable in an amount equal to the difference between the amount

determined under section 925 and the amount actually paid will be deemed created. "Payment of the original amount due the related supplier or FSC, whichever is applicable, or any receivable deemed created, may be in the form of money, property, sales discount, or <u>offset accounting entry</u>." T.D. 8126, 52 Fed. Reg. at 6432 (emphasis added). If payment is by offsetting accounting entries, these "entries must be clearly identified in both the related supplier's and FSC's books of account."[5] Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(iii).

Furthermore, such account receivable will accrue interest, which will be included in the income of the person to whom the indebtedness is owed. Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(ii). Temp. Treas. Reg. § 1.925(a)-1T(e)(3) ensures that the amounts actually paid and the commissions determined to be due under the pricing rules of section 925 are properly

---

[5] This concept is found in other places of Temp. Treas. Reg. § 1.925(a)-1T as well. In Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii), for example, the failure to accurately reflect income and expense in the parties' books may affect their use of administrative pricing methods under section 925(c):

> (ii) Administrative pricing methods. The administrative pricing methods may be applied in situations in which the FSC is either the principal or commission agent on the transaction, or group of transactions, only if the requirements of section 925(c) are met. . . . If a related supplier is performing the required activities on behalf of the FSC with regard to a transaction, or group of transactions, the requirements of section 925(c) will be met if the FSC pays the related supplier an amount equal to the direct and indirect expenses related to the required activities. See paragraph (c)(6)(ii) of this section for the amount of compensation due the related supplier. <u>The payment made to the related supplier must be reflected on the FSC's books and must be taken into account in computing the FSC's and related supplier's combined taxable income. If it is determined that the related supplier was not compensated for all the expenses related to the required activities or if the entire payment is not reflected on the FSC's books or in computing combined taxable income, the administrative pricing methods may be used but proper adjustments will be made to the FSC's and related supplier's books or income</u>. . . .

(Emphasis added.)

accounted for by the FSC and the related supplier. The difference between the amount paid and the amount owed must be properly reflected as an account receivable and corresponding payable on the parties' books because of this interest charge. Likewise, the difference between the amounts actually paid and the amounts owed must be properly recorded on the books of the FSC and the related supplier, as the amount owed may be paid by means of offsetting accounting entries in the FSC and related supplier's books.

Temp. Treas. Reg. § 1.925(a)-1T(e)(5) is likewise concerned with accurately reflecting the amount of income and expense assigned to the FSC and the related supplier. Temp. Treas. Reg. § 1.925(a)-1T(e)(5) provides in relevant part:

> **(5) Procedure for adjustments to redeterminations**.
>
> (i) If a redetermination under paragraph (e)(4) of this section is made of the transfer price, rental payment or commission for a transaction, or group of transactions, the person who was underpaid under this redetermination shall establish (or be deemed to have established), at the date of the redetermination, an account receivable from the person with whom it engaged in the transaction equal to the difference between the amounts as redetermined and the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid. A corresponding account payable will be established by the person who underpaid the amount due.
>
> (ii) An account receivable established in accordance with the above subdivision (5)(i) of this paragraph shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the day after the date the account receivable is deemed established to the date of payment. The interest so computed shall be accrued and included in the taxable income for each taxable year during which the account receivable is outstanding of an accrual basis taxpayer or when paid if a cash basis taxpayer.
>
> (iii) In lieu of establishing an account receivable in accordance with the above subdivision (5)(i) of this paragraph for all or part of an amount due a related supplier, the related supplier and FSC are permitted to treat all or part of any current or prior distribution which was made by the FSC as an additional payment of transfer price or rental payment or repayment of commission (and not as a distribution) made as of the date the distribution was made. Any additional amount arising on the redetermination due the related supplier after this treatment shall be represented by an account receivable established under the above subdivision (5)(i) of this paragraph. To the extent that a distribution is so treated

> under this subdivision (5)(iii), it shall cease to qualify as a distribution for any Federal income tax purpose. If all or part of any distribution made to a shareholder other than the related supplier is recharacterized under this subdivision (5)(iii), the related supplier shall establish an account receivable from that shareholder for the amount so recharacterized. . . .

