No. 06-778 T
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,

Plaintiff

v.

THE UNITED STATES,

Defendant

# DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NATHAN J. HOCHMAN
Assistant Attorney General

DAVID GUSTAFSON
MARY M. ABATE
JOSEPH B. SYVERSON
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6508
(202) 514-9440 (facsimile)

## TABLE OF CONTENTS

Page(s)

**Defendant's Supplemental Brief in Support of Its Cross-motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment** . . . . . 1

1. **The legislative history of the Code's FSC and DISC provisions demonstrates that defendant's interpretation of Treas. Reg. § 1.925(a)-1T(e)(4), unlike plaintiff's interpretation, is consistent with Congress's intent, in enacting the FSC regime, to ensure the United States' compliance with the requirement under the General Agreement on Tariffs and Trade that taxation of related parties be based upon arm's length transfer pricing rules** . . . . . 2

   a. **The DISC program, which did not require arm's length pricing, was increasingly viewed by Congress as inefficient and costly to the fisc** . . . . . 2

   b. **The FSC legislative history, as impacted by the General Agreement on Tariffs and Trade, demonstrates that the FSC regime was intended to remedy a perceived inequity, by, *inter alia*, requiring arm's length pricing with respect to transactions between a FSC and its related supplier** . . . . . 5

   c. **Plaintiff's interpretation of § 1.925(a)-1T(e)(4) permits a result that is inconsistent with Congress's intent to ensure arm's length transfer pricing in the FSC transfer pricing provisions** . . . . . 10

2. **Defendant's interpretation of Treas. Reg. § 1.925(a)-1T(e)(4) is supported by comparison to the DISC provisions, because the DISC provisions did not subject DISCs to U.S. taxation on income attributable to export property** . . . . . 12

   a. **Background: the operation of the DISC provisions** . . . . . 13

   b. **Transfer price redeterminations under the DISC provisions** . . . . . 16

   c. **Treasury Regulation § 1.925(a)-1T(e)(4) included additional language not included in Treas. Reg. § 1.994-1(e)(4) in order to prevent abusive unilateral transfer price redeterminations that were not possible under the DISC provisions, but would otherwise have been possible under the newly-enacted FSC provisions** . . . . . 18

**(Continuation):**

**Page(s)**

**d. The differences between the DISC and FSC provisions explain why the rules for DISC redeterminations contained in Treas. Reg. § 1.994-1(e)(4) could not be applied to the FSC provisions without modification** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**3. Subsections (e)(3) and (e)(5) of Treas. Reg. § 1.925(a)-1T do not render plaintiff's interpretation of subsection (e)(4) of the regulation more plausible, and do not undermine defendant's interpretation of subsection (e)(4)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**a. The operation of subsections (e)(3) and (e)(5) of Treas. Reg. § 1.925(a)-1T** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**b. Plaintiff's interpretation of subsection (e)(4) of Treas. Reg. § 1.925(a)-1T is not supported by subsections (e)(3) and (e)(5) of the regulation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**c. Defendant's interpretation of subsection (e)(4) of Treas. Reg. § 1.925(a)-1T is consistent with subsection (e)(5) of the regulation**. . . . 29

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Appendix**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Separate Volume

**Appendix Contents:** **Appendix Page**

Text of S. 1804, 98th Cong. (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Staff of the S. Comm. on Finance, 98th Cong., Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. 98-169 (Comm. Print 1984) .. . . . . . . . . . . . . . . . . . . 17

Staff of the J. Comm. on Taxation, 98th Cong., Replacement of Domestic International Sales Corporations (DISCs), Description of S. 1804 (Foreign Sales Corporation Act) Scheduled for a Hearing before the Committee on Finance November 18, 1983, JCS-61-83 (Comm. Print 1983).. . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

**Cases:**

**Page(s)**

*Hibbs v. Winn*, 542 U.S. 88 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Trustees of Indiana University v. United States*, 618 F.2d 736 (Ct. Cl. 1980). . . . . . . . . 12

**Statues:**

**Page(s)**

Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984). . . . . . . . . . . . . . . 5

Internal Revenue Code (26 U.S.C.):

§ 301.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

§ 316.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

§ 482.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 16, 18-21

§ 861.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

§ 921.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 32

§ 923.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§ 924.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

§ 925.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 991.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

§ 992.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

§ 993.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13-15

§ 994.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 16

§ 995.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 15

§ 996.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

§ 997.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 535 (Dec. 10, 1971). . . . . . . . . . . . . . 2

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 (Sept. 3, 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520 (Oct. 4, 1976). . . . . . . . . . . . . . 14

**Miscellaneous:**

**Page(s)**

H.R. Rep. No. 92-533, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. (Vol.2) 1825.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

H.R. Rep. No. 94-658, 94th Cong., 1st Sess. (1975), *reprinted in* 1976 U.S.C.C.A.N. (Vol. 4) 2897.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

H.R. Conf. Rep. No. 97-760, 97th Cong., 2d Sess (1982), *reprinted in* 1982 U.S.C.C.A.N 1190, 1258-59. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No. 98-861, 98th Cong., 2d Sess.(1984), *reprinted in* 1984 U.S.C.C.A.N. (Vol. 3) 1445. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Revenue Ruling 82-81, 1982-1 C.B. 109 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Robert E. Hudec*, Reforming GATT Adjudication Procedures: The Lessons of the DISC Case,* 72 Minn. L. Rev. 1443 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

Senate Bill 1804, 98th Cong. (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

S. Rep. No. 92-437, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. (Vol. 2) 1918. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

S. Rep. No. 94-938 (Part I), 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. (Vol. 4) 3439. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Staff of the J. Comm. on Taxation, 98th Cong., Replacement of Domestic International Sales Corporations (DISCs), Description of S. 1804 (Foreign Sales Corporation Act) Scheduled for a Hearing before the Committee on Finance November 18, 1983, JCS-61-83 (Comm. Print 1983).. . . . . . . . . . . 5-7

Staff of the S. Comm. on Finance, 98th Cong., Deficit Reduction Act of 1984:
Explanation of Provisions Approved by the Committee
on March 21, 1984, S. Prt. 98-169 (Comm. Print 1984) .. . . . . . . . . 5, 6, 8, 9, 13, 24

Treasury Regulations (26 C.F.R.):

§ 1.921-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

§ 1.925(a)-1T. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

§ 1.994-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16, 17-19, 23-25

§ 1.861-8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-778 T
(Judge Allegra)

---

ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

**DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant, the United States, pursuant to the Court's order of February 22, 2008, respectfully submits this supplemental brief in support of its cross-motion for summary judgment and in opposition to plaintiff's motion for partial summary judgment. As demonstrated below, consideration of the issues identified in the February 22 order further supports defendant's interpretation of § 1.925(a)-1T(e)(4) because (1) defendant's interpretation, unlike plaintiff's interpretation, is consistent with and furthers the intent of Congress in enacting the transfer pricing rules in § 925 of the Foreign Sales Corporation (FSC) provisions; (2) defendant's interpretation is supported by comparison to the Domestic International Sales Corporation (DISC) provisions of the Internal Revenue Code, because these provisions did not subject DISCs to U.S. taxation on income attributable to export property, whereas the FSCs were subject to U.S.

taxation; and (3) subsections (e)(3) and (e)(5) of Treas. Reg. § 1.925(a)-1T do nothing to render plaintiff's interpretation of subsection (e)(4) of the regulation more plausible, and do not undermine defendant's interpretation of subsection (e)(4).

