1070

for services. Congress directed the Secretary of the Treasury, in consultation with the office of the U.S. Trade Representative, to undertake a study of the advisability of providing the benefits allowed under the FSC election for profits from services performed in the United States and sold outside the United States. The Treasury Department is to report on the results of this study to the Senate Committee on Finance and the House Committee Ways and Means no later than six months after enactment.

15. FSC reports

The Act deletes the prior law requirement for DISC reports after 1984 and substitutes a requirement for FSC reports.

D. Effective Date

These provisions generally apply to transactions after December 31, 1984, in taxable years ending after that date.

E. Revenue Effect

These provisions are estimated to decrease fiscal year budget receipts by $62 million in 1985 and 1986, to increase fiscal year budget receipts by $19 million in 1987 and $80 million in 1988, and to decrease budget receipts by $131 million in 1989.

## BACKGROUND

**S. 1804** (Introduced Aug. 1, 1983)

II

98TH CONGRESS
1ST SESSION

# S. 1804

To amend the Internal Revenue Code of 1954 with respect to the tax treatment of foreign sales corporations.

---

IN THE SENATE OF THE UNITED STATES

AUGUST 4 (legislative day, AUGUST 1), 1983

Mr. DOLE (for himself, Mr. BOREN, and Mr. SYMMS) introduced the following bill; which was referred to the Committee on Finance

---

# A BILL

To amend the Internal Revenue Code of 1954 with respect to the tax treatment of foreign sales corporations.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; AMENDMENT OF 1954 CODE.**

(a) SHORT TITLE.—This Act may be cited as the "Foreign Sales Corporation Act of 1983".

(b) AMENDMENT OF 1954 CODE.—Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1954.

2

**SEC. 2. FOREIGN SALES CORPORATIONS.**

(a) IN GENERAL.—Part III of subchapter N of chapter 1 (relating to income from sources outside the United States) is amended by inserting after subpart B the following new subpart:

**"Subpart C—Taxation of Foreign Sales Corporations**

"Sec. 921. Exempt foreign trade income excluded from gross income.
"Sec. 922. FSC defined.
"Sec. 923. Exempt foreign trade income.
"Sec. 924. Foreign trading gross receipts.
"Sec. 925. Transfer pricing rules.
"Sec. 926. Distributions to shareholders.
"Sec. 927. Other defintions and special rules.

**"SEC. 921. EXEMPT FOREIGN TRADE INCOME EXCLUDED FROM GROSS INCOME.**

"(a) EXCLUSION.—Exempt foreign trade income of a FSC shall be treated as foreign source income which is not effectively connected with the conduct of a trade or business within the United States.

"(b) PROPORTIONATE ALLOCATION OF DEDUCTIONS TO EXEMPT FOREIGN TRADE INCOME.—Any deductions of the FSC properly apportioned and allocated to the foreign trade income derived by a FSC from any transaction shall be allocated between—

"(1) the exempt foreign trade income derived from such transaction, and

S 1804 IS

"(2) the foreign trade income (other than exempt foreign trade income) derived from such transaction,

on a proportionate basis.

"(c) DENIAL OF CREDITS.—Notwithstanding any other provision of this chapter, no credit (other than a credit allowable under section 32, 33(a), 39, or 901) shall be allowed under this chapter to any FSC.

"(d) FOREIGN TRADE INCOME, INVESTMENT INCOME, AND CARRYING CHARGES TREATED AS EFFECTIVELY CONNECTED WITH UNITED STATES BUSINESS.—For purposes of this chapter—

"(1) all foreign trade income of a FSC (other than exempt foreign trade income),

"(2) all interest, dividends, royalties, and other investment income received by a FSC, and

"(3) all carrying charges received by a FSC,

shall be treated as income effectively connected with the conduct of a trade or business conducted through a permanent establishment of such corporation within the United States. Income described in paragraph (1) shall be treated as derived from sources within the United States.

**"SEC. 922. FSC DEFINED.**

"(a) FSC DEFINED.—For purposes of this title, the term 'FSC' means any corporation—

"(1) which—





"(A) was created or organized—

"(i) under the laws of any foreign country, or

"(ii) under the laws applicable to any possession of the United States,

"(B) has no more than 25 shareholders at any time during the taxable year,

"(C) does not have any preferred stock outstanding at any time during the taxable year,

"(D) during the taxable year—

"(i) maintains an office located outside the United States,

"(ii) maintains a set of the permanent books of account of such corporation at such office, and

"(iii) maintains at a location within the United States the records which such corporation is required to keep under section 6001.

"(E) at all times during the taxable year, has a board of directors which includes at least one individual who is not a resident of the United States, and





"(F) is not a member, at any time during the taxable year, of any controlled group of corporations which a DISC is a member, and

"(2) which has made an election (at the time and in the manner provided in section 927(f)(1)) which is in effect for the taxable year to be treated as a FSC.

"(b) SMALL FSC DEFINED.—For purposes of this title, a FSC is a small FSC with respect to any taxable year if—

"(1) such corporation has made an election (at the time and in the manner provided in section 927(f)(1)) which is in effect for the taxable year to be treated as a small FSC, and

"(2) such corporation is not a member, at any time during the taxable year, of a controlled group of corporations which includes a FSC unless such other


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

FSC has also made an election under paragraph (1) which is in effect for such year.

"SEC. 923. EXEMPT FOREIGN TRADE INCOME.

"(a) EXEMPT FOREIGN TRADE INCOME.—For purposes of this subpart—

"(1) IN GENERAL.—The term 'exempt foreign trade income' means the aggregate amount of all foreign trade income of a FSC for the taxable year which is described in paragraph (2) or (3).





"(2) INCOME DETERMINED WITHOUT REGARD TO ADMINISTRATIVE PRICING RULES.—In the case of any transaction to which paragraph (3) does not apply, 34 percent of the foreign trade income derived from such transaction shall be treated as described in this paragraph.

"(3) INCOME DETERMINED WITH REGARD TO ADMINISTRATIVE PRICING RULES.—In the case of any transaction with respect to which paragraph (1) or (2) of section 925(a) (or the corresponding provisions of the regulations prescribed under section 925(b)) applies, 17/23 of the foreign trade income derived from such transaction shall be treated as described in this paragraph.

"(b) FOREIGN TRADE INCOME DEFINED.—For purposes of this subpart, the term 'foreign trade income' means the gross income of a FSC attributable to foreign trading gross receipts.

"SEC. 924. FOREIGN TRADING GROSS RECEIPTS.

"(a) IN GENERAL.—Except as otherwise provided in this section, for purposes of this subpart, the term 'foreign trading gross receipts' means the gross receipts of any FSC which are—

"(1) from the sale, exchange, or other disposition of export property,





"(2) from the lease or rental of export property for use by the lessee outside the United States,

"(3) for services which are related and subsidiary to—

"(A) any sale, exchange, or other disposition of export property by such corporation, or

"(B) any lease or rental of export property described in paragraph (2) by such corporation,

"(4) for engineering or architectural services for construction projects located (or proposed for location) outside the United States, or

"(5) for the performance of managerial services in furtherance of the production of gross receipts described in paragraph (1), (2), (3), or (4).

"(b) FOREIGN MANAGEMENT AND FOREIGN ECONOMIC PROCESS REQUIREMENTS.—

"(1) IN GENERAL.—Except as provided in paragraph (2)—

"(A) a FSC shall be treated as having foreign trading gross receipts for the taxable year only if the management of such corporation during such taxable year takes place outside the United States as required by subsection (c), and

"(B) a FSC has foreign trading gross receipts from any transaction only if economic proc-





Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

8

esses with respect to such transaction take place outside the United States as required by subsection (d).

"(2) EXCEPTION FOR SMALL FSC.—

"(A) IN GENERAL.—Paragraph (1) shall not apply with respect to any small FSC.

"(B) LIMITATION ON AMOUNT OF FOREIGN TRADING GROSS RECEIPTS OF SMALL FSC TAKEN INTO ACCOUNT.—

"(i) IN GENERAL.—Any foreign trading gross receipts of a small FSC for the taxable year which exceed $2,500,000 shall not be taken into account in determining the exempt foreign trade income of such corporation and shall not be taken into account under any other provision of this subpart.

"(ii) ALLOCATION OF LIMITATION.—If the foreign trading gross receipts of a small FSC exceed the limitation of clause (i), the corporation may allocate such limitation among such gross receipts in such manner as it may select (at such time and in such manner as may be prescribed in regulations).

"(iii) RECEIPTS OF CONTROLLED GROUP AGGREGATED.—For purposes of ap-

S 1804 IS

9

plying clauses (i) and (ii), all small FSC's which are members of the same controlled group of corporations shall be treated as a single corporation.

"(iv) ALLOCATION OF LIMITATION AMONG MEMBERS OF CONTROLLED GROUP.—The limitation under clause (i) shall be allocated among the foreign trading gross receipts of small FSC's which are members of the same controlled group of corporations in a manner provided in regulations prescribed by the Secretary.

"(c) REQUIREMENT THAT FSC BE MANAGED OUTSIDE THE UNITED STATES.—The management of a FSC meets the requirements of this subsection for the taxable year if—

"(1) all meetings of the board of directors of the corporation, and all meetings of the shareholders of the corporation, are outside the United States,

"(2) the principal bank account of the corporation is maintained outside the United States at all times during the taxable year, and

"(3) all dividends, legal and accounting fees, and salaries of officers and members of the board of directors of the corporation disbursed during the taxable

S 1804 IS——2

10

year are disbursed out of bank accounts of the corporation maintained outside the United States.

"(d) REQUIREMENT THAT ECONOMIC PROCESSES TAKE PLACE OUTSIDE THE UNITED STATES.—

"(1) IN GENERAL.—The requirements of this subsection are met with respect to the gross receipts of a FSC derived from any transaction if—

"(A) such corporation (or any person acting under a contract with such corporation) has participated outside the United States in the solicitation (other than advertising), the negotiation, or the making of the contract relating to such transaction, and

"(B) the foreign direct costs incurred by the FSC attributable to the transaction equal or exceed 50 percent of the total direct costs incurred by the FSC attributable to the transaction.


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

"(2) Alternative 85-percent test.—A corporation shall be treated as satisfying the requirements of paragraph (1)(B) with respect to any transaction if, with respect to each of at least 2 paragraphs of subsection (e), the foreign direct costs incurred by such corporation attributable to activities described in such paragraph equal or exceed 85 percent of the total direct





costs attributable to activities described in such paragraph.

"(3) Definitions.—For purposes of this subsection—

"(A) Total direct costs.—The term 'total direct costs' means, with respect to any transaction, the total direct costs incurred by the FSC attributable to activities described in subsection (e) performed at any location by the FSC or any person acting under a contract with such FSC.

"(B) Foreign direct costs.—The term 'foreign direct costs' means, with respect to any transaction, the portion of the total direct costs which are attributable to activities performed outside the United States.

"(4) Rules for commissions, etc.—The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection and subsection (e) in the case of commissions, rentals, and furnishing of services.

"(e) Activities Relating to Disposition of Export Property.—The activities referred to in subsection (d) are—

"(1) advertising and sales promotion,





"(2) the processing of customer orders and the arranging for delivery (outside the United States) of the export property,

"(3) transportation from the time of acquisition by the FSC (or, in the case of a commission relationship, from the beginning of such relationship for such transaction) to the delivery to the customer,

"(4) the determination and transmittal of a final invoice or statement of account and the receipt of payment, and

"(5) the assumption of credit risk.

"(f) Burden of Proof Regarding Foreign Management and Economic Process Requirements.—

"(1) In general.—In any judicial or administrative proceeding involving the issue of whether—

"(A) a FSC meets the requirements of subsection (c) for a taxable year, or

"(B) a transaction meets the requirements of subsection (d),

the burden of proof with respect to such issue shall be upon the Secretary if a written statement addressing such issue has been filed by an officer of such corporation under paragraph (2).

"(2) Affidavit.—An authorized officer of a FSC who is a citizen and resident of the United States may





file with the Secretary (at such time and in such manner as the Secretary shall by regulations prescribe) a verified written statement made by such officer under penalties of perjury which—

"(A) declares that such corporation meets the requirements of subsection (c) for the taxable



Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

year and specifies how such requirements have been met, or

"(B) declares that specified transactions of such corporation for the taxable year meet the requirements of subsection (d) and specifies how such requirements have been met.

"(g) CERTAIN RECEIPTS NOT INCLUDED IN FOREIGN TRADING GROSS RECEIPTS.—

"(1) CERTAIN RECEIPTS EXCLUDED ON BASIS OF USE; SUBSIDIZED RECEIPTS AND RECEIPTS FROM RELATED PARTIES EXCLUDED.—The term 'foreign trading gross receipts' shall not include receipts of a FSC from a transaction if—

"(A) the export property or services—

"(i) are for ultimate use in the United States, or

"(ii) are for use by the United States or any instrumentality thereof and such use of





export property or services is required by law or regulation,

"(B) such transaction is accomplished by a subsidy granted by the United States or any instrumentality thereof, or

"(C) such receipts are from another FSC which is a member of the same controlled group of corporations of which such corporation is a member.

"(2) ONE-HALF OF RECEIPTS FROM MILITARY PROPERTY EXCLUDED.—The term 'foreign trading gross receipts' shall not include 50 percent of the gross receipts for the taxable year attributable to the disposition of, or services relating to, military property (within the meaning of section 995(b)(3)(B)).

"(3) INVESTMENT INCOME; CARRYING CHARGES.—The term 'foreign trading gross receipts' shall not include any investment income or carrying charges.

"SEC. 925. TRANSFER PRICING RULES.

"(a) IN GENERAL.—In the case of a sale of export property to a FSC by a person described in section 482, the taxable income of such FSC and such person shall be based upon a transfer price which would allow such FSC to derive taxable income attributable to such sale (regardless of the





sales price actually charged) in an amount which does not exceed the greatest of—

"(1) 1.83 percent of the foreign trading gross receipts derived from the sale of such property by such FSC,

"(2) 23 percent of the combined taxable income of such FSC and such person which is attributable to the foreign trading gross receipts derived from the sale of such property by such FSC, or

"(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

Paragraphs (1) and (2) shall apply only if the FSC meets the requirements of subsection (c) with respect to the sale.

"(b) RULES FOR COMMISSIONS, RENTALS, AND MARGINAL COSTING.—The Secretary shall prescribe regulations setting forth—

"(1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and

"(2) rules for the allocation of expenditures in computing combined taxable income under subsection



Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

Case 1:06-cv-00778-FMA Document 39-3 Filed 03/21/2008 Page 7 of 34



(a)(2) in those cases where a FSC is seeking to establish or maintain a market for export property.





"(c) Requirements for Use of Administrative Pricing Rules.—A sale by a FSC meets the requirements of this subsection if—

"(1) all of the activities described in section 924(e) attributable to such sale, and

"(2) all of the activities relating to the solicitation (other than advertising), negotiation, and making of the contract for such sale,

have been performed by such FSC (or by another person acting under a contract with such FSC).

"(d) Limitation on Gross Receipts Pricing Rule.—The amount determined under subsection (a)(1) with respect to any transaction shall not exceed 2 times the amount which would be determined under subsection (a)(2) with respect to such transaction.

"(e) Taxable Income.—For purposes of this section, the taxable income of a FSC shall be determined without regard to section 921.

**"SEC. 926. DISTRIBUTIONS TO SHAREHOLDERS.**

"(a) Distributions Made First Out of Foreign Trade Income.—For purposes of this title, any distribution to a shareholder of a FSC by such FSC which is made out of earnings and profits shall be treated as made—

"(1) first, out of earnings and profits attributable to foreign trade income, to the extent thereof, and





"(2) then, out of any other earnings and profits.

"(b) Distributions by FSC to Nonresident Aliens and Foreign Corporations Treated as United States Connected.—For purposes of this title, any distribution by a FSC which is made out of earnings and profits attributable to foreign trade income to any shareholder of such corporation which is a foreign corporation or a nonresident alien individual shall be treated as a distribution which is effectively connected with the conduct of a trade or business conducted through a permanent establishment of such shareholder within the United States.

"(c) FSC Includes Former FSC.—For purposes of this section, the term 'FSC' includes a former FSC.

**"SEC. 927. OTHER DEFINITIONS AND SPECIAL RULES.**

"(a) Export Property.—For purposes of this subpart—

"(1) In general.—The term 'export property' means property—

"(A) manufactured, produced, grown, or extracted in the United States by a person other than a FSC,

"(B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a FSC, for direct use, consumption, or disposition outside the United States, and





"(C) not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

For purposes of subparagraph (C), the fair market value of any article imported into the United States shall be its appraised value, as determined by the Secretary under section 402 of the Tariff Act of 1930 (19 U.S.C. 1401a) in connection with its importation.

"(2) Excluded property.—The term 'export property' shall not include—

"(A) property leased or rented by a FSC for use by any member of a controlled group of corporations of which such FSC is a member,

"(B) patents, inventions, models, designs, formulas, or processes whether or not patented, copyrights (other than films, tapes, records, or similar reproductions, for commercial or home use), good will, trademarks, trade brands, franchises, or other like property,

"(C) oil or gas (or any primary product thereof), or

"(D) products the export of which is prohibited or curtailed under section 7(a) of the Export Administration Act of 1979 to effectuate the policy set forth in paragraph (2)(C) of section 3 of

S 1804 IS

19

such Act (relating to the protection of the domestic economy).

"(3) PROPERTY IN SHORT SUPPLY.—If the President determines that the supply of any property described in paragraph (1) is insufficient to meet the requirements of the domestic economy, he may by Executive order designate the property as in short supply. Any property so designated shall not be treated as export property during the period beginning with the date specified in the Executive order and ending with the date specified in an Executive order setting forth the President's determination that the property is no longer in short supply.

"(4) FUNGIBLE AGRICULTURAL PRODUCTS MARKETED THROUGH COOPERATIVES.—

"(A) IN GENERAL.—Fungible agricultural products which are marketed through pooling arrangements of a cooperative described in section 521(b)(1) shall be treated as meeting the requirements of paragraph (1)(B) to the extent that such products are sold for direct use, consumption, or disposition outside the United States, and each member of such pool shall be considered as a producer of such property to the extent of his ratable

S 1804 IS

20

share of such products based upon his contribution of products to the pool.

"(B) SUBPARAGRAPH (A) SHALL NOT APPLY WHERE COOPERATIVE SELLS THROUGH FSC OR DISC.—Subparagraph (A) shall not apply to any products which are sold by the cooperative through a FSC or DISC.

"(C) COOPERATIVE AS AGENT.—A cooperative marketing the products of its patrons shall be treated as acting as the agent of such patrons, regardless of any formal transfer of title to the cooperative.

"(b) GROSS RECEIPTS.—

"(1) IN GENERAL.—For purposes of this subpart, the term 'gross receipts' means—

"(A) the total receipts from the sale, lease, or rental of property held primarily for sale, lease, or rental in the ordinary course of trade or business, and

"(B) gross income from all other sources.

"(2) GROSS RECEIPTS TAKEN INTO ACCOUNT IN CASE OF COMMISSIONS.—In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this subpart as gross receipts shall be the gross receipts on the sale, lease,

S 1804 IS


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

21

or rental of the property on which such commissions arose.

"(c) INVESTMENT INCOME.—For purposes of this subpart, the term 'investment income' means—

"(1) dividends,

"(2) interest,

"(3) royalties,

"(4) annuities,

"(5) rents (other than rents from the lease or rental of export property for use by the lessee outside of the United States),

"(6) gains from the sale or exchange of stock or securities,

"(7) gains from futures transactions in any commodity on, or subject to the rules of, a board of trade or commodity exchange (other than gains which arise out of a bona fide hedging transaction reasonably necessary to conduct the business of the FSC in the manner in which such business is customarily conducted by others),

"(8) amounts includible in computing the taxable income of the corporation under part I of subchapter J, and

"(9) gains from the sale or other disposition of any interest in an estate or trust.

