98th Congress
2d Session

COMMITTEE PRINT

S Prt 98-169
Vol. I

# DEFICIT REDUCTION ACT OF 1984

## EXPLANATION OF PROVISIONS APPROVED BY THE COMMITTEE ON MARCH 21, 1984

## COMMITTEE ON FINANCE
## UNITED STATES SENATE

**Volume I**

APRIL 2, 1984

U S GOVERNMENT PRINTING OFFICE
WASHINGTON · 1984

32-502 O

For Sale by the Superintendent of Documents, U S Government Printing Office
Washington, D C 20402

# DETAILED CONTENTS

## VOLUME I:


Page

I. Legislative Background of Finance Committee Deficit Reduction Provisions ..... 1

II. Summary of Provisions ..... 3

III. General Reasons ..... 81

IV. Revenue and Outlay Effects ..... 89

V. Explanation of Provisions ..... 106

TITLE I—TAX REFORMS GENERALLY ..... 106

A. Deferral of Certain Tax Reductions ..... 106

1. Postponement of increase in amount of used property eligible for investment tax credit ..... 106
2. Postponement of finance lease provisions ..... 107
3. Postponement of increases in amount of property eligible for expensing ..... 111
4. Extension of telephone excise tax ..... 112
5. Postponement of net interest exclusion ..... 113
6. Postponement of increase in foreign earned income exclusion ..... 115

B. Tax-Exempt Entity Leasing ..... 116

1. Overview ..... 127
2. Definition of tax-exempt entity ..... 127
3. Tax-exempt use property ..... 128
4. Depreciation ..... 133
5. Investment tax credit ..... 135
6. Property used under certain service contracts ..... 136
7. Short-term lease exception ..... 149
8. Lease term ..... 149
9. Certain international organizations ..... 150
10. Definition of related party ..... 150
11. Exceptions ..... 151

C. Treatment of Bonds and Other Debt Instruments ..... 155

1. Market discount ..... 155

| | Page |
|---|---|
| 2. Discount on short-term obligations | 160 |
| 3. Original issue discount on tax-exempt bonds | 163 |
| D. Tax Treatment of Corporations and Their Shareholders | 165 |
| 1. Debt-financed portfolio stock | 165 |
| 2. Certain dividends from regulated investment companies | 168 |
| 3. Corporate shareholder's basis in stock reduced by reason of extraordinary dividends | 170 |
| 4. Distributions of appreciated property by corporations | 176 |
| 5. Capital gains distributions from regulated investment companies and real estate investment trusts | 179 |
| 6. Denial of deductions for certain expenses incurred in connection with short sales | 181 |
| 7. Corporate stock warrants | 183 |
| 8. Accumulated earnings tax | 185 |
| 9. Distributions by a corporation of debt obligations having a fair market value less than par | 188 |
| 10. Phaseout of graduated rate for large corporations | 190 |
| 11. Corporate tax preferences | 192 |
| 12. Golden parachutes | 195 |
| 13. Earnings and profits | 197 |
| 14. Continuation of suspension of effective date for certain NOL carryover rules | 203 |
| 15. Distribution requirement in the case of a C reorganization | 204 |
| 16. Control requirement in a D reorganization | 207 |
| 17. Collapsible corporations | 210 |
| E. Partnership Provisions | 213 |
| 1. Partnership allocations with respect to contributed property | 213 |
| 2. Retroactive allocations | 217 |
| 3. Payments to partners for property of certain services | 223 |
| a. Recharacterization of payments for services or property | 226 |
| b. Disguised sales | 230 |
| c. Definition of partner | 232 |
| 4. Character of gain or loss on disposition of contributed property | 233 |
| 5. Transfers of partnership interests by corporations | 236 |
| 6. Use of tiered partnerships to alter character of income on exchanges of partnership interest | 239 |
| 7. Exchange of like-kind property | 241 |

| | Page |
|---|---|
| F. Trust Provisions | 245 |
| 1. Trust distributions | 245 |
| 2. Taxation of multiple trusts | 247 |
| G. Time Value of Money and Other Accounting Changes | 249 |
| 1. Timing and measurement of interest inclusion and deduction in deferred payment transactions | 249 |
| a. Extension of OID rules | 253 |
| b. Modification of rules for making allocations of principal and interest in other deferred payment transactions | 257 |
| 2. Deferred payments for use of property and services | 260 |
| 3. Premature accruals | 264 |
| 4. Prepayments of expenses | 270 |
| 5. Mine reclamation and closing costs | 274 |
| 6. Nuclear power plant decommissioning | 277 |
| 7. Capitalization of construction period interest and taxes | 280 |
| 8. Start-up expenses | 282 |
| H. Provisions Relating to Tax Straddles | 284 |
| 1. Repeal of exception for certain stock options | 291 |
| 2. Treatment of gain or loss where the taxpayer is the grantor of a call option | 292 |
| 3. Extension of mark-to-market rule | 292 |
| 4. Treatment of dealer options | 293 |
| 5. Hedging exemption | 294 |
| 6. Cash-settlement options | 295 |
| 7. Regulatory authority relating to mixed straddles | 295 |
| 8. Short sales against the box | 295 |
| 9. Regulatory authority with respect to identification requirement | 295 |
| I. Pensions, Welfare Benefit Plans, ESOPs | 298 |
| A. General Pension Provisions | 298 |
| 1. Deduction limits for qualified pension plans | 298 |
| 2. Provisions relating to top-heavy plans | 301 |
| 3. Distribution rules for qualified pension plans | 304 |
| 4. Treatment of distributions of benefits substantially all of which are derived from employee contributions | 310 |
| 5. Repeal of estate tax exclusion for qualified pension plan benefits | 312 |
| 6. Affiliated service groups, employee leasing arrangements, and collective bargaining agreements | 314 |

B. Welfare Benefit Plans ........................................ 316
1. Additional requirements for tax-exempt status of certain organizations ........................ 316
a. Additional requirements for tax-exempt status of certain organizations... 319
b. Excise taxes involving funded welfare benefit plans........................................ 322
2. Treatment of certain medical, etc., benefits under section 415 .................................... 326
3. Employer and welfare benefit fund treated as related persons under section 1239 ........... 328
4. Revenue effect of welfare benefit plan provisions ........................................................... 328
C. Retirement Savings Incentives ......................... 329
Special rules relating to individual retirement accounts ............................................... 329
D. Employee Stock Ownership Provisions............ 331
1. Freeze on maximum credit........................... 332
2. Tax-free rollover on sale to employees......... 332
3. Deduction for dividends paid on ESOP loans ........................................................... 333
4. Partial exclusion of interest earned on ESOP loans ................................................... 334
5. Reduced tax rate for sales of stock to an ESOP ................................................................ 334
6. Assumption of estate tax liability by ESOP ................................................................ 335
7. Estate tax exclusion for sales to employees ............................................................ 335
8. Charitable contributions to ESOPs.............. 335
E. Miscellaneous Pension Provisions..................... 337
1. Elimination of retroactive application of amendments made by Multiemployer Pension Plan Amendments Act of 1980 ............... 337
2. Treatment of certain distributions from a qualified terminated plan ............................... 339
3. Special rule for trans-Alaskan pipeline employees ...................................................... 340
4. Distribution requirements for accounts and annuities of an insurer in rehabilitation proceedings ............................................ 342
5. Extension of time for repayment of qualified refunding loans ........................................ 343
6. Pension portability involving telecommunications divestiture........................................ 344
J. Foreign Provisions ................................................ 347
1. Income from factoring trade receivables ..... 347
2. Taxation of certain transfers of property outside the United States................................ 352

| | Page |
|---|---|
| 3. Gain from sale or exchange of stock in certain foreign corporations | 371 |
| 4. Original issue discount and coupon stripping—foreign investors | 374 |
| 5. Source of transportation income | 379 |
| 6. Insurance of related parties by a controlled foreign corporation | 383 |
| 7. Foreign collapsible corporations | 385 |
| 8. Recharacterization of U.S. income as foreign income | 386 |
| 9. Recharacterization of interest income as dividend income | 391 |
| 10. Excise tax on insurance premiums paid to foreign insurers and reinsurers | 395 |
| 11. Provisions relating to foreign personal holding companies | 399 |
| 12. Foreign investment companies | 405 |
| 13. Foreign Investment Companies (secs. 127 and 130 of the bill and secs. 535 and 1246 of the Code) | 409 |
| a. Definition of foreign investment company | 413 |
| b. Extension of accumulated earnings tax to U.S.-owned foreign corporations | 414 |
| 14. Repeal of 30-percent withholding tax on certain interest paid to foreign persons | 416 |
| K. Taxpayer Compliance Provisions | 425 |
| 1. Promoter lists of syndicate participants, and tax shelter registration | 425 |
| 2. Reporting with respect to cash transactions and mortgage interest | 429 |
| 3. Reporting on discharge of indebtedness | 432 |
| 4. Penalty for promoting abusive tax shelters | 434 |
| 5. Interest rate on tax-shelter syndicate items | 436 |
| 6. Regulation of appraisers practicing before the Internal Revenue Service | 438 |
| 7. Provisions relating to individual retirement accounts | 439 |
| 8. Statements required in case of certain substitute payments | 441 |
| 9. Charitable contribution valuation rules; modifications to incorrect valuation penalties | 443 |
| 10. Disclosure of return information to local agencies | 448 |
| 11. Tax Court small tax case provision | 449 |
| 12. Changes in accounting method | 450 |
| 13. Interest of failure to file, valuation overstatement, and substantial understatement penalties | 451 |

| | Page |
|---|---|
| 14. Penalty for fraudulent withholding information | 453 |
| 15. Federal tax deposits | 454 |
| 16. Damages for instituting or maintaining proceedings before the Tax Court primarily for delay | 455 |
| 17. Backup withholding on independent contractors | 456 |
| 18. Reporting of State tax refunds | 457 |
| 19. Clarification of change of venue for certain tax offenses | 458 |
| 20. Tax shelter study | 459 |
| 21. Revenue effects of compliance provisions | 459 |
| L. Depreciation Provisions | 460 |
| 1. Twenty-year accelerated cost recovery for real property | 460 |
| 2. Recapture and installment sales | 465 |
| 3. Non-accelerated cost recovery for movies | 467 |
| 4. Election for sound recordings | 469 |
| M. Miscellaneous Reform Provisions | 472 |
| 1. Inclusion of tax benefit items in income | 472 |
| 2. Below-market and interest-free loans | 474 |
| 3. LIFO conformity | 486 |
| 4. Modification of income averaging | 488 |
| 5. Treatment of personal property used for both business and personal purposes | 490 |
| 6. Treatment of certain related party transactions | 494 |
| 7. Loss treatment for sales of trade or business property | 498 |
| 8. Disallowance of certain expenses where taxpayer uses property similar to property owned by taxpayer | 500 |
| 9. Individual alternative minimum tax and the foreign earned income exclusion | 502 |
| 10. Use of multicompany structure to reduce tax on coal operations | 504 |
| 11. Public utility dividend reinvestment plans | 505 |
| 12. Estimated income tax payments by individuals | 506 |
| 13. Taxation of the Federal Home Loan Mortgage Corporation | 508 |
| 14. Interest on debt used to purchase or carry tax-exempt obligations | 513 |
| TITLE II—LIFE INSURANCE TAX PROVISIONS | 515 |
| A. Present Law | 515 |
| 1. Pre-1959 taxation of life insurance companies | 515 |
| 2. The 1959 Act | 515 |
| 3. TEFRA changes | 518 |

