**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**No. 06-778T**
**(Hon. Francis M. Allegra)**

**ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,**

**Plaintiff**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant**

---

# SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Robert W. DeJoy
Attorney of Record
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 891-3993

Thomas V. M. Linguanti
Robert S. Walton
Of Counsel
BAKER & McKENZIE LLP
130 East Randolph Drive
Chicago, IL 60601
(312) 861-2623

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................ 1

I. THE LEGISLATIVE HISTORIES OF THE DISC AND FSC PROVISIONS ADDRESS TRANSFER PRICING AS BETWEEN A RELATED SUPPLIER AND A FSC; THEY DO NOT ADDRESS THE TIMING OF REDETERMINATIONS ........................................................ 3

A. The government's over-emphasis on the role of the arm's length standard in the transition to FSCs mischaracterizes the differences between FSC and DISC transfer pricing ........................................................ 4

B. The changes from DISC transfer pricing to FSC transfer pricing do not indicate any concern with the assessment or collection of redeterminations ........ 5

II. THE EVOLUTION FROM TREAS. REG. § 1.994-1(e)(4) TO TEMP. TREAS. REG. § 1.925(a)-1T(e)(4) SHOWS THAT THE ISSUES OF PARAMOUNT CONCERN WERE WHETHER (AND HOW) TAXPAYER REDETERMINATIONS COULD BE MADE AND WHETHER THE ARM'S LENGTH INCOME AND EXPENSE WERE PROPERLY REFLECTED IN THE PARTIES' ACCOUNTS ........................................................ 9

A. The "shall affect" sentence requires corresponding income and expenses to be reflected on related parties' books and records; that does not render the sentence "superfluous" ........................................................ 11

B. The government insists on reading words into the regulation that are not there and ignoring the words that are ........................................................ 14

1. The government's contention that the "shall affect" sentence does not apply to redeterminations initiated by the Commissioner is contrary to the plain language of the regulation ........................................................ 14

2. The government continues to assert that its ability to assess additional taxes under section 6501 is a requirement for FSC claims for refund without pointing to where any such pre-condition exists, expressly or implicitly, in the Code or the regulations ................. 16

III. TEMP. TREAS. REG. §§ 1.925(a)-1T(e)(3) AND (e)(5) PROVIDE THE CONTEXT WITHIN WHICH THE "SHALL AFFECT" SENTENCE FITS ................ 18

CONCLUSION ........................................................ 21

# TABLE OF AUTHORITIES

**Page**

## STATUTES

26 U.S.C. § 925 .......... 4, 17
26 U.S.C. § 991 .......... 3
26 U.S.C. § 995 .......... 3
26 U.S.C. § 6321 .......... 7
26 U.S.C. § 6501 .......... 7, 17
26 U.S.C. § 6511 .......... 17

## REGULATIONS

Temp. Treas. Reg. § 1.925(a)-1T .......... *passim*
Treas. Reg. § 1.994-1(a)(1) .......... 5
Treas. Reg. § 1.994-1(e)(4) .......... 9

## REGULATORY AND LEGISLATIVE HISTORY

Staff of S. Comm. on Finance, 98th Cong. 2d Sess., *Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984* (Comm. Print 1984) .......... 3, 4
*Tariff And Trade Proposals: Hearings Before the H. Comm. On Ways and Means*, 91st Cong. (1970) (statement of John S. Nolan, Acting Asst. Sec. for Tax Policy) .......... 4-5

## ADMINISTRATIVE RULINGS AND MEMORANDA

Field Serv. Adv. 200010027 (Dec. 8, 1999) .......... 14
Gen. Couns. Memo. 38,374 (Nov. 30, 1984) .......... 9
Priv. Ltr. Rul. 7949036 (Sep. 5, 1979) .......... 9
Priv. Ltr. Rul. 8035047 (June 5, 1980) .......... 9
Rev. Proc. 84-3, 1984-1 C.B. 361, *modified and superseded* by Rev. Proc. 85-45, 1985-2 C.B. 505 .......... 10
Rev. Rul. 82-81, 1982-1 C.B. 109 .......... 9
Tech. Adv. Memo. 8020008 (1980) .......... 9
Tech. Adv. Memo. 8137026 (May 29, 1981) .......... 9
Tech. Adv. Memo. 8204018 (Oct. 13, 1981) .......... 9
Tech. Adv. Memo. 8232015 (May 4, 1982) .......... 10
Tech. Adv. Memo. 8310004 (Nov. 13, 1982) .......... 10

## TABLE OF AUTHORITIES

**Page**

Tech. Adv. Memo. 8527005 (March 7, 1985) .......... 9

Tech. Adv. Memo. 8720003 (Jan. 27, 1987) .......... 10

Tech. Adv. Memo. 8736006 (June 5, 1987) .......... 10

**CASES**

*Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525 (1989), *aff'd* 933 F.2d 1084 (2d Cir. 1991) .......... 7

*Ciba-Geigy Corp. v. Commissioner*, 85 T.C. 172 (1985), *acq.* 1987-2 C.B. 1 .......... 7

*Compaq Computer Corp. v. Commissioner*, 78 T.C.M. (CCH) 20 (1999) .......... 7

*Eli Lilly & Co. v. Commissioner*, 856 F.2d 855 (7th Cir. 1988), *aff'g in part and rev'g in part* 84 T.C. 996 (1985) .......... 7

