IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-778 T
(Judge Allegra)

ABBOTT LABORATORIES AND U.S. SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant

**DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In our Supplemental Brief pursuant to the Court's order of February 22, 2008, we initially addressed the Court's question about whether any light is shed on the interpretation of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) by the legislative history of the DISC or the FSC provisions, because, upon consideration, it became clear that the legislative history of the transition in the Code from DISC to FSC regimes is the proper starting point for understanding the need for, and thus the meaning of, the sixth sentence of § 1.925(a)-1T(e)(4). We demonstrated that this legislative history reveals that Congress intended that the FSC regime would ensure (as the DISC provisions did not) that United States taxation of related exporting enterprises would be based on arm's-length transfer pricing rules, as required by the General Agreement on Tariffs and Trade (GATT). Accordingly, Congress, in enacting the FSC

provisions, required that a related supplier and FSC be subject to U.S. income taxation on the basis of a *single* transfer or commission price when utilizing the FSC administrative pricing rules, which Congress deemed to be arm's-length. The sixth sentence of § 1.925(a)-1T(e)(4), in furtherance of this purpose, prevented manipulation of these administrative pricing rules by ensuring that, if a price were redetermined after the filing of the related supplier and FSC's original returns, the party whose income was increased thereby was taxed on that additional income.

Plaintiff, on the other hand, after having reviewed the same legislative history, asserted in its supplemental brief that the DISC and the FSC legislative history "has not provided any insight into the meaning of the 'shall affect' sentence [*i.e.*, the sixth sentence of § 1.925(a)-1T(e)(4)]." Pl.'s Supp. Br. at 33. While this statement purports to constitute plaintiff's entire response to the Court's question (3), its true purpose appears to have been to serve as a pretext for plaintiff's resort to a lengthy recitation of what it calls "the de facto regulatory history"– *i.e.*, IRS administrative rulings regarding the DISC provisions. *See ibid.* This recitation, which comprises the bulk of plaintiff's supplemental brief (pp. 14-26), does not shed any light on the interpretation of the sixth sentence of § 1.925(a)-1T(e)(4), and in fact confirms that plaintiff's interpretation of § 1.925(a)-1T(e)(4) ultimately fails to give effect to the sixth sentence.

**1. Plaintiff's recitation of IRS administrative rulings regarding whether DISC redeterminations could be made on amended returns does not support plaintiff's interpretation of § 1.925(a)-1T(e)(4), and confirms that plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) renders it mere surplussage**

After reciting its so-called "de facto regulatory history," plaintiff ultimately asserts that the "de facto regulatory history" supports a reading of the sixth sentence of § 1.925(a)-1T(e)(4)

as merely requiring the creation of accounts payable and receivable between the related supplier and the FSC, to correspond to the redetermination:

> The FSC requirements that "[a]ny redetermination shall affect both the FSC and the related supplier" can be read in light of the DISC rulings and the changes between the DISC and FSC regimes. The "shall affect" language merely requires that the corresponding income and expense *affect the FSC and the related supplier by the establishment of accounts receivable and payable to reflect the amount of the redetermination*.

Pl.'s Supp. Br. at 25 (emphasis added).

The fatal flaw in this argument is that the creation of such accounts payable and receivable is *expressly* required by § 1.925(a)-1T(e)(*5*):

> If a redetermination under paragraph (e)(4) of this section is made . . . the person who was underpaid under this redetermination *shall establish (or be deemed to have established), at the date of the redetermination, an account receivable* from the person with whom it engaged in the transaction equal to the difference between the amounts as redetermined and the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid. *A corresponding account payable will be established* by the person who underpaid the amount due.

(Emphases added.)[1] Indeed, in other parts of its supplemental brief, plaintiff concedes that the source of the requirement to create accounts receivable and payable after a valid redetermination is § 1.925(a)-1T(e)(5). *See, e.g.,* Pl.'s Supp. Br. at 24 (citing § 1.925(a)-1T(e)(5) for the proposition that "the FSC and the related supplier are required to set up corresponding accounts payable and receivable . . . if there is a redetermination of the commission income due the FSC").

---

[1]Even if § 1.925(a)-1T(e)(5)(i) did, somehow, leave any doubt as to the specific source in § 1.925(a)-1T of the requirement to create accounts receivable and payable corresponding to a transfer price redetermination, these doubts would be answered by § 1.925(a)-1T(e)(5)(ii) and (iii), both of which expressly refer to "account[s] receivable created in accordance with the above subdivision (5)(i)."

