# In The United States Court of Federal Claims

No. 06-778T

(Filed: September 24, 2008)

_____

| | |
|---|---|
| ABBOTT LABORATORIES and U.S. SUBSIDIARIES,<br><br>      Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>      Defendant. | *  Tax refund suit; Summary judgment; 26<br>*  U.S.C. §§ 921-28 – foreign sales corporation<br>*  provisions of the Internal Revenue Code of<br>*  1986; Temp. Treas. Reg. § 1.925(a)-1T(e)(4)<br>*  – requirements for redetermination of FSC<br>*  income; Temporary regulation construed –<br>*  redetermination must "affect" entities;<br>*  Validity of legislative regulation; Temporary<br>*  regulation valid; Judgment for defendant. |

_____

**OPINION**

_____

*Robert W. DeJoy, Jr.*, Baker, McKenzie, LLP, New York, NY, for plaintiff.

*Joseph B. Syverson*, Tax Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Nathan J. Hochman*, for defendant.

**ALLEGRA, Judge:**

  The Internal Revenue Code (26 U.S.C.) (the Code) contains a number of statutes of limitations. That governing the assessment and collection of taxes is found in section 6501 of the Code, which generally provides that the amount of any tax imposed "shall be assessed within 3 years after the return was filed." 26 U.S.C. § 6501(a). This period may be extended by timely agreement of the Secretary and the taxpayer. *Id*. at § 6501(c)(4). The limitation period for filing a claim for refund is in section 6511 of the Code, which provides that such a claim "shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid." *Id*. at § 6511(a). Tying these provisions together is section 6511(c)(1), which provides that "[t]he period for filing claim for credit or refund . . . shall not expire prior to 6 months after the expiration of the period within which an assessment may be made pursuant to the agreement or any extension thereof under section 6501(c)(4)." *Id*. at § 6511(c)(4). The upshot of these provisions is this – when there is an extension of the assessment period, the taxpayer can file for a refund for a given taxable year after the Commissioner is barred from making further assessments for that year. *See Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1328 (Fed. Cir. 2007); *New England Elec. Sys. v. United States*, 32 Fed. Cl. 636, 639 (1995).

This statutory "window" figures prominently in this tax refund suit, which is before the court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. This case involves the "foreign sales corporation" provisions of the Code, which, until amended, afforded a tax exemption to a portion of the foreign export income allocated to such foreign corporations. Relying on these provisions, plaintiff sought to shift income it had previously reported on its returns to a foreign sales subsidiary (which had filed separate returns). To effectuate this reallocation, plaintiff filed a claim for refund while the period of limitations under section 6511 was still open, but after the period under section 6501 for assessing the foreign subsidiary with the correlative tax deficiency had expired. Plaintiff asserts that it is entitled to its refund despite the inability of the Internal Revenue Service (IRS) to tax its foreign subsidiary on the corresponding income adjustments. Not so, contends defendant, citing a regulation that requires that redeterminations of income "affect" both the parent and the foreign subsidiary. As this requirement was not met, defendant argues, plaintiff is not entitled to the tax benefits it claims.

**I.     BACKGROUND**

Before describing the facts in greater detail, it is helpful to understand better the very complex statutory framework against which those facts arise.

**A.**

***Statutory Background***

The federal income tax is generally imposed on all income of U.S. corporations without regard to whether *vel non* such income derived in the United States. *See* 26 U.S.C. § 61; *Cook v. Tait*, 265 U.S. 47, 56 (1924). In contrast, foreign corporations are taxed almost exclusively on income meeting statutory criteria identifying it as "connected with" or "sourced in" the United States. *See* 26 U.S.C. §§864(c); 871(a)(1); 881(a), 882(a). In the case of a multinational conglomerate that includes both domestic and foreign entities, the United States predominantly taxes only the income of the U.S.-based corporations. Recognizing the ease with which both domestic and foreign corporations could shift their income among various countries, Congress, as early 1917, sought to preserve the tax base of the United States.[1] Years later, renewed

---

[1] Treasury regulations promulgated under the War Revenue Act of 1917, ch. 63, 40 Stat. 300 (1917), authorized the government to require affiliated domestic corporations and partnerships to file consolidated returns. These regulations were essentially codified by section 1331(b) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 319 (1921). In 1928, Congress enacted section 45 of the Revenue Act of 1928, 45 Stat. 791, 806 (1928), the precursor to current section 482 of the Code. Section 482 empowers the Commissioner of Internal Revenue to allocate income, deductions, and credits between two or more controlled entities, when necessary to prevent tax evasion or clearly to reflect income. 26 U.S.C. § 482; *see also* Francis M. Allegra, "Section 482: Mapping the Contours of the Abuse of Discretion Standard of Judicial Review," 13 Va. Tax Rev. 423, 424-31 (1994).

concerns prompted Congress to enact subpart F of the Code, as part of the Revenue Act of 1962, Pub.L. No. 87-834, § 12, 76 Stat. 960, 1006 (1962), which contained provisions designed to impact the allocation of income, deductions, and credits between two or more controlled entities. But, less than a decade later, Congress grew concerned that it had gone too far, perhaps so encumbering the allocation of export income as to affect adversely exports themselves.

As part of the Revenue Act of 1971, Congress enacted provisions that "provided special tax treatment for export sales made by an American manufacturer through a subsidiary that qualified as a 'domestic international sales corporation'(DISC)." *Boeing Co. v. United States*, 537 U.S. 437, 440 (2003). The DISC provisions sought to "provide substantial stimulus to exports and at the same time to avoid granting undue tax advantages." S. Rep. No. 92-437, at 13 (1971); *see also* H. Rep. No. 92-533, at 7 (1971). Under these provisions, a domestic manufacturer could form a DISC in the United States "the income of which was not taxed at the DISC level. Instead, the corporate shareholder was taxed directly on a portion of the DISC's income deemed distributed. The portion of the income not deemed distributed was not subject to any U.S. taxation until actually distributed." Richard L. Doernberg, International Taxation 395-396 (4th ed. 1999); *see also* Jt. Comm. on Tax'n, Background and History of the Trade Dispute Relating to the Prior-Law Foreign Sales Corporation Provisions and the Present-Law Exclusions for Extraterritorial Income and a Description of These Rules (JCX-10-02) 8-9 (Feb. 25, 2002) (hereinafter "2002 Joint Comm. Report"). This statute thus provided "an incentive to maximize the DISC's share – and to minimize the parent's share – of the parties' aggregate income from export sales." *Boeing*, 537 U.S. at 441.