Under Temp. Treas. Reg. § 1.925(a)-1T(e)(5), if the commission or transfer price is redetermined pursuant to Temp. Treas. Reg. § 1.925(a)-1T(e)(4), the person who has been underpaid as a result of such redetermination must create an account receivable (and the person who underpaid must create a corresponding account payable), equal to the difference between the amount as redetermined and any amount actually paid or reflected in the accounts established under Temp. Treas. Reg. § 1.925(a)-1T(e)(3). The accounts will bear interest, which is to be included in taxable income each year. Temp. Treas. Reg. § 1.925(a)-1T(e)(5) makes it essential for the related supplier and the FSC to reflect accurately on their books the income and corresponding expenses created by a redetermination, as this amount will continue to accrue interest until it is paid. Rather than create an account receivable, the related supplier is granted the option, however, to simply recharacterize past dividend payments from the FSC and treat them as payment of the receivable, which may avoid the interest charge depending on the timing of the distribution. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(iii).

The "shall affect" sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), therefore, fits within this regulatory construct by requiring that the income and expense of both the FSC and the related supplier be adjusted following a redetermination, so that this amount may be properly accounted for. In this regard, any redetermination ***affects*** both the FSC and the related supplier by requiring correlative adjustments to the parties' income and expenses. The correlative adjustment must be made following a redetermination to ensure that the parties' books accurately reflect the correct amounts and that the appropriate accounting entries are recorded pursuant to Temp. Treas. Reg. § 1.925(a)-1T(e)(5).

**B. The "effect" required by Temp. Treas. Reg. § 1.925(a)-1T(e)(4) has collateral consequences to the FSC and the related supplier through the consequences detailed in Temp. Treas. Reg. § 1.925(a)-1T(e)(5).**[6]

The correlative adjustments that must occur pursuant to the "shall affect" sentence when a related supplier's commission expense or a FSC's commission income is redetermined are significant regardless whether they ultimately result in assessment or collection of tax. The correlative adjustments required by the "shall affect" sentence produce several effects for which Temp. Treas. Reg. § 1.925(a)-1T(e)(5) is responsible.

For example, the adjustments made to the FSC's and related supplier's income and expense requires the recognition of interest income and expense by the parties. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(5). To ensure that result, upon a redetermination of a related supplier's commission expense or a FSC's commission income, each party must make, on their books, correlative adjustments to the amounts of their income and expense. Rather than accrue the interest until paid, however, the FSC and related supplier may recharacterize a dividend paid by the FSC as a repayment of the excess FSC commission. Under Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(iii),

> [i]n lieu of establishing an account receivable in accordance with the above subdivision (5)(i) of this paragraph for all or part of an amount due a related supplier, the related supplier and FSC are permitted to treat all or part of any current or prior distribution which was made by the FSC as an additional payment of transfer price or rental payment or repayment of commission (and not as a distribution) made as of the date the distribution was made.

To the extent a FSC and related supplier permit the recharacterization of a prior dividend as a repayment of excess commission income, "it shall cease to qualify as a distribution for any

[6] As discussed at the oral argument, Abbott Laboratories' interpretation of "shall affect" has tax effect for the related supplier and the FSC even though the FSC's statute of limitation on assessment has closed. *See* Transcript of Oral Argument at 37-39, *Abbott Laboratories v. United States*, No. 06-778T (Fed. Cl. argued Feb. 14, 2008).

Federal income tax purpose." Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(iii). Thus, the changes made to the FSC and the related supplier under Temp. Treas. Reg. §§ 1.925(a)-1T(e)(4) and (5) have consequences "for any Federal income tax purpose."[7]

These corresponding adjustments to income, expenses, and interest obligations triggered by Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3), (4), and (5) have other collateral consequences as well, among them being adjustments to the FSC's earnings and profits.[8] Thus, when the FSC is affected by an increase in its commission income and by a resulting increase in its interest income (assuming the FSC's dividends are not used to set off the additional amount owed), so too is the FSC's earnings and profits account increased. This change to a FSC's earnings and profits is significant because the treatment of distributions from a FSC to its shareholders, as well as the FSC's ability to carry over or carry back net operating losses, depends on the amount of the FSC's earnings and profits. *See* Temp. Treas. Reg. § 1.926(a)-1T(a) (FSC distribution out of its earnings and profits includable in shareholders' income as a dividend); Treas. Reg. § 1.926(a)-1(b) (ordering rules for distributions out of a FSC's earnings and profits); Temp. Treas. Reg. § 1.921-3T(c) (ordering rules regarding FSC's earnings and profits attributable to various types of income when FSC incurs an earnings and profits deficit).