**1. The legislative history of the Code's FSC and DISC provisions demonstrates that defendant's interpretation of Treas. Reg. § 1.925(a)-1T(e)(4), unlike plaintiff's interpretation, is consistent with Congress's intent, in enacting the FSC regime, to ensure the United States' compliance with the requirement under the General Agreement on Tariffs and Trade that taxation of related parties be based upon arm's length transfer pricing rules**

The legislative history of the DISC program and of the FSC regime reveals that a principal purpose behind the transfer pricing rules in the FSC provisions was to ensure that the United States fulfilled its treaty obligations under the General Agreement on Tariffs and Trade ("GATT") to tax transactions in export property between related parties on the basis of arm's length pricing rules. Defendant's interpretation of § 1.925(a)-1T(e)(4) is consistent with this intention. Plaintiff's interpretation of § 1.925(a)-1T(e)(4), however, is not, because it permits the assessable tax liability of a related supplier and FSC to be based on an effective transfer price that is not arm's length, as "arm's length" is understood and reflected in § 925.

**a. The DISC program, which did not require arm's length pricing, was increasingly viewed by Congress as inefficient and costly to the fisc**

The DISC provisions (I.R.C. §§ 991-997 (1972)) were enacted in the Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 535 (Dec. 10, 1971), both "to provide tax incentives for U.S. firms to increase their exports," and "as a means of removing discrimination against those who export through U.S. corporations . . . ." H.R. Rep. No. 92-533, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N. (Vol.2) 1825, 1872. Congress sought to achieve these ends through the DISC provisions by allowing U.S. exporters to conduct their export activities through

a DISC, thereby granting U.S. exporters who utilized these provisions (hereafter "related suppliers") two forms of tax benefit: (1) deferral of tax paid by the related supplier on income earned by the DISC on export property, and (2) utilization of safe-harbor inter-company pricing rules in lieu of I.R.C. § 482 to determine the transfer price for transfers of export property from the related supplier to the DISC.

The DISC safe-harbor pricing rules were intended to result in the greatest profit to the DISC, regardless of whether the pricing method was arm's length:

> Under the intercompany pricing rules of present law, a sale to a related person generally must be made on an arm's length basis (*i.e.*, the price charged the related person must be essentially the same as that which would be charged an unrelated third person). Your committee believes it is desirable to avoid the complexities of the present pricing rules in the case of sales by a domestic parent corporation (or other entity considered related under section 482) to a DISC and also provide encouragement for the operation of DISC's. In view of this, your committee has provided two pricing rules which may be used in determining the permissible profits–*although in excess of profit under arm's length rules and regardless of the sales price actually charged*–which a DISC may earn on products which it purchases from a related company and then resells for export. Of course, in any case where the arm's length pricing rule would allow a greater allocation of profit to the DISC than would the new rules, that rule will continue to be applicable.

*Id.* at 1887 (emphasis added). Allocating greater profit to the DISC was more beneficial to its related supplier because the DISC itself was generally not subject to income tax. *See id.* at 1873. Congress also intended that the Secretary of the Treasury would promulgate regulations consistent with these principles that would apply to *commissions* earned by a DISC:

> The bill also provides that the Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as commission agent for the sale, or is a lessee of the property which it then subleases to its customers.

*Id.* at 1888; S. Rep. No. 92-437, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N.

(Vol. 2) 1918, 2014. *See id.* at 2013.

Five years later, however, after having examined the operation of the DISC provisions "at great length," Congress substantially amended the DISC rules, to make them more efficient and less costly to the fisc. Both the House and Senate Committee Reports explained:

> Your committee has examined the DISC provisions at great length and has concluded that the legislation has had a beneficial impact on U.S. exports. . . .
>
> However, your committee also recognized that the revenue cost of the DISC program has been substantial. In 1975, the program is expected to cost nearly $1.3 billion and in 1976 the amount is estimated to be $1.4 billion. Furthermore, the committee believes that the DISC legislation is made less efficient because the benefits apply to all exports of a company, regardless of whether or not a company's products would be sold in similar amounts without export incentives and regardless of whether or not the company is increasing or decreasing its exports.
>
> Given these considerations your committee concluded that the DISC program could become more efficient and less costly while still providing the same incentive for increased exports and jobs by granting DISC benefits only to the extent that a company increases its exports over a base period amount and by excluding from DISC benefits certain products and commodities for which the committee believes that no incentive is needed for export sales.

H.R. Rep. No. 94-658, 94th Cong., 1st Sess., 263-64 (1975), *reprinted in* 1976 U.S.C.C.A.N. (Vol. 4) 2897, 3159; S. Rep. No. 94-938 (Part I), 94th Cong., 2d Sess. (1976), 292-93, *reprinted in* 1976 U.S.C.C.A.N. (Vol. 4) 3439, 3723. DISC tax benefits were further reduced by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 204(a), 96 Stat. 324 (Sept. 3, 1982), in conjunction with a general reduction of corporate tax preferences in the Act. *See* H.R. Conf. Rep. No. 97-760, 97th Cong., 2d Sess (1982), 479-80, *reprinted in* 1982 U.S.C.C.A.N 1190, 1258-59. Meanwhile, criticism of the DISC program by member signatories of the General Agreement on Tariffs and Trade (GATT) had been building, virtually from the time of its inception in 1972.

**b. The FSC legislative history, as impacted by the General Agreement on Tariffs and Trade, demonstrates that the FSC regime was intended to remedy a perceived inequity, by, *inter alia*, requiring arm's length pricing with respect to transactions between a FSC and its related supplier**

The European Economic Community's allegations that the DISC program amounted to an illegal export subsidy, and subsequent action by the GATT Council, provided the impetus for the Senate Finance Committee to propose legislation (S. 1804) to replace the DISC program with the FSC regime. That bill, for which there was no House counterpart, was introduced August 1, 1983, and was ultimately enacted as part of the Deficit Reduction Act of 1984.[1] There was no Senate Finance Committee Report on the 1984 Act, and the House Committee Report on the 1984 Act contains no discussion of the proposed FSC legislation. A Senate Finance Committee Print, however, sets out the committee's views on the Act's provisions, including the committee's explanation of the FSC legislation. Staff of the S. Comm. on Finance, 98th Cong., Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. 98-169 (Comm. Print 1984) (hereafter "Senate Print"). In addition, a report by the staff of the Joint Committee on Taxation, prepared for the Senate Finance Committee hearing on the FSC bill in November 1983, contains a detailed discussion of the legislative history of the DISC provisions, as well as the history of the GATT controversy. Staff of the J. Comm. on

---

[1]Senate Bill 1804, a copy of which is set out in the accompanying Appendix, contained the FSC provisions that were ultimately enacted, with only minimal amendment by the House Conference Committee, in the Deficit Reduction Act of 1984. *Compare* S. 1804, 98th Cong. (1983) *with* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 801(a), 98 Stat. 494 (1984). *See* Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No. 98-861, 98th Cong., 2d Sess., 757, 968-77 (1984), *reprinted in* 1984 U.S.C.C.A.N. (Vol. 3) 1445, 1656-65. The version of § 925 proposed in S. 1804 is identical to the version ultimately enacted. *Ibid.*

Taxation, 98th Cong., Replacement of Domestic International Sales Corporations (DISCs), Description of S. 1804 (Foreign Sales Corporation Act) Scheduled for a Hearing before the Committee on Finance November 18, 1983, JCS-61-83 (Comm. Print 1983) (hereafter "Joint Committee Print").[2]

In its "Reasons for Change," the Senate Print made clear that the GATT controversy, and the need for the United States to comply with GATT requirements, necessitated the "replacement" of the DISC program with the FSC regime:

> Since its enactment, the DISC has been the subject of an ongoing dispute between the United States and certain other signatories of the General Agreement on Tariffs and Trade (GATT), who contend that DISC amounts to an illegal export subsidy that violates the GATT. In 1976, a GATT panel determined that the DISC, as well as certain export tax practices of Belgium, France, and the Netherlands, had some characteristics of an illegal export subsidy. In the case of DISC, the Panel Report pointed to the failure to charge interest on deferred taxes as the offending export subsidy.[[3]] While the United States has not conceded that DISC violates the GATT, in December 1981 the United States agreed to the adoption of the GATT Panel Reports on the DISC and the related tax practices of Belgium, France, and the Netherlands subject to a GATT Council decision which was understood to qualify the findings in the panel reports ("the 1981 Decision").
>
> The 1981 Decision provided that GATT signatories are not required to tax export income attributable to economic processes located outside their territorial limits. *Furthermore, the 1981 Decision also stated that arm's-length pricing principles should be observed in transactions between exporting enterprises and foreign buyers under common control . . .*

---

[2]A copy of the relevant portions of the Senate Finance Committee Print, and a copy of the Joint Committee staff report, are contained in the accompanying Appendix.