S 1804 IS

22

"(d) OTHER DEFINITIONS.—For purposes of this subpart—

"(1) CARRYING CHARGES.—The term 'carrying charges' means—

"(A) carrying charges, and

"(B) under regulations prescribed by the Secretary, any amount in excess of the price for an immediate cash sale and any other unstated interest.

"(2) TRANSACTION.—

"(A) IN GENERAL.—The term 'transaction' means—

"(i) any sale, exchange, or other disposition,

"(ii) any lease or rental, and

"(iii) any furnishing of services.

"(B) GROUPING OF TRANSACTIONS.—To the extent provided in regulations, any provision of this subpart which, but for this subparagraph, would be applied on a transaction-by-transaction basis may be applied by the taxpayer on the basis of groups of transactions based on product lines or recognized industry or trade usage. Such regulations may permit different groupings for different purposes.

S 1804 IS

23

"(3) UNITED STATES DEFINED.—The term 'United States' includes the Commonwealth of Puerto Rico.

"(4) CONTROLLED GROUP OF CORPORATIONS.—The term 'controlled group of corporations' has the meaning given to such term by section 1563(a), except that—

"(A) 'more than 50 percent' shall be substituted for 'at least 80 percent' each place it appears therein, and

"(B) section 1563(b) shall not apply.

"(5) POSSESSIONS.—The term 'possession of the United States' means Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Virgin Islands of the United States.

"(e) SPECIAL RULES.—

"(1) SOURCE RULES FOR RELATED PERSONS.—Under regulations, the income of a person described in

section 482 from a transaction giving rise to foreign trading gross receipts of a FSC which is treated as from sources outside the United States shall not exceed the amount which would be treated as foreign source income earned by such person if the pricing rule under section 994 which corresponds to the rule used under





section 925 with respect to such transaction applied to such transaction.

"(2) PARTICIPATION IN INTERNATIONAL BOYCOTTS, ETC.—Under regulations prescribed by the Secretary, the exempt foreign trade income of a FSC for any taxable year shall be limited under rules similar to the rules of clauses (i) and (ii) of section 995(b)(1)(F).

"(f) ELECTION OF STATUS AS FSC (AND AS SMALL FSC).—

"(1) ELECTION.—

"(A) TIME FOR MAKING.—An election by a corporation under section 922(a)(2) to be treated as a FSC, and an election under section 922(b)(1) to be a small FSC, shall be made by such corporation for a taxable year at any time during the 90-day period immediately preceding the beginning of the taxable year, except that the Secretary may give his consent to the making of an election at such other times as he may designate.

"(B) MANNER OF ELECTION.—An election under subparagraph (A) shall be made in such manner as the Secretary shall prescribe and shall be valid only if all persons who are shareholders in such corporation on the first day of the first





taxable year for which such election is effective consent to such election.

"(2) EFFECT OF ELECTION.—If a corporation makes an election under paragraph (1), then the provisions of this subpart shall apply to such corporation for the taxable year of the corporation for which made and for all succeeding taxable years.

"(3) TERMINATION OF ELECTION.—

"(A) REVOCATION.—An election under this subsection made by any corporation may be terminated by revocation of such election for any taxable year of the corporation after the first taxable year of the corporation for which the election is effective. A termination under this paragraph shall be effective with respect to such election—

"(i) for the taxable year in which made, if made at any time during the first 90 days of such taxable year, or

"(ii) for the taxable year following the taxable year in which made, if made after the close of such 90 days, and

for all succeeding taxable years of the corporation. Such termination shall be made in such manner as the Secretary shall prescribe by regulations.





"(B) CONTINUED FAILURE TO BE FSC.—If a corporation is not a FSC for each of any 5 consecutive taxable years of the corporation for which an election under this subsection is effective, the election to be a FSC shall be terminated and not be in effect for any taxable year of the corporation after such 5th year.".

(b) DIVIDEND RECEIVED DEDUCTION FOR DOMESTIC CORPORATIONS.—


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

(1) IN GENERAL.—Section 245 (relating to dividends received from certain foreign corporations) is amended by redesignating subsection (c) as subsection (d) and by inserting after subsection (b) the following new subsection:

"(c) CERTAIN DIVIDENDS RECEIVED FROM FSC.—In the case of a domestic corporation, there shall be allowed as a deduction an amount equal to 100 percent of any dividend received by such corporation from another corporation which is distributed out of earnings and profits attributable to foreign trade income (within the meaning of section 923(b)) for a period during which such other corporation was a FSC. The deduction allowable under the preceding sentence with respect to any dividend shall be in lieu of any deduction allowable under subsection (a) or (b) with respect to such dividend.".





(2) CONFORMING AMENDMENTS.—

(A) Paragraph (1) of section 246(b) (relating to limitation on aggregate amount of deduction) is amended by striking out "245" each place it appears and inserting in lieu thereof "subsection (a) or (b) of section 245".

(B) Subsection (d) of section 245 (relating to property distributions), as redesignated by paragraph (1), is amended by striking out "subsections (a) and (b)" and inserting in lieu thereof "this section".

(c) TREATMENT OF CERTAIN TRADE RECEIVABLES.—

(1) Subsection (a) of section 553 (defining foreign personal holding company income) is amended by adding at the end thereof the following new paragraph:

"(8) INCOME FROM TRADE RECEIVABLES OF RELATED PERSONS.—Income from an account receivable or evidence of indebtedness arising out of the disposition of property described in section 1221(1), or the performance of services, by a related person (within the meaning of section 954(d)(3)).".

(2) Subsection (b) of section 956 (defining United States person) is amended by adding at the end thereof the following new paragraph:





"(3) TRADE RECEIVABLES OF RELATED UNITED STATES PERSONS.—Notwithstanding paragraph (2), the term 'United States property' includes an account receivable or evidence of indebtedness arising out of the disposition of property described in section 1221(1), or the performance of services, by a United States person who is a related person (within the meaning of section 954(d)(3)).".

(d) CONFORMING AMENDMENTS.—

(1) Section 901 (relating to foreign tax credit) is amended by redesignating subsection (h) as subsection (i) and inserting after subsection (g) the following new subsection:

"(h) TAXES PAID WITH RESPECT TO FOREIGN TRADE INCOME.—No credit shall be allowed under this section for any income, war profits, and excess profits taxes paid or accrued with respect to the foreign trade income (within the meaning of section 923(b)) of a FSC.".

(2) Section 902 (relating to credit for corporate stockholders in foreign corporation) is amended by redesignating subsection (d) as subsection (e) and inserting after subsection (c) the following new subsection:

"(d) TAXES PAID WITH RESPECT TO FOREIGN TRADE INCOME.—No corporation shall be deemed to have paid any




Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

income, war profits, or excess profits taxes with respect to foreign trade income (within the meaning of section 923(b)) of a FSC by reason of an provision of this section.".

(3) Paragraph (1) of section 904(d) (relating to application of section in case of certain interest income and dividends from a DISC) as amended—

(A) by striking out "and" at the end of subparagraph (B),

(B) by striking out subparagraph (C) and inserting in lieu thereof the following:

"(C) taxable income attributable to foreign trade income (within the meaning of section 923(b)),

"(D) distributions from a FSC (or former FSC) out of earnings and profits attributable to foreign trade income (within the meaning of section 923(b)), and

"(E) income other than income described in subparagraph (A), (B), (C), or (D).", and

(C) by striking out the heading and inserting in lieu thereof:

"(d) SEPARATE APPLICATION OF SECTION WITH RESPECT TO CERTAIN INTEREST INCOME AND INCOME FROM DISC, FORMER DISC, FSC, OR FORMER FSC.—".





(4) Subsection (b) of section 906 (relating to special rules) is amended by adding at the end thereof the following new paragraph:

"(5) No credit shall be allowed under this section for any income, war profits, and excess profits taxes paid or accrued with respect to the foreign trade income (within the meaning of section 923(b)) of a FSC.".

(5) Section 951 (relating to amounts included in gross income of shareholders) is amended by adding at the end thereof the following new subsection:

"(e) FOREIGN TRADE INCOME NOT TAKEN INTO ACCOUNT.—The foreign trade income (within the meaning of section 923(b)) of a FSC and any deductions which are apportioned or allocated to such income shall not be taken into account under this subpart.".

(6) Paragraph (4) of section 275(a) (relating to disallowance of deduction for certain taxes) is amended to read as follows:

"(4) Income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States if—

"(A) the taxpayer chooses to take to any extent the benefits of section 901, or





"(B) such taxes are paid or accrued with respect to foreign trade income (within the meaning of section 923(b)) of a FSC.".

(7) Subsection (d) of section 1248 (relating to exclusions from earnings and profits) is amended by adding at the end thereof the following new paragraph:

"(6) FOREIGN TRADE INCOME.—Earnings and profits of the foreign corporation attributable to foreign trade income (within the meaning of section 923(b)) of a FSC.".

(8) Section 934 (relating to limitation on reduction in income tax liability incurred to the Virgin Islands) is amended by adding at the end thereof the following new subsection:

"(f) FSC.—Subsection (a) shall not apply in the case of a Virgin Islands corporation which is a FSC.".

**SEC. 2. INTEREST CHARGE DISC.**


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

(a) INTEREST CHARGE ON DEFERRED TAX.—Section 995 (relating to taxation of DISC income to shareholders) is amended—

(1) by striking out subsections (e) and (f),

(2) by redesignating subsection (g) as subsection (e), and

(3) by adding at the end thereof the following new subsection:

S 1804 IS

32

"(f) INTEREST ON DISC-RELATED DEFERRED TAX LIABILITY.—

"(1) IN GENERAL.—A shareholder of a DISC shall pay for each taxable year interest in an amount equal to the product of—

"(A) the shareholder's DISC-related deferred tax liability for such year, and

"(B) the base period T-bill rate.

"(2) SHAREHOLDER'S DISC-RELATED DEFERRED TAX LIABILITY.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'shareholder's DISC-related deferred tax liability' means, with respect to any taxable year of a shareholder of a DISC, the excess of—

"(i) the amount which would be the tax liability of the shareholder for the taxable year if the deferred DISC income of such shareholder for such taxable year were included in gross income as ordinary income, over

"(ii) the actual amount of the tax liability of such shareholder for such taxable year.

Determinations under the preceding sentence shall be made without regard to carrybacks to such taxable year.

S 1804 IS

33

"(B) ADJUSTMENTS FOR LOSSES, CREDITS, AND OTHER ITEMS.—The Secretary shall prescribe regulations which provide such adjustments—

"(i) to the accounts of the DISC, and

"(ii) to the amount of any carryover or carryback of the shareholder,

as may be necessary or appropriate in the case of net operating losses, credits, and carryovers and carrybacks of losses and credits.

"(C) TAX LIABILITY.—The term 'tax liability' means the amount of the tax imposed by this chapter for the taxable year reduced by credits allowable against such tax (other than credits allowable under sections 31, 39, and 43).

"(3) DEFERRED DISC INCOME.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'deferred DISC income' means, with respect to any taxable year of a shareholder, the excess of—

"(i) the shareholder's pro rata share of accumulated DISC income (for periods after 1983) of the DISC as of the close of the computation year, over

S 1804 IS

34

"(ii) the amount of the distributions-in-excess-of-income for the taxable year of the DISC following the computation year.

"(B) COMPUTATION YEAR.—For purposes of applying subparagraph (A) with respect to any taxable year of a shareholder, the computation year is the taxable year of the DISC which ends with (or within) the taxable year of the shareholder which precedes the taxable year of the share-


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

holder for which the amount of deferred DISC income is being determined.

"(C) DISTRIBUTIONS-IN-EXCESS-OF-INCOME.—For purposes of subparagraph (A), the term 'distributions-in-excess-of-income' means, with respect to any taxable year of a DISC, the excess (if any) of—

"(i) the amount of actual distributions to the shareholder out of accumulated DISC income, over

"(ii) the shareholder's pro rata share of the DISC income for such taxable year.

"(3) BASE PERIOD T-BILL RATE.—For purposes of this subsection, the term 'base period T-bill rate' means the annual rate of interest determined by the Secretary to be equivalent to the average investment

S 1804 IS

35

yield of United States Treasury bills with maturities of 52 weeks which were auctioned during the 1-year period ending on September 30 of the calendar year ending with (or of the most recent calendar year ending before) the close of the taxable year of the shareholder.

"(4) SHORT YEARS.—The Secretary shall prescribe such regulations as may be necessary for the application of this subsection to short years of the DISC, the shareholder, or both.

"(5) PAYMENT AND ASSESSMENT AND COLLECTION OF INTEREST.—The interest accrued during any taxable year which a shareholder is required to pay under paragraph (1) shall be treated, for purposes of this title, as interest payable under section 6601 and shall be paid by the shareholder at the time the tax imposed by this chapter for such taxable year is required to be paid.".

(b) TAXABLE INCOME IN EXCESS OF $10,000,000 DEEMED DISTRIBUTED.—

(1) IN GENERAL.—Subparagraph (E) of section 995(b)(1) (relating to based period export gross receipts) is amended to read as follows:

S 1804 IS

36

"(E) the taxable income of the DISC attributable to qualified export receipts of the DISC for the taxable year which exceed $10,000,000,".

(2) AGGREGATION OF RECEIPTS.—Subsection (b) of section 995 (relating to deemed distributions) is amended by adding at the end thereof the following new paragraph:

"(4) AGGREGATION OF QUALIFIED EXPORT RECEIPTS.—

"(A) IN GENERAL.—For purposes of applying paragraph (1)(E), all DISC's which are members of the same controlled group shall be treated as a single corporation.

"(B) ALLOCATION.—The dollar amount under paragraph (1)(E) shall be allocated among the DISC's which are members of the same controlled group in a manner provided in regulations prescribed by the Secretary.".

(c) ELIMINATION OF CERTAIN DEEMED DISTRIBUTIONS RELATING TO TAXABLE INCOME OF DISC.—Subparagraph (F) of section 995(b)(1) (relating to distributions in qualified years) is amended to read as follows:

"(F) the sum of—

"(i) an amount equal to the product of—

S 1804 IS


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

"(I) the international boycott factor determined under section 999, multiplied by

"(II) one-half of the excess of the taxable income of the DISC for the taxable year (before reduction for any distributions during the year) over the sum of the amounts deemed distributed for the taxable year under subparagraphs (A), (B), (C), (D), and (E), plus

"(ii) any illegal bribe, kickback, or other payment (within the meaning of section 162(c)) paid by or on behalf of the DISC directly or indirectly to an official, employee, or agent in fact of a government, and".

(d) TREATMENT OF SALES THROUGH AGRICULTURAL COOPERATIVES.—Subsection (c) of section 993 (defining export property) is amended by adding at the end thereof the following new paragraph:

"(4) FUNGIBLE AGRICULTURAL PRODUCTS MARKETED THROUGH COOPERATIVES.—

"(A) IN GENERAL.—Fungible agricultural products which are marketed through pooling arrangements of a cooperative described in section 521(b)(1) shall be treated as meeting the require-





ments of paragraph (1)(B) to the extent that such products are sold for direct use, consumption, or disposition outside the United States, and each member of such pool shall be considered as a producer of such property to the extent of his ratable share of such products based upon his contribution of products to the pool.

"(B) SUBPARAGRAPH (A) SHALL NOT APPLY WHERE COOPERATIVE SELLS THROUGH DISC OR FSC.—Subparagraph (A) shall not apply to any products which are sold by the cooperative through a DISC or FSC.

"(C) COOPERATIVE AS AGENT.—A cooperative marketing the products of its patrons shall be treated as acting as the agent of such patrons, regardless of any formal transfer of title to the cooperative.".

(e) CONFORMING AMENDMENTS.—

(1) Subsection (a) of section 291 (relating to corporate preference items) is amended by striking out paragraph (4) and redesignating paragraph (5) as paragraph (4).

(2) Paragraph (1) of section 291(c) (relating to special rules for pollution control facilities) is amended





by striking out "subsection (a)(5)" and inserting in lieu thereof "subsection (a)(4)".

(3) Subsection (a) of section 992 (relating to definition of DISC) is amended—

(A) by striking out "and" at the end of subparagraph (C),

(B) by striking out the period at the end of subparagraph (D) and inserting in lieu thereof ", and", and

(C) by adding at the end thereof the following new subparagraph:

"(E) such corporation is not a member of any controlled group of which a FSC is a member.".

(4) Paragraph (3) of section 993(a) (relating to controlled groups) is amended by striking out "such

term by" and inserting in lieu thereof "the term 'controlled group of corporations' by".

(5) Subsection (c) of section 999 (relating to international boycott factor) is amended by striking out "995(b)(1)(F)(ii)" each place it appears and inserting in lieu thereof "995(b)(1)(F)(i)".

(6) The table of subparts for part III of subchapter N of chapter 1 is amended by inserting after the item relating to subpart B the following new item:

"Subpart C. Taxation of foreign sales corporations.".

S 1804 IS

40

**SEC. 3. TAXABLE YEAR OF DISC AND FSC REQUIRED TO CONFORM TO TAXABLE YEAR OF MAJORITY SHAREHOLDER.**

(a) In General.—Subsection (b) of section 441 (relating to period for computation of taxable income) is amended—

(1) by striking out "or" at the end of paragraph (2),

(2) by striking out the period at the end of paragraph (3) and inserting in lieu thereof "; or", and

(3) by adding at the end thereof the following new paragraph:

"(4) in the case of a FSC or DISC filing a return for a period of at least 12 months, the period determined under subsection (h).".

(b) Determination of Taxable Year.—Section 441 is amended by adding at the end thereof the following new subsection:

"(h) Taxable Year of FSC's and DISC's.—

"(1) In general.—For purposes of this subtitle, the taxable year of any FSC or DISC shall be the taxable year of that shareholder (or group of shareholders with the same 12-month taxable year) who has the highest percentage of voting power.

"(2) Special rule where more than one shareholder (or group) has highest percent-

S 1804 IS

41

age.—If 2 or more shareholders (or groups) have the highest percentage of voting power under paragraph (1), the taxable year of the FSC or DISC shall be the same 12-month period as that of any such shareholder (or group).

"(3) Subsequent changes of ownership.—The Secretary shall prescribe regulations under which paragraphs (1) and (2) shall apply to a change of ownership of a corporation after the taxable year of the corporation has been determined under paragraph (1) or (2) only if such change is a substantial change of ownership.

"(4) Voting power determined.—For purposes of this subsection, voting power shall be determined on the basis of total combined voting power of all classes of stock of the corporation entitled to vote.".

**SEC. 4. EFFECTIVE DATE; TRANSITION RULES.**

(a) Effective Date.—

(1) In general.—Except as provided in paragraph (2), the amendments made by this Act shall apply to transactions after December 31, 1983, in taxable years ending after such date.

(2) Treatment of certain trade receivables.—The amendments made by section 2(c) shall apply to accounts receivable and evidences of indebted-

S 1804 IS

42

ness acquired by the foreign corporation after August 4, 1983, in taxable years ending after such date.

(b) Transition Rules for DISC's.—



10/85 Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

(1) CLOSE OF 1983 TAXABLE YEARS OF DISC'S.—

(A) IN GENERAL.—For purposes of applying the Internal Revenue Code of 1954, the taxable year of each DISC which begins before January 1, 1984, and which (but for this paragraph) would include January 1, 1984, shall close on December 31, 1983.

(B) UNDERPAYMENTS OF ESTIMATED TAX.—To the extent provided in regulations prescribed by the Secretary of the Treasury or his delegate, no addition to tax shall be made under section 6654 or 6655 of such Code with respect to any underpayment of any installment required to be paid before April 13, 1984, to the extent the underpayment was created or increased by reason of subparagraph (A).

(2) EXEMPTION OF ACCUMULATED DISC INCOME FROM TAX.—For purposes of applying the Internal Revenue Code of 1954 with respect to actual distributions made by a DISC or former DISC after December 31, 1983, any accumulated DISC income of a





DISC or former DISC (within the meaning of section 996(f)(1) of such Code) which is derived before January 1, 1984, shall be treated as previously taxed income (within the meaning of section 996(f)(2) of such Code).