| | Page |
|---|---|
| B. Reasons for Change | 520 |
| C. Explanation of Provisions | 523 |
| 1. Overview of the bill | 523 |
| 2. Tax treatment of life insurance companies. | 525 |
| a. Definition of a life insurance company | 525 |
| b. Computation of life insurance company taxable income | 527 |
| c. Policyholders surplus accounts | 536 |
| d. Deductions with respect to reserves | 537 |
| e. Policyholder dividends | 547 |
| f. Operations loss deduction | 553 |
| g. Accounting provisions | 555 |
| h. Definition of company's share and policyholder's share | 557 |
| i. Foreign tax credit | 559 |
| j. Foreign life insurance companies' minimum surplus | 562 |
| k. Contiguous country branches of U.S. life insurance companies | 564 |
| l. Rules relating to capital gains and losses | 565 |
| m. Technical and conforming amendments | 566 |
| n. Effective date and transitional rules | 566 |
| 3. Taxation of life insurance products | 571 |
| a. Definition of a life insurance contract | 571 |
| b. Treatment of certain annuity contracts. | 580 |
| c. Certain exchanges of insurance policies. | 581 |
| d. Group-term life insurance purchased for employees | 582 |
| 4. Studies | 584 |
| 5. Revenue estimates relating to life insurance provisions | 585 |
| TITLE III—REVISION OF PRIVATE FOUNDATION PROVISIONS | 586 |
| A. Limitations on Deduction for Contributions to Private Foundations | 586 |
| B. Exemptions for Certain Operating Foundations from Excise Tax on Investment Income and Expenditure Responsibility Rules | 588 |
| C. Abatement of First-Tier Excise Taxes in Certain Cases | 590 |
| D. Reliance on IRS Classifications | 592 |
| E. Definition of Family Member | 594 |
| F. Public Disclosure and Accessibility of Information on Foundations to Grant Applicants | 595 |
| G. Amendments to Excess Business Holdings Rules | 597 |
| H. Exception to Self-Dealing Rules for Certain Stock Transactions | 603 |
| I. Termination of Status as Substantial Contributor | 605 |

| | Page |
|---|---|
| J. Technical Amendments to Section 4942 Rules | 607 |
| K. Review of Treasury Regulations on Expenditure Responsibility | 608 |
| L. Revenue Effect of Private Foundation Provisions | 609 |
| TITLE IV—ENTERPRISE ZONE PROVISIONS | 610 |
| A. Present Law | 610 |
| B. Reasons for Change | 614 |
| C. Explanation of Provisions | 615 |
| 1. Designation of enterprise zones | 615 |
| 2. Tax credit for zone employers | 620 |
| 3. Tax credit for zone employees | 623 |
| 4. Investment tax credit for zone property | 624 |
| 5. Elimination of capital gains taxation | 625 |
| 6. Industrial development bonds | 627 |
| 7. Tax simplification | 627 |
| 8. Regulatory flexibility | 627 |
| 9. Establishment of foreign trade zones in enterprise zones | 628 |
| D. Effective Date | 628 |
| E. Revenue Effect | 628 |
| TITLE V—FOREIGN SALES CORPORATIONS | 630 |
| A. Present Law | 630 |
| B. Reasons for Change | 634 |
| C. Explanation of Provisions | 636 |
| 1. Overview | 636 |
| 2. Foreign sales corporation generally | 636 |
| 3. Exempt foreign trade income | 638 |
| 4. Foreign trade income | 638 |
| 5. Foreign trading gross receipts | 639 |
| 6. Transfer pricing rules | 646 |
| 7. Distributions to shareholders | 651 |
| 8. Dividends received from a FSC | 651 |
| 9. Other definitions and special rules | 652 |
| 10. Small businesses | 657 |
| 11. Taxable year of DISC and FSC | 659 |
| 12. Transition rules for DISCs | 659 |
| 13. Transfers from DISC to FSC | 661 |
| D. Effective Date | 661 |
| E. Revenue Effect | 661 |
| TITLE VI—HIGHWAY REVENUE PROVISIONS | 662 |
| A. Reduction in Heavy Vehicle Use Tax and Increase in Diesel Fuel Tax | 662 |
| 1. Heavy vehicle use tax | 665 |
| 2. Diesel fuel tax for highway vehicles | 665 |
| B. One-year Extension of Refund of Taxes on Fuels Used in Qualified Taxicabs | 667 |

| | Page |
|---|---|
| C. Increase in Excise Tax Exemption for Alcohol Fuels Mixtures and Alcohol Fuels; Alcohol Fuels Credits; and Duty on Imported Alcohol Fuels | 668 |
| 1. Excise tax exemptions for alcohol fuels mixtures and alcohol fuels | 669 |
| 2. Alcohol fuels credit | 669 |
| 3. Duty on imported alcohol fuels | 669 |
| D. Exemption from Sales Tax for Piggyback Trailers | 671 |
| E. Floor Stocks Refunds with Respect to Certain Tax-reduced Tires and for Retread Tires | 673 |
| TITLE VII—TAX-EXEMPT BOND PROVISIONS | 674 |
| A. Mortgage Subsidy Bonds | 674 |
| 1. Qualified mortgage bonds | 680 |
| 2. Mortgage credit certificates | 681 |
| 3. Statement of Congressional intent regarding mortgage bond and credit programs | 687 |
| 4. Limited authority for refunding of certain veterans' mortgage bonds | 687 |
| B. Industrial Development Bonds | 689 |
| 1. Restriction of cost recovery deduction for certain property financed with tax-exempt bonds | 698 |
| 2. Denial of tax exemption for certain obligations with a Federal guarantee | 698 |
| 3. Additional arbitrage rules for IDBs | 699 |
| 4. Other limitations on the use of IDBs | 700 |
| C. Student Loan Bonds | 705 |
| D. Revenue Estimates Relating to Tax-Exempt Bond Provisions | 710 |
| TITLE VIII—MISCELLANEOUS REVENUE PROVISIONS | 711 |
| A. Estate and Gift Tax Provisions | 711 |
| 1. Qualification of certain holding company stock for installment payment of estate tax | 711 |
| 2. Repeal of the generation-skipping transfer tax | 716 |
| 3. Tax treatment of certain disclaimers of interests transferred before November 15, 1958 | 718 |
| 4. Clarification that certain usufruct interests qualify for estate tax marital deduction | 721 |
| 5. Special estate tax credits | 723 |
| a. Estate tax credit for estate of Nell J. Redfield | 723 |

| | Page |
|---|---|
| b. Estate tax credit for estate of Elizabeth Schultz Rabe | 724 |
| c. Revenue effect of estate tax credit provisions | 725 |
| B. Charitable Provisions | 726 |
| 1. Expansion of circumstances in which a deduction may be claimed for qualified conservation contributions | 726 |
| 2. Collection of amounts for U.S. Olympic Committee | 729 |
| 3. Charitable expense deduction for use of passenger automobile | 730 |
| 4. Permanent rules for reforming governing instruments creating charitable remainder trusts and other charitable interests | 731 |
| 5. Charitable deduction limitations rules | 736 |
| C. Excise Tax Provisions | 737 |
| 1. Excise tax on sport fishing equipment and financing of Sport Fish Restoration and Boating Safety Programs; excise tax on certain arrows | 737 |
| a. Revenue provisions | 737 |
| b. Trust Fund provisions | 745 |
| c. Amendments to the Federal Aid to Sport Fish Restoration Act | 752 |
| d. Amendments to the Federal Boat Safety Act | 754 |
| e. Expansion of excise tax on certain arrows | 755 |
| 2. Increase in the distilled spirits excise tax rate | 756 |
| 3. Certain helicopter uses exempt from aviation excise taxes | 758 |
| 4. Technical amendments to the Hazardous Substance Response Revenue Act of 1980 | 760 |
| D. Employee Benefits | 763 |
| 1. Effective date for 1978 Revenue Act rules on taxation of unemployment compensation benefits | 763 |
| 2. Employee stock options | 765 |
| a. Nonqualified stock options | 766 |
| b. Incentive stock options | 767 |
| 3. Tax treatment of employee awards | 769 |
| 4. Moratorium on issuance of fringe benefit regulations | 776 |
| a. Moratorium on fringe benefit regulations | 777 |
| b. Faculty housing | 777 |

| | Page |
|---|---|
| 5. Extension of exclusion for certain educational assistance programs; timing of deduction for deferred educational benefits | 779 |
| 6. Treatment for social security purposes of employer pickup of employee contributions under State and local retirement plans | 783 |
| E. Miscellaneous Treasury Administrative Provisions | 784 |
| 1. Simplification of certain reporting requirements | 784 |
| 2. Removal of $1 million limitation on working capital fund | 786 |
| 3. Increase in limitation on revolving fund for redemption of real property | 787 |
| 4. Removal of $1 million limitation on authority to dispose of obligations | 788 |
| 5. Secretary of Treasury authorized to accept gifts and bequests | 789 |
| 6. Extension of time for court review of jeopardy assessment where prompt service not made on United States | 790 |
| 7. Extension of period to assess unpaid taxes | 792 |
| 8. Financial accounting for the investment tax credit | 793 |
| 9. Report on regulated futures contract litigation | 794 |
| 10. Lien on assets of financial institutions for unpaid drafts | 795 |
| 11. Disclosure of windfall profit tax to State tax agencies | 796 |
| 12. Statute of limitations relating to contributions to the capital of a corporation | 797 |
| F. Provisions Relating to Distilled Spirits | 798 |
| 1. Repeal of occupational tax on manufacturers of stills and condensers | 798 |
| 2. Return of taxes on spirits used for food or medicinal purposes | 800 |
| 3. Disclosure of alcohol fuel producers to administrators of State alcohol law | 802 |
| 4. Elimination of Government-supplied strip stamps for distilled spirits containers | 804 |
| 5. Modification of payment date and requirement of electronic funds transfer for alcohol and tobacco excise taxes | 806 |
| 6. Removal of Distilled Spirits for Use in Production of Certain Nonbeverage Wine Without Payment of Tax (sec. 848 of the bill and sec. 5214 of the Code) | 809 |
| G. Simplification and Extension of Income Tax Credits | 810 |

Page

1. Simplification of income tax credits ............ 810
2. Energy tax credits ............ 812
   a. Residential energy credits ............ 814
   b. Business energy credits ............ 814
3. Extension of targeted jobs credit ............ 817

H. Tax Treatment of Capital Gains and Losses ............ 819

1. Decrease in holding period required for long-term capital gain treatment ............ 819
2. Deduction of capital losses against ordinary income ............ 820
3. Revenue Effect of Capital Gains and Loss Provisions ............ 821

I. Other Provisions ............ 822

1. Modification of rules governing rehabilitation investment credit ............ 822
2. Tax treatment of regulated investment companies ............ 824
3. Tax treatment of cooperative housing corporations ............ 828
4. Extension of exemption from FUTA for wages of certain fishing boat crew members. 831
5. Extension of the special tax rules for the payment-in-kind program ............ 833
   a. Description of the 1984 payment-in-kind program ............ 833
   b. Treatment of participants in payment-in-kind program ............ 836
6. Acquisition indebtedness of certain educational institutions and certain corporations managing property for tax-exempt organizations; tax exemption for such corporations ... 848
   a. Exception from debt-financed property rules ............ 849
   b. Title holding corporations ............ 850
7. Physicians' and Surgeons' Mutual Protection Associations ............ 851
8. Sale-leasebacks of principal residences ............ 854
9. Changes in the earned income credit ............ 859
10. Shore-based fishery processing facilities ............ 861
11. Treatment of certain motor vehicle operating agreements as leases ............ 864
12. Nonimposition of interest and penalties on tax liability with respect to home won as prize and designed for handicapped foster child of the taxpayer ............ 867
13. Effective date for ruling on minister's expenses allocable to tax-free housing allowance ............ 869
14. Church audits ............ 870
15. Employee tips ............ 880

| | Page |
|---|---|
| 16. Extension of moratorium on application of research and experimental expense allocation regulation | 882 |
| 17. Exclusion from gross income for cancellation of certain student loans | 886 |
| 18. Transitional rule for safe-harbor leasing | 888 |
| 19. Treatment of Indian Tribal governments as State governments for tax purposes | 889 |
| 20. Amortization of expenditures to rehabilitate low-income rental housing | 891 |
| 21. Reenactment of denial of deductions for costs of demolishing certified historic structures. | 893 |
| 22. Reinstatement of deduction for elimination of certain barriers to the handicapped and the elderly | 895 |
| 23. Tax treatment of certain nonprofit child care organizations | 897 |
| 24. Incentives for research and experimentation and for vocational education | 899 |
| a. Extension of credit for increased research expenditures; modification of definition of credit-eligible research expenditures; changes in trade or business requirement | 899 |
| b. Increased credit for corporate support of basic research at universities | 913 |
| c. Augmented charitable deduction for donations to universities of scientific equipment for certain purposes | 918 |
| d. Tax treatment of payments and loan forgiveness received by certain graduate science students | 922 |
| e. Tax incentives for vocational education programs | 925 |
| 25. Percentage depletion for secondary and tertiary production after 1983 | 930 |
| 26. Study of alternative tax systems | 931 |
| 27. Migratory bird hunting and conservation stamps | 932 |
| 28. Treasury study on foreign taxation of certain U.S. services | 933 |
| 29. Boundary Waters Canoe Act payments | 936 |
| TITLE IX—SPENDING REDUCTION PROVISIONS | 938 |
| A. Medicare, Medicaid, and Other Health Provisions | 938 |
| 1. Part B premium | 938 |
| 2. One month delay in medicare entitlement | 939 |
| 3. Modification of working aged provision | 940 |
| 4. Limitation on physician fee prevailing and customary charge levels; participating physician incentives | 940 |