*Eli Lilly & Co. v. United States*, 372 F.2d 990 (Ct. Cl. 1967) .......... 7

*G.D. Searle & Co. v. Commissioner*, 88 T.C. 252 (1987) .......... 7

*General Electric Co. v. Burton*, 372 F.2d 108 (6th Cir. 1967) .......... 17

*Gold v. United States*, 552 F. Supp. 66 (D. Colo. 1982) .......... 17

*Perkin-Elmer Corp. v. Commissioner*, 66 T.C.M. (CCH) 634 (1993) .......... 7

*PPG Indus. Inc. v. Commissioner*, 55 T.C. 928 (1970) .......... 7

*Seagate Tech., Inc. v. Commissioner*, 80 T.C.M. (CCH) 912 (2000) .......... 7

*Sundstrand Corp. v. Commissioner*, 96 T.C. 226 (1991) .......... 7

*Union Carbide Corp. v. Commissioner*, 110 T.C. 375 (1998) .......... 13

*United States v. Brockamp*, 519 U.S. 347 (1997) .......... 18

*Weyerhaeuser Co. and Sub. v. United States*, 32 Fed. Cl. 80 (1994) *aff'd in part & rev'd in part on other grounds*, 92 F.3d 1148 (Fed. Cir. 1996) .......... 15

*Woods Inv. Co. v. Commissioner*, 85 T.C. 274 (1985), *acq.* 1986-2 C.B. 1 .......... 8-9

*Woodward Governor Co. v. Commissioner*, 55 T.C. 56 (1970), *acq.* 1971-2 C.B. 3 .......... 7

**OTHER AUTHORITIES**

Webster's Third New International Dictionary of the English Language Unabridged (Philip Babcock Gove ed., Merriam-Webster, Inc. 1993) (1961) .......... 14

Lewis Carroll, *Through the Looking Glass*, Ch. 6, reprinted in *Alice's Adventures in Wonderland & Through the Looking Glass* (First Signet Class Print 2000) .......... 8

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 06-778T**
**(Hon. Francis M. Allegra)**

**ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,**

**Plaintiff**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant**

**SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The defendant, United States of America, is in the same quandary today as it has been since the start of this dispute with plaintiff, Abbott Laboratories and U.S. subsidiaries ("Abbott Laboratories"). Despite three briefs and an oral argument, the government still has not pointed to a single reference in the controlling statutes, regulations, or legislative or regulatory histories that supports its position that the sentence "[a]ny redetermination shall affect both the FSC and related supplier" within Temp. Treas. Reg. § 1.925(a)-1T(e)(4) means assessment, collection, or timing established by section 6501.[1] There is nothing in the foreign sales corporation ("FSC") statutes or in the FSC regulations that expressly makes the statute of limitations on assessment a

[1] Unless otherwise indicated, all "section" references are to the Internal Revenue Code of 1986 (26 U.S.C.) (I.R.C.), as amended, or to the Treasury Regulations (26 C.F.R.) (Treas. Reg.) issued thereunder in effect during the years at issue.

pre-condition to a taxpayer's entitlement to a refund in the FSC regime. There is nothing in the legislative history of the FSC rules, or in the transition from the domestic international sales corporation ("DISC") rules, that indicates that Congress intended the FSC provisions to alter the traditional requirements for a taxpayer's claim for refund. And there is nothing in the regulatory history, including the Service's own interpretations of the DISC regulations, that suggests that the "shall affect" sentence was meant to impose any new and otherwise unstated requirements as to the timing of assessments on FSCs and their related suppliers.

Nevertheless, the government continues undeterred, relying on the old stand-by argument used by parents who find themselves at their wit's end: "because I said so." In its most recent brief, the government relies on that argument to distort unilaterally the meaning of the arm's length standard under section 482. According to the government, inter-company transfer pricing is now not arm's length if the statute of limitations on assessment bars the government from making an adjustment to a taxpayer's transfer price. For the first time perhaps in the history of transfer pricing disputes, the government maintains that its ability to make an assessment determines the price at which unrelated parties would exchange property or services – the definition of the arm's length standard that has been part of the tax code for more than 80 years.

Fortunately, unlike the frustrated parent, the government may not impose its fickle will and create a timing requirement by mere fiat. When viewed in the context of the FSC statutory and regulatory regimes, when the FSC's evolution from the DISC regime is fully considered, it is the simplest meaning of the "shall affect" sentence that controls. Any changes to the amount of FSC commission expenses (or transfer price in the case of a "buy-sell" FSC arrangement) paid by a related supplier are required to correspond with changes to the income received by a FSC. "Any redetermination shall affect both the FSC and related supplier" applies to any

redetermination by the government and to any redetermination by the taxpayer. The purpose of the "shall affect" sentence, like similar sentences throughout the FSC provisions, is to ensure related-taxpayer compliance by requiring that their accounts and books and records reflect the true transactions between them. Neither the "shall affect" sentence specifically nor the FSC rules generally address assessment or collection or the timing of either. In its supplemental brief, like in the briefs that preceded it, the government continues to read words into the regulations that it did not write and to ignore the words that it did.

This Supplemental Response Brief is submitted in accordance with the Court's April 3, 2008, Order, in further support of Abbott Laboratories' Motion for Partial Summary Judgment, and in opposition to the government's Cross Motion for Summary Judgment.

## I. THE LEGISLATIVE HISTORIES OF THE DISC AND FSC PROVISIONS ADDRESS TRANSFER PRICING AS BETWEEN A RELATED SUPPLIER AND A FSC; THEY DO NOT ADDRESS THE TIMING OF REDETERMINATIONS.

The government rightly notes that the changes from the DISC to the FSC provisions were enacted, in part, in response to complaints by foreign governments.[2] (*See* Defendant's Supplemental Brief in Support of Its Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Partial Summary Judgment ("Gov't Supp. Br.") at 5-6.) The general complaints included that the DISC was a domestic corporation that the U.S. government had exempted from taxation on exports, giving it an unfair advantage in international trade. Staff of S. Comm. on Finance, 98th Cong. 2d Sess., *Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984* 634 (Comm. Print 1984) ("S. Comm.