This flaw in plaintiff's argument underscores the overall failure of plaintiff's interpretation to give independent effect to the sixth sentence of § 1.925(a)-1T(e)(4). As defendant has demonstrated at length in its prior briefing, plaintiff's interpretation of the sixth sentence of § 1.925(a)-1T(e)(4) adds nothing that is not otherwise accomplished by other statutory or regulatory provisions, thus running afoul of the basic principle of construction that all the language of a statutory or regulatory scheme should be given effect.

Plaintiff also seems to find some significance in its recitation of the so-called "de facto regulatory history" in the supposed failure of these rulings to discuss *when* a redetermination could be made under the DISC provisions. *See* Pl.'s Supp. Br. at 16-22. To the extent these *DISC* rulings do not address the specific "timing" issues raised by plaintiff's attempted redetermination, this is hardly surprising, as the DISC, unlike the FSC, was not subject to U.S. income taxation. *See* Def.'s Supp. Br. at 12-25. It was the change to taxability of *FSC*s that provided the impetus for taxpayers to attempt the sort of redetermination that plaintiff and its FSC have attempted in this case, *viz.*, one which, if respected, results in a tax benefit to the related supplier in the form of increased commission expense deductions, and also results in a tax benefit to the FSC by precluding the IRS from assessing the additional tax related to the corresponding increase in the FSC's commission income. *See ibid.*

**2. Similarly, plaintiff's discussion of § 1.925(a)-1T(e)(3) and (e)(5) does not support its interpretation of § 1.925(a)-1T(e)(4), and confirms that this interpretation fails to give effect to the sixth sentence of § 1.925(a)-1T(e)(4)**

Plaintiff's discussion of § 1.925(a)-1T(e)(3) and (e)(5) suffers from the same defects as its recitation of its so-called "de facto regulatory history." That is, plaintiff asserts virtually the same ultimate conclusion, *viz.*, that a redetermination "affects" both the related supplier and the

FSC because it results in the creation of accounts payable and receivable pursuant to § 1.925(a)-1T(e)(5):

> The "shall affect" sentence of Temp. Treas. Reg § 1.925(a)-1T(e)(4), therefore . . . require[s] that the income and expense of both the FSC and the related supplier be adjusted following a redetermination, so that this amount may be properly accounted for. In this regard, any redetermination *affects* both the FSC and the related supplier by requiring correlative adjustments to the parties' income and expenses. The correlative adjustment must be made following a redetermination to ensure that the parties' books accurately reflect the correct amounts and that the appropriate accounting entries are recorded pursuant to Temp. Treas. Reg § 1.925(a)-1T(e)(5).

Plt. Supp. Br. at 30 (emphasis in original). As we explained above, this requirement is *expressly* provided for in § 1.925(a)-1T(e)(5). Thus, plaintiff's discussion in response to the second question posed in the Court's February 22 order reinforces our point that plaintiff is really asking the Court to simply read the sixth sentence of § 1.925(a)-1T(e)(4) out of the regulation.

Plaintiff's supplemental brief makes the additional contention, not previously made, that a change in the "FSC's earnings and profits is significant because . . . the FSC's ability to carry over or carry back net operating losses, depends on the amount of the FSC's earnings and profits." Pl.'s Supp. Br. at 32.[2] Plaintiff's point here is simply unclear, in at least two ways. First, if plaintiff means that the ability of a FSC to carry over or carry back net operating losses is *invariably* impacted by a transfer price or commission expense redetermination, plaintiff is mistaken. The FSC regulations provide that "[t]he amount of the deduction for the taxable year under section 172 for a net operating loss carryback or carryover . . . shall be determined in the same manner as if the FSC were a foreign corporation which had not elected to be treated as a

[2]Plaintiff makes this point in the course of making the argument about the earnings and profits of the FSC that plaintiff made at oral argument. Pl.'s Supp. Br. at 32. This argument was addressed in defendant's supplemental brief. *See* Def.'s Supp. Br. at 32 n.19.