The DISC provisions proved controversial, almost from the start. Soon after their enactment, they were challenged by member nations of the European Community as an impermissible export subsidy in violation of Article XVI of the General Agreement on Tariffs and Trade (GATT). *See* 1 S. Prt. 98-169, at 634 (Comm. Print 1984); Congressional Research Serv., "Export Benefits and the WTO: The Extraterritorial Income Exclusion and Foreign Sales Corporations," (Apr. 24, 2007) (hereinafter "CRS report"). Under GATT, illegal export subsidies can be "as blatant as special tax deductions related to exports or as subtle as the failure to enforce arm's length pricing between commonly controlled entities." Philip L. Jelsma, "The Making of A Subsidy 1984: The Tax and International Trade Implications of the Foreign Sales Corporation Legislation," 38 Stan. L. Rev. 1327, 1331 (1986) (hereinafter "Jelsma") (citing various GATT authorities). In contending the DISC provisions violated GATT, U.S. trading partners charged that the statute itself provided undue tax benefits and that it had been laxly enforced. *Id*. at 1327. In 1984, Congress responded by substantially curtailing the tax benefits associated with the DISC provisions and enacting a new export regime in the form of the "foreign sales corporation" (FSC) provisions of the Code. 26 U.S.C. §§ 921-927. *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 805(b), 98 Stat. 1000-1001 (1984).[2] Under the

---

[2] While not conceding that the DISC provisions violated GATT, the Senate indicated that the United States had agreed to modify its tax legislation to comply with the principles outlined in a 1981 GATT Panel Report, *to wit*, that "GATT signatories are not required to tax export income attributable to economic processes located outside their territorial limits," provided that

latter provisions, a U.S. parent could establish a foreign sales corporation, whose foreign sales income was partially exempt from the U.S. corporate income tax.  S. Prt. No. 98-169, *supra* at 636; R. Doernberg, *supra,* at 397.  Again, as with the DISC regime, it was in the parent's interest to maximize the FSC's share of the taxable income generated by export sales.  After the World Trade Organization (WTO) concluded that the FSC provisions represented a prohibited export subsidy, Congress replaced them with the "extraterritorial income exclusion" of section 114 of the Code.  Pub. L. No. 106-519, 114 Stat. 2423 (2000).

      The FSC provisions "quickly reach, and rarely leave, a plateau of statutory intricacy seldom rivaled in other sections of the Code."  Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 17.14, at 17-43 (4th ed. 1979).  Under these provisions, the foreign trade income of the FSC was defined as its gross income attributable to foreign trading gross receipts (FTGRs).  26 U.S.C. §§ 923(b), 924.[3]  Section 925(a) of the Code authorized taxpayers to allocate the foreign trade income between the FSC and the related supplier using one of three methods.  The first of these were two "administrative pricing" methods that established the FSC's taxable income as either 1.83 percent of the foreign trading gross receipts derived from the export sales, or 23 percent of the combined taxable income of the FSC and its related supplier derived from such sales.  A third method for deriving this income employed the sales price actually charged by the parties, subject to revision under section 482 of the Code.  *See* H.R. Rep. No. 106-845, at 12 (Sept. 13, 2000) (describing the FSC provisions); *Proctor & Gamble Co. v. United States*, 2007 WL 2994686, at * 3 (S.D. Ohio Oct. 6, 2007).[4]  Different methods could be elected on a sale-by-sale or group-of-sales basis, allowing taxpayers to maximize the advantages of the pricing methods within the same tax year.  *See* Temp. Treas. Reg. § 1.925(a)-1T(c)(8)(iii).  A portion of the FSC's taxable income (15/23rds in the case of a FSC owned by a corporate shareholder) was permanently exempted from federal income tax at the FSC level.  The remaining 8/23rds was taxed to the FSC as income effectively connected with the conduct of a U.S. trade or business.  *See* 26 U.S.C. § 923(a).  This after-tax income, when distributed by the FSC as a dividend to its parent, was not subject to tax.  The net effect of this scheme was to shift a prescribed amount of profit on export sales from an entity with a 35 percent effective tax rate to an entity (the FSC) with an effective tax rate of approximately 12

---

"arm's length pricing principles should be observed in transactions between exporting enterprises and foreign buyers under common control."  S. Prt. No. 98-169, at 634 (1984).  *See also* CRS Report at 2.

   [3]  All references to 26 U.S.C. §§ 921-27 are to the versions as they existed during the years in question and prior to being repealed in 2000.  Likewise, all references to the temporary regulations issued under these provisions are to the versions in effect during the years in question.

   [4]  The first two methods enumerated by these provisions represent safe havens in the sense that the allocations established thereunder could not be challenged by the IRS under section 482 of the Code.  *See also* Temp. Treas. Reg. §§ 1.925(a)-1T(c)(2); 1.925(a)-1T(c)(3); 1.925(a)-1T(c)(6).

percent. *See* Staff of Jt. Comm. on Tax'n, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 1045 (1984) (hereinafter "1984 Bluebook").[5]

**B.**

*Factual Background*

During the years at issue, Abbott Laboratories and U.S. Subsidiaries (Abbott) was involved in the research, development and distribution of products used to prevent and cure health-related issues. Abbott Trading Company, Inc. (ATCI) was a wholly-owned subsidiary of Abbot, incorporated in the United States Virgin Islands. In accordance with sections 922(b) and 927(f)(1) of the Code, ATCI elected to be treated as a FSC for federal income tax purposes. Abbot and ATCI were not members of a consolidated group for purposes of the return provisions of section 1501 of the Code. Rather, they were treated as separate taxpayers, filing separate returns.

During the taxable years at issue, Abbot paid ATCI amounts intended to be the maximum commission allowable on the FTGRs derived from the sale of its export products. For its 1987, 1988 and 1989 taxable years, Abbot calculated ATCI's commissions by grouping transactions by product group, using the safe harbor provided by section 925(a)(2) and Temp. Treas. Reg. § 1.925(a)-1T(a)(2), which taxed 23 percent of the combined taxable income of ATCI and Abbot attributable to FTGRs derived from the sale of export property by ATCI. Per this methodology, ATCI's taxable income was reported as 8/23 of the FSC commission expense. For the three years listed, Abbott and ATCI timely filed their tax returns (Forms 1120 and 1120-FSC, respectively), reflecting the following:

| Year | Abbott's Commission Deduction | ACTI's Taxable Income |
|---|---|---|
| **1987** | $28,965,502 | $10,075,071 |
| **1988** | $43,696,910 | $15,199,097 |
| **1989** | $57,512,571 | $19,978,217 |

Subsequently, for its taxable years 1987, 1988, and 1989, Abbott timely filed Forms 872, extending the assessment limitations period on these years until September 30, 1998. *See* 26

---

[5] An example similar to that contained in the 1984 Act's legislative history illustrates how the FSC tax exemption is calculated. Assume that a corporation owns a FSC and that the foreign trade income of the FSC is $46. Under the statute, exempt foreign trade income for a corporate-owned FSC was 15/23 of the foreign trade income, or $31. *See* 1984 Bluebook, *supra*, at 1045.