When read in the context of Temp. Treas. Reg. § 1.925(a)-1T, therefore, the "shall affect" sentence is in harmony with the regulation's concern with properly accounting for income and expenses in the parties' books and records. This is especially important following a

---

[7] Temp Treas. Reg. § 1.925(a)-1T(e)(5)(iii) goes so far as to allow a FSC dividend paid to another shareholder, not the related supplier, to be recharacterized as a repayment of an excess commission with the corresponding establishment of an account payable and account receivable to correct the recharacterization.

[8] Earnings and profits of a FSC include, among other things, items includable in gross income under section 61. *See* Treas. Reg. § 1.312-6(b); Treas. Reg. § 1.964-1(a)(1); Temp. Treas. Reg. § 1.926(a)-1T(b)(2).

redetermination under Temp. Treas. Reg. § 1.925(a)-1T(e)(4). The additional amount owed to the FSC (or the related supplier) will result in an interest-bearing account receivable and corresponding account payable under Temp. Treas. Reg. § 1.925(a)-1T(e)(5). And, all of these income and interest adjustments ultimately affect the FSC's earnings and profits and the amount of distributions eligible to be distributed or used by the FSC's shareholders.

## V. THE LEGISLATIVE HISTORIES OF THE DISC AND FSC PROVISIONS DO NOT SHED LIGHT ON THE MEANING OF "SHALL AFFECT"

Research of the publicly available legislative histories of the Revenue Act of 1971 (DISC provisions) and the Deficit Reduction Act of 1984 (FSC provisions) has not provided any insight into the meaning of the "shall affect" sentence. Unlike the administrative rulings, *i.e.* the de facto regulatory history, the legislative histories do not evidence a reason for the addition of the "shall affect" language in Temp. Treas. Reg. § 1.925(a)-1T(e)(4).

For the Court's benefit, a search of the published legislative history included a review of the following documents:

1. 129 Cong. Rec. (1983);
2. 130 Cong. Rec. (1984);
3. Staff of S. Comm. on Finance, S. Prt. No. 98-169 (1984);
4. H.R. Rep. 98-861, 2d. Sess. (1984)(Conf. Rep.);
5. Staff of J. Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 1037 (Comm. Print 1984);
6. Foreign Sales Corporation Act: Hearings Before S. Comm. On Finance (1983);
7. Staff of J. Comm. On Taxation, Replacement of Domestic International Sales Corporations (DISCs), Description of S. 1804 (Foreign Sales Corporation Act), 98th Cong. (Comm. Print 1983);
8. 117 Cong. Rec. (1971);
9. H.R. Rep. 92-533 (1971);

10. S. Rep. 92-437 (1971);

11. S. Rep. 92-553 (1972) (Conf. Rep.);

12. Staff of Joint Comm. on Int. Rev. Taxation, 92d Cong., General Explanation of the Revenue Act of 1971 (Comm. Print 1971);

13. Tax Proposals Contained in the President's New Economic Policy: Hearings Before the H. Comm. on Ways and Means, 92d Cong. Parts 1-4 (1971);

14. Hearing on H.R. 10947 Before the S. Comm. on Finance, 92d Cong., Parts 1-2 (1971);

15. The President's New Economic Program: Hearings Before the Joint Econ. Comm., 92d Cong., Parts 1-3 (1971);

16. The 1971 Economic Report of the President: Hearings Before the Joint Econ. Comm., 92d Cong., Parts 1-3 (1971);

17. Tariff And Trade Proposals: Hearings Before the H. Comm. On Ways And Means, 91st Cong. Part 1 (1970);

18. Trade Act of 1970 Amendments 925 and 1009 to H.R. 17550: Hearings Before S. Comm. On Finance, 91st Cong. (1983); and

19. H.R. Rep. 91-1435 (1970).

## CONCLUSION

For the reasons set forth above and in its previously submitted briefs, Abbott Laboratories respectfully requests that this Court grant its Motion for Partial Summary Judgment and deny the government's cross-Motion for Summary Judgment as a matter of law.

Respectfully submitted,

s/ Thomas V. M. Linguanti

Robert W. DeJoy
Attorney of Record
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 891-3993

Thomas V. M. Linguanti
Robert S. Walton
Of Counsel
BAKER & McKENZIE LLP
130 East Randolph Drive
Chicago, IL 60601
(312) 861-2623

Counsel for Plaintiff,
Abbott Laboratories and U.S. Subsidiaries

Dated this 21st day of March, 2008

# Regulatory Appendix

**Treas. Reg. §1.994-1(e):**

***(3) Initial payment of transfer price or commission.***

(i) The amount of a transfer price (or reasonable estimate thereof) actually charged by a related supplier to a DISC, or a sales commission (or reasonable estimate thereof) actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.