[3]The 1976 reports did not resolve the dispute, because under GATT, a decision of a panel did not become an official act of the GATT Council unless it was adopted by that body, and, at the time, this adoption required the consent of all the member states. *See* Robert E. Hudec, *Reforming GATT Adjudication Procedures: The Lessons of the DISC Case*, 72 Minn. L. Rev. 1443, 1488-97 (1988) (discussing the history of the GATT proceedings between the panel decisions and the 1981 adoption by the GATT Council).

Senate Print at 634 (emphasis added).[4]

As the Joint Committee Print pointed out in 1983, the 1981 Understanding upon which the 1976 GATT panel report on the DISC provisions was adopted reflected the new Subsidies Code adopted in 1979 at the culmination of the "Tokyo Round" of negotiations concerning revision of GATT. *See* Joint Committee Print at 24, 56-57 (discussing and reproducing relevant portions of the Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade, April 12, 1979, 31 U.S.T. 513, 1186 U.N.T.S. 204 (entered into force January 1, 1980) (hereafter "Subsidies Code")). The Subsidies Code said the following about arm's-length pricing of transactions between related parties involving export property:

---

[4]As the Joint Committee Print explained, this dispute was finally resolved in 1981 by way of a formal "Understanding" between the parties:

> There was no GATT action on [the] panel reports until December 1981. . . . At a meeting in December 1981, the GATT Council adopted all four panel reports but with three qualifications. First, GATT does not require an exporting country to tax economic events that take place outside its territorial limits. *Second, GATT (Article XVI:4) requires arm's-length pricing in transactions between exporting enterprises and foreign buyers under common control.* Third, Article XVI:4 does not prohibit the adoption of measures to avoid double taxation of foreign source income.

Joint Committee Print at 24-25 (emphasis added) (footnote omitted). In a footnote in this section, the Joint Committee Print referred to Appendix B, which reproduced the text of the 1981 Understanding attached to the adoption of the 1976 Panel Reports. *Id.* at 24, 57. The 1981 Understanding provided (*id.* at 57, emphasis added):

> It is further understood that Article XVI:4 requires that arm's-length pricing be observed, i.e, prices for goods in transactions between exporting enterprises *should for tax purposes* be the prices which would be charged between independent enterprises acting at arm's-length.

> The signatories reaffirm the principle that prices for goods in transactions between exporting enterprises and foreign buyers under their or under the same control *should for tax purposes be the prices which would be charged between independent enterprises acting at arm's-length*.

*Id* at 57 (reproducing Subsidies Code, Annex, n. 44) (emphasis added). These provisions concerning arm's length pricing in both the 1979 Subsidies Code and the 1981 Decision addressed the United States's concerns about the leniency of the transfer pricing rules used by some EEC countries. *See* Hudec, 72 Minn. L. Rev. at 1459 (discussing United States's concerns about transfer pricing practices of EEC countries).

A debate on the 1981 Decision ensued within the Council, with the European Economic Community (EEC) taking–

> one step further to request authorization from the GATT Council to take retaliatory action against the United States. . . .
>
> The DISC debate in the GATT Council highlighted the potential danger of a breakdown in the GATT dispute-settlement process, and the isolation of the United States over the DISC issue. To remove the DISC as a contentious issue and to avoid further disputes over retaliation, the United States made a commitment to the GATT Council on October 1, 1982, to propose legislation that would address the concerns of other GATT members. In March 1983, the Administration approved the general outlines of a proposal to replace the DISC with a territorial-type system of taxation for U.S. exports designed to comply with GATT.

Senate Print at 634-35. Despite its disagreement with the EEC's allegations of injury resulting from the United States' DISC program, the Senate Finance Committee agreed that it was necessary to comply with GATT (*id*. at 635):

> Nonetheless, in the interest of resolving the GATT dispute over DISC and assisting the Administration in fulfilling its commitment to the GATT Council, the committee has favorably reported legislation that is consistent with the general outlines of the Administration's proposal.

Then, explaining the provisions of the new FSC legislation, the Senate Print stated:

> Under the GATT rules, an exemption from tax of export income is permitted only if the economic processes which give rise to the income take place outside the United States. *In light of these rules*, the bill provides that a FSC must have a foreign presence, it must have economic substance, and that activities that relate to the export income must be performed by the FSC outside the U.S. customs territory. *Furthermore, the income of the foreign sales corporation must be determined according to transfer prices specified in the bill [as] either prices for sales between unrelated, independent parties or, if the sales are between related parties, formula prices which are intended to comply with GATT's requirement of arm's-length prices.*
>
> * * *
>
> *The committee intends that the pricing principles that govern the determination of the taxable income of a FSC comply with the GATT rules. If export property is sold to a FSC by a related person (or a commission is paid by a related principal to a FSC with regard to export property), the taxable income of the FSC and related person is based upon a transfer price determined under an arm's-length pricing approach or under one of two formulae which are intended to approximate arm's-length pricing.*

*Id.* at 636, 646 (emphasis added).[5]

---

[5]Discussing "other transfer pricing matters," the Senate emphasized its intention that "the administrative pricing rules be applied under rules which will prevent pricing at a loss to the related supplier," and that Treasury "should consider whether the present regulations accomplish this purpose." Senate Print at 649. The report also noted that–

> [u]nder the administrative pricing rules, the transfer price from the related supplier to the FSC may be computed after the FSC sells the goods to a customer. Furthermore, the FSC *and* its related supplier may make adjustments upwards or downwards following the close of the taxable year in which the FSC sells the goods.

*Ibid.* (emphasis added). While this statement regarding "adjustments" appears simply to indicate that "adjustments" were not required to be made before the end of the taxable year, it is significant that it refers to the FSC's and the related supplier's "adjustments" in the conjunctive. *See infra*, Part 2.c (discussing requirement under § 925 of the FSC provisions that a related and supplier make together a *single* initial transfer price determination, and the correlative requirement under the fourth sentence of Treas. Reg. § 1.925(a)-1T(e)(4) that a related supplier and FSC both make together a single redetermination).

**c. Plaintiff's interpretation of § 1.925(a)-1T(e)(4) permits a result that is inconsistent with Congress's intent to ensure arm's length transfer pricing in the FSC transfer pricing provisions**

As seen, the legislative history of the FSC provisions makes clear that Congress intended related suppliers and FSCs to be taxed on their transactions involving export property on the basis of arm's length pricing rules for transfers between related parties. Plaintiff's interpretation of § 1.925(a)-1T(e)(4), however, permits a related supplier and FSC to be taxed on the basis of an effective transfer price that is not arm's length. This is so because it would permit a related supplier and FSC to make a redetermination that subjects the related supplier and FSC to an aggregate U.S. tax liability that is *less than* what it would be if the related supplier and FSC were taxed under the FSC provisions in accordance with a transfer price that is arm's length, as "arm's length" was understood by Congress in the context of the FSC provisions.

Congress expressed its intent concerning taxation on the basis of arm's length pricing between a related supplier and FSC in § 925 of the Code, by providing for three pricing methods that it regarded as approximating an arm's length price in a transaction involving export property between related parties. Plaintiff's interpretation of § 1.925(a)-1T(e)(4), however, would permit redeterminations that result in a total tax liability to the related supplier and FSC that is lower than one could arrive at if the tax liability of the related supplier and FSC reflected a single transfer price that was calculated in accordance with the methods permitted under § 925(a). It does so by, in essence, allowing the related supplier and FSC to use two *different*, inconsistent, transfer price determinations under the methods permitted under § 925(a), applying the redetermined price to affect the tax liability of only one of the two parties involved. Thus, it permits redeterminations that result in a combined tax liability for the FSC and related supplier

that could only be achieved by application of a single transfer price that is outside the bounds of the only methods expressly permitted under § 925(a).