(3) TIME CERTAIN DISTRIBUTIONS ARE DEEMED RECEIVED BY SHAREHOLDERS.—Notwithstanding section 995(b) of such Code, if a shareholder of a DISC elects the application of this paragraph (at such time and in such manner as the Secretary of the Treasury or his delegate shall prescribe by regulations) any distribution which such shareholder is deemed to have received by reason of section 995(b) of such Code with respect to income derived by the DISC in the taxable year of the DISC which begins in 1983 after the date in 1983 on which the taxable year of such shareholder begins shall be treated, for purposes of such Code, as received by such shareholder in 4 equal installments on the last day of each of the 4 taxable years of such shareholder which begins after the taxable year of such shareholder which begins in 1983. The preceding sentence shall apply without regard to whether the DISC exists after December 31, 1983.

(4) TREATMENT OF TRANSFERS FROM DISC TO FSC.—Except to the extent provided in regulations, section 367 of such Code shall not apply to transfers





made before January, 1985 (or, if later, the date 1 year after the date on which the corporation ceases to be a DISC) to a FSC of qualified export assets (as defined in section 993(b) of such Code) held on August 4, 1983, by a DISC in a transaction described in section 351 or 368(a)(1) of such Code.

(5) DEFINITIONS.—For purposes of this subsection, the terms "DISC" and "former DISC" have the respective meanings given to such terms by section 992 of such Code.



Staff of Joint Committee on Taxation, 98th Cong., 1st Sess., (Comm. Print, Nov. 17, 1983), **REPLACEMENT OF DOMESTIC INTERNATIONAL SALES CORPORATIONS (DISCs), DESCRIPTION OF S. 1804 (FOREIGN SALES CORPORATION ACT)** (Prepared for Senate Finance Committee Hearing, Nov. 18, 1983)



## I. SUMMARY

### Domestic International Sales Corporations (DISCs)

Originally proposed by the U.S. Treasury Department in 1970, a system of export income tax deferral for Domestic International Sales Corporations (DISCs) was enacted by Congress as Title V of

the Revenue Act of 1971. The DISC legislation had several purposes. Congress was concerned that many trading nations provided more favorable tax treatment for their exports than the United States provided for U.S. exports, and intended to redress that imbalance in tax treatment. A second purpose was to stimulate exports and thereby improve the nation's balance of payments. A third purpose of DISC was to equalize the tax treatment accorded U.S.-based exporters, on the one hand, and U.S.-owned foreign manufacturing subsidiaries (not subject to current U.S. tax), on the other, and thereby remove an incentive to move manufacturing jobs overseas. It was anticipated that the DISC provisions would particularly aid smaller companies.

A DISC is typically a domestic subsidiary of a U.S. company that is engaged in exporting. The income attributable to qualified export receipts is apportioned between the parent and the DISC, using one of two optional formula pricing rules or, at the choice of the taxpayer, the arm's-length method.

The profits allocated to a DISC are not taxed to the DISC but are taxed to the shareholders of the DISC when distributed or deemed distributed. Each year, a DISC is deemed to have distributed a portion of its income, thereby subjecting that income to current taxation in the shareholder's hands. As originally enacted, DISC generally provided for an annual deemed distribution of 50 percent of a DISC's profits. Thus, tax deferral was limited to 50 percent of the DISC's export income.

To qualify as a DISC, at least 95 percent of a corporation's assets must be export-related and at least 95 percent of the corporation's gross income must arise from export sales or lease transactions and other export-related activities. Special intercompany pricing rules apply with respect to transactions between a DISC and related parties. In general, under these pricing rules, a DISC may earn up to 4 percent of gross export receipts or 50 percent of the combined taxable income of the DISC and its supplier.

In the early and mid-1970s, there were legislative proposals to repeal the DISC legislation or to give the President authority to terminate the application of the DISC provisions as part of multilateral trade agreements. After examining the original DISC provisions at great length, Congress substantially amended them in the Tax Reform Act of 1976. The amendments reflected Congressional concern over the revenue cost of DISC and Congressional belief that the DISC program could be made more efficient and less costly

4

while still providing the same incentive for increased exports and jobs. The most significant amendment was the addition of an incremental method for determining the annual deemed distribution. Generally, under this method, the portion of DISC income qualifying for tax deferral was reduced to 50 percent of the DISC income attributable to increased exports over a base-period figure. Small DISCs are exempted from the incremental rule.

In the Tax Equity and Fiscal Responsibility Act of 1982, Congress reduced the percentage applied to determine DISC income subject to deferral from 50 percent to 42.5 percent for corporate shareholders. This 42.5 percent deferral generally allows deferral of tax on as much as either (1) 21.25 percent of the combined taxable income of a DISC and its related supplier (under the 50-50 intercompany pricing rule), or (2) 1.7 percent of gross export receipts (under the four-percent intercompany pricing rule). Any application of the incremental rule reduces the amount of this deferral, however.

From its inception, DISC was the object of criticism from foreign countries. Several countries, along with the European Economic Community, alleged that DISC was an export subsidy that violated the General Agreement on Tariffs and Trade (GATT). Without agreeing that DISC violates GATT, the Administration has proposed the repeal of DISC and its replacement with a new entity, the "Foreign Sales Corporation" (contained in S. 1804, summarized below).

### S. 1804—Foreign Sales Corporation Act

#### *FSC Provisions*

S. 1804, the proposed Foreign Sales Corporation Act, would provide a new set of tax rules for exports of goods and services. The bill would provide for the establishment of foreign sales corporations (FSCs) which would typically be foreign incorporated subsidiaries of U.S. parents engaged in exporting. Under the bill, an exporter using a FSC could use safe-harbor pricing rules that would generally exempt from U.S. income tax the greater of 17 percent of the taxable income that a FSC and a related party derive from an export transaction or up to some 1.35 percent of the gross receipts from the transaction. The bill would repeal the present DISC rules, with an exception for small exporters, and it would forgive tax on DISC income that has already benefited from tax deferral.

A FSC must be organized under the laws of a jurisdiction outside the U.S. customs area. It must have at least one director who is not a U.S. resident. It must maintain an office outside U.S. customs territory, and it must keep tax records both at that office and in the United States. Finally, it must elect FSC treatment.

The tax rules of the bill would apply to the export income of a FSC if it is managed outside the United States and if economic processes of the transaction take place outside the United States. In addition, the bill would apply to the export income of a small FSC attributable to up to $2,500,000 of export receipts whether or not its management or economic processes are foreign.

To be managed outside the United States, an FSC must have its shareholders' meetings, board meetings, and principal bank account outside the United States. To meet the foreign economic

5

process test with respect to a transaction, the FSC or its agent must solicit, negotiate, or make the contract relating to the transaction outside the United States. In addition, half of the costs the FSC incurs for advertising, handling orders, transportation, collection, and assumption of credit risk with respect to a transaction must be for performance outside the United States; alternatively, 85 percent of its costs for any two of these five activities must be for their performance outside the United States.

Some export transactions between FSCs and related U.S. taxpayers would qualify for administrative transfer pricing rules. These administrative pricing rules would be available only if the foreign sales corporation or its agent performs all the activities of the economic process test. Under the administrative pricing rules, the FSC generally would earn the greater of 23 percent of the taxable income that it and its related party derive from the transaction or 1.83 percent of the gross receipts from the transaction.

The bill would exempt a portion of the export income of a foreign sales corporation from U.S. tax. If a transaction is subject to one of the administrative transfer pricing rules, this exempt portion would be 17/23 of FSC's income from the transaction. Less frequently, this exempt portion would be 34 percent of its export income. The rest of export income (including generally 6/23 of the FSC's income) would be subject to U.S. tax. All investment income of a FSC would also be subject to U.S. tax. Dividends from export income of a FSC to a U.S. corporate shareholder would be tax-exempt at the corporate shareholder level.

The bill would provide tax deferral under the present DISC rules for up to $10 million of export receipts for small exporters, but would require those companies to pay interest on the deferred tax.

The bill would require that FSCs and DISCs have the same taxable year as their parent corporations. It would provide that income from trade receivables of a related party would be passive income subject to the anti-incorporated pocketbook and anti-tax haven rules. Also, it would treat accumulated DISC income as having been previously taxed, so that tax on those amounts would be forgiven and all previously deferred income could be distributed tax-free.

#### *Comparison of the Effects of DISC and FSC*

Like the DISC legislation, the FSC proposal would lower the effective U.S. tax rate on income from capital used in the production of exports. However, it has been argued that the FSC substitute may be less efficient than DISC since exporters would incur operating expenses (and perhaps foreign taxes) associated with their offshore FSCs. Also, compared to DISC, the FSC substitute favors large, older, and slower growing exporters relative to small, new, and rapidly growing export companies. On the other hand, the FSC substitute does not contain some of the disadvantages of a DISC. For example, under the FSC rules there is no requirement equivalent to the qualified assets test; this results in two important differences between DISC and FSC. First, a company would have no restrictions under the FSC rules on how funds are invested; such flexibility is clearly important to business decisions. Second, the consequences of failure of a DISC to meet the qualified assets test

6

(and the gross receipts test) are severe; all previously deferred income may be triggered. In contrast, no such harsh result with respect to prior years could occur under the FSC proposal. Furthermore, the captive DISC demand for Export-Import Bank obligations would be eliminated, reducing the bank's ability to finance U.S. exports.


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

(7)

## II. BACKGROUND AND PRESENT LAW

### A. DISC—Legislative History and Present Law

*Overview*

In the Revenue Act of 1971, Congress provided a system of tax deferral for corporations known as Domestic International Sales Corporations (DISCs) and their shareholders (Code secs. 991–997). The legislation creating DISC mandated annual Treasury Department reports on its operation and effect. The Treasury has issued 10 such reports, the most recent, covering 1981, in July 1983.[1] That report estimates that the DISC legislation increased exports in DISC year 1981 by between $7 billion and $11 billion over what they otherwise would have been. The estimated revenue cost of DISC in that year was $1.65 billion.

*Background—U.S. Taxation of Foreign Income*

The United States subjects to tax the worldwide income of any corporation organized under the laws of the United States. However, foreign corporations (even those that are subsidiaries of U.S. companies) generally are taxed by the United States only to the extent they earn income from a business in the United States or derive investment income there. As a result, the United States usually does not impose a tax on the foreign source income of a foreign corporation even though it is owned or controlled by U.S. persons. Instead, the foreign source earnings of a foreign corporation generally are subject to U.S. income taxes only when and if they are actually remitted to U.S. shareholders as dividends. The tax in this case is imposed on the U.S. shareholder and not the foreign corporation. U.S. tax on the dividend income may be offset by foreign tax credits.

An exception to the general rule is provided for certain "tax haven" base company type activities of controlled foreign corporations (sec. 951). These are foreign corporations more than 50 percent of the stock of which is owned by U.S. shareholders each of which owns at least 10 percent of the corporation's stock. The U.S. shareholders of these corporations are taxed under the subpart F provisions of the Code, enacted in 1962 (and subsequently amended). Under these provisions, certain earnings and profits of the controlled foreign corporation ("subpart F income") are deemed to be distributed to the U.S. shareholders, and are subject to taxation currently whether or not the shareholders actually receive the income in the form of a dividend.

[1] Department of the Treasury, "The Operation and Effect of the Domestic International Sales Corporation Legislation, 1981 Annual Report," July 1983.

8

Subpart F income includes foreign base company sales income, which means sales income earned by a foreign subsidiary on the sale of property purchased from, or sold to, a related company if the property was neither manufactured in nor sold for use in the country in which the subsidiary is incorporated.[2] A U.S. manufacturer generally cannot establish a foreign sales subsidiary in a tax haven through which to route export transactions or other sales transactions without incurring U.S. tax on the subsidiary's income. Although the list of categories of subpart F income has grown and changed since 1962 and since enactment of DISC in 1971, the provision that subjects foreign base company sales income to current U.S. tax has remained basically the same.

*Legislative History of DISC*

***1970 Administration proposal***

The DISC legislation was first proposed by the U.S. Treasury Department in 1970.[3] The Treasury Department argued that changes were needed in the tax treatment of exported goods in order to encourage exports of U.S. goods and thereby improve the balance of

[2] There are now five other categories of subpart F income taxed currently to U.S. shareholders of controlled foreign corporations: (1) income from the insurance of U.S. risks; (2) passive investment income such as dividends, interest, royalties, and rents ("foreign personal holding company income"); (3) income from services performed for or on behalf of a related person by the foreign subsidiary outside of the country in which it is incorporated ("foreign base company services income"); (4) shipping income earned by a foreign subsidiary outside of the country in which it is incorporated, if that income is not reinvested in shipping assets; and (5) foreign oil-related income (not including extraction income) such as income from processing, transporting, or distributing oil or gas if not earned in the country of extraction or consumption. In addition, investments by controlled foreign corporations in U.S. property (such as loans to the U.S. parent) are generally subject to U.S. tax to the extent of previously untaxed earnings (sec. 956).

[3] *See Domestic International Sales Corporation Proposal of the U.S. Treasury Department*, 91st Cong., 2d Sess. (Comm. Print 1970); Staff of House Comm. on Ways and Means, 91st Cong., 2d Sess., *Summary of Testimony Presented at Foreign Trade Hearings Conducted by Committee on Ways and Means*, 114-118 (Comm. Print 1970).

payments.[4] Restriction of imports was considered impractical since it could invite retaliation by U.S. trading partners; also, the Treasury Department suggested that the freedom to import was one of the most effective possible checks on domestic inflationary pressures.

The Treasury Department argued that the existing tax structure tended to create an unnecessary drag on exports and gave some incentive to manufacture abroad rather than in the United States since income from the sale of the foreign manufacturing subsidiary's goods generally is not taxed by the United States until distributed to the shareholders. With the enactment of the anti-tax haven provisions of subpart F in the Revenue Act of 1962, full deferral generally could no longer be obtained by the use of a foreign sales subsidiary to distribute goods manufactured in the United States. In addition, other countries generally appeared to provide more favorable tax treatment for export income than the United States. The DISC legislation was intended to put the domestic manufacturer on a competitive basis with offshore manufacturing sub-

[4] At the time Treasury first proposed DISC, the value of the dollar in relation to other currencies was fixed by agreement among the major trading countries of the world. It appeared that the dollar was overvalued, a factor that tended to reduce exports. In August 1971, President Nixon moved to let the dollar float against other currencies.

9

sidiaries (and with foreign-owned manufacturers) by deferring a portion of income from tax until distributed to the shareholders.

The Treasury Department anticipated that the proposed DISC legislation would work more in favor of companies without existing large foreign structures and extensive foreign tax credits. Larger corporations, the Department suggested, were able to reduce their U.S. tax liability under then-existing law on export earnings by using foreign manufacturing subsidiaries, by making the minimum distribution election (now repealed) provided in subpart F (practically speaking, available only to U.S. exporters with substantial investments in foreign manufacturing facilities), and by means of the foreign tax credit. The DISC legislation was intended to provide equivalent opportunities for tax deferral on foreign income to smaller corporations and corporations newly entering the export market or expanding their export sales.

***Proposed Trade Act of 1970***

The Administration's 1970 DISC proposal was included in the proposed Trade Act of 1970.[5] The proposed Trade Act passed the House but was not enacted. The bill, H.R. 18970, would have phased in the DISC provisions over three years. Deferral of tax would have been permitted on 25 percent of a DISC's income in 1970, 50 percent in 1971, and 100 percent in 1972.

In its report on the bill, the House Committee on Ways and Means stated that the expansion of exports was an important national goal and that the nation's previous strong surplus in export trade had to be restored in order to find a long-range answer to the balance-of-payments problem.[6]

The committee analyzed the effect of the disparate tax treatment given U.S. companies which exported goods abroad and U.S. companies which manufactured goods abroad in foreign subsidiaries, as follows: The exporter was discriminated against because he paid full U.S. taxes on a current basis; the U.S. company which manufactured abroad through a foreign subsidiary, on the other hand, generally was required to pay only the *foreign* taxes on its income on a current basis. Foreign taxes were found by the committee to average about 10 percentage points less than the regular U.S. corporate income tax. The committee also found that the existing tax structure encouraged the reinvestment of foreign earnings of foreign subsidiaries in plants or selling organizations located abroad, since this enabled the parent corporation to postpone the payment of the U.S. tax which would result if the foreign earnings were remitted to the United States. The DISC provisions of the bill were designed to remove the U.S. exporter's disadvantage by freeing him from U.S tax as long as he continued to use export income to expand his export sales organization or to invest his export income in production facilities, to the extent the facilities were used to produce goods in the United States for sales abroad.

The committee expressed the belief that the DISC provisions would encourage domestic companies to engage in export activities and also encourage those who, in any event, would engage in sales

[5] H.R. 18970, 91st Cong., 2d Sess. (1970).

[6] *See* H. Rep. No. 1435, 91st Cong., 2d Sess. 7-8, 15-20, 58-59 (1970).

10

abroad to locate their manufacturing plants in the United States rather than in foreign countries.

Citing various tax advantages provided by other countries to export trade, the committee stated that the deferral of U.S. tax for export companies was desirable so long as the use of the income in the export trade sales and production activities was continued. The committee also stated that the need to make U.S. exporters more competitive with exporters of other countries justified a clearer and more liberal allocation rule in determining the transfer price from domestic producers to export sales subsidiaries.[7]

In the committee's view, the DISC provisions could be expected to give rise to increased export sales in a number of ways. Exports might be increased through using part of the deferred tax resulting from the provisions to lower export prices.[8] More importantly, exports might be increased through increased promotional efforts by U.S. business. By increasing the profitability of exporting, the committee suggested, it would be possible to induce exporters to take positive actions to build up their export markets. Exports might also be increased because the DISC provisions would encourage plant location in the United States, rather than abroad. The DISC provisions would do so not only because of the deferral provided but also because the DISC would be permitted to make loans to its parent ("producer's loans") without the current payment of tax and, thus, could aid substantially in the expansion of plant facilities in the United States to be used for production for exporting.

The committee noted that the DISC bill included provisions especially designed to enable small businesses to take advantage of DISC benefits. For example, small businesses could qualify for DISC treatment though they left most of their selling arrangements to brokers who made sales for them on a commission. The committee believed that this would enable small businesses to obtain the advantage of economy of scale in their selling costs by arranging sales through a broker handling the sales of many small DISCs.

Finally, the committee suggested that, while larger companies would share with small- or medium-sized companies in the incentive to export provided by the DISC provisions, the stimulant in their case was likely to be less than that for small companies. Many larger companies already obtained the advantage of postponement of U.S. tax under existing law in the case of their sales abroad through the use of foreign subsidiaries or other arrangements.

***1971 Administration proposal***

The Administration reintroduced its 1970 DISC proposal in 1971.[9] The only change made in the 1971 proposal was the recommendation that it be fully effective in 1972 rather than be phased in over several years.

[7] H. Rep. No. 1435, 91st Cong., 2d. Sess. 15-16 (1970).
[8] *Id.* at 18.
[9] *See Hearings on H.R. 10947 Before the Senate Comm. on Finance*, 92d Cong., 1st Sess. 14-77 (1971) (testimony of John B. Connally).

11

In connection with the 1971 proposal, the Treasury Department argued that DISC would serve the interests of labor, business, and consumers. Labor would benefit by the increase in U.S. jobs. Business would benefit because many U.S. businessmen, it was argued, would prefer to continue producing in the United States for export markets if the tax treatment of U.S. and foreign production could be equalized. Consumers would benefit because a higher level of exports was needed to support continued expansion of imports.

The Treasury Department also stated that it was becoming increasingly difficult to support a policy that the United States should be a model for other countries by fully taxing its export income. (The subpart F provisions enacted in 1962 were generally intended to subject export income of foreign base companies to tax currently.) According to the Department, the effect of this policy had been the erosion of production in the United States and the transfer of jobs to foreign manufacturing in cases in which tax factors influence decisions on the source of production. The Department reported that the United States had no followers in its effort fully to tax export income currently.

The Treasury Department described the DISC proposal as an effort to cut through the existing complexity of U.S. tax rules applicable to foreign income, and to provide forthrightly the opportunity for tax deferral by use of a domestic corporation rather than a foreign subsidiary.