32-502 O - 84 - 2

| | Page |
|---|---|
| 5. Limitation on increase in hospital costs per case | 943 |
| 6. Fee schedule for clinical laboratory services | 944 |
| 7. Revaluation of assets | 946 |
| 8. Repeal of preadmission diagnostic testing provision | 946 |
| 9. Skilled nursing facility reimbursement | 947 |
| 10. Rounding of part B payments | 948 |
| 11. Agreements for medicare claims processing | 949 |
| 12. Lesser of cost or charges | 950 |
| 13. Hepatitis B vaccine | 950 |
| 14. Limitation on certain foot care services | 951 |
| 15. Coverage of hemophilia clotting factor | 952 |
| 16. Indexing of part B deductible | 952 |
| 17. Cost sharing for durable medical equipment furnished as home health benefit | 953 |
| 18. Extension of medicaid payment reductions and offsets | 954 |
| 19. Mandatory assignment of rights of payment by medicaid recipients | 954 |
| 20. Increase in medicaid ceiling amount for Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa | 955 |
| 21. Increase authorization for maternal and child health block grant program | 956 |
| 22. Medicaid coverage for pregnant women | 956 |
| 23. Recertification of SNF/ICF patients | 957 |
| 24. Study of physician reimbursement for cognitive services | 958 |
| 25. Elimination of part B deductible for certain diagnostic laboratory tests | 959 |
| 26. Payment for services following termination of participation agreements with home health agencies and hospices | 959 |
| 27. Repeal of special tuberculosis treatment requirements under medicare and medicaid | 960 |
| 28. Medicare recovery against certain third parties | 960 |
| 29. Indirect payment of supplementary medical insurance benefits | 961 |
| 30. Elimination of Health Insurance Benefits Advisory Council | 961 |
| 31. Confidentiality of accreditation surveys | 962 |
| 32. Flexibile sanctions for noncompliance with requirements for end stage renal disease facilities | 962 |
| 33. Use of additional accrediting organizations under medicare | 963 |
| 34. Repeal of exclusion of for-profit organization from research and demonstration grants | 963 |

| | Page |
|---|---|
| 35. Requirements for medical review and independent professional review under medicaid | 964 |
| 36. Flexibility in setting rates for hospitals furnishing long-term care services under medicaid | 964 |
| 37. Authority of the Secretary to issue and enforce subpoenas under medicaid | 964 |
| 38. Repeal of authority for payments to promote closing and conversion of underutilized hospital facilities | 965 |
| 39. Presidential appointment of and pay level for the Administrator of the Health Care Financing Administration | 965 |
| 40. Exclusion of certain entities owned or controlled by individuals convicted of medicare or medicaid related crimes | 966 |
| 41. Judicial review of provider reimbursement review board decisions | 966 |
| 42. Access to home health services | 967 |
| 43. Provider representation in peer review organizations [PRO's] | 967 |
| 44. Prospective Payment Assessment Commission | 968 |
| 45. Medicaid clinic administration | 969 |
| 46. Enrollment and premium penalty with respect to working aged provision | 969 |
| 47. Emergency room services | 970 |
| 48. Nurse anesthetists | 971 |
| 49. Prospective payment wage index | 972 |
| 50. Hospice contracting for core services | 972 |
| 51. Exemption of public psychiatric hospitals from provisions limiting reimbursement to SNF rates | 973 |
| 52. Certification of psychiatric hospitals | 974 |
| 53. Payments to teaching physicians | 975 |
| 54. Pacemaker reimbursement review and reform | 975 |
| 55. Open enrollment period for health maintenance organizations and competitive medical plans | 977 |
| 56. Waivers for social health maintenance organizations | 978 |
| 57. Funding for PSRO review | 978 |
| 58. Other considerations | 979 |
| B. Income Maintenance Provisions | 980 |
| Aid to families with dependent children (AFDC) provisions | 980 |
| 1. Parents and siblings of dependent child included in AFDC family | 980 |
| 2. Households headed by minor parents | 981 |
| 3. Clarification of earned income provisions | 982 |

| | Page |
|---|---|
| 4. CWEP work for Federal agencies permitted | 983 |
| 5. Earned income of full-time students | 983 |
| Supplemental security income (SSI) provisions | 984 |
| Adjustments in SSI benefits on account of retroactive benefits under title II | 984 |
| Child support enforcement (CSE) provisions | 985 |
| Regulatory initiative on medical support | 985 |
| C. Social Security Provisions | 986 |
| 1. Special social security treatment for church employees | 986 |
| 2. Social security coverage for legislative branch employees not covered by the civil service retirement system | 991 |
| 3. Employees of nonprofit organizations who are required to participate in the civil service retirement system | 992 |
| D. Grace Commission Provisions | 993 |
| 1. Income and eligibility verification procedures | 993 |
| 2. Collection and deposit of payments to executive agencies | 994 |
| 3. Collection of nontax debts owed to Federal agencies | 996 |
| E. Cover Over of Certain Federal Excise Tax Revenues | 998 |
| 1. Clarification of definition of articles produced in Puerto Rico or the Virgin Islands | 998 |
| 2. Limitation on transfers of excise tax revenues to Puerto Rico and the Virgin Islands | 1000 |
| **VI. Costs of Carrying Out the Committee Provisions and Vote of the Committee** | 1002 |
| **VII. Regulatory Impact and Other Matters to be Discussed Under Senate Rules** | 1003 |
| **VOLUME II:** | |
| **VIII. Statutory Language of Finance Committee Budget Deficit Reduction Provisions** | 1 |

## TITLE V—FOREIGN SALES CORPORATIONS

### (New secs. 921–927 of the Code)

### A. Present Law

***Tax treatment of DISCs generally***

The tax law provides for a system of tax deferral for corporations known as Domestic International Sales Corporations, or "DISCs," and their shareholders. Under this system, the profits of a DISC are not taxed to the DISC but are taxed to the shareholders of the DISC when distributed or deemed distributed to them. Each year, a DISC is deemed to have distributed a portion (discussed below) of its income, thereby subjecting that income to current taxation in the shareholders' hands.[1] Federal income tax can generally be deferred on the remaining portion of the DISC's taxable income until the income is actually distributed to the DISC shareholders, a shareholder disposes of the DISC stock, the DISC is liquidated, distributed, exchanged, or sold, the corporation ceases to qualify as a DISC, or the DISC election is terminated or revoked.

Prior to the Tax Reform Act of 1976, a DISC was deemed to have distributed income representing 50 percent of its export profits and 100 percent of its non-export profits, thus, the tax deferral available under the DISC provisions was limited to 50 percent of the export income of the DISC. The 1976 Act modified DISC so that the deferral is available only for incremental export income. DISC benefits (deferral of tax on 42.5 percent of profits) are limited to income attributable to export gross receipts in excess of 67 percent of average export gross receipts in a 4-year base period. These provisions are known as the incremental provisions. The base period years are the fourth, fifth, sixth, and seventh preceding years. For example, the base period is 1973 through 1976 for taxable years beginning in 1981. If the taxpayer does not have a DISC in any year which would be included in the base period for the current year, the taxpayer is to calculate base period export gross receipts by attributing a zero amount of export gross receipts to that base period year. A DISC with adjusted taxable income of $100,000 or less is exempt from the incremental rule. This exemption is phased out as adjusted taxable income increases from $100,000 to $150,000.

The incremental provisions include special rules to deal with situations where a corporation has an interest in more than one DISC, or where a DISC and the underlying trade or business giving rise to the DISC income have been separated. The purposes of these rules are, first, to ensure that in every year the base period export

[1] In the typical case, a DISC is a wholly owned subsidiary of a U.S. corporation, so distributions and deemed distributions from DISCs are typically subject to corporate tax and, eventually, to shareholder level tax when distributed to individuals

gross receipts which are attributable to a DISC for purposes of deemed distributions in the current year are appropriately matched with the current period export receipts of the DISC and, second, to prevent taxpayers from creating multiple DISCs, or swapping DISCs, to avoid the effect of the incremental rule

To qualify for the deferral, a DISC must be incorporated under the laws of any of the States or the District of Columbia, have only one class of stock, have outstanding capital stock with a par or stated value of at least $2,500, elect to be treated as a DISC, and satisfy the gross receipts and gross assets tests

The gross receipts test requires that at least 95 percent of the corporation's gross receipts consist of qualified export receipts In general, qualified export receipts are receipts, including commission receipts, derived from the sale or lease for use outside the United States of export property, or from the furnishing of services related or subsidiary to the sale or lease of export property Certain managerial services performed by a DISC for an unrelated DISC are qualified export receipts provided that at least 50 percent of the gross receipts of the DISC performing the services are qualified gross receipts Interest on any obligation which is a qualified export asset is also an export receipt Export property must be manufactured, produced, grown, or extracted in the United States Generally, exports subsidized by the U S Government or exports intended for ultimate use in the United States do not qualify as export property The President has the authority to exclude from export property any property which he determines (by Executive order) to be in short supply Energy resources, such as oil and gas and depletable minerals, are denied DISC benefits under the Tax Reduction Act of 1975 That Act also eliminated DISC benefits for products the export of which is prohibited or curtailed under the Export Administration Act of 1969 by reason of scarcity The Tax Reform Act of 1976 reduced DISC deferral on sales of military goods to half the amount which would otherwise be allowed

The gross assets test requires that at least 95 percent of the corporation's assets qualify as export assets Qualified export assets include inventories, export property, necessary operational equipment and supplies, trade receivables from export sales (including certain commissions receivable), producers' loans, working capital, obligations of domestic corporations organized solely to finance export sales under guaranty agreements with the Export-Import Bank, and obligations issued, guaranteed, or insured by the Export-Import Bank or the Foreign Credit Insurance Association In certain situations, nonqualified assets and receipts may be distributed in order to satisfy these qualification requirements

If a DISC fails to meet the qualifications for any reason, the DISC provisions provide for recapture of the DISC benefits received in previous years Recapture of accumulated DISC earnings (because the DISC has become disqualified) is to be spread out over a period equal to two years for each year that the DISC was in existence (up to a maximum of 10 years)

The DISC provisions include special elective intercompany pricing rules, which may be used in lieu of the general intercompany pricing rules of the Code, in order to determine the profits which a DISC may earn on products which it purchases from a related com-

pany and then resells for export or which it sells on a commission basis In general, a DISC may earn up to 4 percent of gross export receipts from a transaction or 50 percent of combined taxable income of the DISC and its related party, in either case, the DISC also earns 10 percent of export promotion expenses Export promotion expenses include freight expenses to the extent of 50 percent of the cost of shipping export property aboard airplanes owned and operated by U S persons or ships documented under the laws of the United States in those cases where the law does not require use of such airplanes or ships (Alternatively, the DISC and its related party may choose a price determined under the usual arm's-length rules ) Neither the 4-percent method nor the 50-50 method can be applied to cause a loss to the related supplier while the DISC is earning a net profit

Under marginal costing rules, if the 50-50 method is used by the DISC, only the marginal or variable production and sales costs for the export property need be included in the computation of combined taxable income In general, the benefits of marginal cost pricing are limited to instances where the variable cost margin on the DISC's export sales of a product is less than the full cost margin on the combined product sales by the DISC and the related supplier

A DISC's taxable year need not conform to the taxable year of any of its shareholders A wholly owned DISC will frequently have a taxable year ending one month after its parent's taxable year ends This difference in taxable years allows an additional 11 months of deferral of income that is deemed distributed to the parent