[2] As the government noted in its supplemental brief (Gov't Supp. Br. at 13 fn. 7), the DISC provisions, unlike the FSC provisions, have not been repealed. *See* I.R.C. § 991 *et seq.* At the same time it enacted the FSC provisions, Congress modified the DISC provisions to reduce the tax benefit to most U.S. taxpayers by enacting the interest-charge provisions of section 995(f). Section 1.994-1, including the DISC administrative pricing rules, has not been amended since 1984.

Staff Explanation"). The FSC provisions were therefore in accordance with a 1981 inter-governmental agreement that permitted a foreign corporation to be exempt from domestic taxes on exports to the extent of its performance of foreign economic processes and so long as the foreign corporation's compensation was arm's length. (Gov't Supp. Br. at 7-8; S. Comm. Staff Explanation at 634-35.)

### A. The government's over-emphasis on the role of the arm's length standard in the transition to FSCs mischaracterizes the differences between FSC and DISC transfer pricing.

First, the government condemns the DISC's transfer pricing as non-arm's length because the DISC and related supplier may use the administrative pricing methods under section 994 to produce a transfer price in excess of that permitted under section 482. (Gov't Supp. Br. at 3.) The government, however, neglects to mention that the same result may be obtained by a FSC and its related supplier. Section 925(a) permits a commission in an "amount which does not exceed the greatest of" (1) 1.83% of foreign trading gross receipts, (2) 23% of combined taxable income, or (3) actual transaction prices subject to section 482. *See also* Temp. Treas. Reg. § 1.925(a)-1T (a)(1) ("If either of the administrative pricing methods (the gross receipts method or combined taxable income method) is applied to a transaction, the Commissioner may not make distributions, apportionments, or allocations as provided by section 482 . . .").

Second, the government argues that the explicit proclamations that the FSC transfer pricing would be arm's length means that the DISC transfer pricing was ***not*** arm's length. (Gov't Supp. Br. at 3.) When the Treasury Department initially proposed the DISC's transfer pricing provisions, however, the Acting Assistant Secretary of the Treasury for Tax Policy testified at hearings on the DISC that the DISC pricing was, in fact, a form of arm's length behavior. "A key feature of the DISC is a special definitive rule for allocation of profits between the U.S. manufacturer and its DISC. This is a 'specific rule' and not an 'easing off' of the 482

rules." *See Tariff And Trade Proposals: Hearings Before the H. Comm. On Ways and Means*, 91st Cong., 539 (1970) (statement of John S. Nolan, Acting Asst. Sec. for Tax Policy). The idea that the DISC pricing was a "specific rule" of arm's length pricing is also contained in the DISC regulations. Section 1.994-1(a)(1) gives priority to the administrative pricing rules over section 482, effectively prohibiting the government from using section 482 when a taxpayer uses the administrative pricing methods – thus acknowledging that the administrative pricing rules were, to the government, reflective of arm's length results. *Cf.* Temp. Treas. Reg. § 1.925(a)-1T(a)(1) ("If either of the administrative pricing methods (the gross receipts method or combined taxable income method) is applied to a transaction, the Commissioner may not make distributions, apportionments, or allocations as provided by section 482 . . .").

By mischaracterizing the role of the arm's length standard in the DISC to FSC transition, the government then makes the broad leap to maintain that, in the correction, the FSC regulations somehow made the statute of limitations on assessment relevant to the definition of the arm's length standard. The government, however, has mischaracterized the differences between the two regimes to justify its interposition of section 6501 into Temp. Treas. Reg. § 1.925(a)-1T(e)(4).

**B. The changes from DISC transfer pricing to FSC transfer pricing do not indicate any concern with the assessment or collection of redeterminations.**

The government distorts Abbott Laboratories' position to claim that Abbott Laboratories' interpretation of the FSC regulatory language somehow permits "non-arm's length" pricing because of the government's inability to assess a tax liability against the FSC in this case. The government performs this sleight of hand in a series of three passages through Section 1 of its supplemental brief. The government first posits:

> Plaintiff's interpretation of § 1.925(a)-1T(e)(4), however, is not [consistent with the intention of the FSC transfer pricing rules to tax transactions between related

> parties on the basis of arm's length pricing], because it permits the assessable tax liability of a related supplier and FSC to be based on an effective transfer price that is not arm's length, as "arm's length" is understood and reflected in § 925.

(Gov't Supp. Br. at 2 (emphasis added).)

The government then expands on this:

> Plaintiff's interpretation of § 1.925-1T(e)(4), however, permits a related supplier and FSC to be taxed on the basis of an effective transfer price that is not arm's length. This is so because it would permit a related supplier and FSC to make a redetermination that subjects the related supplier and FSC to an aggregate U.S. tax liability that is *less than* what it would be if the related supplier and FSC were taxed under the FSC provisions in accordance with a transfer price that is arm's length, as "arm's length" was understood by Congress in the context of the FSC provisions.

(Gov't Supp. Br. at 10 (underscored emphasis added; italicized emphasis in original).)

The government completes the regulatory transformation, warping Abbott Laboratories' position, and the laws of transfer pricing, in their entirety:

> [P]laintiff's tax liability as reflected in its claims for refund in this case reflects the lowest tax liability it could achieve on a basis of a transfer pricing method that is consistent with § 925(a) and the applicable regulations. The tax liability of plaintiff's FSC, however, is based on the different transfer pricing method that it and plaintiff used on their original returns, because the additional commission income that would result to the FSC on the basis of the redetermined commission calculation cannot be assessed at the time of the redetermination. Thus, the combined tax liability of plaintiff and its FSC is lower than it would be if their separate tax liabilities were both based on the redetermined commission expense. Because, *ex hypothesi*¸ the redetermined commission expense reflected the highest possible commission expense that could be calculated consistent with § 925(a) and the applicable regulations, the aggregate tax liability reflected on plaintiff's claims for refund for the years in suit and its FSC's original returns for those years could only have been achieved on the basis of a *single* commission expense calculation that could not be arrived at consistent with the methods provided for in § 925(a).