FSC." Temp. Treas. Reg. § 1.921-3T(c)(2)(i). Under § 172, a net operating loss deduction requires, *inter alia*, a net operating loss that can be carried back or carried over from some other taxable year. § 172(a). "Net operating loss" is defined as "the excess of the deductions allowed by this chapter over the gross income." § 172(c).[3] Thus, in order for the "ability" of a FSC to carry back or carry over net operating losses from a given year to be impacted by a redetermination that increases the income of the FSC, that redetermination would have to result in a change in the amount of the net operating loss, if any, of the FSC. Because such a redetermination would increase the gross income of the FSC, the FSC would need to have a net operating loss prior to the redetermination. If the FSC did not, its "ability" to carry back or carry over a net operating loss (or, more precisely, lack thereof) would not be changed by an increase in its income under such a redetermination.

Second, if plaintiff is simply making the point that it is theoretically *possible* that a redetermination could impact the amount of a FSC's net operating loss carryback or carryover, it is unclear how this point supports plaintiff's position. Plaintiff offers no explanation of how such a possibility remedies the failure of its interpretation of § 1.925(a)-1T(e)(4) to give effect to the language of the sixth sentence. Further, plaintiff's FSC did not report a net operating loss on its original returns for any of the years in suit.[4] *See* Compl. ¶ 28. Thus, plaintiff cannot contend

---

[3]Section 172(d) modifies the definition of "net operating loss" in § 172(c), in ways that are inapplicable here.

[4]This is hardly surprising, given that it is extremely unlikely that a FSC that (along with its related supplier) has elected to use one of the administrative pricing methods of § 925(a) would ever have a net operating loss. As a general matter, a related supplier and FSC have no incentive to structure their affairs so as to result in a loss, because of the preferential U.S. income tax rate applied to a FSC's foreign trade income. §§ 921, 923. Furthermore, when a FSC and (continued...)

that its attempted redetermination "affects" its FSC because it results in the reduction or elimination of a net operating loss of its FSC that was carried back or carried over to some taxable year for which the statute of limitations for assessment is open, for the simple reason that it did not have a net operating loss for any of the years in suit under the original commission expense determination.

In saying this, defendant does not concede that an attempted redetermination in a year for which the FSC's assessment statute was closed could satisfy the sixth sentence of § 1.925(a)-1T(e)(4) simply because the redetermination would, if respected, result in an increase in the assessable income of the FSC in some earlier or later taxable year to which the FSC had carried a net operating loss from the redetermination year. To the extent that such a redetermination, if respected, would result in an increase in the taxable income of the FSC in a year for which the statute of limitations is closed, such a redetermination would still fail to "affect" the FSC, as required by the sixth sentence. It would be highly implausible to suppose that the intention behind the sixth sentence was simply to ensure that there would be *some* carryover or carryback year that would be affected under the redetermination, regardless of whether the increase in income to the FSC in the redetermination year is assessable. In addition, such an interpretation

---

[4](...continued)
related supplier elect to use one of the administrative pricing methods of § 925(a), the FSC and related supplier are always allowed to utilize a transfer price or commission that results in the FSC earning foreign trade income equal to its costs, even if such a price would result in an otherwise-prohibited loss to the related supplier. *See* Temp. Treas. Reg. § 1.925(a)-1T(e)(1)(i); *see also* Temp. Treas. Reg. § 1.921-3T(c)(1)(v) (because of § 1.925(a)-1T(e)(1)(i), "a FSC will not have deficit in its earnings and profits relating to foreign trade income determined with regard to the administrative pricing rules"). Thus, if a FSC that utilizes an administrative pricing method were to have a net operating loss, such a loss would be solely attributable to the FSC's transactions that result in non-foreign trading income or loss. *See* Temp. Treas. Reg. § 1.921-3T(c)(1).

would be inconsistent with the legislative history of the FSC provisions, for the same reason that motivates plaintiff's interpretation: it would result in the related supplier and the FSC being taxed on income attributable to export property on the basis of a non-arm's length transfer price or commission. *See* Def.'s Supp. Br. at 2-12.

**CONCLUSION**

For the reasons stated above, and in defendant's previous briefs filed in this case, defendant respectfully requests that the Court deny plaintiff's motion for partial summary judgment, and grant defendant's motion for summary judgment.

Respectfully submitted,

May 12, 2008

s/ Joseph B. Syverson
JOSEPH B. SYVERSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
TELEPHONE (202) 307-6508
FACSIMILE (202) 514-9440
Joseph.B.Syverson@usdoj.gov

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief

s/ Mary M. Abate
May 12, 2008
Of Counsel