U.S.C. § 6501(c)(4). ATCI also extended the time in which the Commissioner could assess its taxes by filing Forms 872, but only until December 31, 1997.

Thereafter, Abbott recalculated its FTGRs for the years in question, using the transaction-by-transaction method authorized by the Code. The resulting calculations suggested that Abbott was entitled to a refund for the years in question. On June 29, 1998, while the Abbott assessment period was still open under section 6501(c)(4) of the Code, but after ATCI's assessment period had expired, Abbott filed a Form 1120X, Amended U.S. Corporation Income Tax Return, seeking refunds, "due to a redetermination of the Foreign Sales Corporation (FSC) commissions," as follows:

|  | **1987** | **1988** | **1989** |
| --- | --- | --- | --- |
| **Increase Deduction for ATCI Commission** | $6,354,591 | $9,350,873 | $14,435,229 |
| **Reduction of Taxable Income** | $6,354,591 | $9,350,873 | $14,435,229 |
| **Overpayment of Income** | $2,538,702 | $3,179,297 | $4,907,978 |

Also on June 29, 1998, ATCI filed, under penalty of perjury, letters with the IRS revealing additional FSC commission income for 1987, 1988 and 1989, as follows:

|  | **1987** | **1988** | **1989** |
| --- | --- | --- | --- |
| **Total Commission Payable to ATCI** | $51,849,517 | $79,651,168 | $96,546,567 |
| **Total Non-exempt Foreign Trade Income** | $18,034,817 | $27,705,066 | $33,581,792 |
| **Increase in Taxable Income** | $2,210,316 | $3,252,514 | $5,021,005 |

On December 2, 2004, the IRS denied the claims for refund filed by Abbott.

On November 17, 2006, plaintiff filed its complaint in this case seeking $10,625,977, plus interest. On March 23, 2007, defendant filed its answer. On March 29, 2007, defendant filed an amended answer in which it averred that Abbot's refund claims had been denied because they were not filed within the time that the IRS could assess additional taxes against ATCI, as allegedly required by Temp. Treas. Reg. § 1.925(a)-1T(e)(4). On April 16, 2007, plaintiff filed a motion for partial summary judgment as to defendant's additional defense. On June 22, 2007, defendant filed a cross-motion for summary judgment. After briefing was completed, oral argument on this motion was held on February 14, 2008. Thereafter, supplemental briefing was ordered on several issues, which has now been competed.

## II.    DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Arko Executive Servs. v. United States*, 78 Fed. Cl. 420, 423 (2007).  Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  The court must determine whether the evidence reflects a disagreement sufficient to require fact finding or is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 250-52; *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 748-49 (2006).  All facts must be construed and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

### A.

The FSC provisions allowed a U.S. exporter to exempt a portion of the income derived from its exports.  These rules applied to two types of FSCs – so-called "buy/sell" FSCs, in which the parent sold its product to the FSC for resale in foreign markets, and so-called "commission agent" or simply "commission" FSCs, in which the parent paid a commission to the FSC for selling its goods in foreign markets.  26 U.S.C. §§ 925(a), 925(b)(1); *see also* Edward H. Lieberman, Charles M. Bruce, and James P. Hickey, Taxation of U.S. Persons' Foreign Income, Tax Management Portfolio 934-1st Foreign Sales Corporations, Taxation of a FSC 94 (2008) (hereinafter "FSC-TMP").

As noted, various statutory rules allocated taxable income between the FSC and its related supplier, ultimately leading to the calculation of the amount of this exemption.  The portion of the FSC's foreign trade income that was treated as exempt depended upon pricing rules used to allocate export income between the FSC and its related supplier.  *See* 26 U.S.C. §§ 921, 923, 924; 1984 Blue Book at 1045.  In this regard, section 925(a) of the Code provided, in pertinent part,  –

**SEC. 925  TRANSFER PRICING RULES**

(a)  In General. –  In the case of a sale of export property to a FSC by a person described in section 482, the taxable income of such FSC and such person shall be based upon a transfer price which would allow such FSC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of –

    (1)  1.83 percent of the foreign trading gross receipts derived from the sale of such property by such FSC,

    (2)  23 percent of the combined taxable income of such FSC and such person which is attributable to the foreign trading gross receipts derived from the sale of such property by such FSC, or

    (3)  taxable income based upon the sales price actually charged (but subject to the rules provided in section 482).

This subsection, however, dealt only with buy/sell FSCs.  To provide for commission FSCs, Congress authorized the Secretary of the Treasury to prescribe regulations with respect to FSC commissions, rentals, and marginal costing that were consistent with the rules set forth in section 925(a).  26 U.S.C. § 925(b).[6]

In 1987, the Secretary promulgated temporary regulations under section 925(a), specifically invoking his authority under sections 925(b) and 7805 of the Code.  *See* 52 Fed. Reg. 6428-01 (March 3, 1987).[7]  One of these regulations, Temp. Treas. Reg. § 1.925(a)-1T(e)(4), provides that the FSC and its related supplier may redetermine the transfer price to the FSC on a

---

[6]  Specifically, section 925(b) of the Code stated –

(b)  Rules for Commissions, Rentals, and Marginal Costing. – The Secretary shall prescribe regulations setting forth –

(1)  rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and

(2)  rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a FSC is seeking to establish or maintain a market for export property.

[7]  Section 7805(a) of the Code provides that "the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

transaction or group of transactions if they determine that a different transfer pricing method or grouping of transactions is more advantageous.  This regulation provided –

> (4) ***Subsequent determination of transfer price, rental income or commission.*** The FSC and its related supplier would ordinarily determine under section 925 and this section the transfer price or rental payment payable by the FSC or the commission payable to the FSC for a transaction before the FSC files its return for the taxable year of the transaction.  After the FSC has filed its return, a redetermination of those amounts by the Commissioner may only be made if specifically permitted by a Code provision or regulations under the Code.  Such a redetermination would include a redetermination by reason of an adjustment under section 482 and the regulations under that section or section 861 and § 1.861-8 which affects the amounts which entered into the determination.  In addition, a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial.  Also, the FSC and related supplier may redetermine the amount of foreign trading gross receipts and the amount of the costs and expenses that are used to determine the FSC's and related supplier's profits under the transfer pricing methods.  Any redetermination shall affect both the FSC and the related supplier.  The FSC and the related supplier may not redetermine that the FSC was operating as a commission FSC rather than a buy-sell FSC, and vice versa.