(ii) Payment must be in the form of money, property (including accounts receivable from sales by or through the DISC), a written obligation which qualifies as debt under the safe harbor rule of §1.992-1(d)(2)(ii), or an accounting entry offsetting the account receivable against an existing debt owed by the person in whose favor the account receivable was established to the person with whom it engaged in the transaction. The form of the payment to a DISC need not be a qualified export asset under §1.993-2. However, for the requirement that the adjusted basis of the qualified export assets of the DISC at the close of its taxable year must equal or exceed 95 percent of the sum of the adjusted bases of all assets of the DISC at the close of its taxable year, see section 992(a)(1)(B).

(iii) If the district director can demonstrate, based upon the data available as of the 60th day after the close of such taxable year, that the amount actually paid did not represent a reasonable estimate of the transfer price or commission (as the case may be) to be determined under section 994 and this section, an indebtedness will be deemed to arise, from the person required to make the payment in favor of the person to whom the payment is required to be made, in an amount equal to the difference between the amount of the transfer price or commission determined under section 994 and this section and the amount (if any) actually paid and received. Such indebtedness will be deemed to arise as of the date the transaction occurred which gave rise to the indebtedness, except that, if such transaction occurred in a taxable year of the DISC ending on or before August 15, 1975, at the taxpayer's option, the indebtedness will be deemed to arise as of the date by which payment was required under subdivision (i) of this paragraph (e)(3). Such indebtedness owed to a DISC shall be treated as an asset but shall not be treated as a trade receivable or other qualified export asset (see §1.993-2(d)(3)) as of the end of the taxable year of the DISC in which the indebtedness is deemed to arise.

(iv) (a) Except with respect to incomplete transactions to which paragraph (c)(5)(i)(b) of this section applies, if the amount actually paid results in the DISC realizing at least 50 percent of the DISC's taxable income from the transaction as reported in its tax return for the taxable year the transaction is completed, then the amount actually paid shall be deemed to be a reasonable estimate of such transfer price or commission.

(b) With respect to incomplete transactions to which paragraph (c)(5)(i)(b) of this section applies and which were initiated during a taxable year ending after August 15, 1975, the amount actually paid shall be deemed to be a reasonable estimate of such transfer price if any one of the following three tests is met:

(1) The amount actually paid by the DISC to the related supplier in respect of the property does not exceed the related supplier's cost of goods sold (see paragraph (c)(6)(ii) of this section) with respect to the property.

(2) If the transaction is completed by the date on which the DISC's return is required to be filed for the year in which the transaction was initiated, the amount actually paid by the DISC to the related supplier in respect of the property results in the DISC realizing at least 50 percent of the DISC's taxable income from the transaction when completed.

(3) The percentage that (i) an amount equal to (a) the amount actually paid by the DISC to the related supplier in respect of the property minus (b) the related supplier's cost of goods sold with respect to the property, bears to (ii) the related supplier's cost of goods sold in respect of the property, is not greater than 50 percent of the percentage that (iii) the combined taxable income for completed transactions of the same group as the property during the DISC's taxable year in which the incomplete transaction was initiated, bears to (iv) the cost of goods sold of the related supplier and DISC with respect to such transactions.

(c) For purposes of this subdivision (iv), whether the transfer price or commission actually paid is deemed a reasonable estimate may be determined on the basis for grouping transactions chosen by the taxpayer under paragraph (c)(5) and (7) of this section.

***(4) Subsequent determination of transfer price or commission***. The DISC and its related supplier would ordinarily determine under section 994 and this section the transfer price payable by the DISC (or the commission payable to the DISC) for a transaction before the DISC files its return for the taxable year of the transaction. After the DISC has filed its return, a redetermination of the transfer price (or commission) may

only be made if permitted by the Code and the regulations thereunder. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations thereunder or section 861 and §1.861-8 which affects the amounts which entered into the determination of the transfer price or commission.