This conclusion can be illustrated by reference to the facts of this case. Assume, *arguendo*, that plaintiff is correct that, in this case, it has recalculated *its* commission expense on the basis of the § 925(a) method that results in the highest commission expense it could achieve consistent with § 925(a) and the applicable regulations. *See* Compl. ¶¶ 29-49. If this is so, then plaintiff's tax liability as reflected in its claims for refund in this case reflects the lowest tax liability it could achieve on the basis of a transfer pricing method that is consistent with § 925(a) and the applicable regulations. The tax liability of plaintiff's FSC, however, is based on the different transfer pricing method that it and plaintiff used on their original returns, because the additional commission income that would result to the FSC on the basis of the redetermined commission calculation cannot be assessed at the time of the redetermination. Thus, the combined tax liability of plaintiff and its FSC is lower than it would be if their separate tax liabilities were both based on the redetermined commission expense. Because, *ex hypothesi*, the redetermined commission expense reflected the highest possible commission expense that could be calculated consistent with § 925(a) and the applicable regulations, the aggregate tax liability reflected on plaintiff's claims for refund for the years in suit and its FSC's original returns for those years could only have been achieved on the basis of a *single* commission expense calculation that could not be arrived at consistent with the methods provided for in § 925(a).

Thus, at bottom, plaintiff's attempted redetermination results in a redetermination that is inconsistent with the FSC provisions, and in particular § 925, as properly understood in light of the relevant portions of the FSC legislative history. If an interpretation of a regulation results in

an inconsistency with the statute, that is reason to reject that interpretation. *See*, *e.g.*, *Trs. of Indiana Univ. v. United States*, 618 F.2d 736, 739 (Ct. Cl. 1980) ("a regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements"). Thus, the Court should reject plaintiff's interpretation of § 1.925(a)-1T(e)(4), and adopt defendant's interpretation, which alone among the two is consistent with the FSC provisions, properly understood in light of their legislative history.

**2. Defendant's interpretation of Treas. Reg. § 1.925(a)-1T(e)(4) is supported by comparison to the DISC provisions, because the DISC provisions did not subject DISCs to U.S. taxation on income attributable to export property**

As the Court observed during oral argument, there are some parallels between Treas. Reg. § 1.925(a)-1T(e)(4) and its predecessor under the DISC provisions, Treas. Reg. § 1.994-1(e)(4). Tr. of Oral Arg. of February 14, 2008 (hereafter "Tr."), at 4:15-16. The language of the first three sentences of Treas. Reg. § 1.925(a)-1T(e)(4) appears to be modeled on the language of Treas. Reg. § 1.994-1(e)(4), whereas the last four sentences of § 1.925-1T(e)(4) have no apparent progenitors in § 1.994-1(e)(4). The reasons for these similarities and differences between § 1.925(a)-1T(e)(4) and § 1.994-1T(e)(4) becomes clear when they are examined in light of the relevant differences between the DISC provisions of the Code and the FSC provisions of the Code, in particular the fact that a DISC, unlike a FSC, is ordinarily exempted from all U.S. income tax.

Understood in light of these differences, it becomes apparent that augmentation of the language in § 1.994-1(e)(4), on which § 1.925(a)-1T(e)(4) was modeled, was necessary to prevent abusive redeterminations of transfer prices under the FSC provisions of the Code (including the sort of abusive unilateral redetermination that plaintiff has attempted in this case)

that were not possible under the DISC provisions. For this reason, the redetermination rules for the DISC provisions found in § 1.994-1(e)(4) cannot simply be read wholesale into § 1.925(a)-1T(e)(4).[6]

**a. Background: the operation of the DISC provisions[7]**

In order to claim DISC benefits, the related supplier had to first establish a DISC. To qualify as a DISC, a corporation had to elect to be treated as a DISC, and meet other statutory requirements. I.R.C. § 992(a), (b) (1972). Chief among these were the requirements that at least 95 percent of the DISC's gross receipts consist of "qualified export receipts," and that at least 95 percent of the total value of the adjusted bases of all of the DISC's assets be attributable to the adjusted bases of "qualified export assets." I.R.C. § 992(a)(1)(A), (B) (1972). "Qualified export receipts" were defined to include, *inter alia*, receipts from the sale, exchange, lease or rental of "export property," receipts from the sale or exchange of qualified export assets that are not export property, and interest earned on obligations that are qualified export assets. I.R.C. § 993(a)(1) (1972). "Qualified export assets" included both export property itself, and, among other things, assets "used primarily in connection with the sale, lease, rental, storage, handling,

---

[6]In this regard, it is noteworthy that the Senate Finance Committee indicated its intent that "rules comparable to the rules in regulations issued under [the DISC] provisions will be applied to the FSC"–but only "where the provisions of the bill are identical or substantially similar to the DISC provisions under present law." Senate Print at 636.

[7]Although discussion here of the DISC provisions is in the past tense (referring to the former DISC provisions that were "replaced" by the FSC provisions), we note that, in the 1984 legislation, Congress provided for two alternatives to the FSC, as relief from otherwise burdensome FSC requirements for small businesses: the "small FSC," and the "interest charge DISC." *See* Senate Print at 657-59 (explaining the operation of the "interest charge DISC" under §§ 991-997 of the Code as revised in the Act).

transportation, packaging, assembly, or servicing of export property," and accounts receivable and "evidences of indebtedness" that arise as a result of sales, exchanges, leases, or rentals of export property. I.R.C. § 993(b). Finally, "export property" was defined as property "manufactured, produced, grown, or extracted in the United States" by someone other than a DISC that is "held primarily for sale, lease, or rental, in the ordinary course of business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States." I.R.C. § 993(c)(1)(A), (B). However, in order to constitute export property, no more than 50% of the fair market value of the property could be "attributable to articles imported into the United States." I.R.C. § 993(c)(1)(C).

The first of the tax benefits provided by the DISC regime to U.S. exporters, tax deferral, was granted under the DISC provisions by exempting the DISC itself from U.S. tax, and taxing the related supplier on amounts actually distributed or deemed distributed as dividends by the related supplier to the DISC. Under the DISC provisions, a DISC itself was generally exempt from tax. *See* I.R.C. § 991 (1972). The shareholder of a DISC, however, was subject to tax on the earnings and profits of the DISC, to the extent that the DISC either made distributions to its shareholders with respect to its stock, or was deemed to do so by statute. I.R.C. § 995(a), (b) (1972). As originally enacted, the DISC provisions provided for a *pro rata* deemed distribution by the DISC to its shareholders of 50% of the DISC's taxable income for a taxable year, deemed distributed on the last day of the taxable year. I.R.C. § 995(b)(1)(D) (1972). However, as discussed in more detail above, Congress later amended the DISC deemed distribution provisions in the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520 (Oct. 4, 1976), providing a more complicated formula that resulted in a deemed dividend of a percentage of the DISC's taxable

income, where that percentage is defined as the ratio of 67% of the DISC's "gross export receipts"[8] receipts over a defined range of prior years[9] to the DISC's gross export receipts in the current year. *Id.* § 1101 (amending I.R.C. § 995(b), and adding I.R.C. § 993(e)).

The second benefit afforded by the DISC provisions was the option to utilize safe-harbor inter-company pricing rules in lieu of the arm's-length method of § 482. Section 994 allowed a related supplier and DISC to utilize one of two safe-harbor transfer pricing methods, or to use the actual price charged, subject to the provisions of § 482:

> (a) IN GENERAL.– In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—
>
> > (1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts,
> >
> > (2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or
> >
> > (3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

"Export promotion expenses" under the DISC inter-company pricing rules included "expenses

---

[8]"Gross export receipts" was defined as qualified export receipts, less 50% of qualified export receipts attributable to military property. I.R.C. § 993(e)(4) (1976).