***The Revenue Act of 1971***

In 1971, the House passed, as part of the Revenue Act of 1971, a set of DISC provisions broadly similar to those incorporated in the proposed Trade Act of 1970.[10] Unlike the earlier proposed DISC provisions, the 1971 DISC provisions passed by the House in H.R. 10947 generally were to apply only on an incremental basis, to export income in excess of a specified base. Under the House bill, deferral of tax was permitted on export income attributable to sales in excess of 75 percent of the average export sales of the corporate group to which the DISC belonged for the years through 1970. Deferral was granted on 100 percent of this export income.

In its report on the bill,[11] the House Committee on Ways and Means stated that the incremental approach had the advantage of concentrating the benefits of DISC treatment on firms which increased their exports and, thus, would make a greater contribution to resolving the U.S. balance of payments problem.

The Treasury Department opposed the incremental approach.[12] Noting that DISC was designed to induce companies to continue manufacturing in the United States for sale abroad, thus keeping jobs at home, the Treasury Department argued that this purpose would be largely frustrated by the incremental approach because many leading U.S. exporters had had declining or level exports in recent years. These companies would have no incentive to continue manufacturing in the United States for foreign markets under an

[10] *Compare* H.R. 10947, 92d Cong., 1st Sess. (1971) *with* H.R. 18970, 91st Cong., 2d Sess. (1970).
[11] *See* H. Rep. No. 533, 92d Cong., 1st Sess. 39, 58-59 (1971).
[12] *See Hearings on H.R. 10947 Before the Senate Comm. on Finance*, 92d Cong., 1st Sess. 14-16 (1971).

12

incremental rule. In the case of other companies, the Treasury Department suggested, the incremental approach at best would provide only partial deferral treatment, so the effectiveness of DISC in keeping jobs at home would be greatly reduced.

Further, the Treasury Department argued, the incremental approach overlooked the fact that, from a balance of payments standpoint, it was as important to maintain a dollar of existing export sales as to increase export sales by a dollar. The incremental approach would not provide any incentive to help arrest the decline in export sales. The incremental approach also, it was suggested, would penalize corporations who made substantial efforts to maintain or boost their exports in base period years. Finally, the incremental approach was criticized as too complex.

The Senate Finance Committee version of the bill containing the DISC provisions eliminated the incremental approach.[13] A provision was included instead that limited deferral of tax to 50 percent of the export profit of a DISC. The Senate Finance Committee made this change because the committee believed it would make the DISC provisions simpler and more equitable.

The Senate Finance Committee version of the bill also included a provision that would have terminated the DISC system after 10 years—in 1982.[14] This was intended to give Congress a subsequent opportunity to review the need for the DISC provisions in light of the changing international monetary situation.

In addition, the Senate Finance Committee amended the House bill to provide that, to the extent the controlled group, which included the DISC, invested profits of the DISC in foreign plant and equipment, deferral was to cease with respect to those profits. The committee was concerned that the tax-deferred profits of a DISC which were lent to the DISC's parent company (or affiliated company) might be used for investments in foreign plants and equipment by the parent (or domestic or foreign affiliate).

The DISC provisions enacted in the Revenue Act of 1971 followed closely the Senate amendments. An important change was the deletion of the built-in termination date.

In their reports on the legislation, both the House Committee on Ways and Means and the Senate Committee on Finance indicated that it was important to provide tax incentives for U.S. firms to increase exports not only because of the stimulative effects of such incentives but also to remove the existing tax disadvantage of U.S. companies engaged in export activities through domestic corporations.[15] The Treasury Department had described this tax disadvantage in connection with its 1970 and 1971 DISC proposals and the House Ways and Means Committee had reiterated it in its report on the proposed Trade Act of 1970.

The House and Senate Committees emphasized that other major trading nations encouraged exports. The Senate report added that both the House and Senate versions of the DISC provisions were

[13] *See* S. Rep. No. 437, 92d Cong. 1st Sess. 12-13, 90-129 (1971).
[14] This period was reduced to seven years by a Senate floor amendment.
[15] H. Rep. No. 533, 92d Cong., 1st Sess. 58 (1971); S. Rep. No. 437, 92d Cong., 1st Sess. 90 (1971).



Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

13

designed to remove tax disadvantages for U.S. manufacturing, but to avoid granting undue tax advantages to DISCs.[16]

### *Public Law 93-482 and the Tax Reduction Act of 1975*

Public Law 93-482 amended the DISC provisions to enable a financing corporation to qualify as a DISC. This change was made because it came to Congress' attention that a corporation might want to have its sales operations in one DISC and its financing operations in another DISC. A corporation might adopt this corporate structure because it believed the structure would improve its ability to receive outside financing.[17]

The Tax Reduction Act of 1975 amended the DISC provisions to deny DISC benefits for the export of natural resources and energy products (i.e., products for which an allowance for cost depletion is provided) and for products subject to export control under the Export Administration Act of 1969. The Tax Reform Act of 1976 excluded from this amendment sales, exchanges, and other dispositions made after March 18, 1975, and before March 19, 1980, if made pursuant to a fixed contract.

### *The Tax Reform Act of 1976*

Prior to the Tax Reform Act of 1976, legislative proposals were made to eliminate the DISC system entirely, or to give the President authority to terminate the application of the DISC provisions as part of a trade agreement between the United States and a foreign country.[18]

In considering the 1976 legislation, Congress examined the original DISC provisions at great length. It concluded that the DISC provisions had increased U.S. exports. While much of the increase in U.S. exports from 1971, when the DISC provisions were enacted, through 1975, had resulted from the devaluation of the U.S. dollar during that period, Congress believed that a significant portion of the increase resulted from the DISC legislation. This increase in exports, Congress concluded, provided jobs for U.S. workers and helped the U.S. balance of payments.

However, Congress also recognized that questions had been raised as to the revenue cost of DISC. In 1975, the system was estimated to have cost nearly $1.3 billion, and it was estimated that in 1976 the amount would have been $1.4 billion. Further, Congress believed that DISC was made less efficient because DISC benefits applied to all exports of a company, regardless of whether a company's products would be sold in similar amounts without export incentive and regardless of whether the company was increasing or decreasing its exports.

Congress concluded that the DISC program could be made more efficient and less costly while still providing the same incentive for increased exports and jobs.[19] The Tax Reform Act of 1976 made

[16] S. Rep. No. 437, 92d Cong., 1st Sess. 13 (1971).
[17] S. Rep. No. 1060, 93d Cong., 2d Sess. 4-5 (1974). *See also* H. Rep. No. 1402, 93d Cong., 2d Sess. (1974).
[18] *See, e.g.*, S. 1439, 93d Cong., 1st Sess. (1973); H.R. 15452, 93d Cong., 2d Sess. (1974); H.R. 17488, 93d Cong., 2d Sess. (1974).
[19] *See* H. Rep. No. 658, 94th Cong., 1st Sess., 263-64 (1975); S. Rep. No. 938, 94th Cong., 2d Sess., 291-92 (1976).

14

substantial changes in the DISC provisions. Perhaps most significantly, the legislation adopted an incremental approach to DISC benefits under which deferral generally was granted only to the extent of 50 percent of a company's income attributable to increases in its exports over a base period amount. Under prior law, tax generally was deferred on 50 percent of a DISC's income, regardless of whether its exports had increased.[20] The Act also reduced DISC benefits for military goods.

### *Tax Equity and Fiscal Responsibility Act of 1982*

For corporate shareholders, the Tax Equity and Fiscal Responsibility Act of 1982 reduced the deferral rate on incremental DISC income from 50 to 42.5 percent. This change had the effect of reducing DISC tax benefits by 15 percent.

In 1982, Congress reduced corporate tax preferences, including DISC benefits, because (1) the Federal budget faced large deficits, (2) the Accelerated Cost Recovery System enacted in 1981 made some corporate tax preferences less necessary, and (3) there was increasing concern about the equity of the tax system, and cutting back corporate tax preferences was considered a valid response to that concern.[21]

[20] "Small" DISCs were excluded from the incremental rules.
[21] Staff of Joint Comm. on Taxation, 97th Cong., *General Explanation of the Tax Equity and Fiscal Responsibility Act of 1982*, 30-32 (Joint Comm. Print 1982).

### *Summary of Present DISC Rules*

The profits of a DISC are not taxed to the DISC but are taxed to the shareholders of the DISC when distributed or deemed distributed to them. Each year, a DISC is deemed to have distributed a portion (discussed below) of its income, thereby subjecting that income to current taxation in the shareholders' hands.[22] Federal income tax can generally be deferred on the remaining portion of the DISC's taxable income until the income is actually distributed to the DISC shareholders, a shareholder disposes of the DISC stock, the DISC is liquidated, distributed, exchanged, or sold, the corporation ceases to qualify as a DISC, or the DISC election is terminated or revoked.

Under the pre-1976 rules, a DISC was deemed to have distributed income representing 50 percent of its export profits and 100 percent of its non-export profits. In this way, under the prior rules, the tax deferral which was available under the DISC provisions was limited to 50 percent of the export income of the DISC. Under current rules, DISC benefits (deferral of tax on 42.5 percent of profits) are limited to income attributable to export gross receipts in excess of 67 percent of average export gross receipts in a 4-year base period. These provisions are known as the incremental provisions. The base period years are the fourth, fifth, sixth, and seventh preceding years. For example, the base period is 1973 through 1976 for taxable years beginning in 1981. If the taxpayer does not have a DISC in any year which would be included in the base period for the current year, the taxpayer is to calculate base period

[22] In the typical case, a DISC is a wholly-owned subsidiary of a U.S. corporation, so distributions and deemed distributions from DISCs are typically subject to corporate tax and, eventually, to shareholder level tax when distributed to individuals.

15

export gross receipts by attributing a zero amount of export gross receipts to that base period year. DISCs with adjusted taxable income of $100,000 or less are exempt from the incremental rule. This exemption is phased out as adjusted taxable income increases from $100,000 to $150,000.

The incremental provisions include special rules to deal with situations where a corporation has an interest in more than one DISC, or where a DISC and the underlying trade or business giving rise to the DISC income have been separated. The purposes of these rules are, first, to insure that in every year the base period export gross receipts which are attributable to a DISC for purposes of deemed distributions in the current year are appropriately matched with the current period export receipts of the DISC and, second, to prevent taxpayers from creating multiple DISCs, or swapping DISCs, to avoid the effect of the incremental rule.

To qualify for tax exemption, a DISC must be incorporated under the laws of any of the States or the District of Columbia, have only one class of stock, have outstanding capital stock with a par or stated value of at least $2,500, elect to be treated as a DISC, and satisfy the gross receipts and gross assets tests.

The gross receipts test requires that at least 95 percent of the corporation's gross receipts consist of qualified export receipts. In general, qualified export receipts are receipts, including commission receipts, derived from the sale or lease for use outside the United States of export property, or from the furnishing of services related or subsidiary to the sale or lease of export property. Interest on any obligation which is a qualified export asset is also an export receipt. Export property must be manufactured, produced, grown, or extracted in the United States. Exports subsidized by the U.S. Government or exports intended for ultimate use in the United States do not qualify as export property. The President has the authority to exclude from export property any property which he determines (by Executive order) to be in short supply. However, energy resources, such as oil and gas and depletable minerals, are automatically denied DISC benefits under the Tax Reduction Act of 1975. That Act also eliminated DISC benefits for products the export of which is prohibited or curtailed under the Export Administration Act of 1969 by reason of scarcity. The Tax Reform Act of 1976 reduced DISC deferral on sales of military goods to half the amount which would otherwise be allowed.

The gross assets test requires that at least 95 percent of the corporation's assets qualify as export assets. Qualified export assets include inventories of export property, necessary operational equipment and supplies, trade receivables from export sales (including certain commissions receivable), producer's loans, working capital, obligations of domestic corporations organized solely to finance export sales under guaranty agreements with the Export-Import Bank, and obligations issued, guaranteed, or insured by the Export-Import Bank or the Foreign Credit Insurance Association. In certain situations, nonqualified assets and receipts may be distributed in order to satisfy these qualification requirements.

If a DISC fails to meet the qualifications for any reason, the DISC provisions provide for an automatic recapture of the DISC benefits received in previous years. Recapture of accumulated DISC

16

earnings (because the DISC has become disqualified) is to be spread out over a period equal to two years for each year that the DISC was in existence (up to a maximum of 10 years).

The DISC provisions include special elective intercompany pricing rules, which may be used in lieu of the general intercompany pricing rules of the Code, in order to determine the profits which a DISC may earn on products which it purchases from a related company and then resells for export or which it sells on a commission basis. In general, a DISC may earn up to 4 percent of gross export receipts from a transaction or 50 percent of combined taxable income of the DISC and its related party; in either case, the DISC also earns 10 percent of export promotion expenses. Export promotion expenses include freight expenses to the extent of 50 percent of the cost of shipping export property aboard airplanes owned and operated by U.S. persons or ships documented under the laws of the United States in those cases where law does not require use of such airplanes or ships. (Alternatively, the DISC and its related party may choose a price determined under the usual arm's-length rules.) Neither the 4-percent method nor the 50-50 method can be applied to cause a loss to the related supplier while the DISC is earning a net profit.

Under marginal costing rules, if the 50-50 method is used by the DISC, only the marginal or variable production and sales costs for the export property need be included in the computation of combined taxable income. In general, the benefits of marginal cost pricing are limited to instances where the variable cost margin on the DISC's export sales of a product is less than the full cost margin on the combined product sales by the DISC and the related supplier.

A DISC's taxable year need not conform to the taxable year of any of its shareholders. A wholly owned DISC will frequently have a taxable year ending one month after its parent's taxable year ends. This difference in taxable years allows an additional 11 months of deferral of income that is deemed distributed to the parent.

***Source of Income from Export Sales***

The United States taxes U.S. taxpayers on their U.S. and foreign source income, but allows a foreign tax credit for foreign taxes on foreign source income. The foreign tax credit limitation reflects the principle that the credit cannot exceed U.S. tax on foreign source income. In general, in calculating the limitation, most foreign source income is lumped together in a general category known as the "all other" category; a separate limitation or "basket" applies to certain income from deemed DISC distributions (and, separately, to certain interest), however. In most cases, an export sale will not attract foreign tax so long as the U.S. seller does not perform substantial activities in the country of destination. The reason for the separate limitation is that Congress, in enacting the original DISC legislation, did not intend to enable taxpayers to reduce U.S. taxes on low-foreign-taxed distributions from DISCs by crediting foreign taxes on non-DISC income against the U.S. tax on distributions from DISCs.

17

Income of a U.S. person that exports property produced in the United States directly (without using a DISC) is treated as income partly from within and partly from without the United States (sec. 863(b)). This income is not subject to the separate foreign tax credit limitation applicable to DISC income. To the extent that the income is from sources without the United States, it increases the taxpayer's foreign tax credit limitation in the general "all other" category, and thus the foreign taxes that the taxpayer may credit.

An approximation of the portion of income from a typical direct export sale that is foreign source income is 50 percent (see Treas. Reg. sec. 1.863-3(a)(2) (Example (2)). Therefore, a taxpayer with substantial excess foreign tax credits who can make an export sale directly (rather than through a DISC) without incurring foreign tax on the transaction may be subject to tax on only half the income from the export sale.

For example, a U.S. exporter who can make an export sale at a profit of $100 may be able to treat $50 of that income as foreign source. The taxpayer may be able to arrange the sale so that the $50 of foreign source income attracts no foreign tax. Given sufficient excess foreign tax credits, the sale will attract no U.S. tax, either. In that case, the taxpayer will be taxable on only the $50 of income that is U.S. source income.

By contrast, that exporter with excess foreign tax credits may be taxable on $58 of income if it routes the export sale through a DISC. The following table assumes a 17 percent deferral rate for combined taxable income (CTI) of DISC and parent. (This assumed 17-percent deferral rate forms the basis of the FSC proposal.)

CURRENT LAW—DISC—50/50 SPLIT OF CTI—SEC. 863(b)

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *DISC* | |
|---|---|---|---|
| U.S. source (taxable) | $25 | Deferred | $17 |
| Foreign source (exempt) | 25 | Deemed distribution | 33 |
| | 50 | | 50 |

| | |
|---|---|
| Taxable: | |
| U.S. source income of parent | $25 |
| Deemed distribution—separate basket | 33 |
| | 58 |
| Exempt: | |
| Foreign source income of parent | $25 |
| Deferred in DISC | 17 |
| | 42 |

Therefore, some exporters with excess foreign tax credits will choose not to route their export transactions through DISCs.

18

***Income From Factoring Trade Receivables***

When a seller of goods or services extends credit to a purchaser, the seller generally takes from the purchaser a transferable promise to pay in the future (an "account receivable" or a "trade receivable"). If the seller sells that receivable (the promise to pay the debt obligation) to a "factor," the factor earns "factoring" income when it collects the debt for its own account. The factor pays the seller less than the face value of the obligation, that is, the factor buys at a discount. The seller will sell at a discount for two reasons: first, to realize cash from the sale sooner than the buyer would pay for the goods or services, and second, to shift some of the risk of collecting the receivable. The seller would claim a loss from the disposition of the debt obligation for less than face value. The factor may assume some risk that the purchaser of goods or services will not pay its debt. In the typical case, the factor will earn some income because of the time value of money. That is, the reduced price that the factor pays the seller for the obligation will reflect an element of interest income.

Some taxpayers take the position that a controlled foreign corporation located in a tax haven can factor receivables arising from sales of goods or services by related parties without any U.S. tax. For this arrangement to avoid U.S. tax, certain issues would have to be resolved, including (1) whether the discount income is interest, (2) whether the purchase and collection of receivables is a trade or business within the United States, (3) whether the purchase of receivables is an investment in U.S. property, and (4) whether the discount is subpart F income.

There is authority that discount income earned by an active factoring business is not interest for purposes of the personal holding company rules (*Elk Discount Corp.*, 4 T.C. 196 (1944)), or for purposes of the Subchapter S rules (*Thompson* v. *Commissioner*, 73 T.C. 878 (1980)). The Service has held in one instance that discount income that a foreign subsidiary of a U.S. corporation earned was not interest income and was not subject to the anti-tax haven rules of Subpart F of the Internal Revenue Code as foreign personal holding income (private letter ruling 8338043, June 17, 1983).

If a foreign corporation buys receivables of U.S. obligors and then collects the amounts due, that foreign corporation may be engaged in U.S. business. If it is engaged in U.S. business, then its factoring income will be subject to U.S. tax. It is unclear under present law whether foreign corporations that buy obligations of U.S. persons and collect them are engaged in U.S. business (see private letter ruling 8338043, referred to above, which did not rule on the issue). Determination of this issue may depend on individual factual circumstances.

In addition, a U.S. shareholder of a controlled foreign corporation is taxable on its pro rata share of the increase in the taxable year of the foreign corporation's earnings invested in U.S. property (section 956). U.S. property generally includes any obligation of a U.S. person. However, a special rule excludes obligations of unrelated U.S. corporations (sec. 956(b)(2)(F)).

Factoring income of a controlled foreign corporation may be subject to other anti-tax haven rules of Subpart F. For example, factor-



 Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037 

19

ing income may be foreign base company services income, which is income from services performed by or on behalf of a related person outside the country of incorporation of the controlled foreign corporation (sec. 954(e) (see private letter ruling 8338043, noted above, which did not rule on the issue)).

These rules applicable to controlled foreign corporations do not apply to DISCs. Three benefits arise when a DISC holds the receivables arising from export sales: (1) its parent gets cash, (2) the receivables help the DISC meet the qualified export assets test, and (3) the discount income is eligible for deferral. The discount, if treated as interest, would be treated as the DISC's income alone; it would not be included in combined taxable income for purposes of the 50-50 profit split. To the extent the discount income is not shared with the parent as combined taxable income, the DISC gets additional deferral (i.e., the DISC gets deferral on 42.5 percent of the full amount of the discount rather than 42.5 percent of half the discount).