***Source of income from export sales***

The United States taxes U S taxpayers on their U S and foreign source income, but allows a foreign tax credit for foreign taxes on foreign source income The foreign tax credit limitation reflects the principle that the credit cannot exceed U S tax on foreign source income In general, in calculating the limitation, most foreign source income is grouped together in a general category known as the "all other" category, a separate limitation or "basket" applies to certain income from deemed DISC distributions (and, separately, to certain interest) In most cases, an export sale will not attract foreign tax so long as the U S seller does not maintain a fixed place of business or perform substantial activities in the country of destination The reason for the separate limitation is that Congress, in enacting the original DISC legislation, did not intend to enable taxpayers to reduce U S tax on low or untaxed distributions from DISCs by crediting foreign taxes on non-DISC income against the U S tax on distributions from DISCs

Income of a U S person that exports property produced in the United States directly (without using a DISC) is treated as income partly from within and partly from without the United States (sec 863(b)) This income is not subject to the separate foreign tax credit limitation applicable to DISC income To the extent that the income is from sources without the United States, it increases the taxpayer's foreign tax credit limitation in the general "all other" category, and thus the foreign taxes that the taxpayer may credit

An approximation of the portion of income from a typical direct export sale that is foreign source income is 50 percent (see Treas Reg sec 1 863-3(a)(2) (Example (2)) Therefore, a taxpayer with substantial excess foreign tax credits who can make an export sale directly (rather than through a DISC) without incurring foreign tax on the transaction may be subject to tax on only half the income from the export sale

For example, a U S exporter who can make an export sale at a profit of $100 may be able to treat $50 of that income as foreign source The taxpayer may be able to arrange the sale so that the $50 of foreign source income attracts no foreign tax Given sufficent excess foreign tax credits, the sale will attract no U S tax, either In that case, the taxpayer will be taxable on only the $50 of income that is U S source income

By contrast, that exporter with excess foreign tax credits may be taxable on $58 of income if it routes the export sale through a DISC The following table assumes a 17-percent deferral rate for combined taxable income (CTI) of DISC and parent

CURRENT LAW—DISC—50/50 SPLIT OF CTI—SEC 863(b)

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *DISC* | |
|---|---|---|---|
| U S source (taxable) | $25 | Deferred | $17 |
| Foreign source (exempt) | 25 | Deemed distribution | 33 |
| | $50 | | $50 |

| | |
|---|---|
| Taxable | |
| U S source income of parent | $25 |
| Deemed distribution—separate basket | 33 |
| | $58 |
| Exempt | |
| Foreign source income of parent | $25 |
| Deferred in DISC | 17 |
| | $42 |

Therefore, some exporters with excess foreign tax credits may choose not to route their export transactions through DISCs

## B. Reasons for Change

Since its enactment, the DISC has been the subject of an ongoing dispute between the United States and certain other signatories of the General Agreement on Tariffs and Trade (GATT), who contend that DISC amounts to an illegal export subsidy that violates the GATT. In 1976, a GATT panel determined that the DISC, as well as certain export tax practices of Belgium, France, and the Netherlands, had some characteristics of an illegal export subsidy. In the case of DISC, the Panel Report pointed to the failure to charge interest on deferred taxes as the offending export subsidy. While the United States has not conceded that DISC violates the GATT, in December 1981 the United States agreed to the adoption of the GATT Panel Reports on the DISC and the related tax practices of Belgium, France, and the Netherlands subject to a GATT Council decision which was understood to qualify the findings in the panel reports ("the 1981 Decision").

The 1981 Decision provided that GATT signatories are not required to tax export income attributable to economic processes located outside their territorial limits. Furthermore, the 1981 Decision also stated that arm's-length pricing principles should be observed in transactions between exporting enterprises and foreign buyers under common control. Finally, the 1981 Decision stated that the GATT does not prohibit the adoption of measures to avoid the double taxation of foreign source income.

A debate in the GATT Council, the ruling body of the GATT, ensued in early 1982 on the interpretation of the 1981 Decision as it applied to the DISC. This debate delayed progress on other issues of critical interest to the United States.

The European Community (EC) argued that the DISC was an illegal export subsidy because it allowed indefinite deferral of direct taxes on income from exports earned in the United States. The United States defended the DISC on the grounds that its effect on trade as an incentive for exports approximated the effect of the territorial system of taxation used by our European trading partners and found to be consistent with the GATT in the 1981 resolution. The majority of the GATT Council members urged the United States to bring the DISC clearly into conformity with the GATT. The EC went one step further to request authorization from the GATT Council to take retaliatory action against the United States. The EC alleged that the DISC had provided more than $2 billion in subsidies for U.S. exports to member countries of the EC over the previous 10 years. Also, other countries expressed an interest in receiving compensation for the DISC.

The DISC debate in the GATT Council highlighted the potential danger of a breakdown in the GATT dispute-settlement process, and the isolation of the United States over the DISC issue. To remove the DISC as a contentious issue and to avoid further dis-

putes over retaliation, the United States made a commitment to the GATT Council on October 1, 1982, to propose legislation that would address the concerns of other GATT members In March 1983, the Administration approved the general outlines of a proposal to replace the DISC with a territorial-type system of taxation for U S exports designed to comply with GATT

The committee does not find the GATT arguments against DISC persuasive and believes the EC has made no credible showing of any injury resulting from DISC exports Nonetheless, in the interest of resolving the GATT dispute over DISC and assisting the Administration in fulfilling its commitment to the GATT Council, the committee has favorably reported legislation that is consistent with the general outlines of the Administration's proposal Under GATT rules, a country need not tax income from economic processes occurring outside its territory Accordingly, the committee believes that certain income attributable to economic activities occurring outside the United States should be exempt from U S tax in order to afford U S exporters treatment comparable to what exporters customarily obtain in territorial systems of taxation The committee intends that the activities related to that income will be undertaken by a foreign sales corporation outside the U S customs territory A foreign tax credit will not be available with respect to such income, international double taxation is avoided by use of the exemption method The committee intends that the bill will result in approximately the same revenue cost to the U S Treasury as the DISC

The committee recognizes that this legislation will affect current DISCs in different ways, and that some DISCs may have difficulty meeting the foreign presence requirements of foreign sales corporations Small business exemptions have been included to mitigate the effects of the new legislation on such entities Nonetheless, the committee considers the foreign presence requirements of the legislation to be essential in responding to the GATT rules which form the background of this legislation

Although it is aware that the EC has again raised questions about the GATT-compatibility of certain aspects of this proposal, the committee has reported this legislation based on its own assessment, and that of the Administration, that the legislation satisfies GATT rules In light of the considerable effort required to replace the DISC and the new burdens placed on the U S exporters, the committee expects the Administration to vigorously defend this legislation against any GATT challenge and to inform the committee immediately of all GATT developments relating to this legislation

## C. Explanation of Provisions

### 1. Overview

The bill provides that a portion of the export income of an eligible foreign sales corporation (FSC) will be exempt from Federal income tax. It will also allow a domestic corporation a 100 percent dividends-received deduction for dividends distributed from the FSC out of earnings attributable to certain foreign trade income. Thus, there will be no corporate level tax imposed on a portion of the income from exports.

Under the GATT rules, an exemption from tax of export income is permitted only if the economic processes which give rise to the income take place outside the United States. In light of these rules, the bill provides that a FSC must have a foreign presence, it must have economic substance, and that activities that relate to the export income must be performed by the FSC outside the U.S. customs territory. Furthermore, the income of the foreign sales corporation must be determined according to transfer prices specified in the bill: either actual prices for sales between unrelated, independent parties or, if the sales are between related parties, formula prices which are intended to comply with GATT's requirement of arm's-length prices.

The bill provides that the accumulated tax-deferred income of existing DISCs will be deemed previously taxed income and, therefore, exempt from taxation.

The committee recognizes that small exporters may find it difficult to comply with certain of the foreign presence and economic activity requirements. The bill provides, therefore, two options to alleviate the burden of the foreign presence and economic activity requirements to eligible small businesses: the interest-charge DISC and the small FSC.

In general, where the provisions of the bill are identical or substantially similar to the DISC provisions under present law, the committee intends that rules comparable to the rules in regulations issued under those provisions will be applied to the FSC.

### 2. Foreign sales corporation generally

#### *General rule*

To qualify as a FSC, a foreign corporation must have adequate foreign presence. In order to determine whether a corporation has adequate foreign presence, the bill provides that the corporation must satisfy each of the following six requirements.

(1) A FSC must be a corporation created or organized under the laws of any foreign country (which meets certain requirements) or possession of the United States. In other words, the corporation must be formed under the laws of a jurisdiction outside U.S. customs territory. For purposes of this provision, a possession of the

United States includes Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Virgin Islands of the United States, but does not include Puerto Rico If a FSC is organized in a foreign country, that country must be either (a) a party to an exchange of information agreement that meets the standards of the Caribbean Basin legislation (sec 274(h)(6)(A)(i)), or (b) an income tax treaty partner of the United States if the Secretary of the Treasury certifies that the exchange of information program with that country under the treaty is satisfactory

The committee is aware that exchange of information with certain countries, such as Switzerland, is limited because of restrictions of their domestic law The committee is also aware that exchange of information programs may be ineffective if corporate stock may be issued in bearer share form The committee expects that the Secretary of the Treasury will take such factors into account in determining whether to qualify a country under this provision

A foreign entity classified as a corporation under section 7701(a)(3) (relating to the definition of "corporation") will be considered a corporation for purposes of this requirement

(2) A FSC may have no more than 25 shareholders at any time during the taxable year A member of the corporation's board of directors that holds qualifying shares required to be owned by a resident of the country under whose laws the FSC is organized will not be counted as a shareholder for this purpose

(3) A FSC may not have any preferred stock outstanding during the taxable year The committee intends that a FSC will be allowed to create more than one class of common stock for bona fide business purposes However, one or more of the rights of a class of stock may be disregarded if the right has the effect of avoidance of Federal income tax For instance, dividend rights may not be used to direct dividends from exempt foreign trade income to shareholders that have taxable income and to direct other dividends to shareholders that have net operating loss carryovers

(4) A FSC must maintain an office located outside the United States, and maintain a set of the permanent books of account at such office The committee intends that the office must constitute a "permanent establishment" under income tax treaty concepts to satisfy this requirement More than one FSC may share an office, however The office need not be located in the country in which the FSC is organized The permanent books of account must include at least the quarterly income statements and a year-end balance sheet of the FSC "United States" means the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico

In addition, a FSC must maintain at a location in the United States such books and records as are sufficient under Code section 6001 to establish the amount of gross income, deductions, credits or other matters required to be shown in the FSC's tax return

(5) At all times during the taxable year, the FSC must have a board of directors which includes at least one individual who is not a resident of the United States However, the nonresident member of the FSC's board of directors may be a citizen of the United States

(6) A FSC may not be a member at any time during the taxable year of any controlled group of corporations of which a DISC is a member. (After December 31, 1984, the only DISCs will be "interest charge DISCs.")

*Small FSC*

A FSC may elect to be a small FSC with respect to a taxable year (and succeeding years) provided that it is not a member at any time during the taxable year of a controlled group of corporations which includes a FSC (unless the other FSC has also made a small FSC election).

**3. Exempt foreign trade income**

Under the bill, a portion of the foreign trade income of a FSC may be exempt from Federal income tax. To achieve this result, the exempt foreign trade income is treated as foreign source income which is not effectively connected with the conduct of a trade or business within the United States. The portion of foreign trade income that is treated as exempt foreign trade income depends on the pricing rule used to determine the amount of foreign trade income earned by the FSC. If the amount of income earned by the FSC is based on arm's-length pricing between unrelated parties, or between related parties under the rules of section 482, then exempt foreign trade income is 34 percent of the foreign trade income derived from a transaction. For this purpose, foreign trade income will not include any income attributable to patents and other intangibles which do not constitute export property. If the income earned by the FSC is determined under the special administrative pricing rules, then the exempt foreign trade income is 17/23 of the foreign trade income derived from the transaction.

Exempt foreign trade income is an exclusion from gross income of the FSC. Any deductions of the FSC properly apportioned and allocated to the foreign trade income derived by the FSC from a transaction will be allocated on a proportionate basis between exempt and nonexempt foreign trade income. Thus, deductions allocable to exempt foreign trade income may not be used to reduce the taxable income of the FSC.

**4. Foreign trade income**

Foreign trade income is defined as the gross income of a FSC attributable to foreign trading gross receipts. Foreign trade income includes both the profits earned by the FSC itself from exports and commissions earned by the FSC from products or services exported by others.