(Gov't Supp. Br. at 11 (underscored emphasis added; italicized emphasis in original).)

This subtle – or not so subtle – shift by the government that turns an analysis of arm's length pricing into the assessment and collection of tax is specious. It is unheard of to suggest that the transfer price established between related parties is a function of the government's ability

to assess or collect additional taxes. The government provides no citation or any authority for this bizarre position. As a matter of long-standing law, the arm's length question is not whether the government can assess more taxes, but whether the amounts charged by a taxpayer are appropriate when compared to the interactions of unrelated parties acting at arm's length.[3]

As the FSC provisions make clear, they address exclusively the mechanisms by which taxpayers may claim FSC benefits, which include establishing how to set the parties' transfer prices. *See, e.g.,* Temp. Treas. Reg. § 1.925(a)-1T(e)(4). Once that is done, then the question of how the government may collect any additional taxes is set forth in the limitations statute of section 6501 and in other collection provisions such as section 6321 (creation of a lien). Nowhere, anywhere, in the FSC provisions – relating to transfer pricing or otherwise – are the collection provisions altered. And there is nothing in the FSC legislative or regulatory histories that state, or rationally intimate, that a FSC's transfer pricing is determined by the government's ability to collect additional tax in light of the statute of limitations on assessment under section 6501.

In contrast to the government's supposition as to how the FSC provisions operate, the language of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) and its "shall affect" sentence are wholly in keeping with the concern expressed by the FSC's legislative history regarding arm's length transfer pricing. Section 1.925(a)-1T(e)(4) and the "shall affect" sentence ensure that the income

[3] *See, e.g., Eli Lilly & Co. v. United States*, 372 F.2d 990, 995-96 (Ct. Cl. 1967); *Eli Lilly & Co. v. Commissioner*, 856 F.2d 855, 868 (7th Cir. 1988), *aff'g in part and rev'g in part* 84 T.C. 996 (1985); *Sundstrand Corp. v. Commissioner*, 96 T.C. 226, 353 (1991); *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525, 585 (1989), *aff'd* 933 F.2d 1084 (2d Cir. 1991); *G.D. Searle & Co. v. Commissioner*, 88 T.C. 252, 369 (1987); *Ciba-Geigy Corp. v. Commissioner*, 85 T.C. 172, 221 (1985), *acq.* 1987-2 C.B. 1; *PPG Indus. Inc. v. Commissioner*, 55 T.C. 928, 993 (1970); *Woodward Governor Co. v. Commissioner*, 55 T.C. 56, 64 (1970), *acq.* 1971-2 C.B. 3; *Seagate Tech., Inc. v. Commissioner*, 80 T.C.M. (CCH) 912, 913-14 (2000); *Compaq Computer Corp. v. Commissioner*, 78 T.C.M. (CCH) 20, 29 (1999); *Perkin-Elmer Corp. v. Commissioner*, 66 T.C.M. (CCH) 634, 656 (1993).

and expense effect of any redetermination of the arm's length transfer prices are properly reflected and accounted for by both the FSC and related supplier. The "shall affect" sentence ensures that parties properly reflect changes in income and expense that result from a redetermination of arm's length pricing – the goal of section 482 and the regulations thereunder. Whether the transfer pricing between the FSC and the related supplier is arm's length has nothing to do with the government's ability to assess or collect a tax liability. The government has morphed its concern about assessment of tax liability into a concern about the "arm's length" nature of the FSC commissions. In the end, though, assessment follows from arm's length pricing. Arm's length pricing is not dictated by the ability to assess.

Nowhere in the FSC legislative history, or in the FSC regulatory history, is the timing for redetermining the arm's length transfer prices addressed. Neither "arm's length" nor "shall affect" has any assessment requirement, despite how many times the government repeats it. Sheer force of will cannot change the meaning of words to comply with the government's tortured interpretation. If the government wishes to change the meaning of its regulations, it should change the words used in its regulations. Simply saying that the words mean something other than what they say is not enough.[4] *See Woods Inv. Co. v. Commissioner*, 85 T.C. 274, 282 (1985) ("[s]ince respondent has not taken steps to amend his regulations, we believe his apparent

[4] *Cf.* Lewis Carroll, *Through the Looking Glass*, Ch. 6, reprinted in *Alice's Adventures in Wonderland & Through the Looking Glass* at 188 (First Signet Class Print 2000) (reacting to Humpty Dumpty assigning a meaning to a word that is contrary to its known usage):

> "But 'glory' doesn't mean 'a nice knock-down argument,'" Alice objected.
>
> "When I use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean – neither more nor less."
>
> "The question is," said Alice, "whether you can make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master – that's all."

reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter.”), *acq.* 1986-2 C.B. 1.

## II. THE EVOLUTION FROM TREAS. REG. § 1.994-1(e)(4) TO TEMP. TREAS. REG. § 1.925(a)-1T(e)(4) SHOWS THAT THE ISSUES OF PARAMOUNT CONCERN WERE WHETHER (AND HOW) TAXPAYER REDETERMINATIONS COULD BE MADE AND WHETHER THE ARM’S LENGTH INCOME AND EXPENSE WERE PROPERLY REFLECTED IN THE PARTIES’ ACCOUNTS.