This regulation thus required – as a condition precedent to allowing a taxpayer-initiated redetermination of FSC commissions – that: (i) the limitation period under section 6511 be open with respect to both the FSC and the related supplier; and (ii) the redetermination "affect" both the FSC and the related supplier.

      The parties disagree as to the meaning of these conditions, particularly the latter.  Defendant asserts that for the redetermination to "affect" both the FSC and the related supplier, the IRS must be able to assess additional tax due with respect to the taxpayer whose income tax liability is increased as a result of the redetermination.  It argues that because an assessment could not occur against the FSC here, owing to the running of the statute of limitations on assessments, plaintiff could not redetermine its FSC commissions.  Not so, contends plaintiff, for two reasons.  First, it asseverates, the "affect" language does not require that the IRS be able to assess any additional tax generated by the redetermination.  It merely requires that correlative adjustments be made to the income and expenses of the FSC and the related supplier following a redetermination – bookkeeping entries that need not lead to the assessment of tax against the party whose income increased under the redetermination.  Second, plaintiff contends that if the regulation limited redeterminations in the fashion defendant argues, it would be invalid as establishing timing limitations inconsistent with the statutory requirements contained in section 6511(c)(1) of the Code.  The court will consider these claims *seriatim*.

B.

The first issue joined by the parties focuses on the meaning of the temporary regulation. Rules comparable to those employed in statutory construction apply when interpreting an agency regulation. *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005); *Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 853 (1986); *Gen. Elec. Co. v. United States*, 610 F.2d 730, 734 (Ct. Cl. 1979). Accordingly, the starting point here is the language of the regulation, whose plain meaning, if apparent, governs. *See Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006); *Meeks v. West*, 216 F.3d 1363, 1366 (Fed. Cir. 2000). In seeking this meaning, the court must examine the entire regulation, not just the phrase at issue. *See Roberto*, 440 F.3d at 1350; *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577-78 (Fed. Cir. 1995) (en banc). Only if this process yields ambiguity is the court permitted to consult the agency's interpretations or the regulatory history to determine meaning. *Roberto*, 440 F.3d at 1350; *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed. Cir. 2001); *Meeks*, 216 F.3d at 1366.

So, we begin with the language of the regulation. It provides first that "a redetermination may be made by the FSC and related supplier if their taxable years are still open under the statute of limitations for making claims for refund under section 6511 if they determine that a different transfer pricing method may be more beneficial." There is little dispute that this language provides that, at least in the case of a taxpayer-triggered redetermination, the limitations provision of section 6511 must be open for both the FSC and the related supplier for the redetermination to be allowed. The Tax Court confirmed as much in *Union Carbide Corp. and Subs. v. Comm'r of Internal Revenue*, 110 T.C. 375 (1998). There, it indicated that this language was "clear and unambiguous" in "mandat[ing] that the period of limitations under section 6511 be open for both the related supplier and the FSC," noting that "the antecedents of the pronoun 'their' in [the] sentence [] are unequivocally the related supplier **and** the FSC." *Id*. at 385-86 (emphasis in original).[8] *See also* FSC-TMP, *supra*, at 84 ("This redetermination may be made even as late as upon audit, as long as the taxable years of the related supplier and the FSC are still open under Section 6511."). Beyond this point, though, the regulation posed a paradox – why did it require that the refund limitations period be open as to both the FSC and its supplier, when

---

[8] In *Union Carbide Corp. and Subs v. Comm'r of Internal Revenue*, 110 T.C. 375 (1998), the taxpayer calculated its FSC income using the transfer pricing rule in section 925(a)(2). The IRS informed Union Carbide that the FSC was not being audited for the years in issue. For those years, the refund limitations periods expired for the FSC, without extension, on September 15, 1991, August 22, 1992, and September 10, 1993, respectively. 110 T.C. at 378. On December 7, 1993, the IRS issued a tax deficiency notice to Union Carbide and on February 28, 1994, Union Carbide filed a petition in the Tax Court. Thereafter, Union Carbide sought to amend its petition and file claims for refund seeking to increase its FSC benefits by invoking other pricing methods. *Id.* The Tax Court, however, concluded that the redeterminations were barred by Temp. Treas. Reg. § 1.925(a)-1T(e)(4) because they were pursued after the FSC's refund statute of limitations had expired. *Id*. at 392.

-10-

any redetermination would necessarily result in a refund request by only one of those entities? The answer, according to the Tax Court, was that "[t]he dual section 6511 requirement simply specifies an uncomplicated timeframe within which the taxpayer seeking an additional deduction must act, nothing more." 110 T.C. at 387.  Yet, even if this were true, left unanswered was why the regulation required that the *refund* limitations period, rather than the *assessment* limitations period, be open for the company that, via the redetermination, likely would end up owing taxes.

Delving deeper into this question requires consideration of a portion of the temporary regulation not extensively considered in *Union Carbide* – that which provides that a redetermination must "affect" both the FSC and the related supplier.  Dictionary definitions contemporary to the promulgation of the temporary regulation defined the word "affect" variously.  Some of them suggested that to "affect" a situation there had to be a "material" influence.  *See*, *e.g.*, Webster's Third New Int'l Dictionary 35 (1993) ("to act upon, . . . to produce a material influence upon or alternation in"); The Oxford English Dictionary 211 (2d ed. 1989 ) ("to make a material impression on, to act upon, influence, move, touch, or have an effect on").  But others definitions, among them that in Black's Law Dictionary, defined "affect" without  such a materiality component.  *See* Black's Law Dictionary 57 (6th ed. 1990) ("to act upon, influence, change, enlarge or abridge").  Variations in these definitions are, in turn, reflected in the decisional law, with some cases construing the word "affect" as requiring a "material" impact and others not.[9]  Notably, although virtually all these cases cite dictionary definitions (albeit not the same ones), they select among the multiple meanings of the word "affect" by considering the statutory context in which that word was employed.  In these cases, then, it was neither the plain meaning rule nor some corollary thereof, but rather the canon of *noscitur a sociis* – which "counsels that a word is given more precise content by the neighboring words with which it is associated," *United States v. Williams*, 128 S. Ct. 1830, 1839 (2008) – that ultimately proved determinative.[10]