***(5) Procedure for adjustments to transfer price or commission.***

(i) (a) If the transfer price (or commission) for a transaction determined under section 994 is different from the price (or commission) actually charged, the person who received too small a transfer price (or commission) or paid too large a transfer price (or commission) shall establish (or be deemed to have established), at the date of the determination or redetermination under subparagraph (4) of this paragraph of the transfer price (or commission) under section 994, an account receivable from the person with whom it engaged in the transaction equal to the difference in amount between the transfer price (or commission) so determined and the transfer price (or commission) previously paid and received. If the account receivable due the DISC is paid within 90 days after the date it is established (or deemed established), then as of the end of the taxable year of the DISC in which the transaction occurred which gave rise to the indebtedness, the account receivable shall be treated as an asset and, under §1.993-2(d)(3) as a trade receivable, and thus as a qualified export asset.

(b) If, for example, during 1972, a DISC which uses the calendar year as its taxable year sold a product which it purchased that year from its related supplier and paid a price of $10,000 which price is a reasonable estimate under subparagraph (3)(iii) of this paragraph but is later determined under section 994 to be $8,000 immediately before the DISC filed its return for 1972, the DISC must be paid $2,000 (i.e., $10,000 − $8,000) by its related supplier or establish an account receivable from its related supplier of $2,000. The account receivable may be paid without tax consequences, provided that such account receivable is paid within 90 days after the date it is established (or deemed established). Such account receivable paid within such 90 days will be considered to relate to the taxable year in which the transaction occurred which gave rise thereto rather than the taxable year during which it is established or paid.

(ii) Payment must be in a form specified in subparagraph (3) of this paragraph.

(iii) If an account receivable of a DISC described in subdivision (i) of this paragraph (e)(5) is not paid within 90 days of the date it is established (or deemed established), then, as of the end of the taxable year of the DISC in which the transaction occurred which gives rise to the indebtedness, the account receivable shall be treated as an asset except that, if the account

receivable is established (or deemed established) in a taxable year of the DISC ending on or before August 15, 1975, at the taxpayer's option, the account receivable shall be treated as an asset as of the end of such taxable year. However, under §1.993-2(d)(3), an account receivable referred to in the preceding sentence shall not be treated as a trade receivable or other qualified export assets.

(iv) An account receivable established in accordance with subdivision (i) of this subparagraph shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2) from the day after the date the account receivable is deemed established to the date of payment. The interest so computed shall be accrued and included in the taxpayer's taxable income for each taxable year during which the account receivable is outstanding.

(v) (a) In lieu of establishing an account receivable in accordance with subdivision (i) of this subparagraph for all or part of an amount due a related supplier, the related supplier and DISC are permitted to treat all or part of any distribution which was made by the DISC out of its previously taxed income with respect to the year to which the determination or redetermination relates as an additional payment of transfer price or repayment of commission (and not as a distribution) made as of the date the distribution was made. Any additional amount arising on the determination or redetermination due the related supplier after this treatment shall be represented by an account receivable established under subdivision (i) of this subparagraph. To the extent that a distribution is so treated under this subdivision (v), it shall cease to qualify as distribution for any Federal income tax purpose, and the DISC's account for previously taxed income shall be adjusted accordingly. If all or part of any distribution made to a shareholder other than the related supplier is recharacterized under this subdivision (v), the related supplier shall establish an account receivable from that shareholder for the amount so recharacterized. Such account receivable shall be paid in the time and manner set forth in this paragraph (e)(5). In order to obtain the relief provided by this subdivision (v), the conditions and procedures prescribed by Revenue Procedure 84-3 must be met. The provisions of this paragraph (e)(5)(v) shall apply to all open taxable years ending after December 31, 1971.

(b) If, for example, during 1982, a DISC commission from a related supplier with respect to a transaction completed in 1980 was redetermined to be $1,000 less than the commission actually charged by, and paid to, the DISC, the amount of any distribution previously made by the DISC from its 1980 previously taxed income to the related supplies as a shareholder may, to the extent of $1,000, be treated not as a distribution but as a repayment of the commission.

(vi) The procedure for adjustments to transfer price provided by this subparagraph does not apply to incomplete transactions described in paragraph (c)(5)(i)(b) of this section. Such procedure will, however, be applied to any such transaction with respect to the taxable year in which the transaction is completed.