[9]This period, the "base period," was defined as the four-year period beginning seven years before the current year for taxable years beginning in 1980 or later, and as 1972-1975 for earlier taxable years. I.R.C. § 993(e)(5) (1976).

[other than income taxes] incurred to advance the distribution or sale of export property for use, consumption, or distribution outside of the United States," and 50% of certain shipping costs incurred from shipments of export property. I.R.C. § 994(c).

**b. Transfer price redeterminations under the DISC provisions**

Congress did not expressly address in the DISC provisions of the Code the issue of whether a related supplier and a DISC could make a post-filing redetermination of a transfer price determined on their original returns in accordance with one of the methods permitted under § 994(a). The topic of redeterminations of transfer prices under the DISC provisions was, however, addressed in the Treasury Regulations promulgated under § 994:

> (4) *Subsequent determination of transfer price or commission*. The DISC and its related supplier would ordinarily determine under section 994 and this section the transfer price payable by the DISC (or the commission payable to the DISC) for a transaction before the DISC files its return for the taxable year of the transaction. After the DISC has filed its return, a redetermination of the transfer price (or commission) may only be made if permitted by the Code and the regulations thereunder. Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations thereunder or section 861 and § 1.861-8 which affects the amounts which entered into the determination of the transfer price or commission.

Treas. Reg. § 1.994-1(e)(4). Thus, the regulation clarified at least two issues not expressly addressed in the Code. First, it made clear that a post-filing redetermination of a transfer price derived under § 994(a) was permissible, so long as the redetermination was "permitted under the Code and the regulations thereunder." Second, it expressly provided that certain kinds of redeterminations were so permitted, specifically redeterminations attributable to an adjustment of a transfer price under § 482, and an adjustment under § 861 and Treas. Reg. § 1.861-8 that affects the inputs into the transfer price determination.

Clarification on these two points notwithstanding, § 1.994-1(e)(4) still did not expressly address the issue of whether the related supplier and DISC can make a post-filing redetermination of a transfer price determined on their original returns in accordance with § 994. This issue was addressed and answered in the affirmative by the Service in Revenue Ruling 82-81, 1982-1 C.B. 109 (1982). This ruling held that a DISC and its related supplier could "recompute [the DISC's] income under a rule described in section 994 . . . other than that applied in its original return," so long as the DISC and the related supplier have filed timely amended returns reflecting this recomputation. *Ibid.*[10]

Revenue Ruling 82-81 reached this result on the basis of § 1.994-1(e)(4), and an interpretation of the congressional intent underlying § 994. The ruling's analysis started with the observation that § 1.994-1(e)(4) "permits a redetermination of the commission in an amended return if otherwise permitted by the Code and the regulations." *Ibid.* The ruling then stated the premise that the intent behind § 994(a) was that "the DISC and related person select the rule in section 994(a) that maximizes the DISC's taxable income for each transaction."[11] *Ibid.* From

---

[10]Thus, as the Court noted at oral argument, it is true that Rev. Rul. 82-81 involves "an issue similar to the one [in this case] in the context of the D[I]SC rules," Tr. at 6:4-5, insofar as both Rev. Rul. 82-81 and the issue currently before the Court both concern transfer pricing redeterminations. However, the issue addressed by Rev. Rul. 82-81 is, in other respects, very different from the issue here, as the ruling is confined to the more basic question of whether taxpayer-initiated redeterminations are permitted *at all* under the DISC provisions, an issue which is unambiguously addressed in the regulations under the FSC provisions. *See infra*, Part 2.c.

[11]Although Rev. Rul. 82-81 did not offer much analysis on this particular point, the legislative history of the DISC provisions contains ample support for this proposition. *See*, *e.g.*, General Explanation of the Revenue Act of 1971, at 102 (contrasting the arm's-length rule of § 482 with the safe harbor methods under § 994). This presents a marked, and significant, contrast (continued...)

these premises, the ruling reasoned that, where one of the transfer pricing rules of § 994(a) "is chosen in the mistaken belief that it will result in the maximum permissible commission," a post-filing redetermination "is necessary to effectuate [the] statutory intent" behind § 994(a). *Ibid.*

**c. Treasury Regulation § 1.925(a)-1T(e)(4) included additional language not included in Treas. Reg. § 1.994-1(e)(4) in order to prevent abusive unilateral transfer price redeterminations that were not possible under the DISC provisions, but would otherwise have been possible under the newly-enacted FSC provisions**

With this background in place, we are now in a position to understand the significance of the addition in § 1.925(a)-1T(e)(4) of the language that was not contained in § 1.994-1(e)(4). The first three sentences of § 1.925(a)-1T(e)(4) are similar to § 1.994-1(e)(4):

> [1] The *FSC* and its related supplier would ordinarily determine under section *925* and this section the transfer price or rental payment payable by the *FSC* or the commission payable to the *FSC* for a transaction before the *FSC* files its return for the taxable year of the transaction. [2] After the *FSC* has filed its return, a redetermination *of those amounts by the Commissioner* may only be made if specifically permitted by a Code provision or regulations under the Code. [3] Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations under that section or section 861 and § 1.861-8 which affects the amounts which entered into the determination. . . .

Treas. Reg. § 1.925(a)-1T(e)(4) (emphases added to indicate differences from § 1.994-1(e)(4)). For the most part, this language differs from that in § 1.994-1(e)(4) only in that "FSC" is substituted for "DISC" and "925" is substituted for "994" in the appropriate places. There is, however, a significant change that warrants mention. In the second sentence of § 1.925(a)-1T(e)(4), there is language not found in the second sentence of § 1.994-1(e)(4) that indicates that

---

[11](...continued)
with the discussion of the purpose of the transfer pricing rules in the FSC legislative history. *See supra*, Part 1.b-c (contrasting DISC and FSC legislative history on this point).

the sentence refers only to redeterminations made by the Commissioner. By contrast, the second sentence of § 1.994-1(e)(4) applied on its face to redeterminations *simpliciter*, and, as discussed above, was interpreted as such in Rev. Rul. 82-81.

This latter difference between the second sentences of § 1.994-1(e)(4) underscores the fact that the last four sentences of § 1.925(a)-1T(e)(4) were added specifically to address the issue of *taxpayer-initiated* transfer price redeterminations. These last four sentences do not have analogues in § 1.994-1(e)(4):

> [4] In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial. [5] Also, the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods. [6] Any redetermination shall affect both the FSC and the related supplier. [7] The FSC and the related supplier may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC, and vice versa.

Treas. Reg. § 1-925(a)-1T(e)(4).[12]

---

[12]In addition to the reasons discussed below, the fact that the last four sentences of § 1.925(a)-1T(e)(4) were intended to address the issue of taxpayer-initiated determinations is significant because it provides the answer to a question the Court raised during oral argument about the applicability of the sixth sentence of (e)(4) to redeterminations made by the Commissioner. During argument, the Court raised the question of whether the sixth sentence of § 1.925(a)-1T(e)(4) imposes any restrictions on the Service's ability to make transfer pricing adjustments under § 482 after a taxpayer has filed a return. *See* Tr. at 58:19-59:17. The answer to that question is "no." Understood in context, "redetermination" as used in the sixth sentence of § 1.925(a)-1T(e)(4) refers to "taxpayer-initiated redeterminations." The fourth sentence, the beginning of the additions to § 1.994-1(e) in § 1.925(a)-1T(e)(4), indicates a shift of topic with the use of the signal "[i]n addition." Further, all of the newly added sentences surrounding the sixth sentence of § 1.925(a)-1T(e)(4) use "redetermination" and cognate expressions in a way that can only be understood to refer to taxpayer-initiated redeterminations. Thus, as properly read in context, "redetermination" as used in the sixth sentence is correctly understood to refer
(continued...)