(20)

### B. The General Agreement on Tariffs and Trade (GATT)

Concern about U.S. obligations under the General Agreement on Tariffs and Trade (the "General Agreement" or GATT)[23] has motivated introduction of legislation dealing with the Domestic International Sales Corporation provisions.[24] The General Agreement became open for acceptance in October 1947; its provisions (as amended) apply to the United States, the developed countries of the free world, most of the world's developing countries, and a few communist countries.

#### *Substantive Provisions in General*

The thrust of the General Agreement is to prevent countries from favoring domestic goods over foreign goods. The typical method of favoring domestic goods is by import duties. The General Agreement also contains provisions designed to limit subsidies for domestic goods. First, countries must report to the GATT membership subsidies that reduce imports or increase exports (Article XVI:1 of the General Agreement). Article XVI is reproduced in Appendix B.

Second, the General Agreement proscribes export subsidies. It imposes different standards on export subsidies for primary products (such as minerals and agricultural commodities) and non-primary products. Any subsidy which increases the export of a primary product is not to result in a country having more than an equitable share of world export trade in that product (Article XVI(3)).

Countries are to cease granting subsidies on non-primary products when the subsidy results in export sales at lower prices than domestic sales (Article XVI:4). This standard for non-primary products is a "bi-level pricing" standard.

#### *Remedies in General*

If actions of one country nullify or impair any benefit that accrues to another country under the General Agreement, the injured country is to notify the offending country. If the two countries cannot solve the problem, the general membership of GATT is to investigate the matter, and make recommendations, or give a ruling. The general membership may authorize the injured country to suspend the concessions, such as reduced tariffs, it made to the offending country under the General Agreement.[25]

[23] This pamphlet uses the term GATT to mean the agreement or the countries that subscribe to it, as the context requires.

[24] Statements of Senator Dole, 129 *Cong. Rec.* S11761 (August 4, 1983) and *id.* S12072 (September 13, 1983); Statement of Senator Danforth, *id.* S11766 (August 4, 1983).

[25] The text of the GATT provision governing these remedies, Article XXIII, is included in Appendix B.

21

#### *The Illustrative List*

In 1960, a GATT working party adopted an "illustrative list" of "practices generally . . . considered as subsidies" under Article XVI:4 (BISD (Basic Instruments and Selected Documents), 9 Suppl. p. 186). These included:

"(c) The remission, calculated in relation to exports, of direct taxes or social welfare charges on industrial or commercial enterprises;" and"

"(d) The exemption, in respect of exported goods, of charges or taxes, other than charges in connection with importation or indirect taxes levied at one or several stages on the same goods if sold for internal consumption. . . ."

For GATT purposes, there is a distinction between "direct" and "indirect" taxes. Income taxes, such as the U.S. corporate income tax, are "direct" taxes, while some other taxes, such as Value Added Taxes (V.A.T.), are "indirect" taxes. Therefore, forgiveness of corporate income tax on export profits may violate GATT rules, while remission of a V.A.T. may not violate those rules.

The members of the European Economic Community (and other countries) generally impose high Value Added Taxes on goods consumed locally, but they rebate those taxes for exported goods. The staff is not aware of any challenge to this practice of EEC member countries.[26]

[26] For criticism of the effect of this distinction between direct and indirect taxes, see the remarks of Senator Long in *Hearings before the Committee on Finance, U.S. Senate, Nomination of John B. Connally, of Texas, to be Secretary of the Treasury*, January 28 and February 2, 1971, at 39-40. See also U.S. Department of the Treasury, *The Operation and Effect of the Domestic International Sales Corporation Legislation, 1976 Annual Report* at 30-32, and Jackson, "The Jurisprudence of International Trade: The DISC Case in GATT," 72 *Am. Journal of Int'l Law* 747, 751 & n.15.

(22)

### C. GATT's reaction to DISC

The Treasury Department first proposed DISC to Congress in 1970. Before DISC's enactment, the European Economic Community (EEC) indicated its view that DISC constituted a "tax privilege" and a "tax incentive to exports" and "would be contrary to the United States' commitments under the General Agreement."[27] Canada, Switzerland, and Sweden also expressed concern about the DISC proposal.

The DISC provisions became effective on January 1, 1972; early in that year, the EEC formally requested consultation with the United States about DISC. The United States then sought consultations with France, Belgium and the Netherlands with respect to those countries' tax systems, which exempted profits of foreign sales corporations. The United States argued that those countries' territorial tax systems were as generous as or more generous than DISC for exports and that either all were legal under GATT or all were illegal.

In general, these three countries use a "territorial" system of taxation in which profits generated by undertakings operated abroad are exempt from home-country tax.[28] In general, these three countries have low taxes (or no taxes) on foreign profits brought back into the country. Each of these countries, in principle, generally requires arm's-length pricing between related parties, but it is not clear how well these countries enforce or enforced the arm's-length standard.

By 1973, both the United States and the EEC had formally complained to the GATT membership about the alleged tax export subsidies. The GATT Council directed that a Panel of experts examine DISC and the tax practices of France, Belgium and the Netherlands.

In late 1976, the GATT Panel issued reports on the tax practices of all four countries.[29] The Panel concluded that the DISC legislation conferred a tax benefit essentially related to exports, and that this would tend to lead to an expansion of export activity. The Panel noted that the DISC legislation was intended to increase United States exports and noted that the Treasury Department had reported that DISC had in fact increased exports. The Panel

[27] Note on Exchange of Views, GATT Doc. L/3574 (September 13, 1971). For discussions of GATT's reaction to DISC; see Cohen and Hankin, "A Decade of DISC: Genesis and Analysis," 2 *Va. Tax Rev.* 7 (1982), Jackson, "The Jurisprudence of International Trade: The DISC Case in GATT," 72 *American Journal of International Law* 747 (1978); Kwako, "Tax Incentives for Exports, Permissible and Proscribed: An Analysis of the Corporate Income Tax Implications of the MTA Subsidies Code," 12 *Law & Policy in Int'l Bus.* 676 (1980).

[28] This exemption applies not only to exports, but also to purely foreign transactions. For example, profits of a non-French branch (or subsidiary) of a French corporation would generally be exempt from French tax, and would be subject to a low rate of tax (that could be zero in certain cases) on repatriation.

[29] Appendix B of this pamphlet reproduces in full the Panel's conclusions with respect to DISC.

23

further noted that the deferral of tax under the DISC legislation did not attract the interest component of the tax normally levied for late or deferred payment and therefore concluded that, to this extent, the DISC legislation constituted a partial exemption which was either "a remission" or "an exemption" (or both) that was improper under the illustrative list of 1960. The Panel indicated that remissions and exemptions were generally to be considered as subsidies in the sense of Article XVI:4.

The Panel indicated that the DISC legislation could be presumed to result in bi-level pricing. The Panel considered that an export subsidy would lead to any or a combination of the following consequences in the export sector: (a) lowering of prices, (b) increase of sales effort and (c) increase of profits per unit. The Panel expected that all of these effects would occur and that a concentration of the


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

subsidy benefits on prices could lead to substantial reductions in prices. The Panel therefore concluded that the DISC legislation in some cases had effects which were not in accordance with the United States' obligations under Article XVI:4 with respect to non-primary products. The Panel did not examine whether the DISC legislation would give the United States a disproportionate share of the world market in primary products (in terms of Article XVI:3).

The Panel did not accept the United States argument that it had introduced the DISC legislation to correct an existing distortion created by tax practices of certain other contracting parties. The Panel said that that one distortion could not be justified by the existence of another one. In conclusion, the Panel found that there was a *prima facie* case of nullification or impairment of benefits which other countries were entitled to expect under the General Agreement.

On the day that the Panel issued its report on DISC, the three Panels examining the tax practices of France, Belgium, and the Netherlands issued their reports. (The membership of these three Panels was identical to that of the DISC Panel.)

The GATT Panel reports on the tax systems of France, Belgium, and the Netherlands are similar in their analysis and conclusions to the report on DISC.[30] The GATT Panel reports on these three tax systems noted that their application of the territoriality principle allowed some part of export activities to be outside the scope of home country taxes. In this way each country created a possibility of a pecuniary benefit to exports. The Panel did not find it significant (1) that territoriality was a long-standing practice in each country, not created to benefit exports or (2) that each country's territorial system exempted income from foreign investment generally, and not just income from export activity.

The Panel also noted that taxation of dividends from abroad at a nominal rate preserved these tax benefits for exports. The Panel concluded in each case that there was a partial exemption from direct taxes which was either "a remission" or "an exemption" (or both) that was improper under the illustrative list of 1960. The

[30] These reports are "Income Tax Practices Maintained by France," GATT Doc. No. L/4423 (Nov. 2, 1976); "Income Tax Practices Maintained by Belgium," GATT Doc. No. L/4424 (Nov. 2, 1976); GATT, "Income Tax Practices Maintained by the Netherlands," GATT Doc. No. L/4425 (Nov. 2, 1976). Appendix B of this pamphlet contains excerpts from the Panel Report on France.

24

Panel indicated that remissions and exemptions were generally to be considered as subsidies in the sense of Article XVI:4. The Panel added (with respect to each case) that bi-level pricing had probably occurred and concluded that each country's tax practices in some cases had effects which were not in accordance with its obligations under Article XVI:4 with respect to non-primary products. The Panel noted that each country might allow deviations from the arm's-length pricing principle in calculating the allocation of profits between companies and their foreign operations. The Panel found in each case that there was a *prima facie* case of nullification or impairment of benefits which other contracting parties were entitled to expect under the General Agreement.

Belgium and France contested the findings with respect to their tax practices with the argument that exportation (that a tax system could subsidize in violation of GATT) ends at the customs frontier of the importing country. The argument of Belgium was as follows:

"It is clear that export activities end the moment that the foreign importer takes possession of the exported products. All further activities take place at the level of the importer, whether the importer is a fully independent company, or a branch or subsidiary company. Such activities do not enter into the framework of export operations and therefore fall outside the scope of Article XVI:4."[31]

There was no GATT action on these Panel reports until December 1981. The delay was due in part to negotiations that led up to adoption, in 1979, of an "Agreement on Interpretation and Application of Articles VI, XVI, and XXIII" of the General Agreement.[32] This agreement is generally known as the "Subsidies Code." An Annex to that Agreement contained an updated "Illustrative list of export subsidies," which included the following item:

"(e) The full or partial exemption, remission, or deferral specifically related to exports, of direct taxes or social welfare charges paid or payable by industrial or commercial enterprises."

The inclusion of "deferral" in this item represented a significant departure from the 1960 list. One footnote[33] to that item explained that deferral need not amount to an export subsidy where appropriate interest charges are collected. That footnote also indicated

[31] GATT Doc. C/98, March 14, 1977.
[32] See Agreements Reached in the Tokyo Round of the Multilateral Trade Negotiations, H.R. Doc. No. 153, 96th Cong., 1st Sess., pt. 1 (1979).
[33] The text of that footnote appears in Appendix B.

(1) that the reference to deferral was not intended to prejudge the DISC case; (2) that the arm's-length pricing standard should apply in transactions between exporting enterprises and foreign buyers under common control; and (3) that this item was not intended to limit measures to avoid the double taxation of foreign source income.

At a meeting in December 1981, the GATT Council adopted all four panel reports but with three qualifications.[34] First, GATT does not require an exporting country to tax economic events that take place outside its territorial limits. Second, GATT (Article XVI:4) requires arm's-length pricing in transactions between exporting enterprises and foreign buyers under common control.

[34] The text of the agreement is found in Appendix B.

25

Third, Article XVI:4 does not prohibit the adoption of measures to avoid double taxation of foreign source income.

This agreement reflects some of the concepts of the 1979 Subsidies Code. The effect of this agreement on DISC is not clear. In December 1981, David R. MacDonald, Deputy U.S. Trade Representative, stated his office's position that DISC did not violate the principles of GATT, and that this agreement left the United States "under no obligation to modify or eliminate the DISC."[35] In October 1982 the Deputy U.S. Trade Representative informed the GATT Council that the Administration intended to propose legislation to address the concerns that GATT members had with DISC. In March 1983 the President's Cabinet Council on Commerce and Trade approved a proposal for a tax replacement for DISC. That proposal formed the basis for S. 1804 and an identical House bill, H.R. 3810.

The Treasury Department's annual report on DISC for 1981, issued in July 1983, expresses the Administration's official position on the GATT controversy:

"For several years, the provisions of the DISC legislation have been the subject of a dispute between the United States and other General Agreement on Tariffs and Trade (GATT) signatories. Those signatories contend that DISC amounts to an illegal export incentive which violates the GATT. The DISC was found to be an illegal export subsidy by a GATT panel in 1976 along with similar tax practices of Belgium, France, and the Netherlands. While the United States has never conceded that DISC violates the GATT, the United States agreed to the adoption of the GATT panel reports subject to the understanding that GATT signatories need not tax export income generated by economic processes outside their territorial limits, as long as arm's-length pricing principles are observed in transactions between related parties. The understanding also states that the GATT does not prohibit the adoption of measures to avoid the double taxation of foreign source income.

"The DISC dispute remains a serious irritant in U.S. trade relations with other countries, particularly the European Community. Thus, the United States informed the GATT Council in October, 1982 that it would propose to Congress legislation that would address the concerns of its trading partners. In March, 1983, the Administration announced the general elements of a tax alternative to DISC. Legislation on the proposed alternative was being drafted as this report was prepared."[36]

That legislation is S. 1804 (and the companion House bill, H.R. 3810).

[35] 15 *Tax Notes* 884 (June 14, 1982).
[36] Department of the Treasury, *The Operation and Effect of the Domestic International Sales Corporation Legislation, 1981 Annual Report*, 6-7 (July 1983).

(26)

## III. EXPLANATION OF S. 1804 (FOREIGN SALES CORPORATION ACT OF 1983)

### *Overview*

The bill would provide that a portion of the export income of an eligible foreign sales corporation (FSC) would be exempt from Federal income tax. It would also allow a domestic corporation a 100 percent dividends-received deduction for dividends distributed from the FSC out of earnings attributable to certain foreign trade income. Thus, there would be no corporate level tax imposed on a portion of the income from exports.

Under the GATT rules, an exemption from tax of export income is permitted only if the economic processes which give rise to the income take place outside the United States. In light of these rules, the bill would provide that a FSC must have a foreign presence, it must have economic substance, and that activities that give rise to


Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

the export income must be performed by the foreign sales corporation outside the U.S. customs territory. Furthermore, the income of the foreign sales corporation must be determined according to transfer prices specified in the bill: either actual prices for sales between unrelated, independent parties or, if the sales are between related parties, formula prices which are intended to comply with GATT's requirement of such arm's-length prices.

The bill would provide that the accumulated tax-deferred income of existing DISCs would be deemed previously taxed income and, therefore, would be exempt from taxation.

Small exporters may find it difficult to comply with certain of the foreign presence and economic activity requirements. The bill would provide, therefore, two options to alleviate the burden of the foreign presence and economic activity requirements to eligible small businesses: the interest-charge DISC and the small FSC.

***Foreign sales corporation***

To qualify as a FSC, a foreign corporation must have a foreign presence. In order to determine whether a corporation has a foreign presence, the bill would provide an objective test—the corporation must satisfy each of the following six requirements: The corporation must (1) be created or organized under the laws of any foreign country or possession of the United States (a term that includes Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Virgin Islands of the United States, but does not include Puerto Rico, because the United States includes Puerto Rico for purposes of the bill),[37] (2) have no more than 25 shareholders at any time during the taxable year, (3) not

[37] In other words, the corporation must be formed under the laws of a jurisdiction outside U.S. customs territory.

27

have any preferred stock outstanding at any time during the taxable year, (4) maintain an office located outside the United States, maintain a set of the permanent books of account at such office, and maintain within the United States the records required of a domestic corporation for tax purposes, (5) at all times during the taxable year have a board of directors which includes at least one individual who is not a resident of the United States, and (6) not be a member at any time during the taxable year of any controlled group of corporations of which a DISC is a member.

In addition to the above requirements, a FSC must make an election to be treated as a FSC.

***Exempt foreign trade income***

A portion of the foreign trade income of a FSC would be exempt from Federal income tax. To achieve this result, the exempt foreign trade income would be treated as foreign source income which is not effectively connected with the conduct of a trade or business within the United States. The portion of foreign trade income that is treated as exempt foreign trade income depends on the pricing rule used to determine the amount of foreign trade income earned by the FSC. If the amount of income earned by the FSC is based on arm's-length pricing between unrelated parties, or between related parties under the rules of section 482, then exempt foreign trade income is 34 percent of the foreign trade income derived from a transaction. If, however, the income earned by the foreign sales corporation is determined under the special administrative pricing rules, then the exempt foreign trade income is 17/23 of the foreign trade income derived from the transaction.

Exempt foreign trade income is an exclusion from gross income of the FSC. Any deductions of the FSC properly apportioned and allocated to the foreign trade income derived by the FSC from a transaction would be allocated on a proportionate basis between exempt and nonexempt foreign trade income. Thus, deductions allocable to exempt foreign trade income could not be used to reduce the taxable income of the FSC.

In general, no tax credits other than withholding or foreign tax credits would be allowed to a FSC.

***Foreign trade income***

Foreign trade income is defined as the gross income of a FSC attributable to foreign trading gross receipts. Foreign trade income includes both the profits earned by the FSC itself from exports and commissions earned by the FSC from products or services exported by others.

All foreign trade income, other than exempt foreign trade income, would be treated as income effectively connected with the conduct of a trade or business conducted through a permanent establishment within the United States. Furthermore, foreign trade income would be treated as derived from sources within the United States rather than as foreign source income. Thus, foreign trade income other than exempt foreign trade income would be taxed currently and treated as U.S. source income for purposes of the foreign tax credit limitation. This nonexempt foreign trade income

28

would be either 6/23 or 66 percent of foreign trade income, depending on the pricing method used in arriving at foreign trade income.

A FSC may not credit or deduct foreign income, war profits, or excess profits taxes paid or accrued with respect to foreign trade income (whether exempt or nonexempt). The corporate shareholder of a FSC would be not eligible for a deemed-paid foreign tax credit with respect to foreign trade income. Two new categories of income would each be subject to separate foreign tax credit limitations (like DISC distributions under current law): (1) taxable income attributable to foreign trade income (at the FSC level), and (2) distributions from a FSC or former FSC out of earnings and profits attributable to foreign trade income (at the level of the FSC's shareholder). By virtue of these separate limitations, no increase in the FSC's foreign source income in the general "all other" category would result from foreign trade income.

***Foreign trading gross receipts***

In general, foreign trading gross receipts would mean the gross receipts of a FSC which are attributable to the export of certain goods and services (similar to the qualified gross receipts of a DISC under present law). Foreign trading gross receipts of a FSC are the gross receipts which are (1) from the sale, exchange or other disposition of export property, (2) from the lease or rental of export property for use by the lessee outside the United States, (3) for services which are related and subsidiary to the sale, exchange, disposition, lease or rental of export property, (4) for engineering or architectural services for construction projects located outside the United States, or (5) for the performance of managerial services that relate to the production of gross receipts.

For the FSC to have foreign trading gross receipts, two additional requirements must be met—the foreign management and foreign economic process requirements. (These requirements do not apply to small FSCs, described below.) A FSC would be treated as having foreign trading gross receipts only if the management of the corporation during the taxable year takes place outside the United States and only if the economic processes with respect to particular transactions take place outside the United States. (The management test applies to functions of the FSC for the taxable year. In contrast, the economic process test generally applies to every transaction on a transaction-by-transaction basis).

***Foreign management.***—The requirement that the FSC be managed outside the United States would be treated as satisfied for a particular taxable year if (1) all meetings of the board of directors of the corporation and all meetings of the shareholders of the corporation are outside the United States, (2) the principal bank account of the corporation is maintained outside the United States at all times during the taxable year and, (3) all dividends, legal, and accounting fees, and salaries of officers and members of the board of directors of the corporation disbursed during the taxable year are disbursed out of bank accounts of the corporation outside the United States.