Foreign trade income, other than exempt foreign trade income, (nonexempt foreign trade income), generally will be treated as income effectively connected with the conduct of a trade or business conducted through a permanent establishment within the United States. Furthermore, nonexempt foreign trade income, generally will be treated as derived from sources within the United States rather than as foreign source income. Thus, nonexempt foreign trade income generally will be taxed currently and treated as U.S. source income for purposes of the foreign tax credit limitation. If, however, nonexempt foreign trade income is earned in a transac-

tion with an unrelated party or using a pricing method described in section 482 (sec 923(a)(2) nonexempt income), the source and taxation of such income (including the creditability of a foreign tax with respect to such income) will be determined in the same manner as under present law Nonexempt foreign trade income will be either 6/23 or 66 percent of foreign trade income, depending on the pricing method used in arriving at foreign trade income

A FSC will generally not be allowed a foreign tax credit or a deduction for foreign income, war profits, or excess profits taxes paid or accrued with respect to exempt or nonexempt foreign trade income (other than sec 923(a)(2) nonexempt income) Thus, it is intended that a shareholder of a FSC generally will not be eligible for a foreign tax credit with respect to a foreign withholding tax imposed on a dividend attributable to foreign trade income

Two new categories of income will each be subject to separate foreign tax credit limitations (like DISC distributions under current law) (1) taxable income attributable to foreign trade income (at the FSC level), and (2) distributions from a FSC or former FSC out of earnings and profits attributable to foreign trade income (at the level of the shareholder) By virtue of these separate limitations, no increase in the FSC's foreign source income in the general "all other" category of a FSC or its shareholder would result from foreign trade income (See also "Other definitions and special rules," below )

### 5. Foreign trading gross receipts

#### *In general*

In general, foreign trading gross receipts will mean the gross receipts of a FSC which are attributable to the export of certain goods and services (similar to the qualified gross receipts of a DISC under present law) Except for certain receipts not included in foreign trading gross receipts, foreign trading gross receipts mean the gross receipts of any FSC that are attributable to

(1) *The sale of export property* —This generally means receipts from the sale, exchange, or other disposition by a FSC, or by any principal for whom the FSC acts as a commission agent, of export property, such as inventory produced in the United States which is sold "for direct use, consumption, or disposition outside the United States " (See Treas Reg sec 1 993-1(b) )

(2) *The lease or rental of export property* —Leases or rentals of export property by a FSC, or by any principal for whom the FSC acts as a commission agent, to unrelated persons using such property outside the United States will produce foreign trading gross receipts (See Treas Reg sec 1 993-1(c) )

(3) *Services related and subsidiary to the sale or lease of export property* —Gross receipts from the performance of services which are related and subsidiary to the sale or lease of export property, for which the FSC, or a principal for whom the FSC acts as commission agent, receives foreign trading gross receipts also qualify as foreign trading gross receipts (See Treas Reg sec 1 993-1(d) )

(4) *Engineering and architectural services* —Receipts from engineering or architectural services on foreign construction projects which are either located abroad or proposed for location abroad

qualify as foreign trading gross receipts. (See Treas. Reg. sec. 1.993-1(h).)

(5) *Export management services.*—Receipts for certain export management services provided for unrelated FSCs (or DISCs) to aid them in deriving export receipts will qualify as foreign trading gross receipts, whether or not the FSC performing the services is itself engaged in exporting. The Committee intends that managerial services will include activities relating to the operation of an unrelated FSC (or DISC) which derives foreign trading gross receipts from the sale or lease of export property. Management services will include, for example, activities such as preparing export market studies and contacting potential foreign purchasers. (See Treas. Reg. sec. 1.993-1(i) without regard to the 50-percent export receipts limitation.)

For the FSC to have foreign trading gross receipts, two additional requirements must be met—the foreign management and foreign economic process requirements. (These requirements do not apply to small FSCs, described below.) A FSC will be treated as having foreign trading gross receipts only if the management of the corporation during the taxable year takes place outside the United States, and only if certain economic processes with respect to particular transactions take place outside the United States. (The management test applies to functions of the FSC for the taxable year. In contrast, the economic process test generally applies to every transaction on a transaction-by-transaction basis. Certain groupings of transactions will be allowed, however, as described below.)

### *Foreign management*

The requirement that the FSC be managed outside the United States will be treated as satisfied for a particular taxable year if (1) all meetings of the board of directors of the corporation and all meetings of the shareholders of the corporation are outside the United States, (2) the principal bank account of the corporation is maintained outside the United States at all times during the taxable year, and (3) all dividends, legal and accounting fees, and salaries of officers and members of the board of directors of the corporation paid during the taxable year are disbursed out of bank accounts of the corporation outside the United States.

### *Foreign economic processes*

The foreign economic process requirements relate to the place where all or a portion of certain economic process activities are performed; the first requirement relates to the sales portion of the transaction, and the second requirement relates to the direct costs incurred by the FSC.[2] In all cases where a FSC or its agent must perform certain activities, the FSC may contract with its U.S. parent or with any other party, related or unrelated, to act as its agent.

[2] The administrative transfer pricing rules may be used to determine the transfer price of property purchased by a FSC from a related supplier (or to determine the FSC's commission by reference to such pricing rules) only if the FSC or its agent performs *all* of the economic process activities that are conducted in connection with the transaction

***Sales portion of the transaction***

A FSC will not be considered to earn foreign trading gross receipts from a transaction unless the FSC, or a person under contract with the FSC, participates outside the United States in the solicitation (other than advertising), negotiation, or making of the contract relating to the transaction This requirement will be satisfied if the FSC, or its agent, performs any one of the three activities with respect to a transaction outside the United States

The sales requirement will be tested on a transaction-by-transaction basis However, this requirement will be considered to have been met with respect to sales to a single customer during any taxable year if (1) the export property consists of either fungible products, or products which are substantially similar (i e , enumerated in a product category of the *Standard Industrial Classification Manual* and for manufactured products, a seven-digit level in the Bureau of the Census, *Numerical List of Manufactured Products*), (2) the products are sold by the FSC (or its agent) under a single contract, (3) the contract has a term of one year or less which specifies the material terms of each such sale, and (4) if the FSC or its agent performs any one of the three activities once with respect to all such sales

For purposes of this provision, "solicitation" refers to the communication (either by telephone, telegraph, mail, or in person) by the FSC, or its agent, to a specific, targeted, potential customer regarding a transaction "Negotiation" includes any communication by the FSC, or its agent, to a customer or potential customer of the terms of sale, such as the price, credit, delivery, or other specification The term "making of a contract" includes the performance by the FSC, or its agent, of any of the elements necessary to complete a sale such as making an offer or accepting the offer In addition, the written confirmation by the FSC, or its agent, to the customer of an oral agreement which confirms variable contract terms or specifies (directly or by cross-reference) additional contract terms will be considered the "making of a contract" The FSC may act upon standing instructions from its principal The location of a solicitation, negotiation, or making of the contract is determined by the place where the activity is initiated by the FSC, or its agent

***Direct cost tests***

A FSC may not earn foreign trading gross receipts from a transaction unless the foreign direct costs incurred by the FSC attributable to the transaction equal or exceed 50 percent of the total direct costs incurred by the FSC with respect to the transaction (or the FSC meets an alternative 85-percent test, described below)

The term "total direct costs" means, with respect to any transaction, the total direct costs incurred by the FSC attributable to the activities relating to the disposition of export property (five categories of activities are considered) The activities are those performed at any location within or without the United States by the FSC or any person acting under contract with the FSC The term "foreign direct costs" means the portion of the total direct costs incurred by the FSC which are attributable to activities performed outside the United States Although the activities must be performed outside

the United States, either the FSC or any person acting under contract with the FSC may perform the activities

The requirement that the foreign direct costs incurred by the FSC equal or exceed 50 percent of the total direct costs incurred by the FSC attributable to a transaction may be met by an alternative 85-percent test Under this alternative test, a corporation would be treated as satisfying the requirement that economic processes take place outside the United States if the foreign direct costs incurred by the FSC attributable to any two of the five activities relating to disposition of the export property equal or exceed 85 percent of the total direct costs of at least two of those five activities

Only the direct costs paid or accrued by the FSC or its agent will be taken into consideration in meeting the direct cost test It is not necessary to incur expenses in all categories to use either the 50-percent or the 85-percent tests If no costs are incurred with respect to the activities in a category, that category will not be taken into account in meeting the requirement The direct cost tests will be applied on a transaction-by-transaction basis or by alternative groupings based on product lines or recognized industry or trade usage A different direct cost test may be used for different transactions or groupings, that is, the 50-percent test can be used in one transaction, while the 85-percent test can be used in another Furthermore, the committee intends that, generally, a FSC will be allowed to group transactions differently for the various purposes for which grouping is permitted

The committee recognizes that certain foreign military sales must be made through the United States Government typically to foreign governments Accordingly, because of negotiation and other activities with the United States Government, many of the expenses incurred by the FSC in connection with such sales are incurred within the United States The committee intends, therefore, that for purposes of the foreign presence and economic process tests such expenses (and the expenses of the United States Government in connection with the sale) will not be taken into account

***Categories of activities***

The five categories of activities are as follows

(1) *Advertising and sales promotion* —This category includes two distinct activities, "advertising" and "sales promotion " "Advertising" is an appeal, related to a specific product or product line made through any medium and directed at all or a part of the general population of potential export customers Advertising not related to a specific product or product line, such as the cost of corporate image building, is not included in the definition of advertising Advertising primarily directed at customers in the United States will not be considered advertising for purposes of this section

"Sales promotion" is an appeal made in person to a potential export customer for the sale of a specific product or product line made in the context of trade shows or annual customer meetings The cost of trade shows and annual customer meetings shall be included in the total direct cost of sales promotion However, the cost of trade shows and customer meetings will not include the cost of salaries and commissions of direct sales people, but will include payments to organizers or other persons hired for the event

For determining foreign direct costs, the location of the advertising activity will be determined by the place where it is aired, displayed, published, or otherwise presented to the potential customer With respect to broadcast media, such as radio or television, the location will be determined by the place to which the signal is transmitted In the case of print media, the location will be determined by where the publication is distributed, not where it is printed The location of trade promotion activity will be determined by where the customer meeting or trade show is held

(2) *Processing customer orders and arranging for delivery* —This category includes two separate activities "processing customer orders" and "arranging for delivery" "Processing customer orders" means notifying the related supplier of the order and of the requirements for delivery of the export property

"Arranging for delivery" means taking necessary steps to ship the export property to the customer in accordance with the requirements of the order, but does not include packaging, crating, and similar pre-transportation costs The direct costs of "arranging for delivery" will not include shipping expenses They will include the cost of salaries for clerks, telephone, telegraph, and documentation Delivery can occur within or outside the United States For example, a FSC will be considered to have arranged for delivery if the FSC or its agent contacted a trucking company and shipping line to provide transportation for a particular shipment from an interior point in the United States to Rotterdam where the buyer assumes title

For example, in the case of certain property, where the normal industry practice is to make delivery at or near the place of manufacture of such property within the United States, a FSC will be considered to have arranged for delivery if the FSC or its agent notifies the buyer of the time and place of delivery

(3) *Transportation* —Transportation is the activity undertaken by the FSC or its agent for shipping the export property during the period it owns such property If the FSC is acting as a commission agent, this transportation is the activity that is undertaken to ship the export property after the commission relationship begins, even if the relationship begins after the property leaves the U S customs territory

Total direct costs of "transportation" will include expenses incurred by the FSC or its agent for transporting the export property The FSC or its agent will not be considered to undertake transportation activity if the customer pays the cost of transportation directly

The amount of total direct costs treated as foreign direct costs will be determined on the basis of the ratio of mileage outside the U S customers territory to total transportation mileage For example, if 50 percent of the mileage associated with a particular shipment is outside the U S customs territory, 50 percent of the transportation expenses will be considered foreign direct costs The cost of "arranging for delivery," defined above, is not included in the definition of total direct costs of transportation With respect to fungible commodities, total direct costs will include only those transportation costs which are incurred after goods have been identified to a contract

(4) *Determination and transmittal of a final invoice or statement of account and the receipt of payment.*—This category includes two separate activities: the "determination and transmittal" of the final invoice, and the "receipt of payment." "Determination and transmittal" means the assembly of the final invoice or statement of account and the forwarding of the document to the customer. The "final invoice" is the invoice upon which payment is made by the customer. An invoice transmitted after payment is made, as a receipt for payment, would satisfy this definition. The "statement of account" is any summary statement transmitted to a customer giving the status of transactions occurring within an accounting period that does not exceed one taxable year. A single final invoice or statement of account can cover more than one transaction with one customer.