As discussed in detail in Abbott Laboratories’ Supplemental Brief (at 15-23), questions arose under the DISC regime whether taxpayers were permitted to make transfer pricing redeterminations under Treas. Reg. § 1.994-1(e)(4). In a series of rulings from 1979 to 1982, the Service struggled with this question, initially allowing amended returns (*see* Priv. Ltr. Rul. 7949036 (Sep. 5, 1979)), later revoking that decision (*see* Priv. Ltr. Rul. 8035047 (June 5, 1980)), and then prohibiting taxpayer-initiated redeterminations of DISC transfer pricing altogether (s*ee* Tech. Adv. Memo. 8020008 (1980)). In 1981, the Service changed its position again, permitting taxpayers to file amended returns and to redetermine transfer prices. *See* Tech. Adv. Memo. 8137026 (May 29, 1981); Tech. Adv. Memo. 8204018 (Oct. 13, 1981). Finally, in February 1982, the Service solidified its position, ruling in Rev. Rul. 82-81 that timely filed amended returns to redetermine DISC transfer prices would be accepted. *See* Rev. Rul. 82-81, 1982-1 C.B. 109.

The Service then issued a number of rulings answering the question of how redeterminations may be made. The Service permitted amended returns to recalculate the DISC transfer pricing for transactions originally reported on the DISC tax return, but not additional DISC commissions for transactions that could have been, but were not, reported on the original returns. *See* Tech. Adv. Memo. 8527005 (March 7, 1985); Gen. Couns. Memo. 38,374 (Nov. 30, 1984). The Service also clarified that redeterminations may be made to include additional

transactions, but only if those transactions fell within the group of transactions that were previously reported on the DISC returns. *See* Tech. Adv. Memo. 8720003 (Jan. 27, 1987); Tech. Adv. Memo. 8736006 (June 5, 1987).

As part of its new position, the Service ruled in Tech. Adv. Memo. 8232015 (May 4, 1982) and Tech. Adv. Memo. 8310004 (Nov. 13, 1982) that the DISC and related supplier were required to create an account receivable and an account payable for the amount resulting from a redetermination of transfer prices. Likewise, the Service created a procedure allowing distributions that taxpayers previously treated as DISC dividends to be treated as a repayment of the account payable created under Treas. Reg. § 1.994-1(e)(5). *See* Rev. Proc. 84-3, 1984-1 C.B. 361, *modified and superseded* by Rev. Proc. 85-45, 1985-2 C.B. 505.

With the evolution from the DISC regime to the FSC regime, the FSC regulations definitively addressed and answered the questions that were raised in the DISC rulings. The fourth sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) answers the question of whether a taxpayer may redetermine its transfer price by stating "a redetermination may be made by the FSC and related supplier." The question of how a redetermination may be made is answered in the fourth and fifth sentences. The fourth sentence states that the FSC and related supplier may make a redetermination "if they determine that a different transfer pricing method may be more beneficial." The fifth sentence provides an alternative answer to "how" by stating:

> Also, the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods.

The "shall affect" sixth sentence fits within this pattern as an extension of the DISC rulings that required the DISC and related supplier to create offsetting accounts payable and accounts receivable as a result of redeterminations. Thus, the "shall affect" language requires correlative adjustments to the income and expense of the FSC and the related supplier following

a redetermination. In this manner, the corresponding bookkeeping entries may be made just as they were in the DISC rulings. These correlative adjustments also prevent the "abuse" that the government notes is possible under the FSC provisions if the FSC and related supplier "attempt mutually inconsistent redeterminations, or, to the same effect … attempt a redetermination of the related supplier's transfer price that does not make a correlative change to the FSC's transfer price."[5] (Gov't Supp. Br. at 21.)

### A. The "shall affect" sentence requires corresponding income and expenses to be reflected on related parties' books and records; that does not render the sentence "superfluous."

Implementing the words of the "shall affect" sentence to ensure that the FSC and its related supplier's income and expenses correspond does not, as the government contends, render the sixth sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) superfluous. The government construes Abbott Laboratories' interpretation to be that the "shall affect" sentence simply requires "that a redetermination be made by both the related supplier and the FSC." (Gov't Supp. Br. at 23.) Then, the government argues that this renders the sixth sentence repetitious because the fourth sentence "plainly settles this issue, as it only permits the related supplier *and* the FSC to make a *single* redetermination of a transfer price." (*Id.* (emphasis in original).) Abbott Laboratories has never maintained that the sixth sentence means only that a redetermination must be made by both a FSC and a related supplier. Instead, the "shall affect" sentence means that the FSC and related supplier must make correlative adjustments to the amount of income and expense reflected on their books ***following*** a redetermination.

---

[5] The government argues that the FSC provisions are susceptible to "abuse" if a related supplier "make[s] a unilateral redetermination and use[s] that redetermination as grounds for a claim for refund in a given tax year *after* the close of the statute of limitations for assessment of the resulting increase in the taxable income of the FSC…." (Gov't Supp. Br. at 21 (emphasis in original).) However, the government is always in a position to assert the defense of equitable recoupment.

Moreover, and most important perhaps, the adjustments to the parties' books and records must be made for "[a]ny redetermination." This includes redeterminations made by the taxpayer pursuant to the fourth and fifth sentences of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), as well as redeterminations made by the ***Commissioner*** pursuant to the second and third sentences. The "shall affect" sixth sentence is not "repetitious" of the fourth sentence, which applies only to taxpayer-initiated redeterminations based on a change in the transfer pricing method. The sixth sentence is only made superfluous by the way that the government mischaracterizes Abbott Laboratories' position. The government fails to address that a redetermination under the fifth sentence to adjust foreign trading gross receipts or expenses also is subject to the "shall affect" provision to make the appropriate corresponding adjustments to income and expenses.