Such is also the case here.  Viewed in context, the word "affect" appears to require that the redetermination of the transfer price charged to the FSC (or commission paid to the FSC) materially influence the taxes owed by the FSC and the related supplier.  On a broad scale, this

---

[9] The following cases required that there be some "material" influence.  *See Prati v. United States*, 81 Fed. Cl. 422, 431 n. 18 (2008); *United States v. Caldwell*, 463 F.2d 590, 593 n.3 (3d Cir. 1972); *Bd. of Cty. Com'rs of Cty of San Miguel v. Roberts*, 159 P.3d 800, 804 (Colo. Ct. App. 2006); *Shoup v. Wal-Mart Stores, Inc.*, 61 P.3d 928, 933 (Or. 2003) (en banc); *Bd. of Trustees of Comm. College Dist. No. 508, Cty. of Cook v. Coopers & Lybrand*, 803 N.E. 2d 460, 471 (Ill. 2003); *Davis v. State*, 68 S.W. 3d 273, 284 (Tex. App. 2002).  By comparison, the following cases have held that the word "affect" encompasses even *de minimis* impacts.  *See Rhinelander Paper Co. v. Fed. Energy Reg. Comm'n*, 405 F.3d 1, 7 (D.C. Cir. 2005); *United States v. Wiant*, 314 F.3d 826, 830 (6th Cir. 2003), *cert. denied*, 538 U.S. 970 (2003).

[10] The Supreme Court has oft-noted that "[w]ords that can have more than one meaning are given content . . . by their surroundings." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001); *see also FDA v. Brown & Williamson Tobacco* Corp., 529 U.S. 120, 132-33 (2000).


conclusion proceeds from the context provided by the overall regulation, the *raison d'etre* of which was to define the allocation of export income between the FSC and its supplier. More narrowly, however, this same view is reinforced by the sentence in which the proviso lies, in which the word "affect" is unqualified and, conspicuously, not tied to any particular tax attribute of the corporations involved. Rather, that sentence stated that the redetermination had to "affect" the entities themselves, using this holistic syntax presumably to signal that the entities had to accept not some, but all the tax benefits and burdens occasioned by the redetermination. This reciprocity requirement seemingly anticipated that a refund claim would be filed by the entity whose taxes were reduced by the adjustment, while an amended return would be filed by the entity whose taxes were increased by the correlative adjustment – and, in fact, that is precisely how the IRS construed the regulation in a formal notice issued in 1999.[11] The drafters of the regulation thus were left to define when the amended return was to be filed by the entity whose taxable income was to be increased. They could not rely, for this purpose, directly on the Code, which does not recognize the existence of amended returns, let alone define when they should be filed.[12] Instead, relying on a convention they had used in crafting other regulations dealing with "amended" returns, the drafters piggybacked upon the limitations period in section 6511 to describe when the redetermination had to occur.[13] They thereby came to specify the time for

---

[11] In IRS Notice 99-24, 1999-1 C.B. 1069, the IRS stated –

Temp. Treas. Reg. § 1.925(a)-1T(e)(4) permitted FSCs and their related suppliers, upon determining that a different transfer pricing method or grouping of transactions may be more beneficial, to file amended returns to effect a redetermination of the transfer price payable by the FSC or the commission payable to the FSC. Such a redetermination could be made if the taxable years of the FSC and its related supplier were open under the statute of limitations for making claims for refund under section 6511 and if the redetermination affected both the FSC and the related supplier.

[12] The Federal Circuit is among the many courts that have recognized that "no statutory provision expressly authorizes the filing of amended tax returns." *Western Co. of N. Am. v. United States*, 323 F.3d 1024, 1033 (Fed. Cir. 2003); *see also Hillsboro Nat. Bank v. Comm'r of Internal Revenue*, 460 U.S. 370, 378 n.10 (1983); *Dover Corp. & Subs. v. Comm'r of Internal Revenue*, 148 F.3d 70, 72-73 (2d Cir. 1998); *Koch v. Alexander*, 561 F.2d 1115, 1117 (4th Cir. 1977).

[13] The IRS has issued regulations that recognize the existence of "amended" returns and, indeed, has forms that are enumerated as such. *See Treas. Reg.* § 301.6402-3. Under these regulations, the IRS treats the amended return as a claim for refund or credit, subject to the statute of limitations in section 6511. *Id*. at § 301.6402-3(a)(5); *see also Western Co. of N. Am.*, 323 F.3d at 1033 ("according to IRS regulations, the IRS recognizes and accepts amendments to Form 1120 when filed within the statutory time period found in 26 U.S.C. § 6511").

filing a return reflecting taxes owed by referring to a provision normally governing the timing of a claim for taxes overpaid.

With this understanding, it appears, then, that the twin conditions in the temporary regulation were designed to work in tandem to prevent a taxpayer from having its tax cake and eating too – that is, from enjoying the tax decrease triggered by the redetermination undiminished by the correlative increase in taxes owed on the shifted income. To be sure, this interpretation hardly jumps off the page. But, the question here is not whether the regulation could have been better drafted, but rather what it means, as drafted. And, there are three additional factors that buttress defendant's interpretation.

For one thing, that interpretation has the virtue of being the only one that gives meaning to all of the regulation's terms – not only those in the (e)(4) subparagraph, but in the surrounding subparagraphs, as well. By comparison, plaintiff's limiting construction – that the "affect" requirement is intended merely to require the FSC and related supplier to establish book entries consistent with the redetermination – renders portions of Temp. Treas. Reg. § 1.925(a)-1T(e) surplusage. In particular, the latter construction would attribute to subparagraph (4) a requirement that is already found in subparagraph (5), *to wit* –

> If a redetermination under paragraph (e)(4) of this section is made . . . the person who was underpaid under this redetermination shall establish (or be deemed to have established), at the date of the redetermination, an account receivable from the person with whom it engaged in the transaction equal to the difference between the amounts as redetermined and the amounts (if any) previously paid and received, plus the amount (if any) of the account receivable determined under paragraph (e)(3) of this section that remains unpaid. A corresponding account payable will be established by the person who underpaid the amount due.