**Temp. Treas. Reg. §1.925(a)-1T(e):**

***(3) Creation of receivables****.*

(i) If the amount of the transfer price or rental payment actually charged by a related supplier to a FSC or the sales commission actually charged by a FSC to a related supplier has not been paid, an account receivable and payable will be deemed created as of the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of the FSC during which a transaction to which section 925 is applicable occurs. The receivable and payable will be in an amount equal to the difference between the amount of the transfer price or rental payment or commission determined under section 925 and this section and the amount (if any) actually paid or received. For example, a calendar year FSC's related supplier paid the FSC on July 1, 1985, a commission of $50 on the sale of export property. On September 15, 1986, the extended due date of the FSC's income tax return for taxable year 1985, the related supplier determined that the commission should have been $60. The additional $10 of commission had not been paid. Accordingly, an interest-bearing payable to the FSC from the related supplier in the amount of $10 was created as of September 15, 1986. A $10 interest bearing receivable was also created on the FSC's books.

(ii) An indebtedness arising under the above subdivision (i) shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the due date under section 6072(b), including extensions provided for under section 6081, of the FSC's tax return for the taxable year of the FSC in which the transaction occurred which gave rise to the indebtedness to the date of payment of the indebtedness. The interest so computed shall be accrued and included in the taxable income of the person to whom the indebtedness is owed for each taxable year during which the indebtedness is unpaid if that person is an accrual basis taxpayer or when the interest is paid if a cash basis taxpayer. Because the transactions covered by this subdivision are between the related supplier and FSC, the carrying charges provisions of §1.927(d)-1(a) do not apply.

(iii) Payment of dividends, transfer prices, rents, commissions, service fees, receivables, or payables may be in the form of money, property, sales discount, or an accounting entry offsetting the amount due the related supplier, or FSC, whichever applies, against an existing debt of the other party to the transaction. This provision does not eliminate the requirement that actual cash payments be made by the related supplier to a commission FSC if the receipt of payment test of section 924(e)(4) is used to meet the foreign economic process requirements of section 924(d). The offset accounting entries must be clearly identified in both the related supplier's and FSC's books of account.

***(4) Subsequent determination of transfer price, rental income or commission.***

The FSC and its related supplier would ordinarily determine under section 925 and this section the transfer price or rental payment payable by the FSC or the commission payable to the FSC for a transaction before the FSC files its return for the taxable year of the transaction. After the FSC has filed its return, a redetermination of those amounts by the Commissioner may only be made if specifically permitted by a Code provision or regulations under the Code. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations under that section or section 861 and §1.861-8 which affects the amounts which entered into the determination. In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial. Also, the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods. Any redetermination shall affect both the FSC and the related supplier. The FSC and the related supplier may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC, and vice versa.

***(5) Procedure for adjustments to redeterminations.***

(i) If a redetermination under paragraph (e)(4) of this section is made of the transfer price, rental payment or commission for a transaction, or group of transactions, the person who was underpaid under this redetermination shall establish (or be deemed to have established), at the date of the redetermination, an account receivable from the person with whom it engaged in the transaction equal to the difference between the amounts as redetermined and the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid. A corresponding account payable will be established by the person who underpaid the amount due.

(ii) An account receivable established in accordance with the above subdivision (5)(i) of this paragraph shall bear interest at an arm's length rate, computed in the manner provided by §1.482-2(a)(2), from the day after the date the account receivable is deemed established to the date of payment. The interest so computed shall be accrued and included in the taxable income for each taxable year during which the account receivable is outstanding of an accrual basis taxpayer or when paid if a cash basis taxpayer.

(iii) In lieu of establishing an account receivable in accordance with the above subdivision (5)(i) of this paragraph for all or part of an amount due a related supplier, the related supplier and FSC are permitted to treat all or part of any current or prior distribution which was made by the FSC as an additional payment of transfer price or rental payment or repayment of commission (and not as a distribution) made as of the date the distribution was made. Any additional amount arising on the redetermination due the related supplier after this treatment shall be represented by an account receivable established under the above subdivision (5)(i) of this paragraph. To the extent that a distribution is so treated under this subdivision (5)(iii), it shall cease to qualify as a distribution for any Federal income tax purpose. If all or part of any distribution made to a shareholder other than the related supplier is recharacterized under this subdivision (5)(iii), the related supplier shall establish an account receivable from that shareholder for the amount so recharacterized. The Commissioner may prescribe by Revenue Procedure conditions and procedures that must be met in order to obtain the relief provided by this subdivision (5)(iii).

(iv) The procedure for adjustments to transfer price provided by this paragraph does not apply to incomplete transactions described in paragraph (c)(5) of this section. Such procedure will, however, be applied to any such transaction with respect to the taxable year in which the transaction is completed.