The transition from the DISC provisions to the FSC provisions necessitated new language in the regulations specifically addressing taxpayer-initiated redeterminations because the FSC provisions, unlike the DISC provisions, subjected the tax-favored entity (the FSC) to tax. As detailed above, the DISC provisions granted a tax benefit to domestic exporters by exempting the DISC itself from tax, and subjecting the shareholders of the DISC to current taxation on only a portion of the earnings and profits of the DISC. By contrast, the FSC provisions granted a tax benefit to domestic exporters by subjecting the FSC itself to U.S. tax on its foreign trade income that is not exempt foreign trade income. *See* I.R.C. §§ 921, 923 (1984).

Given this difference, the prospect of taxpayer-initiated redeterminations created a potential for abuse of the FSC provisions that was not present under the DISC provisions. Specifically, because, unlike a DISC and its related supplier, both the related supplier and its FSC were subject to tax, the FSC provisions created a potential for abuse in the event that a taxpayer-initiated redetermination would only be applied to the related supplier. This sort of potential abuse could take at least two different forms. First, one way that a related supplier and

---

[12](...continued)
only to taxpayer-initiated redeterminations. *See*, *e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (observing that "a phrase gathers meaning from the words around it" is the "cardinal rule" of construction (internal quotations and citation omitted)). In addition, the Commissioner lacks the power to make a § 482 adjustment to a transfer price or commission expense

In addition, when a related supplier and FSC use one of the administrative pricing methods provided for in § 925(a), other parts of the FSC regulations make clear that the Commissioner cannot, in any event, make a § 482 redetermination of such a transfer price. *See* § 1.925(a)-1T(a)(1) ("If either of the administrative pricing methods . . . is applied to a transaction, the Commissioner may not make distributions, apportionments, or allocations as provided by section 482 and the regulations under that section"). However, this does not limit the ability of the Commissioner to make an assessment of additional tax on a related supplier or FSC if the Commissioner determines that the related supplier or FSC has misapplied the administrative pricing method they chose.

FSC could conceivably have attempted to exploit this aspect of the FSC provisions would be to attempt mutually inconsistent redeterminations, or, to the same effect, for the related supplier and FSC to attempt a redetermination of the related supplier's transfer price that does not make a correlative change to the FSC's transfer price. Second, a related supplier could attempt to make a unilateral redetermination and use that redetermination as grounds for a claim for refund in a given tax year *after* the close of the statute of limitations for assessment of the resulting increase in the taxable income of the FSC, thus resulting in an artificially inflated aggregate FSC benefit.

With these potential abuses made possible by the change to a taxable tax-favored entity in the FSC provisions, it is not surprising to find that these potential abuses are addressed in the new language added to § 1.925(a)-1T(e)(4) concerning taxpayer-initiated redeterminations. The first of these potential abuses is foreclosed by the fourth sentence of § 1.925(a)-1T(e)(4). Such an attempted redetermination would, at best, be questionable in light of the language of § 925(a) alone, which unambiguously requires a related supplier and FSC to calculate their taxable incomes on the basis of a *single* transfer price:

> IN GENERAL.— In the case of a sale of export property to a FSC by a person described in section 482, the taxable income of such FSC and such person *shall be based upon a transfer price* which would allow such FSC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of . . .

(Emphasis added.) However, to the extent that § 925(a) left any room for ambiguity on the issue of whether taxpayer-initiated redeterminations were governed by similar principles, this ambiguity was resolved by the fourth sentence of § 1.925(a)-1T(e)(4). This sentence, among other things, makes clear two principles relating to taxpayer-initiated redeterminations. First, it clarifies that a taxpayer-initiated redetermination is only permitted if it is "made by the FSC and

related supplier." § 1.925(a)-1T(e)(4). Second, the fourth sentence provides that such a redetermination involves a "determin[ation] that *a* different transfer pricing method may be more beneficial." *Ibid.* (emphasis added). Taken together, these two aspects of the fourth sentence of § 1.925(a)-1T(e)(4) prohibit this first type of potential abuse of the FSC provisions, because they require any redetermination to be made by *both* the related supplier *and* the FSC, and only permit the related supplier and FSC to make a redetermination utilizing a single transfer pricing method.

These aspects of the fourth sentence of § 1.925(a)-1T(e)(4), however, do not by themselves prevent the second type of abuse of transfer price redeterminations possible under the FSC provisions, the type that plaintiff has attempted in this case by claiming a refund when the FSC's statute of limitations for assessment has run. For that, additional language was necessary, and that language is found in the sixth sentence of § 1.925(a)-1T(e)(4). As defendant has argued in earlier briefing, a redetermination of commissions for a particular year of the sort plaintiff has attempted does not "affect" the FSC within the meaning of § 1.925(a)-1T(e)(4), because such a redetermination does not result in an increase in the assessable tax liability of the FSC for that year. *See* Def.'s Op. Br. at 16-18.[13]

---

[13]Given this new possibility for abuse of the redetermination rules presented by the changes to the DISC provisions in the FSC provisions, defendant's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) advanced in its prior briefs in this case is further supported by comparison of the sixth sentence to § 1.994-1(e)(4), and the DISC provisions generally. As seen, DISCs were not taxable under those provisions. There was no need to have a provision like the sixth sentence of § 1.925(a)-1T(e)(4) in the DISC regulations, because a redetermination could only conceivably affect the tax liability of the related supplier, the only party subject to tax under those provisions. Rather, the need for a provision like the sixth sentence of § 1.925(a)-1T(e)(4) arose only upon the enactment of the FSC provisions. Thus, to the extent there is any remaining question as to whether the sixth sentence of § 1.925(a)-1T(e)(4) should be read to require a redetermination to affect a FSC by resulting in an increase of its assessable tax liability for the
(continued...)

This comparison also highlights the failure of plaintiff's interpretation of § 1.925(a)-1T(e)(4) to give any independent effect to the language of the sixth sentence. According to plaintiff, the sixth sentence "merely sets forth the basic principle that any changes to the amount of the FSC commission expenses paid by a related supplier should correspond with changes to the income received by the FSC." Plt.'s Op. Br. at 20. Interpreted most charitably,[14] it would seem that plaintiff is interpreting the sixth sentence of § 1.925(a)-1T(e)(4) to require that a redetermination be made by both the related supplier and the FSC. This interpretation, however, renders the sixth sentence of § 1.925(a)-1T(e)(4) superfluous. As already seen, the fourth sentence of § 1.925(a)-1T(e)(4) by itself plainly settles this issue, as it only permits the related supplier *and* the FSC to make a *single* redetermination of a transfer price. Thus, at best, plaintiff's interpretation of the sixth sentence is merely repetitious of other parts of § 1.925(a)-1T(e)(4), and hence runs afoul of the elementary canon of construction that constructions that fail to give effect to *all* the language of a statutory or regulatory provision should be avoided. *See, e.g.*, *Hibbs*, 542 U.S. at 101 (stating the "rule against superfluities" in construction).[15]

---

[13](...continued)
year of the redetermination, comparison of § 1.925(a)-1T(e)(4) to § 1.994-1(e)(4) in light of the relevant differences between the FSC and DISC provisions counsels in favor of answering that question in the affirmative.

[14]But for the principle of charity, plaintiff's use of "should" in this context could lead one to conclude that plaintiff is interpreting the sixth sentence to be merely advisory. Such an interpretation would be squarely at odds with the plain language of the sixth sentence, which unquestionably imposes *some* requirement when it states that "[a]ny redetermination *shall* affect both the FSC and the related supplier." (Emphasis added.)

[15]Indeed, defendant's view that the sixth sentence requires that the affected party's statute of assessment for limitations be open is reflected in, and supported by, plaintiff's own conduct. When plaintiff and its FSC executed their FSC commission agency agreements for the years in (continued...)