***Foreign economic processes.***—Economic processes are treated as taking place outside the United States if two requirements are met. The first requirement is that, with respect to any transaction, the

29

FSC must participate outside the United States in the solicitation (other than advertising), the negotiation or the making of the contract relating to the transaction. This test can be met if either the FSC or any person acting under contract with the FSC has performed one or more of these activities outside the United States.

The second requirement is that the foreign direct costs incurred by the FSC attributable to the transaction must equal or exceed 50 percent of the total direct costs incurred by the FSC with respect to the transaction (or that the FSC meet an alternative 85-percent test, described below).

The term "total direct costs" (the denominator of the fraction) means, with respect to any transaction, the total direct costs incurred by the FSC attributable to the activities relating to the disposition of export property. These activities are those performed at any location within or without the United States by the FSC or any person acting under contract with the FSC. The term "foreign direct costs" (the numerator of the fraction) means the portion of the total direct costs incurred by the FSC which are attributable to activities performed outside the United States. Although the activities must be performed outside the United States, either the FSC

or any person acting under contract with the FSC may perform the activities.

For purposes of the foreign direct-cost test, the costs of five activities relating to the disposition of export property are considered. The activities are (1) advertising or sales promotion, (2) the processing of customer orders and the arranging for delivery (outside the United States) of the export property, (3) transportation from the time of acquisition by the FSC to the delivery to the customer, (4) the determination and transmittal of the final invoice or statement of account and the receipt of payment, and (5) the assumption of credit risk. In the case of a commission relationship, the transportation test is determined from the beginning of the commission relationship rather than from the time of acquisition by the FSC.

The requirement that the foreign direct costs incurred by the FSC equal or exceed 50 percent of the total direct costs incurred by the FSC attributable to a transaction may be met by an alternative 85 percent test. Under this alternative test a corporation would be treated as satisfying the requirement that economic processes take place outside the United States if the foreign direct costs incurred by the FSC attributable to any two of the five activities relating to disposition of the export property equal or exceed 85 percent of the total direct costs of at least two of those five activities.

For example, if the foreign direct costs (incurred by a FSC with respect to a transaction) attributable to advertising and sales promotion, and the assumption of credit risk are 85 percent or more of the total direct costs of these activities, the foreign direct cost test would be satisfied. With respect to this transaction, none of the direct costs of the other activities, for example, the processing of customer orders and arranging for delivery outside the United States of the export property, need be foreign direct costs.

***Burden of proof.***—The burden of proof with respect to the foreign management and economic process requirements would be shifted to the Secretary of the Treasury if a written statement addressing the issue has been filed by an officer of the corporation. The state-

30

ment to be filed with the Secretary must be made by an officer of the FSC who is a citizen and resident of the United States, and must be made under penalty of perjury. Furthermore, the statement must declare that the corporation meets the economic process requirements and the foreign management requirements and must specify how the requirements have been met for the particular transactions.

***Excluded receipts.***—Certain receipts are not included in the definition of foreign trading gross receipts. First, certain receipts are excluded on the basis of use; also, subsidized receipts and certain receipts from related parties are excluded. Examples of such receipts include the receipts of a FSC from a transaction (1) if the export property or services are for ultimate use in the United States or are for use by the United States and the use by the United States is required by law or regulation, (2) if the transaction is accomplished by a subsidy granted by the United States, or (3) if the receipts are from another FSC which is a member of the same controlled group.

Second, one-half of the receipts from military property are excluded from the definition of foreign trading gross receipts.

Third, investment income and carrying charges are excluded from the definition of foreign trading gross receipts. Carrying charges would mean not only amounts normally considered carrying charges but also any amount in excess of the price for an immediate cash sale and any other unstated interest. Thus, a taxpayer could not artificially increase foreign trade income through hidden carrying charges or unstated interest.

Income attributable to excluded receipts would not be foreign trade income and, therefore, no portion of such income would be exempt; furthermore, a corporate shareholder would not get a dividends-received deduction for distributions attributable to such income. For example, investment income and carrying charges would be included in the taxable income of the FSC and, therefore, subject to full U.S. tax. Distributions to a corporate shareholder from earnings and profits attributable to the investment income and carrying charges would be fully taxed again (to the corporate shareholder) because there would be no dividends-received deduction. In other words, the investment income and carrying charges would be subject to tax at the FSC level, the corporate shareholder level and, like all other dividends from the corporate shareholder to its individual shareholders, also at the individual level. At the FSC level, investment income would be eligible for foreign tax credits.

***Transfer pricing rules***

The pricing principles that govern the determination of the taxable income of a FSC are intended to comply with the GATT rules. If export property is sold to a FSC by a related person, the taxable income of the FSC and the related person is based upon a transfer price determined under an arm's-length pricing approach or under one of two formulae which are intended to approximate arm's-length pricing. Taxable income may be based upon a transfer price that allows the FSC to derive taxable income attributable to the sale in an amount which does not exceed the greatest of: (1) 1.83

31

percent of the foreign trading gross receipts derived from the sale of the property; (2) 23 percent of the combined taxable income of the FSC and the related person (these two pricing rules are termed the administrative pricing rules); and (3) taxable income based upon the actual sales price, but subject to the rules provided in section 482. Neither administrative pricing rule can cause a loss to the related supplier while the FSC is earning a net profit.

In order to use the special administrative pricing rules, a FSC must meet two requirements. The first requirement is that *all* of the activities with respect to which the direct costs are taken into account for the 50 percent foreign direct costs test must be performed by the FSC or by another person acting under contract with the FSC. These five activities are advertising and sales promotion, processing of customer orders and arranging for delivery of the property, transportation, billing and receipt of payment, and the assumption of credit risk. The second requirement for use of the administrative pricing rules is that *all* of the activities relating to the solicitation (other than advertising), negotiation and making of the contract for the sale must be performed by the FSC (or by another person acting under contract with the FSC). These two requirements can be met wherever the activities are performed. The activities do not have to be performed outside the United States. It is only necessary that the activities be performed by the FSC or by another person acting under contract with the FSC.

To summarize, to be treated as having foreign gross receipts and hence foreign trade income, the foreign costs of certain activities relating to the disposition of export property must be substantial (either 50 percent of the cost of all five activities or 85 percent of the cost of two of the activities). To use the administrative pricing rules, all five of the activities must be performed by the FSC or by another person acting under contract with the FSC. Furthermore, other activities (solicitation, negotiation, and making of the contract of sale) must be performed by the FSC or by another person acting under contract with the FSC.

***Distributions to shareholders***

Distributions to shareholders must be made first out of foreign trade income. The FSC may have income that is not foreign trade income, for example, investment income. Distributions would be treated as being made first out of earnings and profits attributable to foreign trade income, and then out of any other earnings and profits. Any distribution made by a FSC which is made out of earnings and profits attributable to foreign trade income to a shareholder which is a foreign corporation or a nonresident alien individual would be treated as a distribution which is effectively connected with the conduct of the trade or business conducted through a permanent establishment of the shareholder within the United States. Thus, such distributions would be generally subject to Federal income tax.

***Dividends received from a FSC***

A domestic corporation would be allowed a 100 percent dividends-received deduction for amounts distributed from a FSC out of earnings and profits attributable to foreign trade income. Thus,

32

there would be no corporate level tax on exempt foreign trade income and only a single-level corporate tax (at the FSC level) on foreign trade income other than exempt foreign trade income. To the extent a corporate shareholder of a FSC distributes dividends attributable to foreign trade income to its individual shareholders the amounts would be taxed. Likewise, noncorporate shareholders of a FSC would be taxed currently on all dividends received from a FSC.

A dividends-received deduction would not be allowed, however, for distributions attributable to other earnings and profits. These distributions would therefore be taxed currently to the shareholders, corporate or noncorporate, of the FSC.

***Other definitions and special rules***

***Factoring of trade receivables.***—The bill would add a new category of income to the definition of foreign personal holding company income (which is used in taxing income to the United States shareholders of foreign personal holding companies and controlled foreign corporations (under Subpart F)). This category of income is

income from an account receivable or evidence of indebtedness arising out of the disposition of property described in section 1221(1) (which includes stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business), or the performance of services, by a related person. This rule would apply whether or not the related person is a U.S. person. The effect of this rule is to treat factoring as a tax-haven activity under the Subpart F rules.

In addition, the bill would amend the definition of U.S. property (in Code sec. 956) to include any account receivable or evidence of indebtedness arising out of the disposition of property described in section 1221(1), or performance of services, by a related U.S. person. This rule would apply notwithstanding the rule of current law that excludes from the definition of "U.S. property" obligations of unrelated U.S. corporations. The effect of this amendment would be to treat this factoring activity like certain other transfers of cash from controlled foreign corporations to their U.S. shareholders.

*Export property*.—In general, the term export property means property manufactured or produced in the United States for sale, lease or rental in the ordinary course of trade or business for use outside the United States, and not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

The term export property does not include (1) property leased or rented by a FSC for use by any member of a controlled group of which the FSC is a member, (2) patents and other intangibles, (3) oil or gas or any primary product thereof, or (4) products the export of which is prohibited. Export property also excludes property designated by the President as being in short supply. Coal and uranium products specifically excluded from the definition of export property under the DISC rules would not be excluded under this bill, however.

33

*Cooperatives*.—Agricultural products marketed through cooperatives are subject to special rules. Fungible agricultural products marketed through pooling arrangements of an exempt farmers' cooperative are treated as meeting the requirements that they be export property to the extent that the products are sold for use outside the United States. Each member of the pool is considered as a producer of the property to the extent of his or her ratable share of the product based upon his or her contribution of products to the pool. The special rule does not apply to any products which are sold by the cooperative through a FSC or DISC of which the cooperative is a shareholder. A cooperative marketing the products of its patrons is treated as acting as the agent of the patrons regardless of any formal transfer of title to the cooperative.

*Gross receipts*.—In general, the term gross receipts means the total receipts from the sale, lease, or rental of property held primarily for sale, lease, or rental in the ordinary course of a trade or business, and gross income from all other sources.

In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of these provisions as gross receipts would be the gross receipts on the sale, lease, or rental of the property on which the commissions arose.

*Investment income*.—For purposes of these provisions the term investment income means dividends, interest, royalties, annuities, rents (other than rents from the lease or rental of export property for use by the lessee outside the United States), gains from the sale or exchange of stock or securities, gains from futures transactions in any commodity, amounts includible in computing the taxable income of the corporation under the estate and trust rules and gains from the sale or disposition of any interest in an estate or trust.

*Grouping of transactions*.—Many of the tests required under the foreign management and economic processes requirement are to be applied on a transaction-by-transaction basis. However, regulations would provide that transactions may be grouped based upon product lines or recognized industry or trade usage. The regulations could permit different groupings for different purposes. Such flexibility may be important when grouping transactions for purposes of the direct-cost test, for example.

*Controlled group of corporations*.—A controlled group of corporations is defined as in section 1563(a) except that a 50 percent ownership test is substituted for the 80 percent test.

*Foreign tax credit limitation of related parties*.—The bill would provide a special rule governing the source of income earned by a person related (within the meaning of section 482) to a FSC from transactions giving rise to foreign trading gross receipts of a FSC. That related person's foreign source income from such a transaction could not exceed the amount which would be treated as foreign source income earned by that person if the analogous DISC pricing rule applied. For this purpose, the DISC gross receipts pricing rule of Code section 994(a)(1) is analogous to the bill's gross receipts pricing rule in proposed section 925(a)(1); the DISC combined taxable income pricing rule of Code section 994(a)(2) is analogous to the bill's combined taxable income pricing rule in proposed section 925(a)(2); and the DISC section 482 pricing rule of Code section

34

994(a)(3) is analogous to the bill's section 482 pricing rule in proposed section 925(a)(3).

This special rule governing the source of income and thus the foreign tax credit limitation of parties related to a FSC is necessary to prevent revenue loss. The table below illustrates the application of the bill absent this special rule to a FSC's parent with excess foreign tax credits that exports by selling to its FSC. The table presupposes that the 50 percent of the parent's income from the export sale is foreign source income (as might well be the case under Code sec. 863(b) absent the bill's special rule). It presupposes that the parent has sufficient excess foreign tax credits to offset U.S. tax on all the foreign source income from the export sale. It also presupposes that the export sale is subject to the bill's combined taxable income (CTI) rule (proposed section 925(a)(2)).

FSC—77/23 SPLIT OF CTI ABSENT RESOURCING RULE

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *FSC* | |
|---|---|---|---|
| U.S. source (taxable) | $38.50 | Exempt | $17 |
| Foreign source (exempt) | 38.50 | Taxable | 6 |
| | 77.00 | | 23 |

| | |
|---|---|
| Taxable: | |
| U.S. source income of parent | $38.50 |
| Taxable income of FSC | 6.00 |
| | 44.50 |
| Exempt: | |
| Foreign source income of parent | $38.50 |
| Exempt in FSC | 17.00 |
| | 55.50 |

Under current law, the parent's share of combined taxable income is $50 (as illustrated in the table in the Present Law section of this pamphlet). The parent's foreign source income might be $25 under present law. Exemption of $55.50 under the bill (absent the special rule) would exceed the combination of exemption and deferral of $42 for a parent of a DISC with excess credits under current law (with a 17 percent deferral rate).[38] To maintain parity with DISC, the bill would reduce the foreign source income of the parent in the example above from $38.50 to $25, which would result in an exemption of $42 (comparable to present law). The parent's U.S. source income would increase, under the special rule of the bill, from $38.50 to $52. The following table illustrates the effect of the bill's resourcing rule.

[38] In the Present Law section of this pamphlet, the taxpayer with excess credits was taxable on $58: $25 of U.S. source income plus a $33 deemed DISC distribution, but paid no tax on $25 of foreign source income or on $17 deferred in the DISC.

35

FSC—77/23 SPLIT OF CTI WITH RESOURCING RULE

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *FSC* | |
|---|---|---|---|
| U.S. source (taxable) | $52 | Exempt | $17 |
| Foreign source (exempt) | 25 | ECI | 6 |
| | 77 | | 23 |

| | |
|---|---|
| Taxable: | |
| U.S. source income of parent | $52 |
| ECI of FSC | 6 |
| | 58 |
| Exempt: | |
| Foreign source income of parent | $25 |
| Exempt in FSC | 17 |
| | 42 |

***Participation in international boycotts.***—The exempt foreign trade income of a FSC would be limited if the FSC participates in international boycotts and to the extent that any illegal bribe, kickback or other payment is made to an official employee or agent of a government. Regulations would provide rules similar to those that apply to the deemed distributions of a DISC under section 995(b)(1)F).

***Election.***—A corporation could elect to be treated as a FSC, or a small FSC, for a taxable year at any time during the 90-day period immediately preceding the beginning of the taxable year. The bill would provide that the Secretary of the Treasury has authority to consent to the making of an election at other designated times. The election would be made in a manner prescribed by the Secretary. The election would be valid only if all shareholders as of the first day of the first taxable year for which the election is effective consent to the election.

***Small business***

In order to provide relief for small businesses who may find the foreign presence and economic activity burdensome, the bill would provide two alternatives to the FSC: the interest charge DISC and the small FSC.

*Interest charge DISC.*—A DISC may continue to defer income attributable to $10 million or less of qualified export receipts. Deemed distributions relating to base period exports (the incremental rule) and to one-half of the DISC's income would be eliminated; thus, substantially all of the DISC's income attributable to $10 million or less of qualified export receipts could be deferred. However, unlike the present law DISC, an interest charge would be imposed on the shareholders of the DISC. The amount of the interest would be based on the tax otherwise due on the deferred

36

income computed as if the income were distributed. The interest rate would be tied to the T-bill rate.

The tax that would otherwise be due on the deferred income, termed the shareholder's DISC-related deferred tax liability, means, with respect to the year of the shareholder, the excess of the tax liability for the year computed as if the deferred DISC income were included in income over the actual tax liability for the year. This amount would be computed without regard to carrybacks to such taxable year. The Secretary of the Treasury is directed to prescribe regulations to provide any adjustments necessary or appropriate in the case of net operating losses, credits, and carryovers.

Deferred DISC income generally means the excess of accumulated DISC income at the beginning of the taxable year over the amount by which actual distributions out of accumulated DISC income exceed the current year's DISC income (termed distributions-in-excess-of-income). For shareholders of the DISC whose taxable year is different from that of the DISC, deferred DISC income is measured from the computation year; with respect to any taxable year of the shareholder, the computation year is the taxable year of the DISC which ends within the shareholder's preceding taxable year.

The rate of interest imposed on the shareholder's DISC-related deferred tax liability is determined by reference to a base period T-bill rate; this would mean the annual rate of interest that is equivalent to the average investment yield of U.S. T-bills with maturities of 52 weeks which were auctioned during the one-year period ending on September 30 of the calendar year ending with the close of the taxable year of the shareholder. The Secretary of the Treasury would be expected to publish this rate in October of each year. The interest a taxpayer is required to pay under this provision would be due at the same time the shareholder's regular tax is required to be paid.

Taxable income of the DISC attributable to qualified export receipts that exceed $10 million would be deemed distributed. Thus, if export receipts exceed $10 million, the DISC would not be disqualified; there would merely be no deferral of income attributable to the excess receipts. DISCs which are members of the same controlled group would be treated as a single corporation for purposes of the $10 million-rule.

*Small FSC.*—A FSC could elect to be a small FSC with respect to a taxable year provided that it is not a member at any time during the taxable year of a controlled group of corporations which includes a FSC (unless the other FSC has also made a small FSC election).

In order to have foreign trading gross receipts, a small FSC need not meet the foreign management and foreign economic process requirements. However, in determining the exempt foreign trade income of a small FSC, any foreign trading gross receipts that exceed $2,500,000 would not be taken into account. No exception to the requirements for use of the administrative pricing rules is provided for small FSCs. Because these activities may be performed by the FSC or by another person acting under a contract with the FSC and need not be performed outside the United States, this may not

37

be as onerous a requirement to small exporters as the foreign management and economic process requirements would be.

All small FSCs which are members of the same controlled group would be treated as a single corporation.

If the foreign trading gross receipts of a small FSC exceed the $2,500,000 limitation, the corporation may select the gross receipts to which the limitation is allocated. This provision would allow a taxpayer to choose, for example, to allocate the limitation to gross receipts attributable to transactions where the profit margin is high; in this case, the amount of exempt income would be greater than if the limitation were allocated to low margin transactions.

***Taxable year of DISC and FSC***

The taxable year of any DISC or FSC would be required to conform to the taxable year of the majority shareholder (or group of shareholders with the same taxable year) as determined by voting power. Special rules are provided for where more than one shareholder or shareholder groups have the highest percentage of voting power, and for subsequent changes of ownership.

***Transition rules for DISCs***

The taxable year of any DISC which begins before January 1, 1984 and which would otherwise include January 1, 1984 would close on December 31, 1983. To the extent that any underpayment of estimated tax is created or increased by this provision, no penalty would be imposed.

Accumulated DISC income which is derived before January 1, 1984 would be exempt from tax. This result is achieved by treating such income as previously taxed income.

To alleviate the hardship that may result from deemed distributions to a shareholder of a DISC that would otherwise be recognized in income in a later year by the shareholder, a special rule provides for a spread of such income over four years. Deemed distributions from a DISC attributable to income derived by the DISC in the taxable year of the DISC which begins in 1983 after the date in 1983 on which the taxable year of the shareholder begins would be treated as received by the shareholder in four equal installments; the installments would be treated as received on the last day of each of the four taxable years of the shareholder which begins after the shareholder's taxable year beginning in 1983.

For example, a DISC's taxable year ends January 31 and the corporate shareholder of the DISC is a calendar year taxpayer. In 1983, the corporate shareholder would include in income the deemed distributions from the DISC for the DISC's year ending on January 31, 1983 and, under the bill (absent the four-year spread), the deemed distributions for the 11-month taxable year ending on December 31, 1983. Almost two years of deemed distributions would be includible in income in 1983. Under the bill, the deemed distributions for the 11-month period ending December 31, 1983, would be spread over a four-year period and includible in the income of the shareholder in 4 equal installments: on December 31 of 1983, 1984, 1985, and 1986.