The costs of office supplies, office equipment, clerical salaries, mail, etc., directly attributable to the assembly and transmittal of a final invoice or statement constitute direct costs for this activity. For example, the cost of assembling the final invoice at the FSC's foreign office and mailing it from that office to the customer would meet this definition. This activity does not include the engineering or cost accounting functions involved in the establishment of a price.

"Receipt of payment" means the crediting of the FSC's bank account by the amount of proceeds associated with the transaction. Initial payment may be received in the United States as long as the proceeds are transferred immediately to a bank account of the FSC outside the United States. The total direct costs for this activity include all the expenses incurred by the FSC for maintaining a bank account in which the payment is deposited.

(5) *Assumption of credit risk.*—This category of activity consists of bearing the economic risk of nonpayment with respect to a sale, lease, or contract for the performance of services. A FSC will be considered to bear such risk if it contractually bears such risk and if either a debt becomes uncollectible within the accounting period or an addition is made to the bad debt reserve of the FSC that is allowed as a deduction under present law (sec. 166). If a debt becomes uncollectible within the accounting period or an addition is made to the bad debt reserve of the FSC, the FSC must subtract from its foreign trade income the appropriate percentage of the FSC's (and related supplier's) bad debt expense. The appropriate percent is 34 percent for transactions in which no administrative pricing rule is used. If the FSC uses the combined taxable income pricing method for a transaction, the appropriate percentage is 23 percent. If the FSC uses the gross receipts pricing method for a transaction, the reduction must be an amount determined by multiplying the bad debt expense of the FSC and its related supplier by the ratio of the FSC's taxable income from the transaction (before exclusion of exempt foreign trade income and associated deductions) to the combined taxable income from the transaction. The combined bad debt expense upon which this adjustment is based must be related to foreign trading gross receipts.

In some circumstances, a taxpayer may not have any receivables that become uncollectible within the taxable year; even though the taxpayer is contractually assuming the risk of loss, there is no

actual loss or bad debt expense In such cases, the FSC will be considered to bear the risk of loss, only if it incurs an actual loss (or is allowed to deduct an addition to a bad debt reserve under present law) in at least one year within a three-year period For example, if an FSC contractually assumes the risk of loss but incurs no bad debt expenses in the first two years of operations as a FSC, it cannot satisfy the assumption of credit risk activity in the third year unless it actually incurs a loss in that year However, even if the FSC does not incur a loss in the third year, it would still be treated as having satisfied the assumption of credit test in the first two years If the FSC then incurs a loss in the fourth year, it could use the credit test in the fourth, fifth and sixth years When the FSC actually incurs a bad debt expense will be determined under present-law rules

***Burden of proof***

The burden of proof with respect to the foreign management and economic process requirements will be shifted to the Secretary of the Treasury if a written statement addressing the issue has been filed by an officer of the corporation The statement to be filed with the Secretary must be made by an officer of the FSC who is a citizen and resident of the United States, and must be made under penalty of perjury Furthermore, the statement must declare that the corporation meets the economic process requirements and the foreign management requirements, and must specify how the requirements have been met for the particular transactions

***Excluded receipts***

Certain receipts are not included in the definition of foreign trading gross receipts The first category of excluded receipts are receipts excluded on the basis of use, subsidized receipts, and certain receipts from related parties Examples of such receipts include the receipts of a FSC from a transaction (1) if the export property or services are for ultimate use in the United States, or are for use by the United States and the use by the United States is required by law or regulation, (2) if the transaction is accomplished by a subsidy granted by the United States, or (3) if the receipts are from another FSC which is a member of the same controlled group Gross receipts from sales between related FSCs will be excluded from the definition of foreign trading gross receipts, however, sales between unrelated FSCs may qualify The committee intends excluded receipts to be the same as excluded receipts under the present-law DISC rules, with the following two exceptions

To provide rules that are comparable with the DISC rules for a deemed distribution of one-half of the DISC income attributable to military property, one-half of the receipts from military property is excluded from the definition of foreign trading gross receipts "Military property" means any property which is an arm, ammunition or implement of war designated in the munitions list published pursuant to section 38 of the International Security Assistance and Arms Export Control Act of 1976

Investment income and carrying charges are excluded from the definition of foreign trading gross receipts Investment income includes dividends, interest, royalties, rents other than from the lease

of export property for use outside the United States, gains from the sale or exchange of stocks or securities, and certain other passive income (see "Other definitions and special rules," below) Carrying charges include any amount in excess of the price for an immediate cash sale and any other unstated interest

Income attributable to excluded receipts would not be foreign trade income and, therefore, no portion of such income would be exempt Furthermore, a corporate shareholder would not get a dividends-received deduction for distributions attributable to such income For example, investment income and carrying charges will be included in the taxable income of the FSC and, therefore, subject to full U S tax Distributions to a corporate shareholder from earnings and profits attributable to the investment income and carrying charges will be fully taxed again (to the corporate shareholder) because there would be no dividends-received deduction In other words, the investment income and carrying charges will be subject to tax at the FSC level, the corporate shareholder level and, like all other dividends from the corporate shareholder to its individual shareholders, also at the individual level At the FSC level, investment income will be eligible for foreign tax credits

**6. Transfer pricing rules**

The committee intends that the pricing principles that govern the determination of the taxable income of a FSC comply with the GATT rules If export property is sold to a FSC by a related person (or a commission is paid by a related principal to a FSC with respect to export property), the taxable income of the FSC and related person is based upon a transfer price determined under an arm's-length pricing approach or under one of two formulae which are intended to approximate arm's-length pricing

***Conditions on use of administrative transfer pricing rules***

In order to use the special administrative pricing rules, a FSC must perform significant economic functions with respect to the transaction Accordingly, a FSC must meet two requirements The first requirement is that all of the five activities ("economic process activities") with respect to which the direct costs are taken into account for the 50 percent foreign direct costs test must be performed by the FSC or by another person acting under contract with the FSC These five activities are advertising and sales promotion, processing of customers orders and arranging for delivery of the property, transportation, billing and receipt of payment, and the assumption of credit risk The second requirement for use of the administrative pricing rules is that all of the activities relating to the solicitation (other than advertising), negotiation, and making of the contract for the sale must be performed by the FSC (or by another person acting under contract with the FSC) These two requirements can be met wherever the activities are performed—the activities do not have to be performed outside the United States It is only necessary that the activities be performed by the FSC or by another person acting under contract with the FSC

*Example*

The interaction of this condition for the use of the administrative pricing rule and the foreign economic process requirements may be illustrated as follows P, a domestic corporation, owns all of the stock of S, a corporation organized under the laws of a foreign country that qualifies as a FSC for the taxable year P manufactures product A, which it sells to S for resale to export customers During S's taxable year, S sells 10 units of A to P, a foreign customer The terms of sale are FOB P's plant in Seattle P, acting as agent for S, performed all of the solicitation and negotiation activities with respect to the transaction with F S accepted F's offer of purchase at its office in the foreign country S incurred expenses of $90 for the cost of advertising, $85 of which was attributable to print advertising in the Asian editions of trade magazines S also incurred $10 of direct costs for trade shows in the United States promoting sales of A to domestic and foreign customers, and $25 of direct costs (incurred outside the United States) in processing P's order No costs are associated with arranging for the delivery of the transportation of the product because of the terms of sale S incurred all of the credit costs associated with the transaction S compensated P on an arm's-length basis for its services

S will be allowed to use one of the two administrative pricing rules to determine its transfer price from P for the units of A sold in the transaction, because S or an agent of S performed all of the economic process activities with respect to the transaction S will also satisfy the foreign economic process requirements with respect to the transaction because (i) S participated in making the contract outside of the United States, and (ii) 85 percent of S's direct costs for two of the five categories of activities subject to the direct cost tests (advertising and sales promotion and processing of customer orders and arranging for delivery) were attributable to activities occurring outside the United States (S's direct costs include payments to P for services rendered )

To summarize, to be treated as having foreign gross receipts and hence foreign trade income, the foreign costs of certain activities relating to the disposition of export property must be substantial (either 50 percent of the cost of all five activities or 85 percent of the cost of two of the activities) To use the administrative pricing rules, all five of the activities must be performed by the FSC or by another person acting under contract with the FSC Furthermore, other activities (solicitation, negotiation, and making of the contract of sale) must be performed by the FSC or by another person acting under contract with the FSC

***Determination of transfer price***

For purposes of applying the administrative pricing rules, combined taxable income is determined without regard to the exclusion of exempt foreign trade income Taxable income may be based upon a transfer price that allows the FSC to derive taxable income attributable to the sale in an amount which does not exceed the greatest of (1) 1 83 percent of the foreign trading gross receipts derived from the sale of the property, (2) 23 percent of the combined taxable income of the FSC and the related person (these two pric-

ing rules are termed the administrative pricing rules); or (3) taxable income based upon the actual sales price, but subject to the rules provided in section 482.

*Example:*

An example of the calculations to determine a transfer price using the section 482 method and the alternative administrative pricing method is as follows: A FSC purchases export property from a related supplier and sells the property for $1,000 of foreign trading gross receipts. The FSC incurs expenses attributable to the sale of $225. The related supplier's cost of goods sold attributable to the export property is $550. The related supplier's expense incurred in connection with the sale of the export property is $125. For purposes of this example, it is assumed that the related supplier has no other deductible expenses. It also is assumed that if the related supplier sold the export property to the FSC for $720, the price could be justified as satisfying the standards of section 482, which would allow the FSC to earn $55 on the sale. Under the facts assumed, the FSC may earn, under the more favorable of the two administrative pricing rules, a profit of $23 on the sale.

The FSC's taxable income and the transfer price to the FSC from the transaction, using the administrative pricing methods, and the FSC's taxable income if the transfer price is determined under section 482, would be as follows:

| | |
|---|---|
| (a) *Combined taxable income:* | |
| FSC's foreign trading gross receipts | $1,000.00 |
| Cost of goods sold of related supplier | (550.00) |
| Combined gross income | $450.00 |
| Less expenses: | |
| Direct expenses of related supplier | $125.00 |
| Direct expenses of FSC | 225.00 |
| Total expenses | $(350.00) |
| Combined taxable income | $100.00 |
| (b) *FSC's taxable income and transfer price under combined taxable income method:* | |
| Transfer price to FSC | 23.00 |
| Sales price | 1,000.00 |
| Less: | |
| FSC expense | $(225.00) |
| FSC profit | (23.00) |
| Total | $(248.00) |
| Transfer price | $752.00 |
| (c) *FSC's taxable income and transfer price under gross receipts method:* | |
| FSC taxable income—lesser of 1.83% of foreign trading gross receipts ($18.30) or two times amount in (b) above ($46.00) | $18.30 |

| | |
|---|---|
| Transfer price to FSC | |
| Sales price | 1,000 00 |
| Less | |
| FSC expenses | $(225 00) |
| FSC profit | (18 30) |
| Total | $(243 30) |
| Transfer price | $756 70 |

(d) *FSC's taxable income under section 482*

| | |
|---|---|
| FSC profit | |
| Sales price | $1,000 00 |
| Less | |
| FSC cost of goods sold | $720 00 |
| FSC expenses | 225 00 |
| Total | $(945 00) |
| FSC profit | $55 00 |

***Other transfer pricing matters***

The same intercompany allocation to the FSC will be permitted whether the FSC takes title as principal or acts as a commission agent The committee intends that the administrative pricing rules will be applied under rules which will prevent pricing at a loss to the related supplier In this regard, the committee believes that the Secretary of the Treasury should consider whether the present regulations accomplish this purpose The committee also intends that regulations allow the grouping of transactions and marginal costing Under the administrative pricing rules, the transfer price from the related supplier to the FSC may be computed after the FSC sells the goods to a customer Furthermore, the FSC and its related supplier may make adjustments upwards or downwards following the close of the taxable year in which the FSC sells the goods

The transfer pricing rules only apply to determine the price of a sale to a FSC (or FSC commissions) A FSC, or a principal for which the FSC is acting as commission agent, must sell to a related purchaser on an arm's-length basis, under the provisions of section 482 of the Internal Revenue Code, viewing the FSC and any related supplier as a single entity which sells to the purchaser