In an attempt to find some support for its tenuous superfluous argument, the government references Abbott Laboratories' FSC commission agency agreements (the "Agreements"). (Gov't Supp. Br. at 23 fn. 15.) The government posits that, at the time Abbott Laboratories and its FSC entered into the Agreements, Abbott Laboratories' interpretation of the "shall affect" language was consistent with the government's position here and inconsistent with the position that Abbott Laboratories has maintained in this case since filing its administrative claims for refund. (*Id.*) Specifically, the government points to section 4(c) of the Agreements, which states that the commission amounts may be redetermined "at any time prior to the expiration of the period of limitations for assessment of United States income tax for such taxable year of ATCI or the taxable year of ABBOTT in which such commissions accrued (whichever period of limitations expires first)." (*Id.*; Ex. V to Compl. at 191; Ex. W to Compl. at 205.)

Regardless of the Agreements' language in 1987 and 1988, Abbott Laboratories' position when it filed its claims for refund on June 29, 1998, was wholly consistent with the

government's position at that time. On September 15, 1997, the government argued in *Union Carbide Corp. v. Commissioner*, 110 T.C. 375 (1998), that Temp. Treas. Reg. § 1.925(a)-1T(e)(4) did ***not*** require that assessment under section 6501 be available with respect to a FSC. (*See* Ex. BB, Respondent's Memorandum of Law in Support of Respondent's Motion for Partial Summary Judgment at 58, *Union Carbide Corp. v. Commissioner* (No. 3501-94) ("Gov. U.C. Brief")). The government could not have been clearer:

> [T]he regulation does not require that the limitations period for assessing a tax under Section 6501 be open with respect to [a FSC].

(Ex. BB, Gov. U.C. Brief at 58.) The Tax Court agreed, and, on June 15, 1998, held that it is the statute of limitations under section 6511 that is ***expressly*** referenced in the regulation and that must be open for both the related supplier and the FSC. *Union Carbide*, 110 T.C. at 392. In light of this, Abbott Laboratories filed its claims for refund on June 29, 1998, while the statute of limitations under section 6511 was open for both Abbott Laboratories and its FSC, which was in accordance with the government's stated position, the Tax Court's holding in *Union Carbide*, and the purpose of the Agreements to maximize the FSC benefit.[6] (*See* Section 6 of the Agreements, Exs. V at 193 and W at 207.)

---

[6] Section 8(a) of the Agreements provides:

> This Agreement or any provision hereof shall be deemed to be changed, altered, or modified automatically as provided in sections 3(j) and 6 above, and may otherwise be changed, altered, or modified at any time, and may be terminated at any time, by the parties.

(Ex. V at 194; Ex. W at 208.) The parties' filing of the claims for refund effectively amended the Agreements. Section 6 of both Agreements permits deemed amendments to the Agreements to achieve the benefit-maximizing purpose of the Agreements. (*See* Ex. V at 193; Ex. W at 207.)

**B. The government insists on reading words into the regulation that are not there and ignoring the words that are.**

**1. The government's contention that the "shall affect" sentence does not apply to redeterminations initiated by the Commissioner is contrary to the plain language of the regulation.**

Attempting to find textual support for its position, the government argues that the "shall affect" sentence applies only to taxpayer-initiated redeterminations. (Gov't Supp. Br. at 19.) By doing so, it then leverages that assumption to make its assertion that the "shall affect" sentence was adopted to prevent a related supplier from making a redetermination and claiming a refund after the FSC's statute of limitations on assessment has closed. (Gov't Supp. Br. at 21.) This contention that the sixth sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) does not apply to redeterminations by the Commissioner is consistent with the government's pattern of "situational blindness" when it comes to reading the regulations in this case.

The sixth sentence states: "Any redetermination shall affect both the FSC and the related supplier." Temp. Treas. Reg. § 1.925(a)-1T(e)(4) (emphasis added). The government's argument that "any" applies only to taxpayer-initiated redeterminations is contrary to the plain meaning of the word "any,"[7] let alone to the plain meaning of the regulation *per se*. Even the Service has acknowledged the tenuousness of this position. *See* Field Serv. Adv. 200010027 (Dec. 8, 1999) ("Our conclusion that the 'shall affect' requirement in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) applies only to taxpayer-initiated FSC redeterminations is subject to hazards of litigation." (emphasis in original)). The second, third, fourth, and fifth sentences of Temp. Treas. Reg. § 1.925(a)-1T(e)(4), which precede the "shall affect" sentence, establish who may make a redetermination and for what purposes. The second sentence provides that the ***Commissioner***

[7] Webster's dictionary defines "any" as "one indifferently out of more than two." *See* Webster's Third New International Dictionary of the English Language Unabridged 97 (Philip Babcock Gove ed., Merriam-Webster, Inc. 1993) (1961).

may make a redetermination. The third sentence indicates that such a redetermination by the ***Commissioner*** may be made to reflect adjustments under sections 482 or 861. By comparison, the fourth sentence of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) provides that a ***FSC and related supplier*** are permitted to make redeterminations for the purpose of applying a different transfer pricing method. The fifth sentence states that ***taxpayers*** may also make a redetermination for the purpose of adjusting the profits of the related supplier and the FSC based on changes to the amount of foreign trading gross receipts and the amount of costs and expenses. Thus, the four sentences that precede the "shall affect" sentence describe the circumstances in which ***both*** the Commissioner ***and*** taxpayers may make redeterminations.

"[I]t is well settled that clear, unequivocal, and unambiguous Treasury regulations should be accorded their plain meaning." *Weyerhaeuser Co. and Sub. v. United States*, 32 Fed. Cl. 80, 139 (1994), *aff'd in part & rev'd in part on other grounds*, 92 F.3d 1148 (Fed. Cir. 1996). "Any redetermination" clearly applies to ***any*** of the redeterminations discussed in the preceding four sentences of the regulation – those redeterminations made by the taxpayers and those redeterminations made by the Commissioner. While the government's analysis sheds little light on the meaning of the "shall affect" sentence – even a taxpayer-initiated redetermination must be reflected on both the FSC's and its related supplier's books and records – its attempt to turn the meaning of "any redetermination" into something other than what it says is yet another example of the government ignoring the words of the FSC regulation that exist to justify the interposition of those that do not.