Moreover, plaintiff's interpretation would give the requirements in subparagraph (5) themselves a somewhat hollow ring, by increasing the likelihood that the book entries so carefully prescribed therein would have no real tax ramifications.[14] Adopting plaintiff's position thus would render not one, but more likely two provisions in the temporary regulations superfluous, a result plainly at odds with the familiar axiom of statutory construction that also applies in construing regulations. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2536 (2006) (regulation should not be read "in a way that makes part of it redundant"); *Jewett v .*

---

[14] Shoehorning its interpretation of the "affect" language into the regulation, plaintiff asserts that the regulation required the offsetting book entries, even where additional taxes could not be assessed, to control the calculation of the FSC's earnings and profits and, ultimately, the FSC's ability to carry over or carry back net operating losses. But, again the role that plaintiff would ascribe to Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is actually performed by (e)(5). As such, plaintiff's argument in this regard serves only to highlight the fact that it would essentially read the "affect" language out of the regulation altogether.

*Comm'r of Internal Revenue*, 455 U.S. 305, 316 (1982) (same); *see also Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1108 (2000).

Additional support for defendant's understanding of the "affect" language comes from the purpose of the FSC provisions and the attendant regulations.[15]  Both the statute and regulations were carefully designed to comply with the multi-faceted GATT rules and, in particular, to address GATT concerns that the DISC rules represented an "illegal export subsidy."[16]  As previously described, under the GATT rules, a subsidy existed if "government revenue that is otherwise due is foregone or not collected . . . and a benefit is thereby conferred." CRS Report, *supra* at 2 (quoting from "WTO Agreement on Subsidies and Countervailing Measures, Art. 1.1"); *see also* S. Prt. 98-169, *supra*, at 636.  Critics contended that the DISC rules provided just such a subsidy because they allowed United States exporters to achieve indefinite deferral of taxation on export profits.  *See* Jelsma, *supra*, at 1327.  To address these concerns, Congress limited the tax benefits associated with exports in the new FSC provisions – not only curtailing the tax benefits associated with the exemption, but diminishing, as well, the opportunity for abusing those provisions.  *See* H.R. Rep. 98-861, at 975 (1984) (Conf. Rep.); S. Prt. No. 98-169, *supra,* at 646.  As subsequently described by the Supreme Court, the legislative history thus indicates that "even though the purpose of the DISC and FSC statutes was to provide American firms with a tax incentive to increase their exports, Congress did not intend to grant 'undue tax advantages' to firms." *Boeing*, 537 U.S. at 456 (quoting S. Rep. 92-437, *supra,* at 13).

Yet, interpreted as plaintiff would interpret it, the regulation would grant tax benefits far greater than those afforded by the supplanted DISC provisions.  Indeed, this interpretation – which would exempt not some, but **all** the income shifted to the FSC via the redetermination, and do so for any any taxpayer that had agreed to extend the statute of limitations on assessment – would make a shambles out of Congress' carefully tailored efforts to enact a partial exemption of foreign export income that would pass muster under GATT.  It would also run contrary to yet another canon of construction – that statutes and regulations should be construed consistently

---

[15]  *See, e.g.*, *Holloway v. United States*, 526 U.S. 1, 9 (1999) (noting that "statutory language should be interpreted consonant with the provisions of the whole law, and . . . its object and policy") (internal quotation marks omitted); *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1357 (Fed. Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006) (considering the purpose of a statute to determine the meaning of an ambiguous term in the statutory text); *Prati*, 81 Fed. Cl. at 431.

[16]  1984 Blue Book, *supra* at 1054 ("Congress intended that the pricing principles that govern the determination of the taxable income of a FSC comply with the GATT rules."); 52 Fed. Reg. 6428-01, 6428 (March 3, 1987) (noting, in promulgating temporary regulations, that "[t]his system of taxation was designed to satisfy GATT decisions that a country is not required to tax export income attributable to economic processes located outside of its territorial limits if that income is earned on an arm's length basis.").

with international treaty obligations.[17] While the wish to avoid such an undesirable result would not be enough to allow the court to depart from the plain language of a regulation, it is more than enough reason to eschew a strained construction of the ambiguous terms of the temporary regulation here. Indeed, it should not be overlooked that plaintiff's interpretation would afford greater tax benefits to taxpayers which redetermined their foreign income than offered to those taking similar positions on their original returns. The latter would owe taxes that the former would escape. While, as Mr. Justice McReynolds once stated, "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522 (1923), this court is loathe to impute to Congress, and ultimately, the Treasury Department, a desire to produce such a counterintuitive result without at least some clearer textual support. The court's apprehension is further whetted by the Supreme Court's repeated admonition that courts should be ill-disposed to embrace interpretations "producing . . . unequal treatment among taxpayers, resting on no rational foundation." *United States v. Gilmore*, 372 U.S. 39, 48 (1963).[18]

Finally, it should not be overlooked that, to the extent the regulations are ambiguous, the court is obliged to give broad deference to the IRS interpretation thereof. This is true "even when that interpretation is offered in the very litigation in which the argument in favor of deference is made." *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005).[19] The "agency's construction of its own regulation[] is 'of controlling weight,'"

---

[17] *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 178-79 n.35 (1993); *MacLeod v. United States*, 229 U.S. 416, 434 (1913); *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *Cannon v. U.S. Dept. of Justice, U.S. Parole Comm'n*, 973 F.2d 1190, 1193 (5th Cir. 1992), *cert. denied*, 508 U.S. 915 (1993) ("Absent clear and express congressional intent to the contrary, Treaty-related legislation and regulations must be construed in harmony with their source, the Treaty. Other general legislation and regulations which operate in tandem with the Treaty must also be construed in light of and consistently with the Treaty.").

[18] *Archer-Daniels-Midland Co. v. United States,* 37 F.3d 321, 324 (7th Cir. 1994), *cert. denied*, 514 U.S. 1077 (1995) (upholding, on similar grants, regulations issued under the DISC provisions); *see also Kelly v. United States*, 826 F.2d 1049, 1052-53 (Fed. Cir. 1987) ("Statutes and regulations must be construed to avoid absurd and whimsical results, unrelated to congressional purpose."); *Exxon Mobil Corp. v. United States*, 244 F.3d 1341, 1347-48 (Fed. Cir. 2001) (declining to depart from the plain language of a regulation to avoid a seemingly absurd result).