**d. The differences between the DISC and FSC provisions explain why the rules for DISC redeterminations contained in Treas. Reg. § 1.994-1(e)(4) could not be applied to the FSC provisions without modification**

As we have now seen, given the difference in taxable status between a DISC and a FSC, the redetermination regulations issued under the DISC provisions could not simply be imported into the FSC provisions, but had to be modified to account for the additional complexities resulting from change to a statutory regime where both the related supplier and tax-favored entity were taxable. As the Court noted at oral argument, the legislative history of the FSC provisions indicates that Congress intended that rules similar to those under the DISC regulations would apply under the FSC provisions, but only if the FSC provisions were substantially similar to the analogous DISC provisions. Tr. at 10:4-11; Senate Print at 636. As detailed above, the DISC

---

[15](...continued)
suit (1988 and 1989), their interpretation of § 1.925(a)-1T(e)(4) was *consistent* with defendant's position here and *inconsistent* with plaintiff's interpretation of § 1.925(a)-1T(e)(4) advanced in their briefs in this case. Both of these agreements contain an identical provision under which plaintiff was permitted to initiate a redetermination of its commission expense calculation under § 925 *only* if the statute of limitations for *assessment* remained open for *both* plaintiff *and* its FSC:

> (c) Redeterminations
>
> (1) ABBOTT may modify any of the elections permitted by subsection (a) above with respect to the determination of the commissions payable for any or all Sales relating to any taxable year of ATCI, and may otherwise redetermine the amounts of its commissions to ATCI for any or all of such Sales . . . at any time *prior to the expiration of the period of limitations for assessment of United States income tax for such taxable year of ATCI or the taxable year of ABBOTT in which such commissions accrued (whichever period of limitations expires first)*.

Complt. ¶ 22, Ex. V at 191, Ex. W at 205 (emphasis added).

and FSC provisions are *not* substantially similar with respect to the topic of transfer price redeterminations, because the FSC provisions make the FSC taxable, whereas the DISC was generally not taxable. Thus, although, as shown above, contrasting § 1.994-1(e)(4) with § 1.925(a)-1T(e)(4) helps to illumine the issue of how to interpret the sixth sentence of § 1.925(a)-1T(e)(4), wholesale importation of the rules, or lack thereof, found in § 1.994-1(e)(4) into § 1.925(a)-1T(e)(4) was not contemplated by Congress in enacting the FSC provisions.

**3. Subsections (e)(3) and (e)(5) of Treas. Reg. § 1.925(a)-1T do not render plaintiff's interpretation of subsection (e)(4) of the regulation more plausible, and do not undermine defendant's interpretation of subsection (e)(4)**

Consideration of subsections (e)(3) and (e)(5) of Treas. Reg. § 1.925(a)-1T does nothing to remedy the implausibility of plaintiff's interpretation of § 1.925(a)-1T(e)(4), or to undermine defendant's interpretation of § 1.925(a)-1T(e)(4). Section 1.925(a)-1T(e)(3) does not assist plaintiff for the simple reason that it applies only to initial determinations, not to redeterminations. Section 1.925(a)-1T(e)(5), by contrast, does apply to redeterminations, and may result in interest income to a FSC, if the FSC is the party whose taxable income is increased as a result of the redetermination. However, the potential tax impact of the interest income earned by a FSC as a result of the creation of an account payable under § 1.925(a)-1T(e)(5)(ii) underscores the failure of plaintiff's interpretation § 1.925(a)-1T(e)(4) to give effect to its sixth sentence. Further, this potential tax impact actually supports defendant's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4), because whether or not such a redetermination results in interest income to the FSC is entirely at the discretion of the related supplier, and, in any event, the tax effect of the interest income that may result is likely minuscule in comparison to the tax effect of the redetermination on the FSC in the year to which the redetermination relates. These

circumstances make it highly implausible to suppose that the "affect" referred to in the sixth sentence of § 1.925(a)-1T(e)(4) was intended to have a meaning that could be satisfied solely by the tax impact of interest income earned under § 1.925(a)-1T(e)(5)(ii).

**a. The operation of subsections (e)(3) and (e)(5) of Reg. § 1.925(a)-1T**

Subsections (e)(3) and (e)(5) of § 1.925(a)-1T both require the deemed creation of accounts payable and receivable by a FSC and its related supplier under certain circumstances. Section 1.925(a)-1T(e)(3) applies to initial transfer price determinations when "the amount of the transfer price or rental payment actually charged by a related supplier to a FSC or the sales commission actually charged by a FSC to a related supplier has not been paid . . . ." Treas. Reg. § 1.925(a)-1T(e)(3)(i). In the event of such underpayment, the party that underpaid is deemed to have created an account payable, and the underpaid party is deemed to have created an account receivable. Both accounts are deemed created on the due date (including extensions) for the FSC's tax return for the year at issue. *Ibid.* The receivable and payable are in an amount "equal to the difference between the amount of the transfer price or rental payment or commission determined under section 925 and this section and the amount (if any) actually paid or received." *Ibid.* The receivable, like any receivable between a related supplier and its FSC, ordinarily can be paid "in the form of money, property, sales discount, or an accounting entry offsetting the amount due . . . against an existing debt of the other party to the transaction." *Id.* § 1.925(a)-1T(e)(3)(iii).[16]

[16]Cash payment is required if the payment is from a related supplier to a commission FSC and the related supplier and FSC rely on the "receipt of payment test" of § 924(e)(4) to satisfy the "foreign economic process requirements" of § 924(d). *Ibid.*

A receivable deemed created by § 1.925(a)-1T(e)(3)(i) may result in interest income to the holder of the receivable. Treas. Reg. § 1.925(a)-1T(e)(3)(ii). When such a receivable is created, it bears interest at an arm's length rate from the due date for filing of the FSC's return for the year in which the transaction occurred that gave rise to the receivable. *Ibid.* The interest that results is included in the taxable income of the holder of the receivable. *Ibid.* For an accrual basis taxpayer, such interest is included in each of the taxable years in which it accrues, and, for a cash basis taxpayer, when paid. *Ibid.* Thus, if interest accrues under § 1.925(a)-1T(e)(3)(ii), it is included, at the earliest, in the taxable year immediately after the taxable year in which the transaction that gave rise to the receivable occurred. *See id.* § 1.925(a)-1T(e)(3)(i), (ii).

Section § 1.925(a)-1T(e)(5) provides similar rules for post-filing redeterminations of transfer prices made pursuant to § 1.925(a)-1T(e)(4). This provision requires the creation of accounts receivable and payable when there is a redetermination of a transfer price of a related supplier and FSC. Treas. Reg. § 1.925(a)-1T(e)(5)(i). The accounts receivable and payable are not deemed to have been established during the year to which the redetermination relates, but rather are established "at the date of the redetermination." *Ibid.* The amount of the payable and receivable created is equal to the amount of increase in the relevant price under the redetermination, plus "the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid." *Ibid.*

Section 1.925(a)-1T(e)(5) is also similar to § 1.925(a)-1T(e)(3) in that it contains provisions that require interest on an account receivable created as a result of a redetermination. Treas. Reg. § 1.925(a)-1T(e)(5)(ii). Like § 1.925(a)-1T(e)(3), the interest on receivables

provided for § 1.925(a)-1T(e) is included in the taxable income of the party deemed to hold the receivable under § 1.925(a)-1T(e)(5)(i) for the taxable years in which it accrues, unless the holder is a cash basis taxpayer, in which case it is included when paid. *Ibid.*

After a redetermination under § 1.925(a)-1T(e)(4), the receivable "bear[s] interest at an arm's-length rate . . . from the day *after* the date the account receivable is deemed established to the date of payment." *Ibid.* (emphasis added). Thus, the interest income to the holder of the receivable deemed created by operation of § 1.925(a)-1T(e)(5)(i) begins to accrue only one day after a redetermination of the related supplier and FSC's transfer price under § 1.925(a)-1T(e)(4), and does not accrue at all if the account receivable is paid, by cash payment or one of the other methods permitted under § 1.925(a)-1T(e)(3)(iii), on the date of the redetermination.