38

***Transfers from DISC to FSC***

Except to the extent provided in regulations to be prescribed, section 367 (which taxes some transfers of appreciated assets to foreign corporations) would not apply to transfers made generally before January 1985 to a FSC of qualified export assets held on August 4, 1983, by a DISC in a transaction to which section 351 or 368(a)(1) apply.

***Effective date***

The provisions of the bill would generally apply to transactions after December 31, 1983, in taxable years ending after such date. The provisions relating to treatment of trade receivables would apply to accounts receivable and evidences of indebtedness acquired by the foreign corporation after August 4, 1983 (the date of introduction).

(39)

## IV. ECONOMIC ANALYSIS OF S. 1804

When the DISC legislation was adopted in 1971, the U.S. merchandise trade balance was in deficit for the first time since the



Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

Second World War. Despite enactment of the DISC legislation, the merchandise trade deficit is larger than it was in 1971, and continues to be an important issue of Congressional concern. There has been considerable controversy over the extent to which DISC has actually stimulated exports and whether the associated revenue loss is justified. In this section, the effectiveness of the DISC legislation is analyzed and compared with the substitute foreign sales corporation (FSC) proposal as introduced in S. 1804 and H.R. 3810.

### *Effectiveness of DISC*

The DISC legislation provides an indefinite deferral of tax on a portion of qualified export income which is allocated to a DISC. This effectively reduces the rate of tax on the income from capital used in the production of exports distributed through DISCs. To the extent that the tax benefit is passed through to foreign customers (as a lower dollar price) and the exchange rate is fixed, DISCs increase the competitiveness of U.S. exports. The primary rationale for enacting the DISC legislation was to stimulate exports, and, thereby, the economy and employment, and also to remove a perceived tax disadvantage of domestic exporters. Congress was concerned that tax incentives provided by other countries gave foreign producers, including U.S.-controlled foreign subsidiaries, an advantage over domestic producers, and created a tax incentive for U.S. companies to manufacture offshore.[39]

The Revenue Act of 1971 includes a requirement that the Secretary of the Treasury submit an annual report to Congress analyzing the operation and effect of the DISC provisions. Table 1 summarizes the revenue and export effects of the DISC legislation presented in the annual DISC Reports from 1972 through 1981. According to the Treasury Reports, the increase in merchandise exports attributable to the DISC legislation amounts to 3-4 percent of total U.S. merchandise exports. The revenue cost of the DISC program grew to an estimated $1.65 billion in 1981. The revenue cost per $100 of export increase was estimated to average $40 in 1973-1976 and $20 in 1977-1981. Table 1 also shows that the merchandise trade deficit was four times larger in 1981 than it was in 1972, the first year of DISC operation. These trade deficits are the result of a combination of factors including: the rapid rise in the world market price of petroleum, the 1980 grain embargo, and the con-

[39] H. Rep. No. 533, 92d Cong., 1st Sess. 58 (1971); S. Rep. No. 437, 92d Cong., 1st Sess. 90 (1971).

40

duct of macroeconomic policy both in the United States and abroad.

**Table 1.—DISC Report Estimates: 1972-1981**

[Dollar amounts in millions]

| DISC year | DISC export increase | | DISC revenue cost | | Merchandise trade balance |
|---|---|---|---|---|---|
| | Amount | Percent of total exports | Amount | Percent of export increase | |
| 1972 | NA | NA | $35 | NA | −$6,416 |
| 1973 | $2,180 | 3.1 | 730 | 33 | 911 |
| 1974 | 2,900 | 2.9 | 1,120 | 39 | −5,343 |
| 1975 | 2,380 | 2.2 | 1,150 | 48 | 9,047 |
| 1976 | 2,860 | 2.5 | 1,220 | 43 | −9,306 |
| 1977 | 3,900 | 3.2 | 750 | 19 | −30,873 |
| 1978 | 3,640 | 2.6 | 730 | 20 | −33,759 |
| 1979 | 4,500–7,000 | 2.4–3.8 | 990 | 14–22 | −27,346 |
| 1980 | 6,200–9,400 | 2.8–4.2 | 1,410 | 15–23 | −25,338 |
| 1981 | 7,200–11,000 | 3.0–4.7 | 1,650 | 15–23 | −27,889 |

Sources: Department of the Treasury, 1972-81 DISC Reports; Council of Economic Advisors, *Economic Report of the President* (1983).

The Treasury estimates of the cost effectiveness of DISC have been criticized in a study by Price Waterhouse.[40] The Price Waterhouse study concludes that the DISC legislation is a self-financing tax cut, that is, a tax cut which raises revenue. Unlike the Treasury Report, the Price Waterhouse study assumes that the additional exports attributable to DISC do not draw productive resources such as labor and capital from other sectors of the U.S. economy. Rather, the Price Waterhouse study adopts the position that the DISC export increase represents a net addition to GNP which generates new tax revenues (to the extent that tax on this income is not deferred). The Price Waterhouse position is most likely to be accurate when the economy is in a recession and there are idle resources.

Some economists have criticized the DISC program on the grounds that it is inefficient and does not necessarily increase U.S. employment.[41] They point out that the fixed exchange rate system was replaced by a flexible rate system shortly after the DISC program was enacted. Under the current system of floating exchange rates, export incentives are rendered ineffective, to some extent, by appreciation of the dollar. Such appreciation reduces the dollar price of imports and raises the foreign currency price of exports.

[40] Price Waterhouse, *Economic Impacts of the Domestic International Sales Corporation (DISC) Tax Provisions*, A study prepared for the American Business Conference, et. al., (April 15, 1982).

[41] *See* J.G. Gravelle and D.W. Kiefer, *Deferral and DISC: Two Targets of Tax Reform*, Congressional Research Service (February 3, 1978) and D.L. Brumbaugh, *DISC: Effects, Issues and Proposed Replacements*, Congressional Research Service (April 5, 1983).

41

Thus there may be an expansion of employment in the export sectors, and a decline in employment in import-competing sectors such as the automobile industry. Due to adjustments in the exchange rate over time, export incentives may fail to have a sustained impact on *net* U.S. exports or employment. For this reason, some economists have argued that a change in macroeconomic policy to reduce the high value of the dollar is a better method of resolving the trade deficit than import barriers or export incentives.

In addition to any direct revenue costs associated with the DISC legislation, there may be a hidden efficiency cost to the U.S. economy.[42] This efficiency loss is attributable to the misallocation of resources between export and non-export sectors of the economy. U.S. income may decline both because resources are not deployed in the sectors where their productivity is highest, and because the dollar appreciation which may result from the operation of the DISC legislation reduces income from offshore investments.[43]

Some economists fault the design of the DISC program on the ground that it is inadequately targeted. They argue that exports are unlikely to increase in sectors where DISC tax benefits are not passed forward as lower prices but are instead passed back to shareholders as higher profits.[44] The more difficult it is for firms to enter an industry, the less likely it is that competitive market forces will ensure that DISC benefits result in lower export prices. On these grounds, some have argued that the Export-Import Bank is a more effective program than DISC since the benefits it provides go primarily to the more competitive export sectors.

Another frequent criticism of the DISC legislation is that the benefits are heavily concentrated in the hands of a small number of exporters. According to the 1981 Treasury Report, 35.2 percent of the tax benefit of the DISC program went to 26 DISCs, or 0.3 percent of the total 8665 DISCs in that year. Almost half of the tax benefit (49 percent) went to 89 DISCs, or 1 percent of the total. The main reason for this concentration of DISC benefits is that a few firms account for a large share of total exports. Indeed, the 1981 Report indicates that, per dollar of export income, small DISCs receive more tax savings than large DISCs. This shows the effect of the incremental provisions which, since 1976, have limited deferral to the excess of current period over base period DISC income; DISCs with $100,000 of income or less are exempted from these provisions.

When the DISC legislation was adopted in 1971, Congress was concerned that tax incentives provided by other countries gave foreign manufacturers an advantage over U.S. firms. However, over the last 10 years, there have been numerous changes in the U.S. corporate tax, including: restoration of the investment credit in 1971, liberalization of the investment credit in 1975, reduction of the corporate tax rate from 48 to 46 percent in 1979, and acceleration of depreciation allowances with the introduction of the accelerated capital recovery system (ACRS) in 1981. Since the U.S. investment credit and ACRS depreciation are generally available only on domestic capital, the tax disadvantage of manufacturing in the United States may have declined, if not reversed, since the enactment of the DISC legislation.

[42] J. Mutti and H. Grubert, *DISC and its Effects*, National Bureau of Economic Research Summer Institute on International Studies (December 1982).

[43] Foreign asset holdings of U.S. investors yield foreign currency income. When the dollar appreciates, the value of this foreign investment income drops in dollar terms.

[44] *See* T. Horst and T. Pugel, "The Impact of DISC on the Prices and Profitability of U.S. Exports," *J. of Public Economics*, Vol. 7, 73-87 (1977).

42

The GATT permits member countries to exempt (or rebate) direct taxes, such as value added taxes, on exported items; but GATT prohibits the exemption (or rebate) of direct taxes, such as

corporate income and payroll taxes.[45] Critics of the GATT rules have argued that DISC is necessary to offset the disadvantage U.S. exporters confront as a result of the fact that the United States relies relatively more on direct taxes than its trading partners. However, the difference in relative tax burdens on U.S. and foreign goods is generally due to differences in direct rather than indirect taxes. U.S. exports and locally produced foreign goods are both free of U.S. indirect taxes (e.g., state and local sales taxes), and subject to foreign indirect taxes (e.g., value added taxes) in the country where the goods are used. Similarly, imports and domestically produced goods consumed in the United States are both free of foreign indirect taxes and subject to U.S. indirect taxes. Thus, in general, if U.S. goods have a tax disadvantage in the world market, this results from higher direct taxes (e.g., payroll, property, and income taxes) in the United States compared to our trading partners.

### *Economic Comparison of FSC and DISC*

In a territorial tax system, a nation does not assert the right to tax income attributable to economic activities that take place outside the nation's borders; such income is exempt from the nation's tax. In December 1981, the GATT Council adopted the position that territorial taxation does not constitute an export subsidy provided that arm's-length pricing rules are used to distribute income between a firm and its foreign branches and subsidiaries. The GATT Council did not at that time resolve the longstanding allegation of certain countries that DISC is an illegal export subsidy. In March 1983, the Administration proposed to replace DISC with a new tax system for exports—FSC. Under the FSC proposal, domestic firms which export through an FSC would be exempt from U.S. tax on a portion of the export income attributable to the FSC.

Table 2 shows the computation of U.S. tax for a small DISC, a "typical" DISC, and a FSC. In each case it is assumed that the parent corporation, in conjunction with its DISC or FSC, has $100 of combined gross receipts, $80 of total deductions, and $20 of combined taxable income. In the DISC examples, the $20 of combined taxable income is allocated half ($10) to the parent and half to the DISC.[46] In the small DISC case (less than $100,000 of DISC taxable income), 42.5 percent (i.e., 50 percent less the 15 percent cutback enacted in the Tax Equity and Fiscal Responsibility Act of 1982) of

[45] Although there is some ambiguity, direct taxes are generally defined to include: corporate and personal income, payroll, property, wealth, gift, estate, and other taxes which are imposed on the individual (or entity) that is meant to bear the burden. Indirect taxes are generally defined to include: sales, value added, excise, and other specific taxes which are imposed at one level of production or distribution but are meant to be shifted forward to the ultimate consumer.

[46] Under these facts, the 50 percent of combined taxable income allocation method results in less tax than either the 4 percent of gross receipts method or the arm's-length method.

43

DISC taxable income is deferred from taxation, and 57.5 percent ($5.75) is deemed distributed to the parent. Total taxable income is equal to the parent's allocated income ($10) plus the deemed distribution ($5.75), or $15.75. Thus for a company with a small DISC, tax liability is $7.25 (.46 x $15.75), and the effective tax rate on export income is 36.2 percent ($7.25/$20).[47]

**Table 2.—Comparison of Export Income Taxation Under DISC and the FSC Proposal**

| Item | Small DISC | Typical DISC | Proposed FSC |
|---|---|---|---|
| 1. *Combined account:* | | | |
| Gross export receipts | $100.00 | $100.00 | $100.00 |
| Total deductions | 80.00 | 80.00 | 80.00 |
| Combined taxable income | 20.00 | 20.00 | 20.00 |
| 2. *FSC account:* | | | |
| Gross FSC receipts | NA | NA | 100.00 |
| Total deductions | NA | NA | 95.40 |
| Acquisition cost (transfer price) | NA | NA | 94.40 |
| Other FSC costs | NA | NA | 1.00 |
| FSC net income | NA | NA | 4.60 |
| Exempt income | NA | NA | 3.40 |
| Effectively connected income | NA | NA | 1.20 |
| 3. *DISC account:* | | | |
| DISC taxable income | 10.00 | 10.00 | NA |
| DISC deferred income | 4.25 | 3.40 | NA |
| Deemed distribution | 5.75 | 6.60 | NA |
| 4. *Parent account:* | | | |
| Gross receipts | 100.00 | 100.00 | 94.40 |
| Total deductions | 80.00 | 80.00 | 79.00 |
| Net income before allocation | 20.00 | 20.00 | 15.40 |
| Total taxable income | 15.75 | 16.60 | 16.60 |
| Net income after allocation | 10.00 | 10.00 | 15.40 |
| FSC effectively connected income | NA | NA | 1.20 |
| DISC deemed distribution | 5.75 | 6.60 | NA |
| U.S. tax | 7.25 | 7.64 | 7.64 |
| Effective U.S. tax rate (percent) | 36.2 | 38.2 | 38.2 |

[47] In this example it is assumed that there are no credits and that tax depreciation equals economic depreciation.

The deferral rate for a "typical" DISC is lower than for a small DISC since deferral is limited to 42.5 percent of the excess of cur-

44

rent DISC taxable income over base period income. A typical DISC, according to Treasury data, has a deferral rate of 34 percent, so that $3.40 is deferred from tax, and $6.60 is deemed distributed to the parent. Total taxable income is equal to the parent's allocated income ($10) plus the deemed distribution ($6.60), or $16.60. Thus for a company with a typical DISC, tax liability is $7.64 (.46 x $16.60), and the effective tax rate on export income is 38.2 percent ($7.64/$20).

The computation of tax for a parent selling through a FSC is shown in the third column of Table 2. In this example it is assumed that the FSC is incorporated in a jurisdiction which imposes negligible tax on the income allocated to the FSC. It is also assumed that the FSC performs certain economic activities such as sales promotion and arranging for transportation so that the $100 of export receipts qualifies as foreign trading gross receipts under the proposal. The cost of conducting these economic activities in the FSC accounts for $1 of the total $80 cost of sales and operations.

Under the proposal, one of two methods of apportionment (in addition to the arm's-length method) may be used to determine the FSC's share of the $20 of combined taxable income: (1) 23 percent of combined taxable income, and (2) 1.83 percent of gross receipts. In this example, the income method results in the largest apportionment of income to the FSC: $4.60 (.23 x $20). Hence, the transfer price from the parent to the FSC is established as $94.40 ($100-$1-$4.60) since this is the price which results in exactly $4.60 of foreign trading income. The remaining $15.40 ($20-$4.60) is allocated to the parent company and is subject to U.S. tax. According to the proposal, a portion (17/23) of the FSC's income is exempt from U.S. tax, and the remaining portion (6/23) is "effectively connected" income which is subject to U.S. tax. Total taxable income is equal to the parent's allocated income ($15.40) plus the effectively connected income ($1.20), or $16.60. Thus for a company with a FSC, tax liability is $7.64 (.46 x $16.60), and the effective tax rate on export income is 38.2 percent ($7.64/$20).

Table 2 (which uses Treasury assumptions) shows that the effective U.S. tax rate on export income is 38.2 percent under the FSC proposal as well as for a company with a typical DISC. However, companies with small DISCs, which are exempt from the incremental rule, are taxed more lightly under current law at an effective rate of 36.2 percent. Under the incremental rule of current law, small, new, or rapidly growing DISCs enjoy a higher deferral rate and a lower effective tax rate than large, older, or slow growing DISCs. Since there are no incremental provisions in the FSC proposal, adoption of S. 1804 would tend to hurt small, new, and rapidly growing DISCs which have an above average deferral rate, and benefit large, older, and slow growing DISCs which have a below average deferral rate. Table 3 shows that the rapidly growing export sectors which might tend to be hurt by the FSC proposal include: chemicals, fabricated metal products, electrical machinery, and scientific instruments. The slow growing export sectors which would most likely benefit from the FSC proposal include: minerals, food, lumber, and leather products. (The minerals industry would also benefit because the FSC proposal would provide benefits to

45

products on which depletion deductions are allowable, other than oil and gas related products. Thus, coal and uranium, which are excluded from DISC, would be eligible for FSC benefits.)



10/85 Published by Tax Management Inc., 1985, a subsidiary of The Bureau of National Affairs, Inc., Washington, D.C. 20037

**Table 3.—Growth Rate of DISC Exports by Sector**

[Dollar amounts in billions]

| Sector | 1977 gross receipts | 1981 gross receipts | Growth rate of gross receipts (percent) |
|---|---|---|---|
| Total | $82.681 | $154.078 | 16.8 |
| Nonmanufactured Products | 23.997 | 42.517 | 15.4 |
| Agriculture | 22.512 | 40.401 | 15.7 |
| Mineral products | .767 | 1.063 | 8.5 |
| Other | .716 | 1.053 | 10.1 |
| Manufactured Products | 58.684 | 111.561 | 17.4 |
| Ordnance and accessories | .225 | .197 | −3.3 |
| Food and kindred products | 3.154 | 4.204 | 7.4 |
| Tobacco manufactures | .452 | 1.110 | 25.2 |
| Textile mill products | .837 | 1.829 | 21.6 |
| Apparel, etc | .171 | .582 | 35.8 |
| Lumber, etc. ex. furniture | 2.093 | 2.884 | 8.3 |
| Furniture and fixtures | .018 | .081 | 45.6 |
| Paper and allied products | 1.458 | 3.115 | 20.9 |
| Printing, publishing, etc | .209 | .392 | 17.0 |
| Chemicals & allied products | 6.926 | 16.728 | 24.7 |
| Rubber and misc. products | .565 | 1.085 | 17.7 |
| Leather & leather products | .635 | .837 | 7.1 |
| Stone, clay, glass & cement | .445 | .882 | 18.7 |
| Primary metal | 1.086 | 3.262 | 31.6 |
| Fabricated metal products | 1.860 | 4.264 | 23.0 |
| Machinery, ex. electrical | 13.214 | 22.549 | 14.3 |
| Electrical machinery | 6.118 | 14.360 | 23.8 |
| Transportation equipment | 15.161 | 21.796 | 9.5 |
| Scientific instruments | 2.804 | 6.027 | 21.1 |
| All other manufacturing | 1.254 | 2.379 | 17.4 |

Source: Department of the Treasury, 1977 and 1981 Annual DISC Reports.

Some have suggested that because the FSC proposal lacks an incremental rule, it is likely to be less cost-effective, in terms of revenue loss per dollar of additional exports, than the DISC program. However, it is not certain that the incremental rule has increased the long-run efficiency of the DISC program. First, under the incremental rule, an increase in exports yields tax-deferred income in the current year but reduces tax-deferred income in future years. This occurs because, after four years, the original increase in exports enters into base period gross receipts and decreases the

46

amount of incremental DISC income eligible for deferral.[48] Second, for exporters with slow growing or declining sales, the incremental rule could reduce DISC benefits to the point where it is more advantageous to manufacture offshore than in the United States. For these reasons, the incremental rule, enacted in 1976, may have failed to increase the efficiency of the DISC program compared to a non-incremental system with the same revenue cost (e.g., the FSC proposal).