While the committee believes that it is appropriate to provide special FSC pricing rules for purposes of administrative convenience, it does not intend for such rules to be applied by the Internal Revenue Service or claimed by taxpayers in transactions not involving a FSC The committee believes that the Internal Revenue Service should continue its efforts to improve the administration of the section 482 transfer pricing rules

***Taxation of the FSC***

As described above, a FSC will not be subject to U S tax on exempt foreign trade income The following example illustrates the

determination of exempt foreign trade income using the three transfer pricing methods

*Example*

A FSC sells export property for $1,000 of foreign trading gross receipts The FSC purchases the property from a related supplier The FSC's cost of goods sold, based on the transfer prices derived in the previous example, would be $752 under the combined taxable income method, $756 70 under the gross receipts method, and $720 under section 482 The FSC incurs expenses attributable to the sale of $225

The FSC's foreign trade income, exempt foreign trade income, and expenses properly apportioned and allocated to foreign trade income from the transaction, using the three transfer prices derived in the previous example, would be as follows

(a) If the transfer price to the FSC was determined under the combined taxable income method

| | |
|---|---|
| Foreign trading gross receipts | $1,000 00 |
| Cost of goods sold | (752 00) |
| Foreign trade income | $248 00 |
| Exempt foreign trade income (17/23×$248) | $183 30 |
| Expenses allocable to exempt foreign trade income (183 30/248×$225) | (166 30) |
| Taxable income of FSC not subject to U S tax ($183 30—$166 30) | $17 00 |

(b) If the transfer price to the FSC was determined under the gross receipts method

| | |
|---|---|
| Foreign trading gross receipts | $1,000 00 |
| Less cost of goods sold | (756 70) |
| Foreign trade income | $243 30 |
| Exempt foreign trade income (17/23×$243 30) | $179 83 |
| Expenses allocable to exempt foreign trade income (179 83/243 30 × $225) | (166 30) |
| Taxable income of FSC not subject to U S tax ($179 83—$166 30) | $13 53 |

(c) If the transfer price to the FSC was determined under section 482

| | |
|---|---|
| Foreign trading gross receipts | $1,000 00 |
| Less cost of goods sold | (720 00) |
| Foreign trade income | $280 00 |
| Exempt foreign trade income (34%×$280) | $95 20 |

| | |
|---|---|
| Expenses allocable to exempt foreign trade income (95.20/280 × $225) | (76.50) |
| Taxable income of FSC not subject to U.S. tax ($95.20 – $76.50) | $18.70 |

A FSC's nonexempt foreign trade income will be subject to U.S. tax unless it is determined without reference to an administrative pricing rule, in which case it will be taxed in the same manner and to the same extent as income earned by a foreign corporation that is not a FSC. Interest, dividends, royalties, other investment income and carrying charges will be subject to U.S. tax.

A FSC will not be allowed an investment tax credit or certain other credits. A foreign tax credit will not be allowed with respect to foreign taxes on foreign trade income (other than nonexempt foreign trade income determined without reference to an administrative pricing rule), but will be allowed with respect to other foreign taxes. Foreign trade income (other than nonexempt foreign trade income determined without reference to an administrative pricing rule) will be taken into account under a separate limitation for purposes of determining the foreign tax credit limitation of a FSC.

If a foreign corporation elects to be taxed as a FSC, it must waive any rights it could otherwise claim under a U.S. income tax treaty. Except as described above, a FSC will generally be subject to U.S. tax in the same manner and to the same extent as a foreign corporation that is not a FSC.

**7. Distributions to shareholders**

A FSC will not be required or deemed to make distributions to its shareholders. Actual distributions to shareholders must be made first out of foreign trade income; the FSC may have income that is not foreign trade income, for example, investment income. Distributions will be treated as being made first out of earnings and profits attributable to foreign trade income, and then out of any other earnings and profits. Any distribution made by a FSC which is made out of earnings and profits attributable to foreign trade income to a shareholder which is a foreign corporation or a nonresident alien individual will be treated as a distribution which is effectively connected with the conduct of the trade or business conducted through a permanent establishment of the shareholder within the United States, and as U.S.C source income. Thus, such distributions will be subject to Federal income tax.

Foreign trade income and investment income of a FSC will not be subject to the rules of subpart F. In addition, the Secretary of the Treasury is authorized to exclude property related to the export activities of the FSC from the subpart F rules relating to investments by controlled foreign corporations in U.S. property.

**8. Dividends received from a FSC**

A domestic corporation will generally be allowed a 100 percent dividends-received deduction for amounts distributed from a FSC out of earnings and profits attributable to foreign trade income. Thus, there will be no corporate level tax on exempt foreign trade

income and only a single-level corporate tax (at the FSC level) on foreign trade income other than exempt foreign trade income. However, a 100 percent dividends-received deduction will not be allowed for nonexempt foreign trade income determined without reference to an administrative pricing rule (sec. 923(a)(2) nonexempt income) or a dividend received by a cooperative with respect to foreign trade income that is treated as exempt foreign trade income.

The committee expects that FSC dividends attributable to foreign trade income will not be treated as foreign personal holding company income. This would correspond to the treatment of certain DISC dividends under present law.

Foreign taxes on FSC dividends attributable to foreign trade income (other than nonexempt foreign trade income determined without reference to an administrative pricing rule) will be treated as noncreditable foreign taxes. In addition, such dividend income will be taken into account for purposes of the foreign tax credit limitation under a separate limitation.

To the extent a corporate shareholder of a FSC distributes dividends attributable to foreign trade income to its individual shareholders, the amounts will be taxed. Likewise, distributions to a noncorporate shareholder of a FSC that are not attributable to foreign trade income will be subject to tax in the same manner as distributions from a foreign corporation that has not elected to be treated as a FSC.

A dividends-received deduction will not be allowed, however, for distributions attributable to other earnings and profits. These distributions will therefore be taxed currently to the shareholders, corporate or noncorporate, of the FSC.

### 9. Other definitions and special rules

#### *Export property*

In general, the term export property means property manufactured, produced, grown or extracted in the United States by a person other than a FSC, held primarily for sale, lease, or rental in the ordinary course of trade or business for direct use or consumption outside the United States, and not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

The committee intends that the destination test (whether "use, consumption, or disposition occurs outside the United States") will be considered satisfied if the FSC delivers the property to a carrier or freight forwarder for ultimate delivery, use, or consumption outside of the United States. This rule will apply without regard to (1) the F.O.B. point or place of passage of title, (2) whether the purchaser is a United States or foreign purchaser, or (3) whether the property is for use of the purchaser or for resale.

For purposes of this provision, the fair market value of any article imported into the United States will be its appraised value as determined by the Secretary under section 402 of the Tariff Act of 1930 (19 U.S.C. 1401a) in connection with its importation. The committee intends that the Secretary of the Treasury may prescribe regulations for the determination of foreign content of any product, without necessarily following current regulations. In considering

this issue, the committee expects the Secretary will take into account the effect of any change on revenue, location of employment, and neutrality between similarly situated taxpayers

The term export property does not include (1) property leased or rented by a FSC for use by any member of a controlled group of which the FSC is a member, (2) patents and other intangibles, (3) oil or gas (or any primary product) thereof, or (4) products the export of which is prohibited Export property also excludes property designated by the President as being in short supply Coal and uranium products, and other depletable products (other than oil and gas), specifically excluded from the definition of export property under the DISC rules will not be excluded under this bill, however

*Cooperatives*

Agricultural products marketed through cooperatives are subject to special rules First, the bill provides that for purposes of computing the foreign trade income of the FSC under the combined taxable income method, the combined taxable income of the cooperative and the FSC will be computed without taking into account patronage dividends and per-unit retain allocations, and certain deductions for nonpatronage distributions under section 1382 Thus, the cooperative will not be required to distribute the income attributable to exempt foreign trade income (generally 17/23 of foreign trade income) to benefit from the exemption from corporate level tax on this income This special rule will only apply to the cooperative shareholder of the FSC and not to members or patrons of the cooperative that may be cooperatives themselves (higher tier cooperatives)

The second rule provides that the foreign trade income (other than exempt foreign trade income) will be treated as exempt income to the FSC, but only if such income is distributed currently to the cooperative shareholder If such income is not distributed currently, it will be taxed at the FSC level Distributions from the FSC to the cooperative shareholder that are attributable to foreign trade income treated as exempt foreign trade income will be includible in the taxable income of the cooperative (i e , income eligible for distribution as a patronage dividend as defined in section 1388(a)(3)) Thus, the nonexempt foreign trade income (generally 6/23 of foreign trade income) will not be taxed at the FSC level, but instead will be generally taxed at the member or patron level In other words, the nonexempt foreign trade income will be subject to a single level of tax (as is provided for cooperatives under subchapter T) as if the cooperative had exported directly rather than through a FSC Distributions attributable to foreign trade income will be considered attributable first to nonexempt foreign trade income (even if such income is treated as exempt income)

The final rule provides that the cooperative shareholder of a FSC will not be allowed a dividends-received deduction for distributions from the FSC that are attributable to nonexempt foreign trade income The bill provides this rule because although the nonexempt foreign trade income is treated at the FSC level as exempt in this case, the committee intends that this portion of the income be includible in the income of the members and patrons without the

deferral accorded to exempt foreign trade income. Like other corporations, the cooperative will be allowed a dividends-received deduction for distributions attributable to exempt foreign trade income but not for distributions attributable to passive income.

The special rules for agricultural commodities marketed through cooperatives will be available only if the income of the cooperative eligible for FSC benefit is based on arm's-length transactions between such cooperative and its members or patrons. The committee intends that this rule should prevent the cooperative and its members or patrons from getting additional FSC benefits from transfer prices that do not reflect the fair market value of the property sold to or through the cooperative by its members or patrons.

*Gross receipts*

In general, the term gross receipts means the total receipts from the sale, lease, or rental of property held primarily for sale, lease, or rental in the ordinary course of a trade or business, and gross income from all other sources.

In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of these provisions as gross receipts will be the gross receipts on the sale, lease, or rental of the property on which the commissions arose.

*Investment income*

For purposes of these provisions, the term investment income means dividends, interest, royalties, annuities, rents (other than rents from the lease or rental of export property for use by the lessee outside the United States), gains from the sale or exchange of stock or securities, gains from futures transactions in any commodity, amounts includible in computing the taxable income of the corporation under the estate and trust rules, and gains from the sale or disposition of any interest in an estate or trust.

*Grouping of transactions*

Many of the tests required under the foreign management and economic processes requirement will be applied on a transaction-by-transaction basis. However, the committee intends that regulations could provide that transactions may be grouped based upon product lines or recognized industry or trade usage. The regulations could permit different groupings for different purposes. Such flexibility may be important when grouping transactions for purposes of the direct-cost test, for example.

*Controlled group of corporations*

A controlled group of corporations is defined as in section 1563(a) except that a more than 50 percent ownership test is substituted for the "at least 80 percent" test, and section 1563(b) does not apply.

*Other affiliated entities*

Under the bill, Webb-Pomerene export organizations may be shareholders of a FSC. Members of a Webb-Pomerene organization will be allowed to sell products through a FSC to the Webb-Pomerene organization and, thus, benefit from the FSC provisions as well

as the special provisions under the 1918 Webb-Pomerene Export Trade Act.

### *Foreign tax credit limitation of related parties*

The bill provides a special rule governing the source of income earned by a person related (within the meaning of sec. 482) to a FSC from transactions giving rise to foreign trading gross receipts of a FSC. That related person's foreign source income from such a transaction may not exceed the amount which would be treated as foreign source income earned by that person if the analogous DISC pricing rule applied. For this purpose, the DISC gross receipts pricing rule of Code section 994(a)(1) is analogous to the bill's gross receipts pricing rule in proposed section 925(a)(1); the DISC combined taxable income pricing rule of Code section 994(a)(2) is analogous to the bill's combined taxable income pricing rule in proposed section 925(a)(2); and the DISC section 482 pricing rule of Code section 994(a)(3) is analogous to the bill's section 482 pricing rule in proposed section 925(a)(3).

The committee intends that this special rule governing the source of income, and thus the foreign tax credit limitation of parties related to a FSC, result in foreign source income that is comparable to the foreign source income on the same transaction under present law.