**2. The government continues to assert that its ability to assess additional taxes under section 6501 is a requirement for FSC claims for refund without pointing to where any such pre-condition exists, expressly or implicitly, in the Code or the regulations.**

The government continues to assert that the "shall affect" sentence of Temp. Treas. Reg. § 1.925(a)-1T (e)(4) requires that the statute of limitations on assessments under section 6501 be open when a redetermination of the FSC commission expense is made. After three briefs and an oral argument, however, the government has yet to identify a single place in the entirety of the Internal Revenue Code or the Treasury regulations where section 6501 is used as a pre-condition for a taxpayer's claim for refund. The government cannot do so because nowhere in the FSC statutes, the FSC regulations, and certainly not in Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is there a reference to section 6501, let alone a requirement or precedent anywhere in the tax laws that conditions one party's claim for refund on another related or unrelated party's statute of limitations on assessment.

For its part, Abbott Laboratories has maintained consistently throughout these proceedings that the issue is not one of "assessment and collection," but of "income and expense."[8] Compared to the government's groundless interpretations, the FSC regulations are replete with concern for the proper reflection of income and expense. *See* Temp. Treas. Reg. § 1.925(a)-1T(b)(2)(ii) ("The payment made to the related supplier must be reflected on the FSC's books and must be taken into account in computing the FSC's and related supplier's combined taxable income."); Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(i) ("If the amount of the transfer price or rental payment actually charged by a related supplier to a FSC or the sales commission actually charged by a FSC to a related supplier has not been paid, an account receivable and

[8] A view that the government apparently once shared. (*Cf.* Ex. BB, Gov. UC Brief at 58 ("[T]he regulation does not require that the limitations period for assessing a tax under section 6501 be open with respect to" a FSC).)

payable will be deemed created…"); Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(iii) ("Payment of dividends, transfer prices, rents, commissions, service fees, receivables, or payables may be in the form of money, property, sales discount, or an accounting entry offsetting the amount due the related supplier…"); Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(i) ("the person who was underpaid under this redetermination shall establish (or be deemed to have established), at the date of the redetermination, an account receivable from the person with whom it engaged in the transaction … A corresponding account payable will be established by the person who underpaid the amount due.")

Ignoring the myriad of references to accounting entries, books and records, and the proper reflection of income and expense that appear throughout Temp. Treas. Reg. § 1.925(a)-1T, the government essentially argues that the section 6501 assessment requirement exists because it says so. The government may not impose its administrative will by decree. *See Gold v. United States*, 552 F. Supp. 66, 71 (D. Colo. 1982) ("The IRS has wide discretion, but discretion is not to be equated to fiat"); *General Electric Co. v. Burton*, 372 F.2d 108, 110 (6th Cir. 1967) ("It is well established that a statute may not be broadened by administrative action to cover areas never intended to be reached … by Congress . . ."). Section 6511 establishes a bright-line limitations period for filing claims for refund. Section 925 does not impose any additional time limitation on redeterminations of FSC commission expenses. Likewise, Temp. Treas. Reg. § 1.925(a)-1T(e)(4) references only section 6511, while making no mention of section 6501. The time limitation on claims for refund under section 6511 is the sole time limitation for taxpayers making a redetermination under section 925.

As discussed in detail in Abbott Laboratories' initial briefs, the Supreme Court has held that exceptions to the refund statute of limitations of section 6511 should not be read into the

statute absent Congressional intent. *See United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("Section 6511's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, open ended, 'equitable' exceptions into the statute that it wrote."). Finding no support in section 925, or in the regulations thereunder, the government is now attempting to do just what the Supreme Court prohibited, claiming that the "shall affect" sentence imposes a section 6501 requirement on section 6511 with respect to a refund claim arising from a redetermination of FSC commission expense. This implicit timing requirement is unsupported by statute and is contrary to the Supreme Court's interpretation of section 6511. It is impermissible.

## III. TEMP. TREAS. REG. §§ 1.925(a)-1T(e)(3) AND (e)(5) PROVIDE THE CONTEXT WITHIN WHICH THE "SHALL AFFECT" SENTENCE FITS.

Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3) and (e)(5) establish rules to ensure that a FSC's and related supplier's income and expenses are properly accounted for and recorded in the parties' books. These sections provide the context within which Temp. Treas. Reg. § 1.925(a)-1T(e)(4) and the "shall affect" sentence must be read. The government fails to acknowledge this point, choosing instead to argue that "nothing in § 1.925(a)-1T(e)(3) and (5) helps to advance plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4)." (Gov't Supp. Br. at 28.) The government is wrong, because, unlike the government, Abbott Laboratories is relying on the words of the regulations in analyzing the meaning of Temp. Treas. Reg. §§ 1.925(a)-1T(e)(3), (4), and (5).

Temp. Treas. Reg. § 1.925(a)-1T(e)(3) applies when the related supplier does not pay the amount determined under section 925 that is owed to the FSC before the end of their taxable year. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(i). If the amount of commission determined

under the pricing rules has not been fully paid by the due date of the FSC's tax return, then the FSC and related supplier must create an account receivable and corresponding account payable in an amount equal to the difference between the amount determined under section 925 and the amount actually paid. *Id*. The account receivable will accrue interest, which will be included in the income of the person to whom the indebtedness is owed. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(3)(ii).