[19] Here, as noted above, the IRS' interpretation of the temporary regulation predates this litigation. Plaintiff claims otherwise, pointing to a sentence in the Commissioner's trial brief in *Union Carbide*, which stated that the regulation at issue "does not require that the limitations period for assessing tax under section 6501 be open with respect to [the FSC.]" But, as with plaintiff's argument regarding the regulation itself, this contention takes the quoted language out of context. A fair reading of the Commissioner's brief indicates that the entire focus thereof was on the portion of the regulation that required that the refund limitations period of section 6511 be

the Federal Circuit has stated, "'unless it is plainly erroneous or inconsistent with the regulation.'" *Id*. (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Christensen v. Harris County*, 529 U.S. 576, 588 (2000). But, there is no such anomaly here. Indeed, defendant's interpretation of Temp. Treas. Reg. § 1.925(a)-1T(e)(4) tracks its interpretation of the comparable redetermination provision under the DISC regulations – Treas. Reg. § 1.994-1(e)(4). To be sure, unlike the regulation at issue, the latter regulation stated only that "a redetermination of the transfer price (or commission) may only be made if permitted by the Code and regulations thereunder." Yet, in Rev. Rul. 82-81, 1982-1 C.B. 109, the IRS construed the quoted language as requiring that both the DISC and its parent "timely file" amended returns "in which the DISC recomputes its income under a rule . . . other than that applied in its original return, to determine the maximum allowable commission, and in which the parent makes the correlative adjustments." Congress, of course, could have modified this rule in passing the FSC provisions. But it did not. Instead, the Senate Finance Committee stated that "where the provisions of the bill are identical or substantially similar to the DISC provisions under present law, the committee intends that rules comparable to the rules in regulations issued under those provisions will be applied to the FSC." S. Prt. No. 98-169, *supra* at 636. In the court's view, this passage lends further support to the IRS' interpretation of the successor FISC regulations. *Compare United States v. Board of Comm'rs*, 435 U.S. 110, 134 (1978) ("[w]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby.").[20] It certainly does nothing to advance plaintiff's case.

---

open for both entities and not on the portion requiring that a redetermination "affect" both such entities. Reflecting this, the Tax Court in *Union Carbide* indicated that it was not reaching any questions involving the expiration of limitations period under section 6501. 110 T.C. at 391-92. Given this, the court sees no reason to deny defendant's current interpretation the deference to which it is entitled. Nor certainly is there any basis to invoke here the doctrine of judicial estoppel, which would have required that the government take a clearly inconsistent position in *Union Carbide* upon which the Tax Court relied in its holding. *See*, *e.g., Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (describing the requirements for judicial estoppel); *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 553-54 (2005) (same).

[20] Lest there be any confusion, the court does not mean to suggest that this is an occasion for the invocation of the so-called "legislative reenactment" doctrine, under which Congress would be presumed to have known about the IRS' interpretation of the DISC regulation and thus to have adopted that construction. Application of that doctrine requires that there be a "long-continued executive construction," *United States v. Cerecedo Hermanos y Compania*, 209 U.S. 337, 339 (1908), a circumstance arguably absent here. Nonetheless, it is noteworthy that when Congress repealed the FSC rules in 2000, in favor of a flat exemption for extraterritorial income, the accompanying reports once again indicated that the IRS should apply, by analogy, the regulations it had issued under section 925(b). *See* H. Rep. No. 106-845 at 32.

Accordingly, the court concludes that Temp. Treas. Reg. § 1.925(a)-1(e)(4) required, *inter alia*, that amended returns reflecting a redetermination had to be filed while the statute of limitations for assessment was open as to the entity whose income would be increased by the redetermination.[21]  Under this interpretation of the regulation, the IRS could properly deny a redetermination request made after the respective statute of limitations on assessment had lapsed – precisely the case here.

<center>C.</center>

Having found that the regulation should be interpreted in the fashion that defendant argues, it remains for the court to consider whether the regulation, as so interpreted, is valid.  The court concludes that it is.

At the outset, it is important to recognize that Temp. Treas. Reg. § 1.925(a)-1T(e)(4) is a legislative regulation, promulgated pursuant to a specific grant by Congress – that found in section 925(b) of the Code.  The regulation filled a gap that Congress intended the agency to fill.  *See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council,* 467 U.S. 837, 844 (1984); *Morton v. Ruiz*, 415 U.S. 199, 231 (1974); *see also Zuni Pub. Schools Dist. No. 89 v. Dept. of Ed.*, 127 S.Ct. 1534, 1541 (2007).[22]  Such a regulation is entitled "to more than mere deference or weight."

---

[21] Given the limited facts of this case, this court need not consider how long before the termination of this assessment period the amended returns need be filed.

[22] Plaintiff asserts that the regulation in question is interpretative.  It notes that in 1987, the Treasury Department incorporated the terms of the temporary regulation, by reference, into a proposed final regulation, the preamble of which indicated that "the Internal Revenue Service has concluded that the regulations proposed herein are interpretative and that the notice of public procedure requirements of 5 U.S.C. 553 do not apply."  52 Fed. Reg. 6467-01, 6467 (March 3, 1987).  This reference might be more persuasive were it not for several countervailing facts.  First, in the decision that promulgated Temp. Treas. Reg. § 1.925(a)-1T(e)(4), the Treasury Department listed as authority for the issuance not only its general rulemaking authority under section 7805(a), but also the specific grant of legislative rulemaking authority in section 925(b)(1).  52 Fed. Reg. 6428-01, 6434 (March 3, 1987) ("Section 1.925(a)-1T also issue under 26 U.S.C. 925(b)(1) and 927(d)(2)(B).").  Temporary, proposed and final regulations that were later issued under section 925(a) all similarly invoked section 925(b)(1) as a source for their issuance, as well.  *See* 66 Fed. Reg. 13427-01, 13428 (March 6, 2001) (promulgating a final version of Treas. Reg. § 1.925(a)-1); 63 Fed. Reg. 10351, 10351 (March 3, 1998) (issuing proposed regulations); 63 Fed. Reg. 10351, 10351 (March 3, 1998) (promulgating modified temporary regulations).  None of these notices referred to these regulations as being "interpretative."  Finally, in 1984, when the Treasury Department issued the original version of the temporary regulations under section 925 – albeit ones that did not include the specific provisions at issue – it not only listed those regulations as being authorized by section 925(b), but also invoked the exception to the notice and comment procedures provided by 5 U.S.C. §

*Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981). It has "legislative effect," *Batterton v. Francis*, 432 U.S. 416, 425 (1977), that is to say "'the force and effect of law.'" *The Falconwood Corp. v. United States*, 422 F.3d 1339, 1351 (Fed. Cir. 2005) (quoting *Union Elec. Co. of Mo. v. United States*, 305 F.2d 850, 854 (Ct. Cl. 1962)). It is thus binding in the courts unless it is "procedurally defective," "arbitrary or capricious," or "manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (quoting *Chevron*, 467 U.S. at 844); *see also United States v. Morton*, 467 U.S. 822, 834 (1984); *Schuler Indus. v. United States*, 109 F.3d 753, 755 (Fed. Cir. 1997); Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 110.4.2 (2d ed. 1992). The arbitrary and capricious prong of this standard recognizes the possibility of a zone of acceptable results and requires only that the final decision reached by the agency is the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).[23] A regulation is "manifestly contrary to the statute" if it is outside the scope of the authority delegated under the statute,[24] or "cannot be reconciled with the statute [it] purport[s] to implement," *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990). In the current case, the Secretary's regulations governing the availability of

---

553(b)(3)(B). 49 Fed. Reg. 48273-02, 48274 (Dec. 12, 1984) (noting that "[b]ecause of the need for immediate guidance in this regard, the Internal Revenue Service has found it to be impractical to issue these temporary regulations . . . with notice and public comment"). The latter point is significant for this exception to the APA notice and comment procedures would not have been needed had the temporary regulations under section 925 been viewed as interpretative. *See* 5 U.S.C. § 553(b)(3)(A) (exempting "interpretative" regulations from these procedures).

[23] The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 43; *see also OMV Med., Inc. v. United States*, 219 F.3d 1337, 1343 (Fed. Cir. 2000); *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. at 705, 709 (2006).

[24] *Mead Corp.*, 533 U.S. at 226-27; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Rowan Cos., Inc. v. United States*, 452 U.S. 247, 253 (1981) ("Where the Commissioner acts under specific authority, our primary inquiry is whether the interpretation or method is within the delegation of authority."); *Schweiker*, 453 U.S. at 44; *Rite Aid Corp. v. United States*, 255 F.3d 1357, 1359 (Fed. Cir. 2001).

redeterminations were reasonable and cannot be condemned as either arbitrary, capricious or manifestly contrary to the statute.

In enacting the FSC provisions, Congress did not specify when it might be appropriate to allow a redetermination of FSC taxable income; in fact, it did not mandate such redeterminations at all. This gap is not surprising, for defining the availability of redeterminations "is the kind of highly, technical, specialized interstitial matter that Congress often does not decide itself." *Zuni Pub. Schools Dist.*, 127 S. Ct. at 1541. Nonetheless, as noted, the accompanying reports, in indicating that rules comparable to those under the DISC regime should be applied to the FSC regime, made clear that Congress intended that regulations governing redeterminations be promulgated. *See* S.Prt. No. 98-169, *supra*, at 636. Not coincidentally, the DISC rules referenced in this history were issued under section 994(b) of the Code, which contained language very similar to that in section 925(b). It follows that Congress must have intended that the legislative rulemaking grant contained in section 925(b) authorize the promulgation of regulations governing the scope and timing of FSC redeterminations.[25] Given this, it can hardly be argued that the temporary regulations actually promulgated by the Treasury Department are somehow irreconcilable with the statute. Moreover, there is not the slightest hint that the redetermination rules contained therein were arbitrary or capricious. "[I]t is not enough that the prescribed [rule] shall appear to be unwise or burdensome or inferior to another," the Supreme Court once said, for "error or unwisdom is not equivalent to abuse." *Am. Telephone and Telegraph Co. v. United States*, 299 U.S. 232, 236 (1936).[26] As such, it appears that Temp. Treas. Reg. § 1.925(a)-1T(e)(4) meets each of the basic validity requirements outlined above.

Nor is Temp. Treas. Reg. § 1.925(a)-1T(e)(4), as construed by defendant, inconsistent with timing provisions in section 6511(c)(1) of the Code. Contrary to plaintiff's claim, the regulation did not redefine the timing requirements for a claim for refund. Rather, it merely ensured that redeterminations of FSC income would not whipsaw the Treasury and undercut the carefully-drafted FSC provisions. The regulations, to put the point another way, were not focused on the timeliness of the claim for refund, but rather upon maintaining the integrity of the substantive requirements applicable to FSCs and their suppliers. In doing this, the temporary regulation did not conflict with section 6511(c)(1) any more than if the regulation had barred redeterminations altogether. The Treasury Department, in fact, did bar (or severely limit) analogous redeterminations on several occasions, periodically limiting redeterminations under section 482 of the Code and, after 2001, significantly limiting the ability of FSCs and their supplier to regroup transactions. *See* Treas. Reg. § 1.482-1(a)(3); Rev. Proc. 99-32, 1999-2 C.B. 296 (concerning section 482); T.D. 8944, 66 Fed. Reg. 13427-01 (March 6, 2001) (concerning

---

[25] *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (in defining bounds of legislative rulemaking authority, "an agency may appropriately look to the legislative history and underlying policies of its statutory grants of authority."); *In re Altabon Foods, Inc.*, 998 F.2d 718, 719 (9th Cir. 1993) (same).

[26] *See also Northwestern Elec. Co. v. FPC*, 321 U.S. 119, 124 (1944); *Kansas City South. Ry. Co. v. United States*, 231 U.S. 423, 443-44 (1913).

the FSC provisions). Yet, such actions were never challenged – and for good cause. If, then, it was permissible for the Secretary to prohibit certain redeterminations entirely without running afoul of section 6511, then it was likewise permissible for him to promulgate regulations that afforded this option, but only in a fashion designed to minimize abuse and comply with the GATT obligations. There is, in short, no conflict here between the regulation, as interpreted by defendant, and any other provision of the Code – and certainly not the "manifest" sort of conflict that would require this court to invalidate a legislative regulation.

Finally, even if the court believed that the challenged regulation were interpretative – which it does not – it would still be obliged to "treat the regulation with deference." *Boeing*, 537 U.S. at 448; *see also Cottage Savings Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 560-61 (1991). Were that the case, the court would still conclude that the regulation represented a reasonable interpretation of the FSC provisions, consistent with the structure of and legislative intent underlying those provisions. And, for the reasons discussed above, it would likewise conclude that the regulations are not inconsistent with section 6511(c)(1) of the Code.

### III. CONCLUSION

The court will not paint the lily. Based on the foregoing, the court **DENIES** plaintiff's motion for partial summary judgment and **GRANTS** defendant's cross-motion for summary judgment. The Clerk is hereby ordered to dismiss the complaint.

**IT IS SO ORDERED**.

                                                    s/ Francis M. Allegra
                                                    Francis M. Allegra
                                                    Judge