**b. Plaintiff's interpretation of subsection (e)(4) of Treas. Reg. § 1.925(a)-1T is not supported by subsections (e)(3) and (e)(5) of the regulation**

At the outset, it bears noting that nothing in § 1.925(a)-1T(e)(3) and (5) helps to advance plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4). As detailed above, plaintiff's interpretation renders the sixth sentence of § 1.925(a)-1T(e)(4) superfluous, because it has the sixth sentence saying nothing more than what is already said in the fourth sentence.[17] This failure is not remedied or justified by § 1.925(a)-1T(e)(3) or (5). Section 1.925(a)-1T(e)(3), as seen above, only results in the adjustments following certain initial transfer price determinations, not redeterminations. Thus, it is not directly material to the interpretation of § 1.925(a)-1T(e)(4).

Section § 1.925(a)-1T(e)(5), by contrast, does apply to redeterminations, but it does

[17] *See infra*, Part 2.c.

nothing to explain how what would otherwise constitute a redetermination under § 1.925(a)-1T(e)(4) could fail to do so in consequence of plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4). In fact, if anything, § 1.925(a)-1T(e)(5) further underscores the failure of plaintiff's interpretation to give independent effect to the sixth sentence. Section § 1.925(a)-1T(e)(5) presupposes that a related supplier and FSC will both have made a single redetermination of their transfer price once they have made a redetermination. *See* § 1.925(a)-1T(e)(5)(i) (creating an account receivable in the hands of the "person who was underpaid under [the] redetermination," and creating a "corresponding account payable . . . by the person who underpaid the amount due"). Thus, the supposed work done by plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) does nothing to change the effects under § 1.925(a)-1T(e)(5) of a transfer price redetermination.

**c. Defendant's interpretation of subsection (e)(4) of Treas. Reg. § 1.925(a)-1T is consistent with subsection (e)(5) of the regulation**

Defendant's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) is consistent with § 1.925(a)-1T(e)(5). Defendant understands the sixth sentence of § 1.925(a)-1T(e)(4) to prohibit an attempted redetermination by a related supplier and FSC that does not result in an assessable increase in the tax liability of the party whose taxable income would be increased under the redetermination in the taxable year to which the redetermination relates, because such a redetermination does not "affect" the party whose taxable income would be increased in that year (in this case, the FSC).[18]

[18]For ease of exposition, we assume that, in the redeterminations under discussion in the remainder of this section, the FSC is the party whose taxable income would increase in the year (continued...)

Assuming, *arguendo*, that a related supplier may make a one-sided redetermination and request a refund after the FSC's statute of limitations for assessment has closed, as plaintiff asserts, the potential effects of § 1.925(a)-1T(e)(5) would give rise to situations in which a redetermination would result in an increase in the taxable income of the FSC which is assessable, even though the statute of limitations for assessment against the FSC for the increase in taxable income resulting from the redetermination has expired. That is, the interest income that might accrue to the FSC by operation of § 1.925(a)-1T(e)(5) would result in an increase in the taxable income of the FSC in the year that the related supplier and FSC made the redetermination. Thus, if such interest income were to accrue, it would result in an assessable increase in the taxable income of the FSC, even if the statute of limitations for assessment of the FSC for the taxable year to which the redetermination relates had expired, because the statute of limitations for assessment for tax liability in the current year obviously would not have expired.

This possible increase in the assessable taxable income of the FSC on account of § 1.925(a)-1T(e)(5) does not, however, give rise to an interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) that is more plausible than defendant's interpretation. Admittedly, one could conceivably interpret the sixth sentence of § 1.925(a)-1T(e)(4) in such a way that the interest income to the FSC that may result under § 1.925(a)-1T(e)(5) would be sufficient to "affect" the FSC within the meaning of § 1.925(a)-1T(e)(4). However, this interpretation is simply not plausible, for at least two reasons.

---

[18](...continued)
to which the redetermination relates. Of course, depending on the redetermination, this party, in actuality, could be either the FSC or the related supplier.

First, this interpretation is implausible because it effectively would permit the related supplier to decide, at the time of the redetermination, whether the attempted redetermination will be respected under the sixth sentence of § 1.925(a)-1T(e)(4). Under this interpretation, the related supplier would be required *not* to immediately pay the account payable it would be deemed to hold under § 1.925(a)-1T(e)(5)(i) in order for its redetermination to be respected under the sixth sentence of § 1.925(a)-1T(e)(4), if the statute of limitations for assessment of the FSC had already expired for the taxable year to which the redetermination relates. If the related supplier did pay the account payable on the day of the redetermination, no interest would accrue, and thus there would be no increase in the taxable income of the FSC in a year for which the statute of limitations for assessment is open. *See* Treas. Reg. § 1.925(a)-1T(e)(5)(ii). Thus, under this interpretation, whether an attempted redetermination "affect[s]" the FSC under these circumstances would depend only on when the related supplier chose to pay the account payable. This consequence alone renders the interpretation suspect, as it strains credulity to suppose that the *only* purpose behind the sixth sentence of § 1.925(a)-1T(e)(4) was to prevent an attempted redetermination by the related supplier who failed to realize that it would need to cause the FSC to be "affected" by the redetermination by having the related supplier wait at least one day to pay the account payable created, but to reward with a windfall the related supplier who did realize this.

Second, even leaving this consequence aside, an interpretation that would permit the sixth sentence of § 1.925(a)-1T(e)(4) to be satisfied solely by the effects of interest accrual to the FSC under § 1.925(a)-1T(e)(5)(ii) is highly implausible. Such an interpretation would require one to suppose that the drafters of § 1.925(a)-1T(e) intended a rule that would allow redeterminations

that permit assessment of the *interest* to the FSC resulting from a redetermination, but do not permit assessment of the *principal* from which that interest arises. Further, the related supplier and FSC really have no incentive to generate interest income attributable to an account receivable created under § 1.925(a)-1T(e)(5)(ii), because such interest income is not taxed at a favorable rate under the FSC provisions. *See* I.R.C. §§ 921(d), 924(a); Treas. Reg. § 1.921-2(f). Given this, it is simply unreasonable to suppose that the only concerns that the sixth sentence of § 1.925(a)-1T(e)(4) was intended to address were concerns about the impact of interest accrual resulting from § 1.925(a)-1T(e)(5)(ii).[19]

## CONCLUSION

For the reasons stated above, and the reasons stated in defendant's previous briefs filed on this matter, defendant respectfully requests that the Court deny plaintiff's motion for partial summary judgment, and grant its cross-motion for summary judgment.

[19] At argument, plaintiff's counsel suggested that the impact on the earnings and profits of a FSC of the interest accrued under § 1.925(a)-1T(e)(5)(ii) could result in the FSC being "affected" by a redetermination within the meaning of § 1.925(a)-1T(e)(4), regardless of whether the statute of limitations for assessment against the FSC was open at the time of the redetermination. *See* Tr. at 20:18-22. This argument is unpersuasive for at least two reasons. First, it is subject to all the objections advanced above against the similar argument based on the interest accrual itself, because the purported impact on the earnings and profits of the FSC would only result if the interest accrual itself happened in the first place. Second, an increase in the earnings and profits of the FSC would, in any event, not "affect" the FSC within the meaning of § 1.925(a)-1T(e)(4), because such earnings and profits are only relevant for determining the tax effects on shareholders of a FSC of a distribution with respect to the FSC's stock, and hence would not impact the FSC's assessable tax liability. *See* I.R.C. §§ 301, 316.

Respectfully submitted,

March 21, 2008

s/ Joseph B. Syverson

JOSEPH B. SYVERSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
TELEPHONE (202) 307-6508
FACSIMILE (202) 514-9440
Joseph.B.Syverson@usdoj.gov

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief

s/ Mary M. Abate

March 21, 2008

Of Counsel