An important difference between DISC and the FSC substitute is that a FSC must be incorporated abroad and may be subject to foreign tax. Under the FSC proposal, the foreign taxes paid by a FSC would not be credited against U.S. tax liability. In addition, the FSC must maintain an office and a permanent set of books outside the United States and must engage in some of the economic activities related to the export receipts of the parent company. Only small FSCs (under $2.5 million of annual gross receipts) are exempted from the requirement of conducting significant offshore economic activities. The additional expenses (including any foreign taxes) associated with operating a FSC would reduce the net benefit from exporting through a FSC. Thus, for the same revenue loss, the FSC legislation may stimulate fewer additional exports than DISC since firms would only utilize a FSC if the tax savings cover the transaction costs of the offshore corporation.

Another important difference between DISC and the FSC substitute is that DISC provides a deferral of tax, rather than an exemption from tax. To qualify for tax deferral, the asset test requires that a DISC invest 95 percent of its accumulated deferred income in qualified export assets such as: export trade receivables, producer loans, inventory, and Export-Import Bank (Ex-Im) obligations. For many companies the restrictions on the use of these funds are not a significant burden. Receivables can be financed and the parent can obtain the current use of funds through producer loans. But to the extent that the accumulated tax-deferred income must be invested in Ex-Im obligations, which have a low yield and do not enable the parent corporation to use the funds in normal operations, the asset test imposes more of a burden. According to the 1981 DISC Report, 6 percent (i.e., $1.2 billion) of total DISC assets were invested in Ex-Im obligations. (Adoption of the FSC proposal would eliminate the captive market for low yield Ex-Im obligations and, consequently, reduce the ability of the Ex-Im Bank to finance exports.) For some companies, the asset test may become sufficiently onerous that there would no longer be an incentive to export through a DISC. Since the FSC proposal is an exemption system, there is no asset test. Thus FSC may be a more potent export incentive in cases where the asset test would have reduced DISC benefits.

Another important practical difference between DISC and the FSC substitute arises from elimination of the assets test and the gross receipts test. The consequences of failure of a DISC to meet these tests are severe; all previously deferred income may become

[48] *See* Appendix C of the Treasury's 1976 DISC Report. There it is argued that if export receipts grow faster (slower) than the cost of capital, then the incremental rule makes DISC less (more) cost-effective than it would be without the incremental rule.

47

taxable. In contrast, even if a FSC fails to meet the requirements to be a FSC, or to meet the economic process tests with respect to a transaction, no such harsh result follows; current benefits may be lost but not the benefits from prior years.

(49)

**APPENDIX A:**

**SIDE-BY-COMPARISON OF DISC AND FSC PROVISIONS**

| Item | DISC | FSC |
|---|---|---|
| 1. Entity subject to Federal income tax | No. | Yes (exclusion for exempt foreign trade income). |
| 2. Type of entity | (a) A corporation which is incorporated under the laws of any State;<br>(b) that has one class of stock, par or stated value of $2,500;<br>(c) no restriction on number of shareholders;<br>(d) no Board of Directors restriction. | (a) A corporation which is incorporated under the laws of a foreign country or U.S. possession;<br>(b) that has no preferred stock;<br>(c) that has no more than 25 shareholders;<br>(d) that has at least one nonresident individual on Board of Directors. |
| 3. Election | Yes. | Yes. |
| 4. Taxable year | Need not conform to taxable year of shareholders. | Must conform to taxable year of majority shareholder. |
| 5. Qualified export assets and gross receipts requirement | Yes. Failure to satisfy requirements results in taxation of previously deferred income and may result in termination of DISC. | No. |
| 6. Foreign presence requirement | No. | Yes. |
| 7. Excluded corporations | Generally not a tax-exempt corporation, personal holding company, financial institution, insurance company, regulated investment company, or S corporation. | Not a member of a controlled group which includes a DISC. |
| 8. Type of income | 95 percent must be qualified gross receipts. | Exclusion from income is limited to exempt foreign trade income. |

50

**SIDE-BY-COMPARISON OF DISC AND FSC PROVISIONS— Continued**

| Item | DISC | FSC |
|---|---|---|
| 9. Export receipts | Qualified gross receipts are, generally gross receipts from the sale, lease or rental of export property and from related services; and certain dividends, interest, and gross receipts from qualified assets (other than export property). | Foreign trading gross receipts are generally the same as DISC qualified gross receipts; but do not include dividends, interest, and gross receipts from certain property that is not export property. To qualify foreign management and foreign economic process requirements must be met. |
| 10. Excluded receipts | Generally not: (a) gross receipts for use in U.S. that is subsidized or used by the U.S. under law requiring such use; and (b) receipts from a related DISC. | (a) Same as DISC, and (b) receipts from a related FSC. |
| 11. Export property | (a) Property manufactured, produced or grown in the U.S. for use or disposition outside the U.S. | (a) Same as DISC, and (b) fungible agricultural products sold through an exempt farmers' cooperative. |
| 12. Excluded property | Generally not: property for use by a related corporation, intangibles, depletable products, property the export of which is prohibited, and property in short supply. | Same as DISC, except oil and gas are the only excluded depletable products (coal and uranium are not excluded). |
| 13. Intercompany pricing rules | Transfer price based on: (a) 4 percent of qualified export receipts; (b) 50 percent of combined taxable income; or (c) sales price actually charged but subject to sec. 482. | Transfer price based on: (a) 1.83 percent of foreign trading gross receipts; (b) 23 percent of combined taxable income; or (c) same as in DISC. To use administrative pricing rules ((a) or (b) above) for a transaction the FSC must perform certain activities with respect to the transaction. |
| 14. Taxation of income to shareholders | DISC not subject to tax, but shareholders are subject to tax on certain deemed distributions and actual distributions out of deferred income. | FSC subject to tax. Corporate shareholder receives a 100 percent dividend-received deduction for dividends attributable to foreign trade income. |

51

| Item | DISC | FSC |
|---|---|---|
| 15. Disposition of stock | Gain recognized as a dividend to the extent of accumulated DISC income. | No similar provision needed because there is no deferred income. |
| 16. Distributions | Treated as: (a) first out of previously taxed income; (b) second, out of accumulated DISC income; and (c) third, out of any other earnings and profits. | Treated as: (a) first out of earnings and profits attributable to foreign trade income; and (b) second, out of any other earnings and profits. |
| 17. Maximum tax benefit | Deferral of tax on 1.7 percent of gross receipts or 21.25 percent of combined taxable income (subject to reduction by incremental rule). | Tax exemption on 1.35 percent of gross receipts or 17 percent of combined taxable income. |
| 18. Small business | Exemption from incremental rule if taxable income is $100,000 or less; phaseout of exemption from incremental rule between $100,000 and $150,000. | (a) Interest-charge DISC (applicable to gross receipts of $10 million or less) essentially same as DISC, except—no incremental rule; no deemed distributions, and an interest charge is imposed on deferred income. (b) Small FSC exception for gross receipts of $2,500,000 or less from certain foreign presence and foreign economic activity requirements. |

(52)

## APPENDIX B:

## SELECTED GATT DOCUMENTS

### 1. Article XVI of the General Agreement

### *Subsidies*

SECTION A — SUBSIDIES IN GENERAL

1. If any contracting party grants or maintains any subsidy, including any form of income or price support, which operates directly or indirectly to increase exports of any product from, or to reduce imports of any product into, its territory, it shall notify the Contracting Parties [throughout this Appendix, the term "Contracting Parties," with initial capital letters, refers to the general membership of GATT] in writing of the extent and nature of the subsidization, of the estimated effect of the subsidization on the quantity of the affected product or products imported into or exported from its territory and of the circumstances making the subsidization necessary. In any case in which it is determined that serious prejudice to the interests of any other contracting party is caused or threatened by any such subsidization, the contracting party granting the subsidy shall, upon request, discuss with the other contracting party or parties concerned, or with the Contracting Parties, the possibility of limiting the subsidization.

SECTION B—ADDITIONAL PROVISIONS ON EXPORT SUBSIDIES

2. The contracting parties recognize that the granting by a contracting party of a subsidy on the export of any product may have harmful effects for other contracting parties, both importing and exporting, may cause undue disturbance to their normal commercial interests, and may hinder the achievement of the objectives of this Agreement.

3. Accordingly contracting parties should seek to avoid the use of subsidies on the export of primary products. If, however, a contracting party grants directly or indirectly any form of subsidy which operates to increase the export of any primary product from its territory, such subsidy shall not be applied in a manner which results in that contracting party having more than an equitable share of world export trade in that product, account being taken of the shares of the contracting parties in such trade in the product during a previous representative period, and any special factors which may have affected or may be affecting such trade in the product.

4. Further, as from 1 January 1958 or the earliest practicable date thereafter, contracting parties shall cease to grant either directly or indirectly any form of subsidy on the export of any prod-

53

uct other than a primary product which subsidy results in the sale of such product for export at a price lower than the comparable price charged for the like product to buyers in the domestic market. Until 31 December 1957 no contracting party shall extend the scope of any such subsidization beyond that existing on 1 Janu-

ary 1955 by the introduction of new, or the extension of existing, subsidies.

5. The Contracting Parties shall review the operation of the provisions of this Article from time to time with a view to examining its effectiveness, in the light of actual experience, in promoting the objectives of this Agreement and avoiding subsidization seriously prejudicial to the trade or interests of contracting parties.

### 2. Article XXIII of the General Agreement

### *Nullification or Impairment*

1. If any contracting party should consider that any benefit accruing to it directly or indirectly under this Agreement is being nullified or impaired or that the attainment of any objective of the Agreement is being impeded as the result of

(a) the failure of another contracting party to carry out its obligations under this Agreement, or

(b) the application by another contracting party of any measure, whether or not it conflicts with the provisions of this Agreement, or

(c) the existence of any other situation,

the contracting party may, with a view to the satisfactory adjustment of the matter, make written representations or proposals to the other contracting party or parties which it considers to be concerned. Any contracting party thus approached shall give sympathetic consideration to the representations or proposals made to it.

2. If no satisfactory adjustment is effected between the contracting parties concerned within a reasonable time, or if the difficulty is of the type described in paragraph 1(c) of this Article, the matter may be referred to the Contracting Parties. The Contracting Parties shall promptly investigate any matter so referred to them and shall make appropriate recommendations to the contracting parties which they consider to be concerned, or give a ruling on the matter, as appropriate. The Contracting Parties may consult with contracting parties, with the Economic and Social Council of the United Nations and with any appropriate inter-governmental organization in cases where they consider such consultation necessary.

If the Contracting Parties consider that the circumstances are serious enough to justify such action, they may authorize a contracting party or parties to suspend the application to any other contracting party or parties of such concessions or other obligations under this Agreement as they determine to be appropriate in the circumstances. If the application to any contracting party of any concession or other obligation is in fact suspended, that contracting party shall then be free, not later than sixty days after such action is taken, to give written notice to the Executive Secretary to the Contracting Parties of its intention to withdraw from this Agree-

54

ment and such withdrawal shall take effect upon the sixtieth day following the day on which such notice is received by him.

### 3. Report of the GATT Panel on DISC: Conclusions [49]

67. The Panel started by examining the effects of the DISC legislation in economic terms. The Panel concluded that it conferred a tax benefit and that this benefit was essentially related to exports. The Panel considered that if the corporation income tax was reduced with respect to export related activities and was unchanged with respect to domestic activities for the internal market this would tend to lead to an expansion of export activity. Therefore, the DISC would result in more resources being attracted to export activities than would have occurred in the absence of such benefits for exports.

68. The Panel noted that the United States Treasury had acknowledged that exports had increased as a result of the DISC legislation and the Panel considered that the fact that so many DISCs had been created was evidence that DISC status conferred a substantial benefit.

69. The Panel noted that the DISC legislation was intended, in its own terms, to increase United States exports and concluded that, as its benefits arose as a function of profits from exports, it should be regarded as an export subsidy.

70. The Panel examined whether a deferral of tax was "a remission" in terms of item (c) or "an exemption" in terms of item (d) of the illustrative list of 1960 (BISD, 9 Suppl. p. 186).

71. The Panel was not convinced that a deferral, *simply* because it is given for an indeterminate period, was equal to a remission or an exemption. In addition it noted that the DISC legislation provided for the termination of the deferral under specified circumstances. The Panel further noted, however, that the deferral did not attract the interest component of the tax normally levied for late or deferred payment and therefore concluded that, to this extent, the DISC legislation constituted a partial exemption which was covered by one or both of paragraphs (c) and (d) of the illustrative list.

72. The Panel noted that the contracting parties that had accepted the 1960 Declaration had agreed that the practices in the illustrative list were generally to be considered as subsidies in the sense of Article XVI:4. The Panel further noted that these contracting parties considered that, in general, the practices contained in the illustrative list could be presumed to result in bi-level pricing, and considered that this presumption could therefore be applied to the DISC legislation. The Panel concluded, however, from the words "generally to be considered" that these contracting parties did not consider that the presumption was absolute.

73. The Panel considered that, from an economic point of view there was a presumption that an export subsidy would lead to any or a combination of the following consequences in the export sector: (a) lowering of prices, (b) increase of sales effort and (c) in-

55

crease of profits per unit. Because the subsidy was both significant and broadly based it was to be expected that all of these effects would occur and that, if one occurred, the other two would not necessarily be excluded. A concentration of the subsidy benefits on prices could lead to substantial reductions in prices. The Panel did not accept that a reduction in prices in export markets needed automatically to be accompanied by similar reductions in domestic markets. These conclusions were supported by statements by American personalities and companies and the Panel felt that it should pay some regard to this evidence.

74. The Panel therefore concluded that the DISC legislation in some cases had effects which were not in accordance with the United States' obligations under Article XVI:4.

75. The Panel examined the significance of the various options under the DISC legislation for the allocation of profits from export sales between parent companies and DISCs, and concluded that these could influence the size of the exemption.

76. The Panel concluded that the provision allowing the deduction of certain shipping costs by DISCs (on the condition that exports be carried in United States vessels), and the provision allowing 10 percent of export promotion expenses to be assigned as a deductible expense to a DISC would appear to confer additional pecuniary benefits.

77. The Panel considered that, as it had found the DISC legislation to constitute an export subsidy which had lead to an increase in exports, it was also covered by the notification obligation contained in Article XVI:1.

78. While the Panel noted that primary product exports were eligible for DISC benefits and had been traded substantially through DISCs, it did not examine whether the benefits would result in the United States obtaining a disproportionate share of the world market in terms of Article XVI:3.

79. The Panel noted the United States argument that it had introduced the DISC legislation to correct an existing distortion created by tax practices of certain other contracting parties. However, the Panel did not accept that one distortion could be justified by the existence of another one and considered that, if the United States had considered that other contracting parties were violating the General Agreement, it could have had recourse to the remedies which the General Agreement offered. On the other hand, the fact that tax practices of certain other countries had been in force for some time without being the subject of complaints was not, in itself, conclusive evidence that there was a consensus that they were compatible with the General Agreement.

80. In the light of the above and bearing in mind the precedent set by the Uruguayan case (BISD, 11 Suppl. p. 100),[50] the Panel found that there was a *prima facie* case of nullification or impairment of benefits which other contracting parties were entitled to expect under the General Agreement.

[49] This is an excerpt from GATT Doc. L/4422 (Nov. 2, 1976). The Panel's conclusions began with paragraph 67; the preceding 66 paragraphs set forth background information and the arguments of the parties.

[50] That case stands for the proposition that where there is a clear infringement of the provisions of the General Agreement, or in other words, where measures are applied in conflict with the provisions of GATT, there is prima facie nullifacation or impairment of benefits.

56

### 4. Report of the GATT Panel on French Tax Practices: Conclusions (Excerpts) [51]

"The Panel noted that the particular application of the territoriality principle by France allowed some part of export activities, belonging to an economic process originating in the country, to be outside the scope of French taxes. In this way France has foregone revenue from this source and created a possibility of a pecuniary benefit to exports in those cases where income and corporation tax provisions were significantly more liberal in foreign countries."

"The Panel found that however much the practices may have been an incidental consequence of French taxation principles rather than a specific policy intention, they nonetheless constituted a subsidy on exports because the above-mentioned benefits to exports did not apply to domestic activities for the internal market. The Panel also considered that the fact that the practices might also act as an incentive to investment abroad was not relevant in this context."

"The Panel also noted that the tax treatment of dividends form abroad [taxation at a nominal rate] ensured that the benefits referred to above were fully preserved."

". . . [T]he Panel concluded that there was a partial exemption from direct taxes. The Panel further concluded that the practices were covered by one or both items (c) and (d) of the illustrative list of 1960 (BISD, 9 Suppl. p. 186)."

"The Panel added that bi-level pricing had probably occurred. . . , [and] concluded that the French tax practices in some cases had effects which were not in accordance with French obligations under Article XVI:4."

"The Panel noted that the allocation of profits between companies and their foreign operations was made in accordance with the arm's-length pricing principle but that there were formal exceptions[52] to this principle and concluded that the benefit would be increased to the extent that arm's-length pricing was not fully observed."

"The Panel was of the view that, given the size and breadth of the export subsidy, it was likely that it had led to an increase in French exports in some sectors and, although the possibility could not be ruled out that the tax arrangements would encourage production abroad and a decrease in exports in other sectors, nonetheless concluded that it was also covered by the notification obligation of Article XVI:1."

"The Panel found that there was a *prima facie* case of nullification or impairment of benefits which other contracting parties were entitled to expect under the General Agreement."

### 5. 1979 Subsidies Code—Footnote 2 to Item (e)

In adopting the Subsidies Code in 1979, the GATT signatories included the following footnote to explain Item (e) of the Illustrative

[51] This is a series of excerpts from "Income Tax Practices Maintained by France," GATT Doc. No. L/4423 (Nov. 2, 1976).

[52] Notes of the French Administration in 1959 and thereafter had indicated that the French authorities did not apply arm's-length pricing rules strictly to export transactions (Panel report at paragraph 26).

57

List of export subsidies, which lists exemption, remission or deferral, specifically related to exports, of direct taxes:

"The signatories recognize that deferral need not amount to an export subsidy where, for example, appropriate interest charges are collected. The signatories further recognize that nothing in this text prejudges the disposition by the Contracting Parties of the specific issues raised in GATT document L/4422 [the DISC case].

The signatories reaffirm the principle that prices for goods in transactions between exporting enterprises and foreign buyers under their or under the same control should for tax purposes be the prices which would be charged between independent enterprises acting at arm's length. Any signatory may draw the attention of another signatory to administrative or other practices which may contravene this principle and which result in a significant saving of direct taxes in export transactions. In such circumstances the signatories shall normally attempt to resolve their differences using the facilities of existing bilateral tax treaties or other specific international mechanisms, without prejudice to the rights and obligations of signatories under the General Agreement, including the right of consultation created in the preceding sentence.

"Paragraph (e) is not intended to limit a signatory from taking measures to avoid the double taxation of foreign source income earned by its enterprises or the enterprises of another signatory.

"Where measures incompatible with the provisions of paragraph (e) exist, and where major practical difficulties stand in the way of the signatory concerned bringing such measures promptly into conformity with the Agreement, the signatory concerned shall, without prejudice to the rights of other signatories under the General Agreement or this Agreement, examine methods of bringing these measures into conformity within a reasonable period of time. . . ."

At a meeting in December, 1981, the GATT Council adopted all four panel reports governing the tax practices of Belgium, France, the Netherlands, and the United States, but with a qualification. The text of the agreement is reproduced herein.

### 6. GATT Council Adoption of Panel Reports

The Council adopts these reports on the understanding that with respect to these cases, and in general, economic processes (including transactions involving exported goods) located outside the territorial limits of the exporting country need not be subject to taxation by the exporting country and should not be regarded as export activities in terms of Article XVI:4 of the General Agreement. It is further understood that Article XVI:4 requires that arm's-length pricing be observed, i.e., prices for goods in transactions between exporting enterprises and foreign buyers under their or the same control should for tax purposes be the prices which would be charged between independent enterprises acting at arm's length. Furthermore, Article XVI:4 does not prohibit the adoption of measures to avoid double taxation of foreign source income.

(58)

## APPENDIX C

## FLOW CHART: QUALIFICATION FOR BENEFITS UNDER S. 1804