This special rule governing the source of income and thus the foreign tax credit limitation of parties related to a FSC is necessary to prevent revenue loss. The table below illustrates the application of the bill (absent this special rule) to a FSC's parent with excess foreign tax credits that exports by selling to its FSC. The table presupposes that the 50 percent of the parent's income from the export sale is foreign source income (as might be the case under Code sec. 863(b) absent the bill's special rule). It presupposes that the parent has sufficient excess foreign tax credits to offset U.S. tax on all the foreign source income from the export sale. It also presupposes that the export sale is subject to the bill's combined taxable income (CTI) rule (proposed section 925(a)(2)).

FSC—77/23 SPLIT OF CTI ABSENT RESOURCING RULE

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *FSC* | |
|---|---|---|---|
| U.S. source (taxable) | $38.50 | Exempt | $17 |
| Foreign source (exempt) | 38.50 | Taxable | 6 |
| | $77.00 | | $23 |

| | |
|---|---|
| Taxable: | |
| U.S. source income of parent | $38.50 |
| Taxable income of FSC | 6.00 |
| | $44.50 |

Exempt:

| | |
|---|---|
| Foreign source income of parent | $38.50 |
| Exempt in FSC | 17.00 |
| | $55.50 |

Under current law, the parent's share of combined taxable income is $50 (as illustrated in the table in the Present Law section). The parent's foreign source income might be $25 under present law. Exemption of $55.50 under the bill (absent the special rule) would exceed the combination of exemption and deferral of $42 for a parent of a DISC with excess credits under current law (with a 17 percent deferral rate).[1] To maintain parity with DISC, the bill would reduce the foreign source income of the parent in the example above from $38.50 to $25, which would result in an exemption of $42 (comparable to present law). The parent's U.S. source income would increase, under the special rule of the bill, from $38.50 to $52. The following table illustrates the effect of the bill's resourcing rule.

FSC—77/23 SPLIT OF CTI WITH RESOURCING RULE

*(Exporter With Excess Foreign Tax Credits)*

| *Parent* | | *FSC* | |
|---|---|---|---|
| U.S. source (taxable) | $52 | Exempt | $17 |
| Foreign source (exempt) | 25 | ECI | 6 |
| | $77 | | $23 |

Taxable:

| | |
|---|---|
| U.S. source income of parent | $52 |
| ECI of FSC | 6 |
| | $58 |

Exempt:

| | |
|---|---|
| Foreign source income of parent | $25 |
| Exempt in FSC | 17 |
| | $42 |

[1] In the Present Law section of this report, the taxpayer with excess credits was taxable on $58 $25 of U S source income plus a $33 deemed DISC distribution, but paid no tax on $25 of foreign source income or on $17 deferred in the DISC

*Participation in international boycotts*

The exempt foreign trade income of a FSC will be limited if the FSC participates in or cooperates with international boycotts (as defined in sec. 999(b)(3)) and to the extent that any illegal bribe, kickback, or other payment is made to an official employee or agent of a government. Regulations may provide rules similar to those that apply to the deemed distributions of a DISC under section 995(b)(1)(F).

*Other*

The bill provides that no tax may be imposed on foreign trade income by any possession of the United States. In addition, to the extent provided in regulations, property that is otherwise U.S. property which is held by a FSC and which is related to the export activities of the FSC, will not be treated as an investment in U.S. property (under sec. 956).

*Election*

A corporation may elect to be treated as a FSC, or a small FSC, for a taxable year at any time during the 90-day period immediately preceding the beginning of the taxable year. The committee intends that a newly formed corporation will be permitted to make an election on or before the 90th day after the beginning of its first taxable year. The bill provides that the Secretary of the Treasury has authority to consent to the making of an election at other designated times. The election must be made in a manner prescribed by the Secretary. The election will be valid only if all shareholders as of the first day of the first taxable year for which the election is effective consent in writing to the election. Once an election is made, it will, unless revoked by the corporation, continue in effect for subsequent years in which the corporation qualifies to be a FSC, unless the corporation fails for five consecutive years to qualify as a FSC (e.g., because of a failure to maintain a foreign office or to have a director that is not resident in the United States).

An election to be treated as a FSC may be revoked by the corporation any time after the first taxable year it is in effect. To be effective for a given taxable year, however, the revocation must be made on or before the 90th day of that year. A revocation made after the expiration of the 90-day period will not be effective until the following taxable year. A properly made revocation relating to a taxable year of the FSC is effective beginning the first day of that year. If the corporation fails to qualify as a FSC for a period of five consecutive taxable years, the FSC election will terminate automatically. A corporation whose FSC election has been terminated may again elect to be a FSC.

**10. Small businesses**

In order to provide relief for small businesses who may find the foreign presence and economic activity burdensome, the bill provides two alternatives to the FSC: the interest charge DISC and the small FSC.

### *Interest charge DISC*

A DISC may continue to defer income attributable to $10 million or less of qualified export receipts. Deemed distributions relating to base period exports (the incremental rule) and to one-half of the DISC's income will be eliminated; thus, substantially all of the DISC's income attributable to $10 million or less of qualified export receipts may be deferred. However, unlike the present-law DISC, an interest charge will be imposed on the shareholders of the DISC. The amount of the interest will be based on the tax otherwise due on the deferred income computed as if the income were distributed. The interest rate will be tied to the T-bill rate.

The tax that would otherwise be due on the deferred income, termed the shareholder's DISC-related deferred tax liability, means, with respect to the year of the shareholder, the excess of the tax liability for the year computed as if the deferred DISC income were included in income over the actual tax liability for the year. This amount will be computed without regard to carrybacks to such taxable year. The Secretary of the Treasury is directed to prescribe regulations to provide any adjustments necessary or appropriate in the case of net operating losses, credits, and carryovers.

Deferred DISC income generally means the excess of accumulated DISC income at the beginning of the taxable year over the amount by which actual distributions out of accumulated DISC income exceed the current year's DISC income (termed distributions-in-excess-of-income). For shareholders of the DISC whose taxable year is different from that of the DISC, deferred DISC income is measured from the computation year; with respect to any taxable year of the shareholder, the computation year is the taxable year of the DISC which ends within the shareholder's preceding taxable year.

The rate of interest imposed on the shareholder's DISC-related deferred tax liability is determined by reference to a base period T-bill rate; this would mean the annual rate of interest that is equivalent to the average investment yield of U.S. T-bills with maturities of 52 weeks which were auctioned during the one-year period ending on September 30 of the calendar year ending with the close of the taxable year of the shareholder. The Secretary of the Treasury will be expected to publish this rate in October of each year. The interest a taxpayer is required to pay under this provision would be due at the same time the shareholder's regular tax is required to be paid.

Taxable income of the DISC attributable to qualified export receipts that exceed $10 million will be deemed distributed. Thus, if export receipts exceed $10 million, the DISC would not be disqualified; there would merely be no deferral of income attributable to the excess receipts. DISCs which are members of the same controlled group would be treated as a single corporation for purposes of the $10 million-rule.

### *Small FSC*

A FSC that elects to be a small FSC need not meet the foreign management and foreign economic process requirements in order

to have foreign trading gross receipts However, in determining the exempt foreign trade income of a small FSC, any foreign trading gross receipts that exceed $5 million will not be taken into account No exception to the requirements for use of the administrative pricing rules is provided for small FSCs Because these activities may be performed by the FSC or by another person acting under a contract with the FSC and need not be performed outside the United States, the committee expects that this may not be as onerous a requirement to small exporters as the foreign management and economic process requirements might be

Small FSCs which are members of the same controlled group will be treated as a single corporation Regulations will prescribe how the $5 million gross receipts limitation will be allocated among members of a controlled group

If the foreign trading gross receipts of a small FSC exceed the $5 million limitation, the corporation may select the gross receipts to which the limitation is allocated This provision will allow a taxpayer to choose, for example, to allocate the limitation to gross receipts attributable to transactions where the profit margin is high, in this case, the amount of exempt income would be greater than if the limitation were allocated to low-margin transactions

**11. Taxable year of DISC and FSC**

The taxable year of any DISC or FSC will be required to conform to the taxable year of the majority shareholder (or other group of shareholders with the same taxable year) as determined by voting power Voting power will be determined on the basis of the total combined voting power of all classes of stock of the corporation entitled to vote Special rules are provided where more than one shareholder or shareholder groups have the highest percentage of voting power In cases where there are subsequent changes of ownership, the Secretary is directed to prescribe regulations under which these rules will apply only if there is a substantial change of ownership

**12. Transition rules**

The taxable year of any DISC which begins before January 1, 1985 and which would otherwise include January 1, 1985, will close on December 31, 1984 To the extent that any underpayment of estimated tax is created or increased by this provision, no penalty will be imposed The qualified assets test (under sec 992(a)(1)(B)) will not apply to any taxable year ending on December 31, 1984

***Accumulated DISC income***

Accumulated DISC income which is derived before January 1, 1985, will be exempt from tax This result is achieved by treating such income as previously taxed income

***Export Trade Corporations***

Export Trade Corporations (ETCs) may elect to discontinue operating as ETCs or elect to be a FSC If an ETC so elects before January 1, 1985, the previously untaxed income attributable to earnings derived before January 1, 1985, will be treated as previously taxed income

ETCs that do not elect to discontinue operating under the ETC rules may continue to operate as ETCs. However, in this case no portion of the untaxed income of the ETC will be treated as previously taxed income under the provisions of this bill.

***Distributions***

To alleviate the hardship that may result from deemed distributions to a shareholder of a DISC that would otherwise be recognized in income in a later year by the shareholder, a special rule provides for a spread of such income over four years. Deemed distributions from a DISC attributable to income derived by the DISC in the taxable year of the DISC which begins in 1984 after the date in 1984 on which the taxable year of the shareholder begins will be treated as received by the shareholder in four equal installments; the installments will be treated as received on the last day of each of the four taxable years of the shareholder which begins after the shareholder's taxable year beginning in 1984.

For example, a DISC's taxable year ends January 31 and the corporate shareholder of the DISC is a calendar year taxpayer. In 1984, the corporate shareholder will include in income the deemed distributions from the DISC for the DISC's year ending on January 31, 1984 and, under the bill (absent the four-year spread), the deemed distributions for the 11-month taxable year ending on December 31, 1985. Almost two years of deemed distributions will be includible in income in 1984. Under the bill, the deemed distributions for the 11-month period ending December 31, 1984, will be spread over a four-year period and includible in the income of the shareholder in 4 equal installments: on December 31 of 1984, 1985, 1986, and 1987.

***Long-term contracts***

The bill provides a transitional rule for taxpayers using the completed contract method of accounting. The transitional rule will apply if a taxpayer (1) has, on March 15, 1984, and at all times thereafter a firm plan, evidenced in writing, to enter into a contract, and (2) enters into a binding contract by December 31, 1984. The transitional rule provides that the taxpayer will be treated as having satisfied the foreign presence tests for periods before and the economic process tests with respect to costs incurred before December 31, 1984, with respect to such transactions. The income from the long-term contract will be treated as FSC income when recognized, provided the general FSC requirements are satisfied after December 31, 1984.

The bill also provides a transition rule for taxpayers with long-term contracts who do not use the completed contract method of accounting. The transitional rule will apply if a taxpayer enters into a binding contract before March 15, 1984. The rule provides with respect to such transactions that the taxpayer will be treated as having satisfied the foreign presence tests for periods before and the economic process tests with respect to costs incurred before December 31, 1984. This rule will apply only to income attributable to such contracts that is recognized before December 31, 1986.

Finally, a transition rule is provided for transactions undertaken pursuant to contracts entered into by a taxpayer on or before De-

cember 31, 1984, that are performed, or with respect to which all consideration is includible in income, before the end of the first taxable year of the FSC ending after January 1, 1985. Under this rule, a taxpayer will be treated as having satisfied the foreign presence tests for periods before and the economic process tests with respect to costs incurred before December 31, 1984, with respect to such transactions.

### 13. Transfers from DISC to FSC

Except to the extent provided in regulations to be prescribed, section 367 (which taxes some transfers of appreciated assets to foreign corporations) will not apply to transfers made generally before January 1, 1986 to a FSC of qualified export assets held on August 4, 1983, by a DISC in a transaction to which section 351 or 368(a)(1) apply.

## D. Effective Date

These provisions will generally apply to transactions after December 31, 1984, in taxable years ending after such date.

## E. Revenue Effect

This provision will decrease fiscal year budget receipts by $43 million in 1985, $33 million in 1986; increase receipts by $36 million in 1987, and $88 million in 1988; and decrease receipts by $98 million in 1989.