Contrary to the government's bald assertion that Temp. Treas. Reg. § 1.925(a)-1T(e)(3) "is not directly material to the interpretation of § 1.925(a)-1T(e)(4)" (Gov't Supp. Br. at 28), Temp. Treas. Reg. § 1.925(a)-1T(e)(3) is, on its face, indicative of the pervasive theme throughout Temp. Treas. Reg. § 1.925(a)-1T of properly accounting for amounts of income and expense. That is what the "shall affect" sentence of (e)(4) does, and that is what the provisions of (e)(3) do as well.

For its part, Temp. Treas. Reg. § 1.925(a)-1T(e)(5) is an extension of Temp. Treas. Reg. § 1.925(a)-1T(e)(3), but is concerned with accurately reflecting the amount of income and expense assigned to the FSC and the related supplier ***following*** a redetermination. If the commission or transfer price is redetermined pursuant to Temp. Treas. Reg. § 1.925(a)-1T(e)(4), then the FSC and the related supplier must create corresponding accounts payable and receivable equal to the difference between the redetermined amount and the amount previously determined. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(i). As in Temp. Treas. Reg. § 1.925(a)-1T(e)(3), the related supplier and the FSC must reflect accurately the income and corresponding expenses created by a redetermination on their books, because, among other things, this amount continues to accrue interest until paid. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(5)(ii).

Again, the government refuses to let go of the thin reed that is its position in this case and argues that "the supposed work done by plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) does nothing to change the effects under § 1.925(a)-1T(e)(5) of a transfer price redetermination." (Gov't Supp. Br. at 29.) The government then attempts to discredit its version of Abbott Laboratories' argument, stating "it is simply unreasonable to suppose that the only concerns that the sixth sentence of § 1.925(a)-1T(e)(4) was intended to address were concerns about the impact of <u>interest accrual</u> resulting from § 1.925(a)-1T(e)(5)(ii)." (Gov't Supp. Br. at 32 (emphasis added).)

The "shall affect" sentence is concerned with amounts of income and expense that must be accounted for, not with the (resulting) interest income, which the government suggests. The accrual of interest, though, happens only upon the proper reflection of that income and expense, and the creation of accounts receivable and payable, in the parties' books and records. The interest income that may be earned under accounts receivable created pursuant to Temp. Treas. Reg. § 1.925(a)-1T(e)(5) following a redetermination is, per the FSC regulation, one of the collateral consequences of the correlative adjustments to the FSC's and related supplier's income and expense.

The "shall affect" sentence must be read in the context of the sections that precede and follow it. All three sections address accurate reflection and recordation of the FSC's and the related supplier's income and expense. When read within this regulatory construct, the "shall affect" sentence "fits." It requires correlative adjustments to the FSC's and related supplier's income and expenses following a redetermination. This correlative adjustment triggers Temp. Treas. Reg. § 1.925(a)-1T(e)(5), which ensures that the parties' books accurately reflect the correct amounts and that the appropriate accounting entries are recorded. Thus, the effect

created by the "shall affect" sentence is the proper reflection of redetermined transfer prices between the FSC and related supplier. The "shall affect" language, like the entirety of section 925 and the regulations thereunder, is concerned with the proper determination of transfer price and the income and expense effect for the FSC and the related supplier. Nothing more. Nothing less.

## CONCLUSION

It seems appropriate to recall in conclusion what, precisely, is at issue in the parties' cross motions for summary judgment: did Abbott Laboratories file its claims for refund in a timely manner under Temp. Treas. Reg. § 1.925(a)-1T(e)(4)? The government maintains that Abbott Laboratories' refund claim was not timely, because the statute of limitations on assessment under section 6501 had expired against Abbott Laboratories' FSC, even though the statutes of limitations on refund claims under section 6511 were open for both Abbott Laboratories and its FSC in accordance with *Union Carbide*.

Since the beginning of this case, and after three briefs and an oral argument, the problem for the government has been that the only authority for its interpretation is itself. It can point to no statute, no regulation, and no case law that supports its interpretation of Temp. Treas. Reg. § 1.925(a)-1T(e)(4). Indeed, in the only case to have addressed the timeliness of a FSC refund claim, *Union Carbide,* the government's position was opposite to the one it takes now; and, in that case, the Tax Court declined to adopt the interpretation that the government makes now.

If the dearth of language to support the government's position sits on one end of the regulatory-interpretation spectrum, then the abundance of language to support Abbott Laboratories' analysis sits on the other. Abbott Laboratories has maintained that the "shall affect" language of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) ensures that taxpayers' income and

expenses match up following a redetermination under the FSC rules and that the parties accurately reflect these corresponding changes in their books and records. Throughout the FSC regulations generally, and Temp. Treas. Reg. § 1.925(a)-1T specifically, those concepts – and words – are embodied. The government cannot say the same for either its "self-cited" position or the unprecedented requirement that a refund claim be made contingent on the government's ability to assess a liability against another related party. At some point, the government's interpretation of the FSC regulations and, thus, its motion for summary judgment must crumble under the weight of an analytic construct that can find no express language – in the statutes, in the regulations, in the legislative or regulatory histories, or in the case law – to support it.

* * *

For the reasons set forth above and in its previously submitted briefs, Abbott Laboratories respectfully requests that this Court grant its Motion for Partial Summary Judgment and deny the government's cross-Motion for Summary Judgment as a matter of law.

Respectfully submitted,

s/ Thomas V. M. Linguanti

Robert W. DeJoy
Attorney of Record
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 891-3993

Thomas V. M. Linguanti
Robert S. Walton
Of Counsel
BAKER & McKENZIE LLP
130 East Randolph Drive
Chicago, IL 60601
(312) 861-2623

Counsel for Plaintiff,
Abbott Laboratories and U.S. Subsidiaries

Dated this 12th day of May, 2008